```
1                      UNITED STATES DISTRICT COURT
                       SOUTHERN DISTRICT OF FLORIDA
2
                       CASE NO. 4:16-CR-10042-KMM
3


4
     UNITED STATES OF AMERICA          Key West, Florida
5
                                       July 12, 2017
6         vs.                          Wednesday


7
     GABRIEL GARCIA-SOLAR,             Scheduled for 8:30 a.m.
8    ALONSO BARRERA-MONTES,           8:28 a.m. to 5:32 p.m.
     MOISES AGUILAR-ORDONEZ,
9    JOSE CANDELARIO PEREZ-CRUZ,
     JOSE FERNANDO VILLEZ-PICO,
10   MARTIN VALECILLO-ORTIZ, AND
     JOSE MARTIN LUCAS-FRANCO          Pages 1 - 401
11


12   ------------------------------------------------------------

13
                       JURY TRIAL - DAY 3 of 5
14

15              BEFORE THE HONORABLE K. MICHAEL MOORE
                 UNITED STATES CHIEF DISTRICT JUDGE
16


17

18   APPEARANCES:

19

20   FOR THE GOVERNMENT:          JODI ANTON, AUSA
                                  FRANCIS VIAMONTES, AUSA
21
                                  United States Attorney's Office
22                                500 East Broward Boulevard
                                  Suite 700
23                                Fort Lauderdale, Florida  33394

24

25
```

```
 1   APPEARANCES (CONTINUED):

 2
     FOR GABRIEL GARCIA-SOLAR:      STEWART GLENN ABRAMS, AFPD
 3

 4   FOR ALONSO BARRERA-MONTES:     JOSE RAFAEL RODRIGUEZ, ESQ.

 5
     FOR MOISES AGUILAR-ORDONEZ:    JOSEPH ABRAHAM CHAMBROT, ESQ.
 6

 7   FOR JOSE CANDELARIO PEREZ-CRUZ:    JUAN DIEGO BERRIO, ESQ.

 8
     FOR JOSE FERNANDO VILLEZ-PICO:     ORLANDO DO CAMPO, ESQ.
 9

10   FOR MARTIN VALECILLO-ORTIZ:        SILVIA PINERA-VAZQUEZ, ESQ.

11
     FOR JOSE MARTIN LUCAS-FRANCO:      ISRAEL JOSE ENCINOSA, ESQ.
12

13

14

15
     STENOGRAPHICALLY
16   REPORTED BY:              GLENDA M. POWERS, RPR, CRR, FPR
                               Official Court Reporter
17                             United States District Court
                               400 North Miami Avenue, Room 08S33
18                             Miami, Florida 33128

19

20

21

22

23

24

25
```

```
 1                          I N D E X
                                                      PAGE
 2

 3                    GOVERNMENT'S EVIDENCE

 4    WITNESSES                                       PAGE

 5

      OFFICER JOSHUA HIGGINS
 6
          Direct Examination by Ms. Viamontes          11
 7        Cross-Examination by Mr. Abrams              40
          Cross-Examination by Mr. Rodriguez          50
 8        Cross-Examination by Mr. Chambrot           55
          Cross-Examination by Mr. Berrio             61
 9        Cross-Examination by Mr. do Campo           67
          Cross-Examination by Ms. Pinera-Vazquez     74
10        Cross-Examination by Mr. Encinosa           83
          Redirect Examination by Ms. Viamontes       90
11

12    LIEUTENANT JUNIOR GRADE TYLER HAMES

13        Direct Examination by Ms. Anton            105
          Cross-Examination by Mr. Abrams            142
14        Cross-Examination by Mr. Rodriguez         155
          Cross-Examination by Mr. Chambrot          164
15        Cross-Examination by Mr. Berrio            167
          Cross-Examination by Mr. do Campo          168
16        Cross-Examination by Ms. Pinera-Vazquez    170
          Cross-Examination by Mr. Encinosa          181
17        Redirect Examination by Ms. Anton          189

18

      OFFICER JASON RUTLEDGE
19
          Direct Examination by Ms. Viamontes        196
20        Cross-Examination by Mr. Abrams            212
          Cross-Examination by Mr. Rodriguez         229
21        Cross-Examination by Mr. Chambrot          231
          Cross-Examination by Mr. Berrio            238
22        Cross-Examination by Ms. Pinera-Vazquez    247
          Redirect Examination by Ms. Viamontes      254
23        Recross-Examination by Mr. Abrams          261
          Recross-Examination by Mr. Encinosa        261
24

25
```

```
 1                    I N D E X  (continued)
                                                      PAGE
 2

 3                    GOVERNMENT'S EVIDENCE

 4    WITNESSES                                        PAGE

 5
      FORENSIC CHEMIST JEANNETTE PERR
 6
          Direct Examination by Ms. Anton             268
 7        Cross-Examination by Mr. Abrams             279
          Cross-Examination by Mr. Rodriguez          287
 8        Cross-Examination by Mr. Chambrot           290
          Cross-Examination by Mr. Berrio             291
 9        Cross-Examination by Mr. do Campo           293
          Redirect Examination by Ms. Anton           294
10

11    FORENSIC CHEMIST ELIZABETH ANN ADKINS

12        Direct Examination by Ms. Viamontes         302
          Voir Dire Examination by Mr. do Campo       305
13        Direct Examination by Ms. Viamontes (continued)  305
          Cross-Examination by Mr. Rodriguez          315
14        Cross-Examination by Ms. Pinera-Vazquez     316

15
      HSI AGENT DAVID VILLANUCCI
16
          Direct Examination by Ms. Anton             317
17        Cross-Examination by Mr. Abrams             327
          Cross-Examination by Mr. Rodriguez          329
18        Cross-Examination by Mr. Chambrot           329
          Cross-Examination by Mr. Berrio             330
19        Cross-Examination by Ms. Pinera-Vazquez     331
          Cross-Examination by Mr. Encinosa           332
20        Redirect Examination by Ms. Anton           334

21
      PETTY OFFICER JOSEPH PFRIMMER
22        Direct Examination by Ms. Anton             338

23

24

25
```

```
 1                    E X H I B I T S

 2

 3   GOVERNMENT'S EXHIBITS                          ADMITTED

 4
     Exhibit 31                                        29
 5
     Exhibit 8                                         37
 6
     Exhibits 19 - 24                                  39
 7
     Exhibits 33 - 114                                116
 8
     Exhibits 12 - 17                                 118
 9
     Exhibit 32                                       123
10
     Exhibit 38                                       205
11
     Exhibit 65                                       256
12
     Exhibit 39                                       278
13
     Exhibit 34                                       313
14
     Exhibit 35                                       324
15
     Exhibit 64                                       347
16

17

18   DEFENDANT'S EXHIBITS

19   Valecillo-Ortiz Exhibits 4 & 5                  169

20

21

22

23

24

25
```

1          (Continued from Day 2 of 5.)

2          (Defendants aided by Court-Certified Spanish

3     Interpreters.)

4          COURTROOM DEPUTY:  All rise for the jury.

5          MS. PINERA-VAZQUEZ:  Your Honor, I have a motion before

6     the jury comes in.

7          THE COURT:  All right.

8          MS. PINERA-VAZQUEZ:  Thank you, Judge.

9          COURTROOM DEPUTY:  (Directed to Jury:)  Sorry, false

10    alarm.

11          MS. PINERA-VAZQUEZ:  Thank you, Judge.

12          Yesterday, when Officer Hadley testified about what the

13    third-party interpreter/translator told him regarding the

14    defendants' statements, we objected, both on hearsay grounds

15    and Crawford grounds; and I want to make sure that the record

16    is protected because Officer Hadley testified to --

17          THE INTERPRETER:  One moment, Your Honor.  We're having

18    issues with the system.

19          (Momentary pause; technical difficulties resolved.)

20          THE COURT:  Go ahead.

21          MS. PINERA-VAZQUEZ:  -- because Officer Hadley

22    testified to one of the essential elements of this charge,

23    which was regarding the 90-page registration document that was

24    in Spanish and that goes to one of the elements that the

25    Government must prove.

1          Pursuant to United States versus Charles, 772 Fed. 3d

2     139 Eleventh Circuit, 2013, the Eleventh Circuit held that:

3          Even though an Interpreter's statements may be

4     perceived as reliable under the hearsay rule, the United States

5     Supreme Court rejected reliability as too narrow a test for

6     protecting against a confrontation clause of the Sixth

7     Amendment.

8          Under the Crawford framework the defendants' Six

9     Amendment's rights to confront the interpreter, who is the

10    declarant of the out-of-court statement -- testimonial

11    statement that the Government sought to admit through the

12    testimony of Hadley.

13         Thus, Your Honor, at this juncture, we continue to

14    reiterate our objection, both on the hearsay and proffer

15    ground.  We request that we be permitted to cross-examine the

16    statements of the interpreter.

17         I've asked the prosecutors before I presented this

18    motion as to whether or not they were going to bring the

19    interpreter.

20         The response was vague, they don't know.

21         Our position is that they have to bring the

22    interpreter, otherwise, it will be reversible error, because we

23    do not have an opportunity to cross-examine the out-of-court

24    declarant who is making the testimony and statements.

25         THE COURT:  All right.  Can you bring the jury in?

1          MR. ABRAMS:  Additionally, Judge, and very briefly.

2          On that same issue, I believe that witness is also

3    perhaps pivotal in regard to the jurisdictional questions.

4    There are questions to be asked of this witness regarding

5    jurisdiction in the documents that only she was able to

6    understand.

7          THE COURT:  Okay.

8          MS. VIAMONTES:  Your Honor, reference to the

9    jurisdiction, if we can, I would ask at this time when the jury

10   comes in the Court read the portion of the jury instruction

11   regarding jurisdiction because, as we anticipated, defense

12   counsel is trying to interject the jurisdiction into this case,

13   which has been determined pretrial and is no longer an element

14   that needs to be proven during this trial because it was

15   determined by the Court.

16         THE COURT:  Okay.  Give me the instruction and I'll

17   read it.

18         MS. VIAMONTES:  Thank you, Your Honor.

19         THE COURT:  Bring the jury in.

20         MS. VIAMONTES:  It is in our proposed jury instruction.

21   Should I hand it up?

22         THE COURT:  I don't have it in front of me.  I just

23   need it.

24         MS. VIAMONTES:  I'll hand it up to Your Honor.

25         MR. ABRAMS:  Well, Judge, respectfully, we'd object to

1    that, you know, reading one -- singling out one instruction,

2    at this point, especially when we brought up the issue of

3    carrying jurisdiction with the case.

4            THE COURT:  Okay.

5            MS. PINERA-VAZQUEZ:  I object also, Your Honor.

6            THE COURT:  All right.

7            MS. ANTON:  There was one other issue I wanted to

8    address with the Court.  Could we go sidebar for that?

9            THE COURT:  All right.

10           (Sidebar discussion held as follows:)

11           MS. ANTON:  The second alternate juror 10 is taking

12   notes on his own paper and pen.  I thought perhaps we should

13   address them on the issue of note-taking.

14           MS. PINERA-VAZQUEZ:  Which we request they be allowed

15   to take notes.

16           (Sidebar discussion concluded and the following was

17   held in open court:)

18           THE COURT:  Ladies and gentlemen, let me give you an

19   instruction -- two instructions, actually, of issues that have

20   come up during the course of the trial.

21           First, with respect to some of the testimony that was

22   presented yesterday regarding jurisdiction, the vessel in this

23   case has been determined by the Court to be a vessel subject to

24   the jurisdiction of the United States, so that is not an issue

25   before you.  That is a legal determination that has previously

1   been made.

2          Secondly, I'm told that at least one juror has been

3   taking notes, and I want to give you an instruction on

4   note-taking.  You're certainly entitled to take notes.

5          If you want to take notes, just let me know and I'll

6   provide you with a pen and a notepad.  But you're under no

7   obligation to take notes.

8          But if you do choose to takes notes -- which, as I say,

9   is entirely appropriate -- you should not give undue weight to

10  your notes as opposed to your recollection of all the testimony

11  you're hearing in the case.

12         You don't want to be selective in your recall just

13  based on your notes and maybe not recalling something that --

14  or may not be considering something that you did not put in

15  your notes.  So just be cautious about that, that your notes

16  may not be entirely complete.

17         Secondly, if you're not a note taker, you should not

18  give excessive weight to somebody -- some other juror who is

19  taking notes.

20         So, with that in mind, as I said, if you want to take

21  notes, we provide pen and paper to do that.  But if you don't,

22  that's fine, too.

23         But in either case, don't give excessive weight to

24  someone else's notes, independent of your own recollection of

25  what the testimony and the evidence has been.  Okay.

```
1              Let's see, where are we?  Do we have a new witness?

2              MS. VIAMONTES:  Yes, Your Honor.

3              THE COURT:  Okay.

4              MS. VIAMONTES:  Your Honor, at this time, the

5    United States of America calls Officer Higgins.

6              COURTROOM DEPUTY:  Raise your right hand, please.

7              Do you solemnly swear the testimony you're about to

8    give is the truth, the whole truth, and nothing but the truth,

9    so help you God?

10             THE WITNESS:  Yes, ma'am.

11             COURTROOM DEPUTY:  Thank you.  Please be seated.  If

12   you will speak slowly and clearly, state your full name and

13   spell it for the record.

14             THE WITNESS:  Joshua David Higgins, J-O-S-H-U-A,

15   D-A-V-I-D, H-I-G-G-I-N-S.

16             COURTROOM DEPUTY:  Thank you.

17             (OFFICER JOSHUA HIGGINS, being sworn, testified as

18   follows:)

19                         DIRECT EXAMINATION

20   BY MS. VIAMONTES:

21   Q.  Good morning, Officer Higgins.  How are you?

22   A.  Good morning.  I'm doing well.

23   Q.  Sir, could you please introduce yourself to the members of

24   the jury, tell them where you work, what capacity, what your

25   rank is?
```

1    A.   I'm Josh Higgins.  I've been in the Coast Guard for 13

2    years.  I'm currently onboard Cutter *Mellon*.  I've been there

3    since July of '14.

4         I came in the Coast Guard in 2004 and immediately became a

5    boarding team member in 2005.  I've been doing that -- I've

6    been doing boarding since 2005 and very experienced in doing

7    it.

8         And my job on board is I maintain all the weapons, and from

9    our pistols all the way up to the 76-millimeter cannon on the

10   front and everything in between.

11        Is there anything else you need to know?  I mean --

12   Q.   Well, you mentioned "boarding team member."

13   A.   Yes, ma'am.

14   Q.   Let's talk a little bit about that.

15   A.   Okay.

16   Q.   Did you have to receive any specialized training to be a

17   boarding team member?

18   A.   Correct.  So --

19   Q.   Tell the members of the jury about that.

20   A.   We go to Charleston, South Carolina, and go through a

21   two-week course which you learn how to do everything that is

22   required of a boarding team member, so what jurisdiction is,

23   what your authority is, what your personal defense is.

24        So if I have to defend myself how to employ all the tools

25   that we use, so handcuffs, batons, pepper spray, what the

1    certain levels of force are, so level one is officer presence,

2    all the way up to level six, which is deadly force and how to

3    employ all those different levels of force regarding how the

4    subject's actions are to us, and you have to be certified in

5    all of these techniques.

6         Some of them are quarterly, some of them are semi-annually,

7    some are annual, depending on what the task is, and then every

8    time you go to a new unit you have to get recertified at that

9    unit by the commanding officer, so when I reported to *Mellon* I

10   took an oral board, the commanding officer sits down and says,

11   do you know what X, Y and Z, and I explain to the CO, yes, this

12   is what I know, and he signs off saying, very well, he's

13   qualified.

14   Q.   What's your particular role as a boarding team member?

15   A.   My particular role is mainly security, so I will come on

16   board and I take direct commands from the boarding officer.

17        So the boarding officer has all of the authority and I can

18   act on his or her authority.  So if the boarding officer says,

19   "Stand here and keep an eye on these suspects while I go and

20   look at the registration or paperwork," whatever it may be,

21   that's my job.  If the boarding officer says, "I need you to go

22   into the fish hold and measure the fish and count the fish and

23   make sure that that is all within state regulations," then

24   that's what I do.

25        I am directly there to support the boarding officer and

1    give my recommendation to the boarding officer if I see

2    something out of the ordinary.

3    Q.   When you're sent out to be part of a boarding crew,

4    describe to the members of the jury how you're deployed.

5         Are you on a small over-the-horizon?

6    A.   Yes, ma'am.

7    Q.   Well, on an over-the-horizon vessel?

8    A.   Correct.

9    Q.   And is that on the Cutter *Mellon*?

10   A.   Yes, ma'am.

11   Q.   The over-the-horizon, why is it called over-the-horizon?

12   Explain that to the jury.

13   A.   It's called an over-the-horizon boat because we have two

14   forms of communication, VHF radio and HF radio, which is very

15   high frequency and then high frequency radio.  The high

16   frequency antenna will actually allow the small boat to go

17   beyond the horizon and still keep communication with the cutter

18   via the wavelength of the high frequency radio.  So we can send

19   it over the horizon.  That's the reason they call it that.

20        And it just gives us greater distance to go and complete

21   our missions.  It also has a larger fuel tank and, you know,

22   better navigational equipment.

23   Q.   Does the over-the-horizon have a capacity to travel at high

24   rates of speed?

25   A.   Yes, ma'am.

1   Q.   How fast can you get -- can you go?

2   A.   Top speed is 45 knots.

3   Q.   Now I'm going to place on the Elmo Government's Exhibit 10,

4   which is in evidence, that will take a while to warm up, and if

5   you could, once it does -- you think it's on?

6        As that is warming up, let's direct your attention to

7   October 18, 2016.  Do you remember that day?

8   A.   Yes, ma'am.

9   Q.   Were you working on that day?  Were you on duty?

10  A.   I was.

11  Q.   And did you receive orders to board an over-the-horizon?

12  A.   We received orders to chase a Panga, yes.

13  Q.   Were you on a Coast Guard cutter at the time?

14  A.   Yes, ma'am, I was aboard *Mellon*.

15  Q.   And whereabouts was the Cutter *Mellon* situated at the time?

16  A.   Open water.  They don't exactly tell us.

17  Q.   Was it in the Eastern Pacific?

18  A.   Yes, ma'am, in the Eastern Pacific.  All I knew is that we

19  were off the coast of Mexico somewhere.  They don't give us an

20  exact position.

21  Q.   Do you have any say in where the Cutter *Mellon* goes?

22  A.   No, ma'am, they don't give me --

23  Q.   Above your pay grade?

24  A.   That's way above my pay grade.

25  Q.   So on October 18, 2016, were you on this vessel depicted in

1    Exhibit 10 on the Elmo?

2    A.   Yes, ma'am.

3    Q.   And do you see the over-the-horizon in that picture?

4    A.   I do.   That is what we referred to as *Mel-II*, so that's the

5    starboard side boat.   There is another one on -- I'm sorry,

6    that's the portside boat and there's another one on the

7    starboard side that obviously you can't see in this picture.

8    Q.   Can you describe how the over-the-horizon looks like in

9    that picture?   How can we spot it?

10   A.   It's just below the -- or just after the superstructure,

11   the orange hull, right there, with the -- it looks like black

12   and gray sponson with -- there's a crane that actually lowers

13   it into the water, that's what's holding it.

14   Q.   And that's *Mellon II*?

15   A.   Correct.

16   Q.   Were you on *Mellon II* on October 18th?

17   A.   No, ma'am, I was on *Mel-I*.

18   Q.   All right.   So you're on *Mel-I* --

19   A.   They're very similar.

20   Q.   They're very similar.   What was the difference between the

21   two?

22   A.   *Mel-I* has an aluminum hull and *Mel-II* is the older version

23   that has the fiberglass hull.

24   Q.   You board the *Mel-I* and how do you get into the water?

25   A.   They lower us via davit, it's a two-point davit, which is

1   basically a big crane, hooks onto the front and the aft portion

2   of the small boat, and then just lowers us straight from the

3   height you see there, right into the water.

4   Q.   Once you get into the water, do you begin pursuing a target

5   of interest vessel?

6   A.   Yes, ma'am.   So we, as soon as we get in the water, the

7   bridge team will give us last known reported position, and we

8   head off in that direction, whatever it is, and we go off of a

9   compass, so 270, whichever way they tell us to go.   They don't

10  say north/south east/west, they give us a compass position.

11  Q.   Could you visually see with your eyes the target of

12  interest when you first get into the water?

13  A.   Negative.

14  Q.   What was your position on *Mel-I*?

15  A.   I'm the pursuit crewman, which means I'm sitting in the

16  back of the vessel, and my job as a pursuit crewman is to, A,

17  get us in the water safely, by unhooking the clamps that

18  actually connect the small boat to the davit, and then B, as

19  the pursuit gunner.

20       So if we needed to employ a noncompliant vessel use of

21  force to get them to stop, that would be my job.

22  Q.   You mentioned you're the gunner?

23  A.   Yes, ma'am.

24  Q.   What type of weapon did you have with you on October 18th

25  as you boarded *Mel-I* and pursued the target of interest?

1   A.   So, for a noncompliant vessel use of force to get them to

2   stop we employ two weapons, a shotgun or an M-16 rifle.   The

3   12-gauge shotgun we would use for warning shots, we have what's

4   called a flash bang round, you employ the flash bang round

5   approximately 50 yards in front of the vessel at about a

6   10-degree angle, and it's what you would think it would.   It

7   goes up, makes a big loud noise, a big white flash, and

8   designed to say, hey, we're here, you guys should probably

9   stop.

10       To get the vessel to stop with the shotgun, we have what's

11  called copper slug rounds and you shoot the slug rounds into

12  the engine and it's got a slug or a copper tip, rather, and the

13  copper tip will melt and go right through the engines and get

14  the engine to stop.

15       Additionally, we also have the M-16.   You can use the M-16

16  for warning shots as well.   You shoot in front of the vessel

17  and create splashes, again, approximately 45 degrees in front,

18  and when -- if the vessel is trying to get away from us, they

19  will see the splashes and it's designed to compel them to stop.

20       If they don't stop, we move to the next step which is use

21  the rifle rounds to shoot the engines for the same purpose of

22  disabling the engines and the vessel comes to a stop.

23  Q.   So would you use the M-16 first?

24  A.   The M-16 is the primary choice.

25  Q.   Have you had an opportunity to see the GoPro video footage

1    from October 18th, 2016?

2    A.  Yes, ma'am.

3    Q.  And can you see yourself in the first portion of that video

4    with your M-16?

5    A.  Yes.

6    Q.  Now --

7    A.  So the reason for employment of that is when the vessel

8    does come to a stop, my job is to move to the bow of the vessel

9    and keep eyes on all of the personnel in that suspect vessel

10   because the rest of the crew is radioing and they're really

11   busy relaying to the cutter where we're at, how many people

12   they see, any information they can give off the vessel, so what

13   color it is, if there is any flag markings, all that stuff, my

14   job is to make sure that I keep everybody else secure because

15   they're not keeping their eyes on that vessel.

16   Q.  Does each officer, each crew member have a distinct task?

17   A.  Yes, ma'am.

18   Q.  And your task is security?

19   A.  Correct.

20   Q.  Now you mentioned that you have the ability to use force to

21   get a target of interest to stop.  Do you have to receive

22   permission from anyone in order to use force?

23   A.  Correct.  So when we are pursuing a noncompliant vessel, we

24   will report what we're seeing and all that stuff gets radioed

25   back to the cutter, the cutter relays that to the district

1    which is out of the California, and that goes right up to a

2    two-star admiral and they say, yes, you're allowed to use this

3    use of force, which the technical term is noncompliant vessel,

4    use of force, continuing, so there's four steps.

5    Q.   Were you given authority to use force by a two-star admiral

6    on October 18, 2016?

7    A.   Yes, ma'am, but we didn't have to use it because the vessel

8    did come to a stop.

9    Q.   How did you get the vessel to come to a stop without using

10   force?

11   A.   We saw the MPA, which is the plane that actually detected

12   them.  It came down right off of -- I mean, it looked maybe a

13   couple hundred feet off of the ocean, and I think they call it

14   a rig, slow rig, something like that, but it's a very -- I

15   guess the word is a good show of force because they came down

16   and they're like, hey, we're here, you guys should probably

17   stop, and I think when the vessel saw them, it definitely

18   forced them to stop and say, hey, we need to stop.

19   Q.   Once the vessel stops, the target of interest, is your

20   *Mel-I* able to catch up to them?

21   A.   Yes, ma'am.

22   Q.   Now, tell the members of the jury what happens once you

23   catch up to the target of interest; what do you do?

24   A.   Okay.  When we catch up to them, if you guys have seen the

25   video you've seen me go up forward so I maintain security, the

1  rest of the crew is relaying our position, and what they're

2  seeing and everything like that.

3      And also, the boarding officer is having the interpreter

4  tell the crew to muster on the bow.  Once everybody is on the

5  bow, that's when we got onboard the vessel because we don't

6  want to jump on board with all the crew members back aft when

7  where we're getting on board, because it's not safe for us to

8  be on board.

9  Q.  Once the crew is mustered onto the bow, do you then board

10  the vessel?

11  A.  Yes, ma'am.

12  Q.  Do you board with your M-16?

13  A.  Negative.

14  Q.  Why not?

15  A.  It's not necessary.  They already stopped, they're

16  compliant.  I don't need them -- I don't need the M-16 to show

17  that force anymore.  I'm showing the amount of force I need,

18  which is just officer presence.

19  Q.  Do you have any other weapon on you as you board the target

20  of interest?

21  A.  Yes, ma'am, my PEW, my pistol, and it's holstered.

22  Q.  Now we're talking about the target of interest.  Can you

23  describe the type of vessel that it is?

24  A.  It's a Panga, usually gray or blue on the bottom, painted

25  up, and then usually it's white on the top.  They're usually

1    about 20, 25 feet, somewhere in there, and open hull, deep

2    bottom, and at least two outboard engines, sometimes more.

3    Q.   I'm placing on the Elmo Government's Exhibit 9 in evidence,

4    I will take it out of this protective sleeve because it causes

5    a glare.  Do you recognize Government's Exhibit 9?

6    A.   Yes, ma'am.

7    Q.   Is that the target of interest that we're referring to from

8    October 18, 2016?

9    A.   Yes, ma'am, that's myself on the right, Officer Hadley on

10   the left, and the cutter in the background.

11   Q.   Who took the photographs in this case while you were out

12   there in the open ocean of the Panga?

13   A.   This particular photograph, I'm not sure because that was

14   taken from one of our small boats, but all the pictures that

15   were taken on the Panga were taken by me.

16   Q.   Now I'm placing on the Elmo Government's Exhibit 18 which

17   is also in evidence.  Do you recognize this photograph?

18   A.   Yes, ma'am, I took this photograph.

19   Q.   And what does this photograph depict?

20   A.   This photograph is a picture of all of the suspects which

21   are seated to my left.

22   Q.   And is that -- you mentioned all of the suspects which were

23   seated to your left?

24   A.   Yes, ma'am.

25   Q.   Have you had an opportunity to look around the courtroom?

1   A.   Yes, ma'am.

2   Q.   And do you see the individuals that you saw on October 18,

3   2016, which are pictured in Government's Exhibit 18 here in the

4   courtroom today?

5   A.   Yes.

6   Q.   Do you see all seven of them?

7   A.   Yes.

8   Q.   Okay.  And you don't know which one is which name

9   necessarily, do you?

10  A.   No, ma'am, not a hundred percent.

11  Q.   But the seven in court are the same seven that you saw out

12  on the ocean on this Panga on October 18, 2016, correct?

13  A.   Correct.

14  Q.   Does this picture depict when you tell them to muster on

15  the bow, is that what they're doing there, they're mustered on

16  the bow?

17  A.   No, ma'am, this is right before we are taking them to the

18  cutter.

19  Q.   All right.  So you don't take pictures right away, right?

20  A.   No, it's not safe.

21  Q.   So toward the end before they're removed from the Panga

22  that's when the pictures are taken?

23  A.   Yes, ma'am.

24  Q.   And is this how the defendants looked back on October 18,

25  2016?

1   A.   Yes.

2   Q.   Did any of them look extremely filthy?

3   A.   No.

4   Q.   Let's take a look at the gentleman in the yellow Adidas

5   soccer jersey, do you see him?

6   A.   Yes, ma'am.

7   Q.   He's wearing red pants?

8   A.   (Nodding affirmatively).

9   Q.   Did that yellow soccer jersey or the red pants have feces

10  all over it?

11  A.   No, ma'am.

12  Q.   Urine?

13  A.   No, ma'am.

14  Q.   Did it look filthy as if he had been in the bottom

15  compartment of a large ship for two weeks?

16  A.   Negative.

17  Q.   Did any of them look like they had been out at sea for 12

18  days?

19  A.   No, ma'am.

20  Q.   Were some of them partially clean-shaven or close-shaved?

21  A.   Very much so, and you can tell on the photograph as well.

22  If it was 12 days, you would think there would be a lot more

23  facial hair.

24  Q.   Now, let's describe the Panga a bit more.  As you get on

25  this Panga, is it easy to walk around it?

```
 1    A.   No.

 2    Q.   Why not?

 3    A.   Well, several reasons, but the main two factors being that

 4    there were fuel drums everywhere and there had been fuel

 5    spilled everywhere, so it was very slick.

 6    Q.   Could you smell the fuel?

 7    A.   Yes, ma'am, very strong.

 8    Q.   Did you have a problem keeping your footing at times?

 9    A.   Personally, I did, yes.  I definitely slipped and fell

10    once.

11    Q.   And why did you slip and fall?

12    A.   I believe it was due to fuel being on the deck.

13    Q.   Other than yourself, who else boards the target of interest

14    Panga?

15    A.   Officer Hadley and Officer Barajas.

16    Q.   Is Officer Hadley armed?

17    A.   Yes.

18    Q.   Is Officer Higgins armed?

19    A.   Yes, I am.

20    Q.   I'm sorry, Officer Barajas?

21    A.   Yes, ma'am.  I'm sorry, no, she is not.  She's just the

22    interpreter.

23    Q.   Do you ask the crew members, the defendants, do you ask

24    them any questions when you're on board?

25    A.   Yes, several.  They're called right of visit questions.
```

1    Q.   Do you pose the questions yourself?

2    A.   I do not.  I maintain security.  The boarding officer asks

3    those questions through the interpreter, and then vice-versa.

4    Q.   So let me ask you again, did do you pose any questions to

5    the defendants -- did you pose any questions while you were on

6    the Panga?

7    A.   Negative.

8    Q.   As the boarding officer is posing questions to the

9    defendants with the use of the interpreter, what are you doing?

10   A.   Maintaining security, so I keep my eyes on the crew just to

11   make sure that they are not doing anything that could harm

12   myself or my teammates.

13   Q.   Is your weapon drawn at the time?

14   A.   Negative.  It's holstered.

15   Q.   It's holstered.

16        Do you hear the exchange between Officer Hadley, Barajas

17   and the defendants?

18   A.   Yes.

19   Q.   Does there come a time that the defendants are asked if

20   they have any navigational equipment?

21   A.   Yes.

22   Q.   And initially, are you given navigational equipment?

23   A.   Negative.

24   Q.   Are they asked again regarding navigational equipment?

25        MS. PINERA-VAZQUEZ:  Objection.  Hearsay, Judge.

```
 1              Crawford.  He doesn't speak Spanish, Your Honor.

 2              MS. VIAMONTES:  It's not offered for the truth of the

 3    matter asserted, Your Honor.

 4              THE COURT:  Overruled.

 5              MS. PINERA-VAZQUEZ:  I also object on confrontation

 6    grounds.

 7    BY MS. VIAMONTES:

 8    Q.  Are you -- is a question posed again regarding navigational

 9    equipment?

10    A.  Yes.

11    Q.  Do you see someone then admit to having navigational

12    equipment?

13    A.  Yes, ma'am.

14              MS. PINERA-VAZQUEZ:  Objection, Judge, calls for a

15    hearsay response.

16              THE COURT:  Overruled.

17    BY MS. VIAMONTES:

18    Q.  Did you see someone give you navigation equipment?

19    A.  Yes.

20    Q.  Did you retrieve that navigational equipment?

21    A.  I did.  It was a Garmin GPS.

22    Q.  Who did you retrieve it from?  Would it assist you if I put

23    this exhibit back up, Number 18?

24    A.  The gentleman in the all black standing in between the

25    gentleman in the yellow and the gentleman in the white shirt.
```

1            MS. VIAMONTES:  Your Honor, if the witness could please

2    step down from the witness stand to be able to point to the

3    jury.

4            THE COURT:  All right.

5    BY MS. VIAMONTES:

6    Q.  Sir, if you would, could you please point the gentleman

7    that gave you the GPS?

8    A.  This young man (indicating).

9            MS. VIAMONTES:  And if the record would reflect that

10   the witness has pointed to Mr. Moises Ordonez.

11           THE COURT:  It so reflects.

12           MS. VIAMONTES:  Permission to approach.  It is

13   Exhibit 31.

14   BY MS. VIAMONTES:

15   Q.  Officer Higgins, I've handed you what's been premarked as

16   Government's Exhibit 31 for identification.  Do you recognize

17   it?

18   A.  I do.

19   Q.  Have you had an opportunity to look at it?

20   A.  Yes, ma'am.

21   Q.  And did you cut open or did we cut open this morning the

22   outer seal envelope so you could look at that GPS?

23   A.  Yes, ma'am, we it open so that we could see the innermost

24   evidence bag, which was provided by *Mellon,* which you can tell

25   it's from *Mellon* because it's got Officer Hadley's name on with

1    date and all of *Mellon's* information and then also a chain of

2    custody who we have given it to, et cetera.

3    Q.   What is Government's Exhibit 31 for identification?

4    A.   It is a hand-held GPS, brand name Garmin.

5    Q.   And is it in the same or substantially the same condition

6    it was in when you retrieved it from Moises Ordonez on October

7    18, 2016?

8    A.   Yes, ma'am, it appears to be very similar.

9         MS. VIAMONTES:   Your Honor, at this time the Government

10   moves Exhibit Number 31 into evidence.

11        THE COURT:   Be admitted.

12        (Government's Exhibit 31 admitted into evidence.)

13   BY MS. VIAMONTES:

14   Q.   Did you see where Mr. Moises Ordonez retrieved the Garmin

15   from?

16   A.   Out of his pocket, his left pocket, on his pants.

17   Q.   Any aside from providing security en route, providing

18   security during the right of visit questioning, did you have

19   any other responsibility onboard the Panga on October 18, 2016?

20   A.   Yes, ma'am.

21   Q.   Tell the members of the jury what else you did.

22   A.   Once we received permission to remove the suspects from the

23   Panga and transfer them to *Mellon*, we then complete our full

24   law enforcement boarding which includes looking for weapons,

25   navigational equipment, any radios, any sort of identification

1  items, anything that could help a law enforcement

2  investigation.

3      And that includes taking all the pictures, taking pictures

4  of the engines, counting up all the fuel that was on board, and

5  then also searching for any sort of evidence that may indict,

6  and that's it, which it's easily explained, but it takes a long

7  time.

8  Q.  You're looking for any sort of evidence?

9  A.  Yes, ma'am.

10  Q.  Do you look for all types of evidence?

11  A.  All types.

12  Q.  Okay.  If there's evidence that may tend to exonerate them,

13  would you be interested in that, too?

14  A.  One hundred percent.

15  Q.  Now, is this after the defendants were taken off to the

16  *Mellon* that you searched and looked for this evidence?

17  A.  Correct, it's not safe to do it while they're on board.

18  Q.  How long were you on the Panga with the defendants?

19  A.  Approximately, seven hours.

20  Q.  Are you just sitting there the whole time watching them?

21  A.  Yes.

22  Q.  And were you in close proximity to them?

23  A.  Within 20 feet.

24  Q.  Could you tell whether their clothing smelled?

25  A.  I didn't go and smell any of the defendants -- or the

1    defendants, however, there was a very, very strong odor of

2    gasoline on board.  So it could have been from the fuel that

3    was on the deck.  I'm not sure.  It was very strong.

4    Q.  Was it overwhelming, the smell?

5    A.  Yes, ma'am.

6    Q.  After the defendants were taken to Cutter *Mellon*, did you

7    perform any testing on the actual vessel, the Panga?

8    A.  Yes, I performed what was called ION swipes.

9    Q.  Describe to the members of the jury what an ION swipe is

10   and how you do it.

11   A.  An ION swipe is a small piece of paper, it's about the size

12   of a Band-Aid, it's got -- it's really rough, so that when you

13   swipe it on things it will pick up part of whatever you're

14   swiping it on.

15        And the way we employ it, is you'll put -- so, for example,

16   if I'm taking eight ION swipes, I'm going to grab eight rubber

17   gloves and put them all on at the same time, which helps to

18   make sure nothing gets contaminated, so I will take my ION

19   swipe and swipe it on whatever --

20   Q.  Wait, before you get to how -- I'm sorry to cut you off,

21   Officer, before you get to how you actually do it, let's talk

22   about the kit.

23   A.  Okay.

24   Q.  Do you have an ION swipe kit with you when you board the

25   target of interest?

1    A.   Yes, ma'am, it's a small plastic pelican case that's

2    waterproof and inside of it will be a pen, a notepad, and the

3    rubber gloves, and then also inside of that is another smaller

4    waterproof case that has the swipes in it themselves that keep

5    them segregated from everything else, so they don't get

6    contaminated.

7    Q.   So then you open your kit, right?  Are the gloves contained

8    in there?

9    A.   Yes, ma'am.

10   Q.   You put on the eight gloves?

11   A.   Correct.

12   Q.   How are you able to differentiate between one ION swipe and

13   another?

14   A.   When we take the swipe, so we'll run it across whatever

15   we're trying to measure, and then write on it wherever we took

16   it from, so number one was port helm or port bow or wherever we

17   took it.  You write on the swipe itself, you fold the glove

18   over it to keep it from getting contaminated, and then you

19   throw it in a plastic bag, and move on to the next side.

20        And then also, the reason that there's a notepad in the kit

21   is while I'm, or whoever is doing the swipes, the other person

22   writes down a number on the notepad correlating where it went

23   to, where it's from, et cetera.

24   Q.   And did you follow that procedure on October 18, 2016?

25   A.   Yes, ma'am.

1   Q.   Why were you using -- or taking eight swipes?

2   A.   It's based on the size of the vessel.  If the vessel had

3   been larger we would have taken more swipes to get greater

4   coverage area.

5   Q.   Do you take the swipes from different areas?

6   A.   Yes.

7   Q.   What sort of areas -- actually, what areas did you swipe on

8   October 18, 2016?

9   A.   We did -- you're looking at the picture of the vessel, we

10  did the engine helms, which you can partially see right by the

11  engine that --

12  Q.   Am I pointing to the engine hull?

13  A.   That's the engine, yes, ma'am.  If you go forward, right

14  there, that's the engine helm, so it's basically the handle

15  that they use to steer it with.  There were two engines so

16  there were two helms.  We started there, swiped the handles of

17  those, moved to where I am actually sitting right there, the

18  bench seat, swiped that.

19        And then we did the port and starboard rail, the midships

20  there, so right where the rail is, yep, and then the port and

21  starboard bow, and then finished off with another bench seat

22  that's up forward.

23  Q.   Now, do you do each swipe individually and separately?

24  A.   Yes.

25  Q.   And once you swipe, what do you do with that swipe?

1   A.   You fold the glove over it and then you put it into a

2   separate plastic bag and segregate it.

3   Q.   All right.

4   A.   And then they will go back to the ship.

5   Q.   And do you mark either on the glove or on the swipe which

6   number swipe that is?

7   A.   Yes, it's on the swipe itself.

8   Q.   On the actual fabric?

9   A.   Correct.

10  Q.   And does that then correlate with your notes as to where

11  you took that swipe from?

12  A.   Yes, ma'am.

13  Q.   And those notes, are they then taken to the Cutter *Mellon*?

14  A.   Correct.

15  Q.   Do you analyze the swipes?

16  A.   Negative.

17  Q.   Somebody else does?

18  A.   Correct.

19  Q.   Was that Officer Rutledge in this case?

20  A.   Yes, ma'am.

21  Q.   So he gets your notes and your swipes?

22  A.   Correct.

23  Q.   And you took eight swipes?

24  A.   Yes.

25  Q.   And did you fold each one into a separate glove?

1   A.   Yes.

2   Q.   And this is done after the defendants are on the Cutter

3   *Mellon*?

4   A.   Yes.

5   Q.   Did you swipe the defendants?

6   A.   I did not, no.

7   Q.   Let's talk briefly about your observations of the Panga

8   pictured in Government's Exhibit 9 on the Elmo.  You had an

9   opportunity to look around and search it?

10  A.   Yes.

11  Q.   What did you see around there?

12  A.   Lots of fuel drums, that was the main thing that was on

13  board.  There was a little bit of trash.  There was some water,

14  like a few bottles of water.

15  Q.   When you say a few bottles of water, do you mean a few

16  five-gallon bottles of water or gallon bottles of water?

17  A.   No, ma'am, like liter bottles this yea big (indicating).

18  Q.   Like personal size?

19  A.   Yes, ma'am.

20  Q.   A few of those?

21  A.   Yes, ma'am.

22  Q.   But there were seven members on board, the crew?

23  A.   Correct.

24  Q.   Did you see food?

25  A.   There was a little bit of food.  One in particular I

1   remember was a small thing of beans, it was like beans in a

2   bag.

3   Q.   Did you see any fishing equipment?

4   A.   Negative.

5   Q.   Did you see any first aid kits?

6   A.   No.

7   Q.   Any medical equipment?

8   A.   No.

9           MS. VIAMONTES:   One moment, Your Honor.

10          (Brief pause in the proceedings.)

11          MS. VIAMONTES:   Permission to approach, Your Honor?

12          THE COURT:   All right.

13   BY MS. VIAMONTES:

14   Q.   Officer Higgins, I handed you what's been premarked as

15   Government's Exhibit 8 for identification.   Do you recognize

16   it?

17   A.   Yes, ma'am.

18   Q.   What is it?

19   A.   These are the engines that were on board that Panga.

20   Q.   Is that a photograph of the engines that were on board that

21   Panga?

22   A.   Correct, that I took.

23   Q.   And does that paragraph accurately depict the way the

24   engines looked when you saw them on October 18, 2016?

25   A.   Yes, it does.

1          MS. VIAMONTES:  Your Honor, at this time the Government

2     moves Government's Exhibit 8 for identification into evidence.

3          MS. PINERA-VAZQUEZ:  No objection.

4          THE COURT:  Move it in.

5          (Government's Exhibit 8 admitted into evidence.)

6          MS. VIAMONTES:  Permission to publish, Your Honor.

7          THE COURT:  All right.

8          MS. VIAMONTES:  And permission to publish the Garmin

9     GPS, Your Honor.

10          THE COURT:  All right.

11     BY MS. VIAMONTES:

12     Q.  Before we get to Government's Exhibit 8, I am now placing

13     on the Elmo Government's Exhibit 31.  Is this the Garmin

14     hand-held GPS that you testified that you obtained from

15     defendant Moises?

16     A.  Yes, ma'am.

17     Q.  I'm now placing on the Elmo Government's Exhibit 14 -- I'm

18     sorry, 8, which is now in evidence.  What type of engines are

19     these?

20     A.  Yamaha.

21     Q.  I'm sorry?

22     A.  Yamaha.

23     Q.  And how many did you see on the Panga?

24     A.  Those two.

25     Q.  And what was the horsepower of the two engines you saw on

1   the Panga target of interest?

2   A.   The horsepower rating is denoted by the two numbers listed

3   there, 115 and 85.

4   Q.   Is that a lot of horsepower for a 26-foot Panga?

5   A.   Yes.

6   Q.   And could that vessel travel at a high rate of speed?

7   A.   Yes.

8   Q.   You mentioned -- when you described the Panga, you

9   mentioned the depth of it.  Can you describe the depth of the

10  Panga target of interest in this case?

11  A.   When I was standing in it, it came up to about my hips, so

12  I'm five foot-six, half of that.

13  Q.   So can it carry a lot of cargo in there?

14  A.   Yes, ma'am.

15       MS. VIAMONTES:   Permission to approach, Your Honor.

16  BY MS. VIAMONTES:

17  Q.   Officer Higgins I handed you what's been premarked as

18  Government's Exhibits 19 through 24.  Can you take a look at

19  those?

20       What are Government's Exhibits 19 through 24?

21  A.   Photos of the defendants.

22  Q.   Of each one individually?

23  A.   Yes, ma'am.

24  Q.   All right.  And we've already moved another photograph in

25  that's not included in there of one of the defendants.  Now, I

1    will place that on the Elmo, it's Government Exhibit Number 25.

2        Do you recognize Government Exhibit 25 as well?

3    A.  Yes, ma'am.

4    Q.  Is that one of the crew members that you saw on October 18,

5    2016?

6    A.  Yes, ma'am.

7    Q.  Now, drawing your attention back to Government's Exhibits

8    19 through 24, do those exhibits accurately depict the way the

9    defendants looked when you saw them on October 18, 2016?

10   A.  Yes, ma'am.

11       MS. VIAMONTES:  Your Honor, at this time the Government

12   moves Government's Exhibits 19 to 24 for identification into

13   evidence.

14       MS. PINERA-VAZQUEZ:  No objection.

15       THE COURT:  Be admitted.

16       (Government's Exhibits 19-24 admitted into evidence.)

17       MS. VIAMONTES:  Permission to publish, Your Honor.

18   BY MS. VIAMONTES:

19   Q.  Now, Officer Higgins, as I publish these exhibits, I'm

20   going to refer to them by their number, and can you let me know

21   when you see the person that you got the GPS -- I apologize.

22   Sorry about that.

23       Officer Higgins, I'm going to publish Government's Exhibits

24   19 through 24 individually on the Elmo, and can you just take a

25   look up there and let me know when you see the person that you

1    obtained the GPS from?

2    A.   Okay.

3    Q.   I'm now placing on the Elmo Government's Exhibit 20.  I'm

4    placing on the Elmo Government's Exhibit 21.

5         I'm placing on the Elmo Government's Exhibit 22?

6    A.   That's him.

7    Q.   I'm placing on the Elmo Government's Exhibit 23.

8         And I'm placing on the Elmo Government's Exhibit 24.  And

9    I'm placing on the Elmo Government's Exhibit 19.

10         MS. VIAMONTES:  No further questions, Your Honor.  I

11   tender the witness.

12         THE COURT:  Cross.

13                      CROSS-EXAMINATION

14   BY MR. ABRAMS:

15   Q.   Good morning, sir.

16   A.   Good morning.

17   Q.   As part of your involvement in this case onboard the

18   *Mellon*, your first involvement began with what you described

19   being deployed on *Mel-I* to stop our boat; is that right?

20   A.   Correct.

21   Q.   Okay.  So you are not a witness to anything that happened

22   before that that was alleged in regard to the dumping of

23   controlled substances?

24   A.   Negative.

25   Q.   Now, you referred to -- when you were deployed -- is that

1    the right word -- deployed on *Mel-I*?

2    A.   It is.

3    Q.   I want to use the right word.  When you were deployed on

4    *Mel-I*, which led to the stopping of our boat, you described --

5    I think you said it took -- how long did it take?

6    A.   Approximately, 10 to 20 minutes.

7    Q.   Okay.  And during that time when you first were lowered

8    into the water, I believe you were asked, you said you couldn't

9    see our boat?

10   A.   Negative.

11   Q.   Is that right?

12   A.   No.

13   Q.   And you referred to it as a pursuit; is that right?

14   A.   Correct.

15   Q.   Now you knew you were going after a particular boat; right?

16   A.   Yes.

17   Q.   Now, do you have any reason to believe -- or there's no

18   reason to believe that the people who you were going after, our

19   boat, knew they were being pursued?

20   A.   No.  But they were going at a high rate of speed and they

21   didn't stop when they saw us.  Usually, if people are out and

22   they are looking for their lost fishermen that were, you know,

23   need to be rescued, if the Coast Guard shows up that's a good

24   asset to have because that's our job, to rescue people.

25   Q.   Okay.  Well, at first, as you said you didn't see them;

1    right?

2    A.   Correct.

3    Q.   All right.  No one's pretty well in the water?

4    A.   Yeah.

5    Q.   Is there any reason to believe they saw you?

6    A.   No.

7    Q.   How about seeing the *Mellon*?

8    A.   No.

9    Q.   The *Mellon's* pretty large?

10   A.   It is, but you can't see it over the horizon.

11   Q.   Okay.  And when, in fact, the airplane came down low over

12   the boat, the boat stopped; right?

13   A.   It did.

14   Q.   And, in fact, when you approached our boat, most of the

15   time, perhaps with the exception -- well, you watched the GoPro

16   video; right?

17   A.   Yes, sir.

18   Q.   The GoPro video has audio?

19   A.   Yes.

20   Q.   And with the exception of approximately 15 seconds at no

21   time did *Mel-I* have its siren going; right?

22   A.   Is that -- I'm sorry, is that a question?

23   Q.   That's a question.

24   A.   I don't recall.  It's -- the video is -- there's so much

25   going on in the background with the engine noise, the water

1    splashing, it could have been drowned out.

2    Q.   The siren?

3    A.   It could have been because of where the GoPro's mounted and

4    where the siren is actually located, it could be drowned out.

5    The siren is on what's called the A pillar, which is on the

6    center of the vessel, and they're mounted diametrically, so one

7    facing forward and one facing aft, and it could have been

8    drowned out.

9    Q.   You're the security guy; right?

10   A.   Correct.

11   Q.   At the time *Mel-I* is approaching our boat you had your M-16

12   in your hand; right?

13   A.   Negative.

14   Q.   What did you have in hand?

15   A.   I had nothing, I had my eyes on the vessel just to make

16   sure they're safe.  I don't put hands on weapons until I'm told

17   to do so.

18   Q.   And where are you located on the boat during the pursuit of

19   our boat?

20   A.   The very back, portside.

21   Q.   And you're telling me that the sirens on *Mel-I* are designed

22   to be heard over water; right?

23   A.   Correct.

24   Q.   For a considerable distance?

25   A.   I'm not sure of the distance they're supposed to be heard,

1    but they are loud, yes.

2    Q.   Even if you're standing besides that siren, you're on the

3    boat with the -- you're on the source of that sound?

4    A.   I definitely heard them.

5    Q.   And the siren was on for a relatively short period of time;

6    right?

7    A.   I -- it was all happening so fast, I -- the amount of time

8    is -- when your adrenaline's flowing, it seems longer or

9    shorter, based on perception.

10   Q.   Fair to say when its siren was activated, regardless of its

11   length that boat was stopped -- our boat was stopped?

12   A.   Yes.

13   Q.   Now, when your boat, when *Mel-I* approaches -- as *Mel-I* is

14   approaching our boat, you testified as to the options that you

15   have or the steps that you go through what might be necessary

16   to stop a boat; right?

17   A.   Correct.

18   Q.   All right.  And those included, you testified, about the

19   flash bang; right?

20   A.   Yes, sir.

21   Q.   And that's something that makes a flash and makes a noise?

22   A.   Correct.

23   Q.   Used to make a noncompliant vessel -- well, used to

24   encourage a noncompliant vessel to be compliant?

25   A.   Correct.

1   Q.   If that doesn't work, then you described the copper slug

2   rounds?

3   A.   Yes.

4   Q.   Right, which will penetrate an engine cowling and melt?

5   A.   Correct.

6   Q.   Is that what used to be referring to as nonlethal disabling

7   fire?

8   A.   Negative.  No, it's always been called disabling fire, it's

9   never been nonlethal, and that's why when we employ that, our

10  tactics, we have to use is get our vessel in front of the

11  noncompliant vessel, so when I'm shooting, I'm actually aiming

12  backwards so that anybody that's in the vessel will not be in

13  our line of fire.

14  Q.   You're too young, you don't remember when it was called

15  nonlethal disabling fire, do you?

16  A.   No, sir.

17  Q.   So, but you didn't need to employ that?

18  A.   Negative.  As soon as they come to a stop those options are

19  out the window.

20  Q.   And that included the potential option of shooting our

21  engines?

22  A.   Correct.

23  Q.   So you didn't have to do any of that?

24  A.   Negative.

25  Q.   Now, when you approached our boat, I understand you said

1  during the approach you were going pretty fast, you're probably

2  holding on or you're strapped into a seat?

3  A.   We have feet stirrups and also a seatbelt.

4  Q.   Okay.  Now, when you are approaching and, again, it looks

5  like on the GoPro -- and I'll show it to you if you want --

6  your boat approaches our boat relatively slowly; right?

7  A.   Okay.

8  Q.   Is that true?

9  A.   Yes, as soon as they came to a stop the coxswain is aware,

10  he needs to come down, otherwise it could be potentially we

11  would over-pursue them or potentially run into them.

12      So he did the right thing which is it coming down which is

13  come down on the throttle and ease in.

14  Q.   And you don't know at this point what you are going to be

15  dealing with when you encounter the crew of our boat?

16  A.   Negative.

17  Q.   Number one is safety; right?

18  A.   A hundred percent.

19  Q.   For you and your crew?

20  A.   Yep.

21  Q.   Particularly for you as safety officer; right?

22  A.   Correct.

23  Q.   All right.  You have your M-16 now?

24  A.   I do.

25  Q.   Okay.  The other members of the crew, with the exception of

1    the interpreter, they're armed?

2    A.   Just Officer Hadley.  The coxswain and the engineer are not

3    armed.

4    Q.   Weapons drawn?

5    A.   Just me.

6    Q.   How about Officer Hadley?

7    A.   I don't recall.  He may have.  But I'm all the way up

8    forward, I can't see him.

9    Q.   Okay.  The others, perhaps, with the exception of the

10   interpreter, have weapons available to them, if needed?

11   A.   If needed, but they're not qualified in those weapons so

12   they don't have the authority to grab them.

13   Q.   Well, you're suddenly in a shootout with seven guys,

14   then --

15          MS. VIAMONTES:  Objection, Your Honor, it calls for

16   speculation.

17          THE COURT:  Overruled.

18   BY MR. ABRAMS:

19   Q.   If you're suddenly in a shootout with seven guys, you want

20   everybody on their boat to be able to defend themselves; right?

21   A.   Correct, and they would and they would have the commanding

22   officers authority to back them up on that decision.  If your

23   life's in danger and your crew's life is in danger, you have to

24   do what you have to do.

25   Q.   When you come to our vessel and our vessel is ordered to

1    shut off the engines and everybody go up front, everyone was

2    compliant; right?

3    A.   Yes, sir.

4    Q.   Tension deescalates a little bit?

5    A.   It does.

6    Q.   And then you and Officer Hadley are able to board our boat,

7    and I believe you said at that point you weren't carrying your

8    M-16 any more?

9    A.   Negative.

10   Q.   Negative meaning correct?

11   A.   I was not carrying it.

12   Q.   Okay.  And the guys were cooperative with you?

13   A.   They were.

14   Q.   Now, you didn't -- you weren't -- you weren't the

15   individual who asked questions; Officer Hadley, through the

16   interpreter, asked questions of the people on board; right?

17   A.   Yes, sir.

18   Q.   Now you testified that there was the, quote/unquote,

19   overwhelming -- this may have been Ms. Viamontes' word not

20   yours, but I heard the overwhelming smell of gasoline; is that

21   right?

22   A.   That's correct.

23   Q.   Strong smell of gas?

24   A.   Right.

25   Q.   Well, there was a lot of gas on the boat; right?

```
 1    A.    There was.
 2    Q.    And you were aware that prior to our boat stopping, it was
 3    moved?
 4    A.    Yes.
 5    Q.    Now -- well, gasoline sloshes on the moving sea; right?
 6    A.    It does.
 7    Q.    I want to ask you a little bit about the ION scans, now you
 8    are tasked with taking the swipes; right?
 9    A.    Correct.
10    Q.    I believe you said it was like a bandage-sized paper or
11    swab?
12    A.    Yes, sir.
13    Q.    And you handled that with a glove?
14    A.    Correct.
15    Q.    And that was to avoid contamination purposes?
16    A.    Correct.
17    Q.    And the way you take those swabs, and correct me if I am
18    wrong, you will take that swab in the glove and you will run it
19    across the surface; is that right?
20    A.    That's right.
21    Q.    I believe what you said you fold the glove onto the swab?
22    A.    That's after we write the number on it, and then we fold it
23    over and put it in a plastic bag.
24    Q.    Okay.  Now, when you are taking the swabs, do you -- are
25    you looking specifically for, like, powder or something on the
```

1    object you are taking the swab of?

2    A.   No, sir, we are basing it strictly on how can we get the

3    greatest amount of coverage on this vessel, and what would be

4    the highest probability of whatever being touched.  So that's

5    why we did the helms where they hold, the rails, anything where

6    someone may have touched.

7    Q.   And you understand that the ION scan measures -- looks for,

8    measures, searches for substances in quantities, which are

9    referred to as nanograms; right?

10   A.   No, sir, that's not my specialty.  My only job is to take

11   the swabs and then they are sent back to the ship where our

12   specialist runs all that stuff.

13   Q.   So you don't know the science.  You know what you're tasked

14   to do?

15   A.   Correct, that's it.

16   Q.   So you were not responsible for testing the sample, just

17   collecting?

18   A.   Just collecting, that's correct.

19        MR. ABRAMS:   Okay.  Thank you.  I have no further

20   questions, Judge.

21                        CROSS-EXAMINATION

22   BY MR. RODRIGUEZ:

23   Q.   Good morning, sir.  How are you?

24   A.   Good morning.  I'm doing well.

25   Q.   The only report that you prepared was your statement,

1    correct?

2    A.   That's correct.

3    Q.   That's the only thing we have from you in written form?

4    A.   Typed out, yes, sir.

5    Q.   And you had a chance to review that before you came in

6    today?

7    A.   Yes, sir.

8    Q.   What else did you review before you came in today?

9    A.   I watched a few of the GoPro videos, I looked at the

10   pictures that were presented, and I think -- oh, and I saw the

11   MPA video for the first time, and I think that's it.

12   Q.   Now, sir, you mentioned that you went to -- I think you

13   said South Carolina for training?

14   A.   Yes, sir.

15   Q.   And that you called it levels of force course?

16   A.   It's called boarding team member course, and during that

17   course we go over the levels of force for what we employ.

18   Q.   So it's broader than just the use of weapons?

19   A.   Correct, it is a focus -- use of weapons is a focus in

20   there, but it is broader than just that.

21   Q.   And it involves law enforcement training?

22   A.   Correct.

23   Q.   In fact, I think, if I remember correctly, during direct

24   examination you said part of your duty, when you do a boarding,

25   is to collect evidence to indict.  Did you say that?

 1   A.   I said that.

 2   Q.   So you are very well aware that part of your duties, when

 3   you board a vessel such as the Panga, is in a law enforcement

 4   capacity, that is, to collect evidence to present for an

 5   indictment and criminal prosecution in a court of law as you

 6   sit here today?

 7   A.   That's correct.

 8   Q.   And so in this particular case you were very conscious

 9   about the collection of evidence, were you not?

10   A.   I was.

11   Q.   And you mentioned the ION swabs; correct?

12   A.   Yes.

13   Q.   Do you recall whether any of the items that were on the

14   vessel were retained for evidence, other than the ION swabs?

15   A.   On the vessel, there was -- the only thing that I remember

16   taking off was the Garmin, that hand-held GPS.

17   Q.   Which you said one of the individuals handed to you?

18   A.   Correct.

19   Q.   And then did the ION swabs?

20   A.   Correct.

21   Q.   So that the actual Panga itself, you were requested

22   permission to destroy?

23   A.   Yes, as a hazard to navigation when we were fully complete

24   with our law enforcement boarding.

25   Q.   So the Panga was, in fact, destroyed?

1    A.   Yes.

2    Q.   And clearly, not available for additional testing by

3    defense lawyers, for example?

4    A.   Correct, but we can't leave it out there, it's a hazard to

5    navigation.

6    Q.   How many inflatables does the *Mellon* have?

7    A.   Our small boats?

8    Q.   Yes.

9    A.   We have two.

10   Q.   Do you have any other small vessels on board other than the

11   two that you just mentioned?

12   A.   Negative.

13   Q.   Those are the only two?

14   A.   Yes, sir.

15   Q.   The engines that you took pictures of, the motors, those

16   were also destroyed along with the Panga?

17   A.   Yes.

18   Q.   So your testimony about their horsepower and their

19   strength, those are unavailable for us to test as well, because

20   they're destroyed?

21   A.   Correct.

22   Q.   Do you recall being on the Panga when a 90-page document

23   was handed over to be reviewed by Officer Hadley and Officer

24   Barajas?

25   A.   I saw documents being passed.  I could speculate that's it

1    90 pages, I have no idea, but I don't speak Spanish and I

2    wasn't paying attention to what they were saying, my focus was

3    on the safety of my crew.  All I saw was things being passed

4    back and forth.  I don't know what it was.

5    Q.   You stated that your focus was the individuals that were

6    stopped; correct?

7    A.   Correct.

8    Q.   And so part of that focus would include -- I imagine --

9    them handing over a document to one of your crew members?

10   A.   Correct, and I saw -- like I said, I saw documents being

11   passed, I don't know what it was.

12   Q.   And you don't know whatever happened to those documents?

13   A.   No.

14   Q.   You took photographs yourself?

15   A.   Yes, sir.

16   Q.   Did you take photographs of inside the Panga itself?

17   A.   The only photographs we took inside the Panga were what you

18   saw with the engines and then the picture the defendants.

19   Q.   So the gas tanks that you make reference to, those went

20   down with the Panga in the Pacific Ocean?

21   A.   Correct.

22   Q.   So those are not available for us to look at as well?

23   A.   That is correct.

24   Q.   And you've been trained to keep evidence to indict;

25   correct?

1    A.   Under the instructions of the boarding officer which

2    receives his instructions from our commanding officer which

3    receives his instruction from a two-star admiral, so yes.

4    Q.   Do you recall whether or not -- I understand that, and

5    you're talking about their Coast Guard duties, but you have a

6    law enforcement task when you go on there; correct?

7    A.   That's correct.

8    Q.   When you boarded the Panga, do you recall whether there

9    were life vests on board?

10   A.   There were not, that's why we had to provide them with

11   some.

12   Q.   So you do not recall that the individuals had life vests;

13   is that correct?

14   A.   No, I don't recall that at all.

15        MR. RODRIGUEZ:   Thank you, sir.   I have no further

16   questions.

17                        CROSS-EXAMINATION

18   BY MR. CHAMBROT:

19   Q.   Good morning, sir.

20   A.   Morning.

21   Q.   Just briefly, go back to the documents.

22   A.   Okay.

23   Q.   Did you see each one of these individuals hand up their

24   individual documents to the crew, your crew?

25   A.   In regards to, like, identification or anything like that?

1   Q.   Yes.

2   A.   No.

3   Q.   How many documents were handed up, if you'll recall?

4   A.   The only one I remember being handed is that it was like a

5   brown piece of paper, it kind of looked like a notebook, it was

6   yea big, it could have been in reference to what the last

7   gentleman was talking about where it could have been that

8   90-page whatever, that's all I saw being handed back and forth.

9   Q.   Just for the record, when you say yea big, it's about an

10  inch-and-a-half, two inches?

11  A.   I would say a centimeter.

12  Q.   So let's take it in inches.

13  A.   Half an inch.

14  Q.   Half an inch, okay.

15       Were you able to photograph those documents?

16  A.   Negative.

17  Q.   Did you feel that there was any importance to those

18  documents?

19  A.   No, I did not.

20  Q.   Did the crew on the Panga, in your observation, give a

21  great amount of weight or importance to those documents?

22  A.   Not that I could see, no.

23  Q.   Okay.  Did the folks on your boat give those documents any

24  weight whatsoever?

25  A.   No.

1    Q.   So they weren't collected and brought back to the *Mellon*?

2    A.   They were not.

3    Q.   They were burned, destroyed?

4    A.   I assume so.

5    Q.   Okay.  Now, you wrote that two motors that were in the back

6    of the Panga, at least a picture of the two motors; correct?

7    A.   Correct.

8    Q.   They were different sizes?

9    A.   Yes.

10   Q.   One was an 85, another one was a 115; correct?

11   A.   Yes.

12   Q.   They pull differently -- they have different strength;

13   correct?

14   A.   They should.

15   Q.   So it would be kind of difficult to have a motor here and a

16   big motor here running together because then the big motor

17   would just take over and start turning, correct?

18   A.   Not necessarily, if you run them at different RPMs, you can

19   reach the same speed with each motor, but I'm not a mechanical

20   engineer either.

21   Q.   Okay.  So you would have to take the bigger motor and

22   reduce its power to get it to the same size or the same power

23   as the little motor?

24   A.   That would make sense.

25   Q.   So that 115 then is not really running as a 115, it was

1    probably running as an 85?

2    A.   I wouldn't be able to comment on that, I wasn't on board.

3         MS. VIAMONTES:   Objection, Your Honor, it calls for

4    speculation.

5    BY MR. CHAMBROT:

6    Q.   Okay.  But you will agree that usually when you stop a

7    boat, both engines are usually pretty much the same size;

8    correct?

9    A.   In my training and experience, I've seen many boats that

10   have different-sized engines.

11   Q.   Okay.  Let's change topics.

12   A.   Okay.

13   Q.   Let's go back to the swabs.  When you're doing the swabs,

14   you look for areas that are clean; correct?

15   A.   I look for areas that would be a high probability of

16   somebody touching them with their hands.  It doesn't

17   necessarily have to be clean.

18   Q.   But would you stay away from something that is oily or

19   filthy or --

20   A.   Not necessarily, if it is where somebody would place their

21   hands, then it should be swabbed.

22   Q.   So let's say now you swabbed on an area that's really oily,

23   would that be a good swab, in your opinion?

24   A.   It may be, like I said before, I'm not the expert on

25   analyzing them, I'm just told how to do it and where to take

1    them from.

2    Q.   Okay.  Now, you were shown pictures of these defendants;

3    correct?

4    A.   Yes, sir.

5    Q.   Individually?

6    A.   Yes, sir.

7    Q.   And their clothes appear to be pretty clean; correct?

8    A.   They did.

9    Q.   And you did not photograph the fuel on deck?

10   A.   No.

11   Q.   Do you know how much fuel was on deck?

12   A.   No.

13   Q.   How far were away they from the land?

14   A.   I don't know.

15   Q.   Okay.  You're out there in your little world, you really

16   don't know exactly whether you're at?

17   A.   There's -- there are other people on the ship that keep

18   track of where we're at, my job is to go out and do boardings.

19   Q.   You also stated that you gave commands to these

20   individuals, correct?

21   A.   In regards to having them muster on the bow?

22   Q.   Yes.

23   A.   That was the boarding officer that gave those commands.

24   Q.   Did you speak to them at all?

25   A.   I did speak to them, through the interpreter.

1   Q.   Through the interpreter?

2   A.   Correct.

3   Q.   You have don't speak Spanish?

4   A.   Negative.

5   Q.   So whatever communication was being done by you, it was

6   through Officer Barajas?

7   A.   Correct.

8   Q.   You stated that you took some notes?

9   A.   For the swipes?

10  Q.   Yes.

11  A.   Yes.

12  Q.   Okay.

13  A.   And it's actually Officer Hadley that takes the notes.  I

14  can't perform both tasks at once.  If I'm doing the swipes,

15  someone else has to take the notes, otherwise there's a risk of

16  dropping the swipe and contaminating it, so he's taking notes

17  while I'm doing the swipes.

18  Q.   And you're pretty much telling him what to write?

19  A.   Correct.

20  Q.   Or he just does it on his own?

21  A.   No, I'm telling him to write, for example, this is number

22  four, it was taken on the starboard, et cetera, whatever that

23  example may be.

24  Q.   Did you take any other notes?

25  A.   No.

1    Q.   Now, you stated that you got the GPS from -- by the way, I

2    didn't introduce myself.  My name is Joe Chambrot, I represent

3    Mr. Ordonez.

4    A.   Hi, how are you doing.

5    Q.   Hi.  How are you.

6         You took the GPS on the Panga or the *Mellon*?

7    A.   On the Panga.

8    Q.   And he handed to you?

9    A.   Correct.

10        MR. CHAMBROT:  I have no further questions, Judge.

11                        CROSS-EXAMINATION

12   BY MR. BERRIO:

13   Q.   Good morning, Officer Higgins, how are you?

14   A.   Good morning, I'm doing well.

15   Q.   My name is Juan Berrio, I represent Jose Candelario

16   Perez-Cruz.  We've never met before; right?

17   A.   No, sir.

18   Q.   You have met with Ms Anton and Ms. Viamontes on previous

19   occasions?

20   A.   Correct.

21   Q.   How many times did you meet with them?

22   A.   Starting Sunday night, once, and then yesterday, so three

23   times.

24   Q.   You discussed your testimony here today?

25   A.   Correct.

```
 1   Q.   And what you're going to say here today?

 2   A.   Yes.

 3   Q.   And you discussed -- and you've reviewed photographs?

 4   A.   Correct.

 5   Q.   And you've reviewed video?

 6   A.   Correct.

 7   Q.   Did you also see Officer Hadley yesterday?

 8   A.   I did.

 9   Q.   You saw him outside this courtroom?

10   A.   I did.

11   Q.   Did you speak to him yesterday?

12   A.   Before the court, yes.

13   Q.   You didn't speak to him after the courtroom?

14   A.   I didn't, we're not allowed to.

15   Q.   You didn't speak to him about his testimony or anything

16   like that?

17   A.   Negative.

18   Q.   You discussed the OTH in this case and its features,

19   correct?

20   A.   Yes.

21   Q.   You've been on that boat for some time, you've been doing

22   boardings using those boats?

23   A.   Yes.

24   Q.   Those are really nice boats, the OTH, the

25   over-the-horizons?
```

1    A.    They are.

2    Q.    They are powerful boats; yes?

3    A.    Yes.

4    Q.    They move very fast?

5    A.    Yes.

6    Q.    Very expensive boats, very nice?

7    A.    I can't speak to how expensive there.

8    Q.    They're equipping you with fast boats to go out there and

9    intercept different vessels that you come across or different

10   vessels that you want to stop; right?

11   A.    That's correct.

12   Q.    They have 500-horsepower Cummings diesel engines?

13   A.    I'm not a boat engineer, so I don't know what the

14   horsepower is.

15   Q.    Okay.  So you're not familiar with it having Hamilton jet

16   drive or anything of that nature?

17   A.    No, sir, that's not my specialty.

18   Q.    All you know is that it moves very fast?

19   A.    Correct, and I sit in the back.

20   Q.    You have a good view?

21   A.    Actually, no.

22   Q.    And you said it tops out at 45 knots per hour?

23   A.    That's my understanding, yes.

24   Q.    How did you come across that, who told you that?

25   A.    It's in the boat manual.

1   Q.   And you didn't see that it had 500-horsepower when you

2   looked at the boat manual?

3   A.   The boat manual is not what you think of as a car manual, a

4   boat manual is a training aid for the Coast Guard based on you

5   need to know these tasks for this specific boat, so it only

6   labels top speed, it doesn't tell you what horsepower is, for

7   example, when I take an oral board to get qualified as a boat

8   crewman, they're not going to ask the horsepower, they're going

9   to ask top speed, they don't ask the horsepower.  So this boat

10  manual, it only specifies what you need to know as a boat

11  crewman; does that make sense?

12  Q.   I think so, I think that makes sense to me.

13       And the top speed is 45 knots per hour, and obviously the

14  top speed is when it's not heavy with people on board?

15  A.   Correct, the top speed will vary.

16  Q.   It will vary.  If you have a lot of weight on board, it

17  will even go slower; right?

18  A.   Yes.

19  Q.   The more weight, the slower it will go?

20  A.   Yes.

21  Q.   So that 45 knots per hour is maybe one person on board?

22  A.   No.  It's designed for the minimal crew that we take to do

23  a pursuit mission.  So a coxswain that's driving; a navigator;

24  a pursuit mission commander; myself and then the engineer.  So

25  five people, it should do 45 knots.

```
 1   Q.   I understand.  You also discussed a Panga on this case on

 2   direct testimony?

 3   A.   Yes.

 4   Q.   The OTH and the Panga are very different boats; right?

 5   A.   Correct.

 6   Q.   The OTH is much more powerful; correct?

 7   A.   I would assume so, I've never driven a Panga so I can't

 8   attest to how powerful they are.

 9   Q.   Okay.  But it should be more powerful, more faster because

10   you're trying to stop these boats; right?

11        MS. VIAMONTES:  Objection, Your Honor, calls for

12   speculation.

13        THE COURT:  Sustained.

14   BY MR. BERRIO:

15   Q.   And this Panga that you stopped, you said that it had two

16   engines on it?

17   A.   Yes, sir.

18   Q.   And it had -- one engine was 115 horsepower?

19   A.   Yes.

20   Q.   The other engine was 85 horsepower?

21   A.   Correct.

22   Q.   A total of 200 horsepower; yes?

23   A.   Yes.

24   Q.   And it had more crew members on that Panga than you had on

25   your OTH; right?
```

1   A.   Yes.

2   Q.   On your OTH, you had five people?

3   A.   Yes.

4   Q.   The Panga had seven people on it?

5   A.   Correct.

6   Q.   Did you see the date that these engines were manufactured

7   on, this Yamaha engines that were on the Panga, did you notice

8   a date when they were manufactured?

9   A.   I took the engine covers off and took pictures of that but

10  I don't recall when they were made.

11  Q.   So you don't know how old they are?

12  A.   No, sir.

13  Q.   You don't know how long they had been used for?

14  A.   Negative.

15  Q.   You don't know how long they had been in the water for?

16  A.   I don't.

17  Q.   As they get older, they tend to lose more power and more

18  force, I would think; right?

19  A.   I would assume so.

20  Q.   During your boarding of this Panga, you didn't locate any

21  tarps, did you?

22  A.   No, I did not.

23  Q.   There were no tarps located in the debris field?

24  A.   I can't speak to the debris field, I never went there.

25  Q.   In terms of the Panga, no tarp at all?

1    A.   Negative.

2         MR. BERRIO:   I have no further questions.

3                        CROSS-EXAMINATION

4    BY MR. do CAMPO:

5    Q.   Good morning, sir.

6    A.   Good morning.

7    Q.   I believe you testified that when you launched on the *Mel-I*

8    you couldn't see the Panga; right?

9    A.   Correct.

10   Q.   When you're on the ocean, your vision, your line of sight

11   is limited by the horizon; correct?

12   A.   Absolutely.

13   Q.   And how far the horizon is from you is a function of how

14   high you are off of sea level; right?

15   A.   Correct.

16   Q.   Would you know how far the horizon is from you, from your

17   position on the rib boat that you were on, on the

18   over-the-horizon boat?

19   A.   When you're at sea level, you can estimate the horizon

20   being ten nautical miles.

21   Q.   Ten nautical miles.  So would it be fair, then, to say that

22   when you launched on the Mel, the Panga was at least ten

23   nautical miles away from you?

24   A.   That would make sense.

25   Q.   And you took off -- and I know you weren't the driver of

1   the over-the-horizon boat, but would it be the standard

2   procedure that it would be operating as fast as possible to go

3   as safe, given the crew and everything?

4   A.  Yes, sir.

5   Q.  So it would probably be moving somewhere along the line of

6   45 knots?

7   A.  Somewhere in there.

8   Q.  And travelling at that speed, did you overtake the Panga,

9   at one point?  In other words, did it came into your line of

10  sight?

11  A.  It came into our line of sight but we never overtook it.

12  Q.  You say you never overtook it because at some point the

13  Panga just came dead in the water and you were able to come up

14  to it?

15  A.  Correct.

16  Q.  But at some point, did come into your line of sight while

17  it was still moving?

18  A.  Yes.

19  Q.  And do you recall how long that took?

20  A.  A few minutes.

21  Q.  A few minutes, all right.

22      I want to ask you some questions about the fuel tanks that

23  you saw -- the fuel drums.

24  A.  Yes.

25  Q.  Do you recall approximately how many you saw?

1    A.   Somewhere between ten and 15.

2    Q.   And do you recall how big they were?

3    A.   May I stand up?

4    Q.   Sure.

5    A.   So they were approximately this tall and about this wide,

6    blue.

7    Q.   You want to hazard a guess as to how big that is, just so

8    that the record shows?

9    A.   I would estimate it was probably about -- it was in liters

10   so it was probably 50 liters.

11   Q.   Fifty liters.  Do you have any idea what that is in

12   gallons?

13   A.   More than one.  No idea.

14   Q.   And you said there were ten to 15?

15   A.   Yes, sir.

16   Q.   Were they all full?

17   A.   Negative.

18   Q.   Some of them were --

19   A.   Some were empty, some were half full, some had been tipped

20   over.

21   Q.   Do you have any idea how much fuel was there, how many

22   liters?

23   A.   Overall?

24   Q.   Overall.

25   A.   No, I don't remember.

```
 1   Q.   Okay.  Did you take any photos of these field drums?

 2   A.   Negative.

 3   Q.   Now, is that your call or is that the boarding officer's

 4   call as to what gets photographed?

 5   A.   It's the boarding officer's call as to what gets

 6   photographed.

 7   Q.   And he never instructed you to take a photo of the fuel

 8   drums?

 9   A.   No, sir.

10   Q.   Can I show you what's been --

11        Can you hear me?

12            THE INTERPRETER:   Yes.

13   BY MR. do CAMPO:

14   Q.   I want to show you what's been admitted as Government's

15   Exhibit 18, and can you follow with my pen here where I'm

16   pointing out?

17   A.   Okay.

18   Q.   Do you recognize that portion of the Panga?

19   A.   Yes, that's a bench sheet.

20   Q.   And now that bench seat, is that fixed in?

21   A.   Yes, yes.

22   Q.   It's molded into the fiberglass hull of the boat; right?

23   A.   Right.

24   Q.   So that can't be moved forward or aft; right?

25   A.   Negative.
```

```
 1   Q.   Now, where were the fuel drums in relation to that fixed
 2   bench, were they forward of it or were they behind it?  In
 3   other words, it would be in front of where these gentlemen were
 4   standing?
 5   A.   Both, there were some just forward of that and some that
 6   they're actually standing on, and actually some that I'm
 7   standing on now when I was taking this photograph.  They were
 8   everywhere.
 9   Q.   And would you be able to characterize there were more in
10   the front, more in the back, about equal split?
11   A.   They were equally split.
12   Q.   Equal split, okay.  So seven to ten, say, on either side?
13   A.   Give or take.
14   Q.   Give or take.  Sir, I want to show you what's been admitted
15   as Government's Exhibit 9.  Okay.  Now, is that you in the hat?
16   A.   Yes, sir.
17   Q.   And is that Officer Heady in the helmet?
18   A.   Officer Hadley, correct.
19   Q.   Hadley, I'm sorry, Hadley in the helmet.
20        Now, do you know, looking at this picture, where that bench
21   is in relation to where you and Officer Hadley are seeing?
22   A.   Without being able to see it, I can't know exactly where
23   it's at, but I would estimate that he is standing just aft of
24   this, so it should be just forward of him, yeah, right in that
25   area.
```

1    Q.   Just forward of him?  In other words, between you two?

2    A.   Negative, right at --

3    Q.   Right at his back?

4    A.   Correct.

5    Q.   Now, give me one second.

6         Now I'm going back to Government's Exhibit 18.

7    A.   Yes.

8    Q.   You took this photograph; correct?

9    A.   Yes, sir.

10   Q.   And you were asked some questions about whether -- the

11   appearance of the gentleman depicted in the photograph; right?

12   A.   Regarding the cleanliness of their clothes, yes.

13   Q.   Did you take this photo with a digital camera or with a

14   film camera?

15   A.   Digital.

16   Q.   And then you forwarded that digital image to wherever you

17   forwarded the rest of this evidence to, correct?

18   A.   The entire digital camera goes back to the cutter once we

19   are done taking pictures and then someone extrapolates from

20   there.  I can't speak to that.

21   Q.   Now you would agree to me that the digital image that you

22   took has more detail than this printed-out photograph?

23   A.   It should, yes.

24        MR. do CAMPO:  I'm sorry, Judge, best laid plans.

25        THE COURT:  You're giving yourself too much credit.

1      MR. do CAMPO:  All right, well, listen it's not

2    cooperating and I don't want to slow up the process.

3    BY MR. do CAMPO:

4    Q.   I just want to clarify that this -- that picture,

5    Government's Exhibit 18, does come from a digital image; right.

6    A.   That's correct.

7    Q.   Now, the primary purpose of the Coast Guard is search and

8    rescue; is it not?

9    A.   It's one of our main missions, yes.

10   Q.   And, sir, I imagine that it's common when you conduct a

11   search and rescue mission, the persons that you rescue are

12   grateful; correct?

13   A.   Yes.

14   Q.   And they're usually quite pleased that you showed up;

15   right?

16   A.   Correct.

17      MR. do CAMPO:  Thank you.  I have no further questions.

18      THE COURT:  Cross.

19      MS. PINERA-VAZQUEZ:  Your Honor, can we request that

20   all -- Your Honor, on behalf of the defendants, can we request

21   that all the evidence that's actually introduced be placed in a

22   place where it's accessible to defense attorneys and I don't

23   have to request it from the Government, that way it's in the

24   middle?

25      MS. VIAMONTES:  Absolutely, Judge, we have no

1    objection.  I am placing it now, if you give me a second.

2              Judge, in this courtroom where do you keep the

3    evidence?

4              THE COURT:  Normally, I think it's the responsibility

5    of each party to be responsible for --

6              MS. VIAMONTES:  Is it okay at the Government table?

7              THE COURT:  Whatever you want to do, but you're

8    responsible for your own.

9              MS. VIAMONTES:  Thank you.

10             MS. PINERA-VAZQUEZ:  Thank you.

11                       CROSS-EXAMINATION

12   BY MS. PINERA-VAZQUEZ:

13   Q.  Officer Higgins, when you first boarded the Panga, you

14   didn't find any drugs?

15   A.  Negative.

16   Q.  And you didn't find any weapons?

17   A.  Negative.

18   Q.  Let's talk about your timing.  11:15 you said you left the

19   Cutter *Mellon*?

20   A.  Correct, and they're all approximate times.

21   Q.  And it took you about ten minutes to get to the Panga,

22   about 11:25.  How long before you actually boarded the Panga?

23   A.  I believe it was another 15 minutes, maybe, ten minutes.

24   It wasn't very long.

25   Q.  So once you boarded the Panga, you started asking

1    questions, both you and Officer Hadley; right?

2    A.   Negative.

3    Q.   Officer Hadley?

4    A.   Officer Hadley asked the questions through the interpreter.

5    I maintained security.  I didn't ask any questions.

6    Q.   You didn't ask any questions?

7    A.   No.

8    Q.   Okay.  Now those questions began, you said -- I'm sorry,

9    when did you say you boarded?

10   A.   Approximately 11:20, 11:30, it was approximately ten

11   minutes after we came up on scene.

12   Q.   So 11:30, and according to your report, you finished that

13   questioning, that questioning ended about 12:30, an hour later.

14   A.   Okay.

15   Q.   Is that a yes?

16   A.   It sounds right.  It's all approximate times.

17   Q.   So for about an hour you questioned -- Officer Hadley

18   questioned the members on the vessel; right?

19   A.   Yes.

20   Q.   And when I said Officer Hadley, he doesn't speak Spanish

21   either; right?

22   A.   No.

23   Q.   And you don't speak Spanish?

24   A.   Negative.

25   Q.   So the one who actually did the questioning was Officer

1    Barajas which is the Spanish interpreter; right?

2    A.   That is correct.  She did the questioning through Officer

3    Hadley who has a sheet that has very specific questions on it,

4    for example --

5            THE COURT:  Back up, back up.

6    A.   -- where is your last port of call, what are your names, do

7    you have IDs, et cetera, et cetera.

8    BY MS. PINERA-VAZQUEZ:

9    Q.   You don't know exactly what the individual said because you

10   don't speak Spanish?

11   A.   Correct.

12   Q.   You're relying on what supposedly Officer Barajas is

13   interpreting?

14   A.   Yes.

15   Q.   Now you testified that -- actually, I believe the

16   Coast Guard's job is search and rescue?

17   A.   That's one of our missions, correct.

18   Q.   It's the United States Coast Guard?

19   A.   That's correct.

20   Q.   Now at the time of this incident, the United States

21   Coast Guard cutter was in the Eastern Pacific; right?

22   A.   Yes.

23   Q.   That's really far away from any border of the United

24   States; right?

25   A.   It is.

1   Q.   I believe it's 150 miles from Mexico?

2   A.   Okay.

3   Q.   Was it?

4   A.   I already testified that I wasn't sure how far away we were

5   from any land.

6          MS. PINERA-VAZQUEZ:  Where's the other map that was

7   introduced, the big map?  There was another one.

8          I stepped on it by accident, excuse me.

9   BY MS. PINERA-VAZQUEZ:

10  Q.   Do you know at least --

11         MS. PINERA-VAZQUEZ:  May I approach, Your Honor?

12         THE COURT:  All right.

13  BY MS. PINERA-VAZQUEZ:

14  Q.   Do you know if you were in the Eastern Pacific?

15  A.   I do.

16  Q.   I'm going to show you a map that was introduced into

17  evidence as Government's Exhibit 41.

18  A.   Okay.

19  Q.   And ask you to point out, more or less, where you were at?

20  A.   We should have been in this area somewhere.

21  Q.   And that's near Mexico?

22  A.   Correct.

23  Q.   Really, and this is the United States right here, correct?

24  A.   It is.

25  Q.   Now, Mexico also has its own Coast Guard; right?

1    A.   Yes, ma'am.

2    Q.   So it's reasonable to assume that the majority of the

3    vessels in that area where you pointed out near Mexico were

4    Mexican vessels?

5    A.   That's reasonable.

6         MS. VIAMONTES:   Objection, this calls for speculation,

7    Your Honor.

8         THE COURT:   Go ahead.  See where it goes.

9    BY MS. PINERA-VAZQUEZ:

10   Q.   There's going to be more vessels than vessels from the

11   United States; right?

12   A.   More Mexican vessels than United States?

13   Q.   Than the United States?

14   A.   Yes.

15   Q.   So no reason to assume that when you were in pursuit, I

16   believe you used the word pursuit, of this foreign vessel that

17   they would know that you're the United States Coast Guard;

18   right?

19   A.   We have a Coast Guard flag, we have -- we're announcing

20   over the loud hailer that we are the U.S. Coast Guard, it's

21   printed in two-inch letters on each sponson U.S. Coast Guard.

22   Once you make sight of our vessel, it's pretty obvious.

23   Q.   Well, if you're from the United States, but if you're from

24   Mexico, you might not have an idea who's following you.

25   A.   If's fair, but it's also pretty obvious when there's a U.S.

1    flag and a Coast Guard flag flying.

2    Q.   Let's talk about the pictures, you took about 131 pictures

3    in this case?

4    A.   I took a lot, I don't know how many I took.

5    Q.   In other words, the pictures that we have here aren't the

6    only pictures that you've taken; right?

7    A.   Correct.

8    Q.   And you said you took pictures of -- you took pictures of

9    the engine, which we've seen?

10   A.   Uh-huh.

11   Q.   Now, and this, I think, has already been asked, but you

12   didn't take any pictures of anything inside the boat; right?

13   A.   Negative.

14   Q.   And those pictures were taken at the direction of Officer

15   Hadley because you're not in charge of the law enforcement

16   side; right?

17   A.   That is correct.

18   Q.   You're in charge of security?

19   A.   That's correct, and assisting the boarding officer, as

20   necessary.

21   Q.   So whatever you did in relation to law enforcement

22   gathering was based on Officer Hadley's instructions; right?

23   A.   Affirmative.

24   Q.   All right.  Let me show you the picture that was taken, one

25   of the pictures, and I'm not sure if this is working, I

1    appreciate your help.  Thank you so much.  I may have done

2    something.  My heel got stuck there.

3         COURT SECURITY OFFICER:  It will have to warm up again.

4    BY MS. PINERA-VAZQUEZ:

5    Q.  For purposes of the record, this is Government's

6    Exhibit 18.  The prosecutor put this picture on and asked you

7    about the man in yellow.

8    A.  Okay.

9    Q.  The man in yellow is my client, Martin Ortiz?

10   A.  Okay.

11   Q.  And you said that -- I believe the question was whether or

12   not he smelled of feces and urine?

13   A.  That's correct.

14   Q.  And your response was no?

15   A.  No, he did not.

16   Q.  And I think she also asked whether or not it looked like if

17   he had been 12 days in a cargo hold.  Do you remember that?

18   A.  Yes.

19   Q.  And you said no?

20   A.  I said no.

21   Q.  Well, do you know if he was wearing this when he was in the

22   12 days in the cargo hold?

23   A.  I don't.

24   Q.  You don't know whether or not Mr. Ortiz, my client, changed

25   when he got out of that cargo hold, correct?

1   A.   I do not.

2   Q.   In fact, he's wearing a yellow jersey?

3   A.   He is.

4   Q.   Do you know where that yellow jersey is from?

5   A.   No, I don't.

6   Q.   Do you know that yellow jersey is a Colombian soccer

7   national team jersey?

8            MS. VIAMONTES:   Objection, Your Honor, he said he

9   doesn't know where it's from.

10           THE COURT:   Sustained.

11  BY MS. PINERA-VAZQUEZ:

12  Q.   Do you have no idea when he had changed?

13  A.   No, ma'am.

14  Q.   So, of course, if he had changed from the cargo hold when

15  he got onto the Panga boat, he would not smell of feces or

16  urine; correct?

17  A.   That's correct.

18  Q.   And, in fact, you know that there was -- each of these

19  individuals had personal items with them that were put into

20  custody, right?

21  A.   I didn't handle that part of the investigation.

22  Q.   Who did?

23  A.   It should have been Officer Hadley.

24  Q.   When you were taking the ION swipes, did you take pictures

25  of the locations where you took the ION swipes?

1    A.   No.

2    Q.   You said you slipped and fell because there was fuel on the

3    floor?

4    A.   Yes, ma'am.

5    Q.   Did you file a report with the cutter that you slipped and

6    fell?

7    A.   Nope.

8    Q.   Did you go to the infirmary to see if you were okay?

9    A.   No, ma'am, it was just a normal slip and fall, I slipped, I

10   got back up.

11   Q.   And you didn't put anything about the strong smell of

12   gasoline in your statement; right?

13   A.   I did not.

14   Q.   And there's also nothing in the statement that says that

15   the floor had a bunch which fuel on the floor; right?

16   A.   I didn't put that in there.

17   Q.   And it also doesn't say anything in your statement that you

18   had slipped and fell on fuel; right?

19   A.   I didn't feel that that was pertinent.

20   Q.   You were asked questions about the engines, and I believe

21   about the 115, the 85, the different horsepower engines.

22        Now, you would agree with me, that depending on the amount

23   of weight a vessel has depends how fast it can go?

24   A.   I agree.

25   Q.   The more weight a vessel has, the slower it goes; right?

1    A.   Yes.

2    Q.   So do you know the capacity of the Panga, how much weight

3    it can hold?

4    A.   No.

5    Q.   But you would agree with me that if you put too much weight

6    on a Panga, it could actually sink?

7    A.   Not in my training and experience, I've seen many Pangas in

8    my 13 years that have been loaded down and they don't sink.

9    They go slow but they don't sink.

10   Q.   So your testimony was that a Panga could never sink?

11   A.   That's not what I said.

12   Q.   Okay.

13   A.   I said if they are loaded down, they're not going to go

14   slow, but they're not going to sink.

15   Q.   But my question is you would agree with me that it could be

16   a possibility that if you put too much weight on it loaded, it

17   can sink?

18   A.   Absolutely, if you put too much weight on an aircraft

19   carrier, it would sink as well.

20   Q.   It would as well.

21        MS. PINERA-VAZQUEZ:  No more questions.

22                        CROSS-EXAMINATION

23   BY MR. ENCINOSA:

24   Q.   Good morning.

25   A.   Good morning, sir.

1   Q.   Sir, you were asked some questions about Exhibit 31.  It's

2   the hand-held GPS --

3   A.   Yes.

4   Q.   -- that was found, somebody on the crew, it wasn't found on

5   Mr. Lucas, on this individual sitting there; correct?

6   A.   Negative.

7   Q.   Lucas-Franco, I'm sorry, I haven't had coffee this morning.

8        It wasn't found on him; right?

9   A.   No.

10  Q.   Now, you're the one that seized this; correct?

11  A.   I took it from that individual and gave it to the boarding

12  officer.  As a BTM, I am not allowed to seize anything, I'm

13  only allowed to collect it.

14  Q.   You're not trained in law enforcement; right?

15  A.   I am trained in law enforcement, I'm not trained to seize

16  evidence.  There's a difference between actually obtaining it

17  and actually seizing it.

18  Q.   Let me tell you, this item, GPS, was put inside a lot of

19  bags; right, plastic bags?

20  A.   Correct.

21  Q.   There's this bag and then there's like three more bags,

22  right?

23  A.   Yes.

24  Q.   And I guess once it's seized and put in one bag, and if

25  it's taken place someplace for testing, then it's unsealed and

1    put in another bag, but the original bag is kept; right?

2    A.   To my understanding.  Again, I am not an evidence expert,

3    once it's collected and I give it to the boarding officer that

4    is out of my hands.

5    Q.   And the reason we have all these bags here is because you

6    want to preserve this and you want to preserve the chain of

7    custody; right?

8    A.   Yes, sir.

9    Q.   And you want to treat this piece of evidence with a lot of

10   respect, right?

11   A.   Yes.

12   Q.   Because, eventually, it's going to become before a jury;

13   right, and they need to see it; right?

14   A.   Correct.

15   Q.   Now, you were aboard that vessel; right?

16   A.   Yes.

17   Q.   You said that the only item, the only document was the big

18   document that was found -- that was handed over by one of the

19   individuals on the boat?

20   A.   Correct.

21   Q.   What there any piece of paper that the individuals on the

22   boat were asked to write out?

23   A.   I don't remember.

24   Q.   If there was such a piece of paper, would it be important

25   to treat it with the same respect as the GPS?

1    A.   If that paper existed, it would probably be here.

2    Q.   I said wouldn't it be important to have treated that

3    document, the big thick document, with the same respect as the

4    GPS?

5    A.   Possibly.  However, I can't make that call because

6    everything that was in that document would get relayed back to

7    the cutter and they give them all that information that is in

8    that document, if an admiral determines that it's, you know,

9    not necessary, then that's what's relayed to the boarding

10   officer and he says it's not necessary.

11   Q.   Are you saying that an admiral would want to violate

12   somebody's rights or the rights to the jury to view the

13   evidence?

14            MS. VIAMONTES:   Objection, Your Honor.   Argumentative.

15            THE COURT:   Sustained.

16   A.   I'm not saying that at all.

17   Q.   Now you had no communications with an admiral; right?

18   A.   Negative.

19   Q.   Now, you are communicating back and forth with the main

20   ship and the other inflatable that was there; right?

21   A.   Correct.

22   Q.   And you do it by radio; right?

23   A.   Usually, or if the other vessel is near enough we can just

24   yell out.

25   Q.   And you also have the GoPro camera on; right?

1   A.   Correct.

2   Q.   And it had audio; right?

3   A.   Correct.

4   Q.   So a lot of communications got retained by the GoPro

5   camera?

6   A.   I can't say, I mean --

7   Q.   If it's there, it's there; right?

8   A.   If it's on there, it's on there.

9   Q.   Now, this photo here, Exhibit 18, and I'm going to move the

10  microphone over here, this gentleman over here (indicating),

11  Mr. Lucas-Franco, the guy in blue, right, you said it looked

12  like he had a clean shirt on to you.

13  A.   I never said that.  The only person I asked about their

14  clothes was the man in yellow.

15  Q.   You didn't smell any particular odor on Mr. Lucas-Franco,

16  did you?

17  A.   I never went up to him and smelled him either, but just

18  being onboard the Panga was a strong smell of gasoline.

19  Q.   But you never smelled him?

20  A.   Not personally, no.

21  Q.   You didn't write that on your report anyhow; right?

22  A.   Negative.

23  Q.   And you don't know when he changed his jersey, if he

24  changed it; right?

25  A.   I have no idea.

1    Q.   You don't know how he got on the boat either; correct?

2    A.   I don't.

3    Q.   When you boarded -- prior to boarding the Panga, you're the

4    gentleman with the M-16; right?

5    A.   Correct.

6    Q.   And then something is said over the intercom and the

7    individuals go like this, right, they put their hands in their

8    head?  That's visible in the GoPro film; correct?

9    A.   Correct, correct.

10   Q.   And they kept it there; right?

11   A.   (Nodding head affirmatively).

12   Q.   And you said there were a lot of gas tanks inside; right?

13   A.   Yes, sir.

14   Q.   Now, you were the gentleman that took this photo here?

15   A.   Yes, sir.

16   Q.   And you took the photos of the engines too; right?

17   A.   Right.

18   Q.   And you didn't take photos of the inside of the boat;

19   correct?

20   A.   Negative.

21   Q.   Let me show you Exhibit 9.  That's you sitting down; right?

22   A.   Yes, sir.

23   Q.   And that's Hadley?

24   A.   Correct.

25   Q.   And it's just you and him on the boat; right?

1    A.   Yes.

2    Q.   And you're sitting down talking; right?

3    A.   Correct.

4    Q.   You're not there taking pictures; correct?

5    A.   That's correct, not at that moment.

6    Q.   Not at that moment, you had plenty of time to take

7    pictures, right, you had plenty of time to preserve all the

8    evidence for the jury; correct?

9    A.   That's correct.

10   Q.   And put the document in a plastic bag for the jury; right?

11   A.   Correct, if we're instructed to do so.

12   Q.   You didn't do it; right?

13   A.   No, sir.

14   Q.   Hadley didn't do it either; right?

15   A.   Negative.

16   Q.   We talked about the ION swipe; right?

17   A.   Okay.

18   Q.   That was also put inside a plastic bag; right?

19   A.   Yes, sir.

20   Q.   And you had to be very careful how you did it; right?

21   A.   Yes.

22   Q.   And that's to preserve it; right?

23   A.   Absolutely.

24   Q.   Now, you also are aware that the reason you preserved

25   things, you want to keep it in the same condition as when you

1   received it, is because other things can be obtained from

2   pieces of evidence; correct?

3   A.   They could be, yes.

4   Q.   There could be fingerprints, right?

5   A.   Right.

6   Q.   That could prove somebody's innocence; right?

7   A.   They could.

8   Q.   Or it could approve somebody's guilty; right?

9   A.   They could.

10   Q.   It could be DNA; right?

11   A.   It could be, I'm not an expert.

12   Q.   It could be examined to see if there were any traces of any

13   drugs; right?

14   A.   Could be.

15   Q.   You could have done on ION swipe on this, too; right?

16   A.   Absolutely could have.

17   Q.   And you didn't do that either; right?

18   A.   Nope.

19        MR. ENCINOSA:  I have no further question now.  Thank

20   you.

21        THE COURT:  Yes.  Redirect?

22                        REDIRECT EXAMINATION

23   BY MS. VIAMONTES:

24   Q.   Officer Higgins --

25   A.   Yes, ma'am.

1    Q.   Let's talk a little bit about collection of evidence.

2    A.   Okay.

3    Q.   Were you're collecting evidence, are you looking for items

4    that can prove and disprove whether or not somebody committed a

5    crime?

6    A.   Both, we're looking for both things.

7    Q.   Okay.   Therefore, the GPS, can that help prove or disprove

8    whether or not --

9            MR. BERRIO:   Objection as to speculation, Your Honor.

10           THE COURT:   Overruled.

11           MS. VIAMONTES:   I haven't even finished my question.

12   BY MS. VIAMONTES:

13   Q.   -- whether or not the people you interacted with on October

14   18, 2016, on that Panga, had previously jettisoned drugs from

15   their boat?

16   A.   It could.

17   Q.   Could a 90-page document show whether they jettisoned drugs

18   off of their boat?

19           MS. PINERA-VAZQUEZ:   Objection.   The witness has

20   testified --

21           MR. CHAMBROT:   Objection.   Speculation.

22           MS. PINERA-VAZQUEZ:   Excuse me, the objection --

23           THE COURT:   Overruled.

24   BY MS. VIAMONTES:

25   Q.   Can a document prove or disprove whether or not these seven

1    men jettisoned packages or bales from their Panga?

2    A.   It could.

3    Q.   The document could show whether they threw it off?

4    A.   If they wrote it down, I don't know what was on that

5    document, so...

6    Q.   Now, your primary purpose in the Coast Guard is to save

7    lives?

8    A.   Correct.

9    Q.   Were you ever asked to go out looking for another boat that

10   may be sinking on October 18th, 2016?

11         MS. PINERA-VAZQUEZ:  Objection, calls for a hearsay

12   response.

13         THE COURT:  Overruled.

14   A.   No.

15   BY MS. VIAMONTES:

16   Q.   Did you have go out looking for another vessel --

17   A.   Negative.

18   Q.   -- on October 18, 2016, that may have been sinking?

19   A.   No, ma'am.

20   Q.   When you boarded the target of interest, how many people

21   were on it?

22   A.   Seven.

23   Q.   And how many people boarded?

24   A.   Three.

25   Q.   So there were 10 people on the target of interest?

1    A.    Correct.

2    Q.    And all the fuel that was on there?

3    A.    Yes.

4    Q.    Was there still space for additional cargo?

5    A.    Yes.

6    Q.    Let's talk about the motors.

7          In your 13 years in the Coast Guard, is it uncommon to see

8    two different size motors on the second vessel?

9    A.    Not at all.

10   Q.    You mentioned that the Panga, the target of interest, was a

11   hazard to navigation after the seven defendants were taken to

12   the cutter, it was a hazard to navigation, what does that mean?

13   A.    That means with the hazardous materials on board, so all

14   the fuel and plus with the Panga being painted white and blue

15   matching in with the water, another vessel could come through

16   and run into it and possibly be in danger, so we sink it so all

17   of that material is no longer a material to someone else.

18   Q.    So you could not just leave it out there, is that what

19   you're saying.

20   A.    That would not be in anyone's best interest.

21   Q.    Can you guys take it back with you to the cutter and just

22   tow it behind your OTH and just lift it onto the cutter?

23   A.    Negative.

24   Q.    Why not?

25   A.    There was only two cranes on the cutter and it's for each

```
 1   of our small boats and there's no other way to get any other
 2   Panga onboard the vessel itself.
 3   Q.   When you stated earlier that you're looking for evidence to
 4   indict, are you only looking for evidence that leads toward an
 5   indictment toward guilty?
 6   A.   No, it could be either way.
 7   Q.   Do you mean a charging decision?
 8   A.   Correct.
 9   Q.   As to whether or not to seek an indictment?
10   A.   Yes.
11   Q.   When Mel-I was deployed and you begin your pursuit, are the
12   lights on?
13   A.   The lights are on immediately.  The sirens and the loud
14   hailers don't come on until we approach the vessel.
15   Q.   When -- did you see the target of interest going fast?
16   A.   I didn't have a very good vantage point from where I was
17   sitting, I was only to see the vessel itself when we were
18   coming up alongside, maybe the last couple hundred of yards and
19   by that time they were already slowing, slowing down.
20   Q.   The OTH was going very fast; right?
21   A.   Oh, yes, ma'am.
22   Q.   Do you consume more fuel when you're going fast?
23   A.   Yes.
24   Q.   Gas is expensive?
25   A.   Yes.
```

1   Q.   Now, the gas on the target of interest, was it in jugs?

2   A.   Some of it was.

3   Q.   And some was spilled about?

4   A.   Correct.

5   Q.   Now, I'm placing on the Elmo Government's Exhibit 11 which

6   is in evidence, it's not too clear here on the Elmo, and if you

7   want I can hand it to you to see it up close.  Would you like

8   me to hand it to you?

9   A.   Yes, ma'am, please.

10          MS. VIAMONTES:   Permission to approach, Your Honor.

11          THE COURT:   All right.

12   BY MS. VIAMONTES:

13   Q.   Now that you have seen it up close, I will place it on the

14   Elmo for the jury to see it.  It's hard to see and the jury

15   will have an opportunity to see it later, the actual picture up

16   close.

17          Do you see two blue containers inside the target of

18   interest?

19   A.   Yes, ma'am, those were some of the fuel containers.

20   Q.   Do they have a white cap on them?

21   A.   Correct.

22   Q.   And are those some of the fuel containers that you

23   mentioned earlier?

24   A.   Yes, ma'am.

25   Q.   Were they all in similar shape and size?

1    A.   Yes.

2    Q.   Were they all the same color?

3    A.   They were all blue.

4    Q.   And the interior of the Panga, what color was it painted?

5    A.   Blue.

6    Q.   It was like a pale blue, like a light blue?

7    A.   Yeah, like water colored blue, ocean blue.

8    Q.   Similar to the color of the ocean?

9    A.   Yeah.

10   Q.   Is that typical for the Pangas to be colored like the color

11   of the ocean?

12   A.   Yes, ma'am.

13   Q.   Now, one of the defense attorneys was attempting to show

14   you a clear image, if you will, than what we're seeing over the

15   Elmo.

16       Regardless of the pictures, did you get to see these seven

17   defendants in person on October 18, 2016, with your own eyes?

18   A.   Yes, ma'am.

19   Q.   And did you spend a great deal of time with them on that

20   Panga?

21   A.   Yes.

22   Q.   How many hours?

23   A.   Approximately seven, seven or eight.

24   Q.   More than you would like; right?

25   A.   It was hot.

 1   Q.   Now, did you get to make observations of the way that they

 2   looked?

 3   A.   Yes, ma'am.

 4   Q.   Do you need to rely on the pictures to remember whether or

 5   not they had a lot of facial hair?

 6   A.   No, ma'am, it's much clearer in my mind than it is in that

 7   picture.

 8   Q.   The defense attorneys were asking you about the translator.

 9   You don't speak Spanish; right?

10   A.   Negative.

11   Q.   The Coast Guard certifies you for the jobs that you're

12   given to do; rights?

13   A.   Correct.

14   Q.   And does the Coast Guard certify translators for the job

15   they're going to do?

16   A.   They do.

17   Q.   Do you each rely on each other?

18   A.   Yes, we have to.

19   Q.   Do you rely on your translator?

20   A.   Yes.

21   Q.   Do you question your translator?

22   A.   No.  She knows her job.

23   Q.   Is it fair to say that we rely on translators in many

24   aspects of our lives; right?

25   A.   Yes.

1   Q.   In this line of work?

2   A.   Yes.

3   Q.   Now, you don't know exactly how far out you are off land;

4   right?

5   A.   No.

6   Q.   The cutter was stationed somewhere between Mexico and

7   Colombia in the Eastern Pacific?

8   A.   Yes.

9   Q.   Is the cutter in international waters?

10  A.   It is.

11  Q.   And this interdiction, was it in international waters?

12  A.   It was.

13  Q.   Defense counsel asked you about Government's Exhibit 9

14  where you're sitting on the rail of the target of interest.

15  How long were you out there on that Panga?

16  A.   I was out there, we got on board approximately 11:30 and we

17  didn't get off until 2130.

18  Q.   What's 2130 in civilian?

19  A.   9:30 p.m., so we got there at 11:30 in the morning and

20  didn't get off until 11:30 p.m.

21  Q.   It was dark by the time you got off?

22  A.   Yes, ma'am.

23  Q.   So the entire time, you're not taking pictures the entire

24  10 or 12 hours you're out there?

25  A.   Negative, there are a lot of times where we probably, in

1   this instance, are sitting there waiting for instructions.

2   Q.   In this instance, the defendants have already been

3   transported to the *Mellon*?

4   A.   Yes, ma'am.

5   Q.   And do you wait to be given instruction from your superiors

6   on the *Mellon* for each task that you're going to do?

7   A.   Absolutely.

8   Q.   And during those times, you can rest and take a seat in

9   between?

10  A.   Correct, and there are times that we can make a discretion,

11  for instance, if they say start your full law enforcement

12  boarding, we know we have a checklist we have to go through, we

13  don't have to go through the way they can tell us, we can say,

14  all right, this is going to be easy to start with, so we have

15  discretion, but a lot of times we are awaiting on specific

16  instruction before we can continue.

17  Q.   In your 13 years with the United States Coast Guard, have

18  you had occasion, have you had the opportunity to come in

19  contact with people out at sea that were stranded?

20  A.   Yes.

21  Q.   Have you had occasion to come in contact with people that

22  were lost at sea for a considerable amount of days?

23       MS. PINERA-VAZQUEZ:   Objection, Your Honor, irrelevant

24  to this case.

25       THE COURT:   Overruled.

1    A.   Yes, I was on a previous cutter that was stationed out of

2    Virginia, we rescued 118 migrants.

3    BY MS. VIAMONTES:

4    Q.   And can you make visual observations of those people that

5    are stranded out at sea that corroborate that they were

6    stranded out at sea?

7            MS. PINERA-VAZQUEZ:   Objection.

8            THE COURT:   Overruled.

9    A.   It's very obvious that people are malnourished and in need

10   of rescuing when they're -- you can tell.   It looks like the

11   commercials that you see where these people are starving to

12   death.   That's what it looks like, only in person.

13   BY MS. VIAMONTES:

14   Q.   Did any of these seven defendants look like they were

15   starving when you came in contact with them on October 18th?

16   A.   No, ma'am.

17   Q.   Did any of them look like they had been stranded out at sea

18   for two weeks?

19           MS. PINERA-VAZQUEZ:   Objection, calls for speculation.

20           THE COURT:   Overruled.

21   A.   Not my experience.

22   BY MS. VIAMONTES:

23   Q.   Now, defense counsel asked you whether you had the

24   opportunity to meet with Ms. Anton and I.   And you have; right?

25   A.   Correct.

1    Q.   Did we tell you what to say here in this federal court of

2    law?

3    A.   No, we went over the videos and we looked at it and I had

4    to initial that I saw the video and you told me it was just

5    what we had to do before we go in, I had to look at it before

6    we go in.  That's it.

7              MS. VIAMONTES:  No further questions, Your Honor.

8              THE COURT:  You may step down.  Let's go ahead and take

9    our morning recess.

10             MS. PINERA-VAZQUEZ:  Before we release the witness, may

11   we have a sidebar?

12             COURTROOM DEPUTY:  All rise.

13             (Jury exited the courtroom at 10:35 a.m.)

14             THE COURT:  What did you have?

15             MS. PINERA-VAZQUEZ:  Judge, I believe this is the

16   witness that took the 131 pictures and yesterday the Government

17   had hard copies of all those pictures, so I did not make hard

18   copies of the pictures and we would like to introduce all the

19   pictures into evidence, if the Government doesn't have an

20   objection, then we don't have to -- the witness can be excused.

21   Otherwise, we request that the witness stay so we can introduce

22   it through him, but we would like all the 118 pictures in

23   evidence.

24             THE COURT:  Any problem?

25             MS. VIAMONTES:  Your Honor, I have no objection on

1    cross-examination, whatever is admissible they can move it in.

2    However, all these pictures were provided to defense counsel in

3    discovery in this case, and I'm going to ask the Court at this

4    time to instruct the defense counsel to stop with the speaking

5    objections as to all these pictures, because they're giving the

6    impression to the jury that we're hiding the ball, that these

7    weren't given, these were all given to defense counsel in

8    discovery in this case, it's not our job to print out their

9    exhibits, they were given to them.

10        I don't think it is our job to provide hundreds of the

11   pictures or insinuate that we have to move in hundreds of

12   pictures.  We've picked the ones that we believe are probative.

13   If they feel that they have other exhibits that they want to

14   move in, I have no objection to them moving in, those exhibits

15   are in cross of this witness or other witnesses.

16        MS. PINERA-VAZQUEZ:  If I may respond, Your Honor,

17   actually, I'm not saying -- we were provided pictures, I agree

18   and we appreciate providing the evidence.  131 pictures are in

19   a disk.  Yesterday, the Government had hard copies.

20        So in order to save the Government money, because I am

21   CJA appointed lawyer, I did not want to go to Office Depot,

22   because I'm not in my office, to print out 131 pictures which I

23   asked before at sidebar before my question I asked, do you have

24   the pictures, the hard copies, they said no.

25        So my only request from the Court, Your Honor, is if

1    the Government is going to object to us introducing the

2    pictures, I mean, I can go print them tonight, but if they're

3    going to object to us not introducing them because the witness

4    is not here, we request that this witness --

5        THE COURT:  When you say "this witness," which witness?

6        MS. PINERA-VAZQUEZ:  I'm sorry, this witness,

7    Officer Higgins, that took the pictures because otherwise I

8    don't have anybody to introduce them through.

9        THE COURT:  But you don't have any problems with all

10   the pictures coming in.

11       MS. VIAMONTES:  I have no objection and they can move

12   in the digital copies if they want, the jury is going to have a

13   jury laptop back there where they can view them if they chose

14   to do it that way.

15       I just don't want to be responsible for marking

16   exhibits, later uploading exhibits, and if I've come prepared

17   with my pictures and later I want to use one of these pictures,

18   I don't think I need to give them to defense counsel, they

19   should be prepared to present their case.

20       MS. PINERA-VAZQUEZ:  I will go ahead and print them.

21       THE COURT:  You go ahead and print them out.  I

22   understand, she's raising a different issue here of being

23   responsible for uploading for appellate purposes and that's a

24   housekeeping task that's a pain in the neck, it has to be done,

25   and so --

1          MS. PINERA-VAZQUEZ:  I are hoping there won't be any

2     appellate issues in this case and there won't be an appeal, but

3     despite that, hopefully I will go and make copies, as long as

4     there is no objection, then I think they will be introduced.

5     Thank you so much, and I just wanted to make sure.

6          THE COURT:  You will stipulate to the admission of the

7     remaining photographs.

8          MS. VIAMONTES:  Yes, Your Honor.

9          MS. PINERA-VAZQUEZ:  Thank you, Judge, I appreciate it.

10         THE COURT:  Let's take a short break.

11         (Recess taken from 10:37 a.m. to 10:51 a.m.)

12         (Jury entered courtroom at 10:51 a.m.)

13         THE COURT:  Call your next witness.

14         MS. ANTON:  The Government calls Officer Tyler Hames.

15         THE COURT:  Please be seated, everyone.

16         COURTROOM DEPUTY:  Raise your right hand, please.  Do

17    you solemnly swear the testimony you're about to give is the

18    truth, the whole truth, and nothing but the truth, so help you

19    God?

20         THE WITNESS:  I do.

21         COURTROOM DEPUTY:  Thank you.  Please be seated.  And

22    would you state your full name and spell it for the record.

23         THE WITNESS:  All right.  My name is Tyler David Hames,

24    spelled T-Y-L-E-R, David, D-A-V-I-D, H-A-M, as in Michael, E-S.

25

1          (LIEUTENANT JUNIOR GRADE TYLER HAMES, being sworn,

2    testified as follows:)

3                          DIRECT EXAMINATION

4    BY MS. ANTON:

5    Q.   Good morning.

6    A.   Morning.

7    Q.   Would you please formally introduce yourself to the ladies

8    and gentlemen of our jury?

9    A.   Yes, my name is Lieutenant Junior Grade Tyler Hames.  I am

10   currently am a weapons officer onboard the Coast Guard Cutter

11   *Mellon*, the cutter being the boat that I'm on.  I have been

12   there now currently a year and two months, as of today.

13   Q.   And could you briefly describe for us some of your

14   background with the Coast Guard?

15   A.   My last unit was with the Coast Guard cutter *Alliance* out

16   of Portsmouth, New Hampshire.  It's another white hull boat,

17   meaning law enforcement, it's one of our smaller attachments,

18   210 feet.

19        I've currently been -- I was with that unit for two years

20   and had done District 1 fisheries, patrols, which is dealing

21   with maritime resources, and then District 7 dealing with

22   migrant operations.

23   Q.   Prior to that, can you explain some of your educational

24   background with the Coast Guard?

25   A.   Yes, I graduated high school in 2009 and went to New Mexico

1    Military Institute for a year, for ten months, graduated there

2    with almost an associate's in science.  I was there under the

3    Coast Guard.

4         From there I was picked up in 2010 to go to the Coast Guard

5    Academy, graduated in 2014, with a bachelor of science in

6    management focusing on accounting and finance.

7    Q.   And you said that you are now on the *Mellon*?

8    A.   I am now currently residing on the *Mellon*.

9    Q.   What are your job duties and job description of the *Mellon*

10   *now*?

11   A.   As the weapons officer, I'm one of the three department

12   heads onboard the ship, I run a department of 50-plus

13   personnel.  I'm in charge of what we say is main, train and

14   equip.  I find the person on the ship, I train them and I equip

15   them with the equipment they need in order to pick up the

16   mission.

17   Q.   Do you need any law enforcement training?

18   A.   I went through our boarding officer school in Charleston,

19   South Carolina known as FLETC.  It is an accredited, kind of

20   like a university type deal, so I spent six weeks there and

21   graduated with a certificate, and then passed two boards in

22   order to receiving my boarding officer qualification and

23   boarding team member qualification.

24   Q.   Let's talk specifically about last October, 2016,

25   specifically, October 18th.  Were you on the U.S.

1    Coast Guard Cutter *Mellon* at that time?

2    A.   I was.

3    Q.   And what was your position on the *Mellon* then?

4    A.   At that time I was still the weapons officer, and at the

5    time, I was the boarding officer for the second vessel.

6    Q.   Okay.  And where was the U.S. Coast Guard Cutter *Mellon*,

7    generally in what part of the world?

8    A.   At that time, we were just south of Mexico.

9    Q.   In the Eastern Pacific?

10   A.   In the Eastern Pacific.

11   Q.   And were you on routine patrol?

12   A.   We were on patrol down there, yes.

13   Q.   At some point on that day, October 18th of 2016, did you

14   all get word that you were to go and pursue a specific target

15   of interest?

16   A.   We were told there was a target of interest in the area,

17   they gave us the position and we headed towards that position.

18   Q.   Now you say "we."  Who are you referring to when you say

19   we?

20   A.   We is the Coast Guard Cutter *Mellon*.

21   Q.   Was the target of interest position close to the

22   Coast Guard Cutter *Mellon*?

23   A.   It was in our proximity area, our ship can last up to two

24   weeks so the endurance of that ship can range anywhere between

25   a hundred to 200 nautical miles or a stretch of where we are

1    supposed to cover at any one time.

2    Q.   So when the call was made to go out and pursue this

3    specific target of interest, did the Coast Guard Cutter *Mellon*

4    send out some faster boats?

5    A.   Once we got within a reasonable distance for our small

6    boats, we worry about crew fatigue, we launched them, I believe

7    it was roughly 30 nautical miles from their location.

8    Q.   Can you explain to us which one of those smaller boats that

9    you were on?

10   A.   What we have is we call contact and cover, the first vessel

11   which has the initial boarding team was the contact and that

12   was covered, so I am there for the security of them to make

13   sure that they have positive control and ensure that there

14   isn't any shifty movement happening, basically there for the

15   security of our boarding team, the safety for everybody on

16   board.

17   Q.   So are you on the *Mellon-II*?

18   A.   No.  So what we have is what we call *Mel-I* and *Mel-II*,

19   which are our small boats, a *Mark-III* and a *Mark-II*, because

20   they're Zodiac vessels, small boats made in Canada.

21        *Mel-I* was the contact, *Mel-II* was the cover.

22   Q.   So *Mel-I* is the contact, meaning that would contain the

23   boarding officers and the boarding crew?

24   A.   The officer boarding team crew that were on scene first and

25   went onboard the Panga.

1   Q.   So who was with you on the other *Mel-II* boat?

2   A.   So I had myself as the pursuit mission commander; I had my

3   coxswain, pursuit coxswain, who was BM-II Nash; I had my

4   pursuit boarding team member, which was GN-II Lucia; and then I

5   believe I had -- we had a "TACLET" detachment with us.  They

6   are maritime enforcement specialists.  They are a specific

7   detachment that go along with Navy vessels and Coast Guard

8   vessels.  I believe it was ME3, McDonald, who was with me on

9   that one.

10  Q.   As a pursuit mission captain --

11  A.   Commander.

12  Q.   -- as a pursuit mission commander, what are your

13  responsibilities on that vessel?

14  A.   So it's my responsibilities to ensure the safety and

15  security of the boarding team that is on board.  I make the

16  call as to whether or not we go on board, if it's safe to

17  pursue, if we're shot at, if it's safe to proceed, or if we

18  continue.

19      So we don't get on board unless I say we get on board.

20  Q.   And you all don't know what to expect from your encounter

21  at the time you're dispatched?

22  A.   Not at all.

23  Q.   So, can you explain to the ladies and gentlemen of the jury

24  what kind of gear and artillery you all have aboard *Mel-II*?

25  A.   So as a pursuit mission commander all I have is a handgun.

1    My pursuit crew member, they will have a Remington shotgun, an

2    M-16 rifle and a handgun.  And those are used to disable the

3    target of interest.

4        So the shotgun and the M-16 are not used for personal

5    protection, but to disable their vessel.

6    Q.   And does the *Mel-II* have markings that indicate it's

7    Coast Guard on it?

8    A.   Correct.  On the -- what we have is the sponson, which goes

9    around the exterior part of the vessel, it says

10   "U.S. Coast Guard," also has identification number for the hull

11   number, and we also fly the Coast Guard ensign and American

12   flag.

13   Q.   And are you all specifically wearing gear that has markings

14   of the U.S. Coast Guard?

15   A.   Yes, our body armor has U.S. Coast Guard.

16   Q.   When you are leaving the Coast Guard Cutter *Mellon,* are you

17   on the opposite side of the cutter than the other *Mel-I*?

18   A.   Correct.

19   Q.   And did you all have trouble getting off the cutter?

20   A.   No, not at all.

21   Q.   So once the boat gets in the water, are both you and the

22   *Mel-I* approaching at the same time?

23   A.   We had some complications with our vessel, with our *Mel-II,*

24   it's an older, small boat, we were able to fix it so by the

25   time we got on the scene with the Panga, they had already taken

1    control we were just there standing as security.

2    Q.   So *Mel-I* arrived at the target of interest before you did?

3    A.   Correct.

4    Q.   Can you tell us, when you arrived, what was it you saw

5    happening?

6    A.   The boarding team had waited until we arrived so that they

7    had cover, they had went on board and took positive control and

8    from there we were basically waiting for word from the

9    Coast Guard *Mellon*, more orders of what they would like for my

10   vessel to do as the cover.

11   Q.   And as the cover, when you arrived and saw that the

12   situation was under control, did the *Mellon* ultimately dispatch

13   you to what we're calling the jettison field?

14   A.   That is correct.

15   Q.   And that is the debris field?

16   A.   That is correct.

17   Q.   And were you given specific coordinates of where to go and

18   look for that?

19   A.   We were given a last-known position and it was updated from

20   the air-laps -- that's the plane that we had overhead -- it was

21   telling us where it was tracking.

22   Q.   Can you tell us from the point you were at the Panga with

23   the other *Mel-I* boat, how far did you have to go to get to the

24   jettison boat?

25   A.   Over 30 miles.

1    Q.   And did you all travel pretty quickly?

2    A.   We traveled at best speed.

3    Q.   And what is the best speed on that boat?

4    A.   That boat would range between 32 and 40 knots.

5    Q.   And is that boat equipped with a camera like the *Mel-I* has

6    a GoPro on it?

7    A.   Yes, it did have a GoPro.

8    Q.   Was that GoPro recording that day?

9    A.   No, we had an issue with the battery on it.

10   Q.   Would you have recorded a trip to the jettison field to

11   recover contraband even if it was working?

12   A.   Yes.  We do that.

13   Q.   So tell us --

14   A.   We do that for all -- any time we know that we're going to

15   be in a high speed pursuant, the camera's on.

16   Q.   Tell us what happened when you got the 30 miles to the

17   jettison field?

18   A.   Once we arrived on the scene, we had our airline asset

19   overhead, they started guiding us in, first started finding

20   smaller debris, picking it up, putting it on board, and as soon

21   as we got to the entire field, which was quite extensive, we

22   immediately stopped, radioed to the air-laps that we were on

23   scene, they radioed back to our *Mellon* and we started bringing

24   the stuff onboard the ship.

25   Q.   Oak.  And how big would you proximate that debris field

1   was, how large?

2   A.   It was pretty -- it was scattered because it was all

3   connected by a line, so it would be skewed to say how large it

4   was just because of we're eye level pretty much with the debris

5   field.

6   Q.   You mentioned it was all connected with a line?

7   A.   It was all connected by one line.

8   Q.   Could you explain to the ladies and gentlemen of our jury,

9   what did it consist of?  What did it actually look like?

10  A.   It looked like different colored, like potato sacks,

11  something you would find like if you went to Lowe's, it also

12  had the same colored string, the string was red and white.

13       When we got there we ended finding in the center of the

14  debris field a GPS tracker type deal and then a stick that had

15  another thing that was labeled, we later found it was a spot

16  tracker.

17  Q.   So how do you go about getting that debris, the cargo from

18  the ocean onto Mellon II?

19  A.   We're manually picking it up.

20  Q.   So manually picking it up, you guys are leaning over?

21  A.   Leaning over, picking it up and bring on board.

22  Q.   Was it heavy?

23  A.   Very.

24  Q.   How many were on your boat doing it?

25  A.   We had two of us really that could do it safely.

1    Q.    And how long did it take you to collect it?

2    A.    A little over an hour, maybe an hour-and-a-half.

3    Q.    Do you remember how many bales or packages you pulled out

4    of the water?

5    A.    Honestly, I would have to take a look to see how many --

6    this is one of eight cases that we had conducted.

7    Q.    You mentioned this is one of eight cases.  Is this the

8    first of those eight cases that you did?

9    A.    This is the first of eight cases.

10   Q.    So at this time, October of 2016 --

11   A.    This is the first and only case that we had.

12   Q.    -- so there are no other detainees or --

13   A.    Nothing else was onboard the ship.

14   Q.    -- cargo aboard the ship.  Okay.

15        Now you mentioned that you saw something in the debris

16   field, there were potato sack-like packages with a rope and

17   then you indicated some other GPS type buoy, is that what you

18   said?

19   A.    Correct.

20   Q.    Can you explain to us what that was or what you thought it

21   was?

22   A.    Basically, it looks like a dome that's floating, the top

23   half is a clear shield that has a solar panel so it doesn't

24   have to rely solely on battery so it won't die out there.

25        From some of our techs when we brought it on board *Mellon*

 1   said it was usually used for fishing.

 2           MR. BERRIO:  Objection as to hearsay.

 3           THE COURT:  Sustained.

 4   BY MS. ANTON:

 5   Q.  Do you have any prior experience dealing with this type of

 6   buoy?

 7   A.  I do not, no.

 8   Q.  Did you all pull it out of the water?

 9   A.  We did.

10   Q.  Was it heavy?

11   A.  It was heavy for the time after pulling out all the bales.

12   Q.  And did you keep it on your boat and then take it back to

13   the Coast Guard Cutter *Mellon*?

14   A.  We did.

15   Q.  And did you do the same thing with all the packages that

16   you pulled out of the water?

17   A.  We did.

18   Q.  You kept it on your boat and brought it back to the *Mellon*?

19   A.  Correct.

20           MS. ANTON:  Permission to approach, Your Honor.

21           THE COURT:  All right.

22   BY MS. ANTON:

23   Q.  I'm going to show you what has been previously marked as

24   Government's Exhibit 33, it's a large box that is right by the

25   witness stand.

1          MS. ANTON:  Since it is heavy, Your Honor, I would ask

2    would the witness be able to step town and look inside the box

3    and see if he can identify it?

4          THE COURT:  Okay.

5    BY MS. ANTON:

6    Q.   Would you kindly step down and see if you can recognize and

7    identify Government's Exhibit Number 33?

8    A.   Yes, that is it.

9    Q.   And is Government's 33 the buoy that you referred to taking

10   it out of the water?

11   A.   Yes, that is correct.

12   Q.   How do you know that?  How do you know it's the same buoy?

13   A.   Because of the signature that's on there, I'm the one who

14   supervised from the time it was brought onboard the ship until

15   the time it was put in its own holding cell on the ship.

16         MS. ANTON:  At this time, the Government would move

17   Government's Exhibit 33 in evidence and request permission to

18   publish.

19         THE COURT:  All right.  Admitted.

20         (Government's Exhibit 33 admitted into evidence.)

21         MS. ANTON:  I am going to ask for permission to publish

22   with the assistance of the witness.  Is that all right, Your

23   Honor?

24         THE COURT:  All right.

25   BY MS. ANTON:

1    Q.   If you don't mind, would you step down again and if you're

2    able to, remove Government's Exhibit 33 from that box.

3         Are you able to?  Put it on the floor in front?

4         THE COURT:  Bring it closer to the jury and hold it up

5    and --

6    BY MS. ANTON:

7    Q.   Thank you.  As you're putting it back in the box, I noticed

8    that when you took it out it was wrapped in what appears to be

9    aluminum foil.

10   A.   Correct.

11   Q.   Thank you again, it's rather heavy.

12        Would you explain to the ladies and gentlemen of the jury

13   why there is aluminum foil in that box?

14   A.   Yes, we wrap it with aluminum foil so it cannot send or

15   receive a signal inside the skin of the ship.  We had received

16   prior information from other units --

17        MR. RODRIGUEZ:  Objection, hearsay.

18        THE COURT:  Not being offered for the truth of the

19   matter, overruled.

20   BY MS. ANTON:

21   Q.   You can proceed.

22   A.   So other units had told us that if we did not have this

23   thing wrapped in aluminum foil and we had it inside the skin of

24   the ship, that it would send out a signal and we could be

25   traced by whoever put it out there.

1          MS. ANTON:  Permission to approach, Your Honor.

2          THE COURT:  All right.

3   BY MS. ANTON:

4   Q.  I'm going to show you what is marked as Government's 12

5   through 17, I'm going to set them in front of you and I want

6   you to look at them and tell me if you recognize them.

7   A.  Yes.

8   Q.  Are those photographs of the bales that you were just

9   talking about, the *Mellon* boat and the GPS buoy and spot tracer

10  that were taken on October 18th, 2016?

11  A.  Yes, ma'am.

12  Q.  Do those pictures fairly and accurately depict how those

13  items looked back then?

14  A.  Yes, ma'am.

15         MS. ANTON:  At this time, Government moves Exhibits 12

16  through 17 into evidence.

17         MS. PINERA-VAZQUEZ:  No objection.

18         THE COURT:  All right.  Admitted.

19         MS. ANTON:  Permission to publish?

20         THE COURT:  All right.

21         (Government's Exhibits 12 - 17 admitted into evidence.)

22  BY MS. ANTON:

23  Q.  I've put Government's 12 up on the Elmo.  Can you tell the

24  ladies and gentlemen of the jury -- can you tell the members of

25  our jury what that's a picture of?

1    A.   Yes, that is a picture of the small boat that I was in

2    charge of.  Those are the bales that we picked out of the

3    water.  And the crew that I had on board.

4    Q.   So your boat looks pretty full?

5    A.   The boat is definitely full.

6    Q.   And was the boat heavy?

7    A.   Oh, yeah, we had to take it slow going back.

8    Q.   And how many members of the Coast Guard did you say were on

9    that boat?

10   A.   We had five members that were on there.

11   Q.   And were you able to collect that whole jettison field and

12   put it on that one boat?

13   A.   We were able to, yes.

14   Q.   How do you all get back onto the *Mellon*?

15   A.   What we have is what we call a Welin Lambie davit, we have

16   a single point and a dual point.  The dual point is the Welin

17   Lambie.  It attaches right back on the aft end of the ship

18   where you have one member sitting back there, we have a little

19   clip, we have a aft clip that connects to that back clip and we

20   have a forward clip that you can see where we have a gentleman

21   right there in the front, where you kind of see a line hanging

22   just over the bow.

23        That forward clip will pick it up and raise it so nothing

24   either gets teetered, falls off, anything like that, it's our

25   most secure davit that we have, also our most utilized as well.

1   Q.   It's able to lift the boat up with all of you and all the

2   equipment on it?

3   A.   Correct.

4   Q.   Government 13 that's in evidence, is that a picture of the

5   GPS buoy that you just told the jury that you also pulled out

6   of the water?

7   A.   That is correct.

8   Q.   And do you photograph this one it's back on the *Mellon*?

9   A.   Yes, ma'am.

10  Q.   I'm going to show you now Government's Exhibit 14.  Can you

11  explain to us what Government's Exhibit 14 is a picture of.

12  A.   That would be the stick that had the little spot tracker

13  that we had on it, that we saw, we didn't know what it was

14  until after we took the electrical duct tape off, we found it

15  in the debris field just on the exterior side.

16  Q.   So this stick with that contraption at the end in

17  Government's 14 was found in the debris field?

18  A.   That is correct.

19  Q.   Was it tied to one of the bales?  Can you explain how it

20  was in the debris field?

21  A.   Like I said it was on -- we approached it, it was just on

22  the outer side of where the center of the debris field was, it

23  was attached to that same line which was attached to all the

24  bales.  They were sticking just outside of the water.

25  Q.   So everything was attached together so nothing could really

1   float away from each other?

2   A.   That is correct.

3   Q.   I'm going to show you Government's 15, which is a close-up

4   of the end of that stick.   Is that the duct tape contraption

5   you referred to as the spot trace?

6   A.   That is correct.

7   Q.   Can you tell the ladies and gentlemen what a spot trace is?

8   A.   Yes.   Basically, what it is, it's -- it basically sends out

9   a constant signal so that anyone can trace it.   It has a number

10  that you can even checkout your cell phone that say where its

11  position is at any given time.

12  Q.   So is it fair to say it's like a tracker?

13  A.   Basically, it's a tracker.

14  Q.   And did you unwrap the duct-tape from that tracker?

15  A.   I did not unwrap the duct-tape but it was shown to me, I

16  was supervising while it was unwrapped.

17  Q.   So you were supervising the process of collecting and

18  gathering this evidence?

19  A.   Correct.

20  Q.   So it was unwrapped by a member of your team?

21  A.   That is correct.

22  Q.   And was it photographed after it was unwrapped?

23  A.   It was photographed after it was unwrapped.

24  Q.   I'm showing you Government's Exhibit 16.   Is that a

25  photograph of the GPS spot trace tracker after it was

1    unwrapped?

2    A.   That is correct.

3    Q.   And is this an electronic device that has a serial number

4    and that you could -- do you know that you could register it

5    online, is that what this is?

6    A.   That much I didn't get into.  We had a specialist on board

7    that took it apart and he was the one that really introduced us

8    into it, so I can't speak to that.

9    Q.   All right.  The bales, after you pulled them up to the

10   Coast Guard Cutter *Mellon,* what was the procedure and practice

11   that you all did in order to do the integrity?

12   A.   We kept minimal hands that would be able to touch any bit

13   of evidence or contraband.  Once it was loaded on -- once we

14   had *Mel-II* hooked up and brought alongside the ship and brought

15   up, it was handled by a small group of members that were

16   supervised, brought directly to the fantail, the stern of the

17   ship where it was counted, taken pictures of and we had

18   numerous of our specialists there, they were there to do rep

19   samples and to take a look at GPS trackers and what not.

20        MS. ANTON:  Permission to approach with Government's

21   Exhibit 32.

22        THE COURT:  All right.

23        MS. PINERA-VAZQUEZ:  What is it?

24        MS. ANTON:  The spot tracker.

25   BY MS. ANTON:

1    Q.   So if you could look at Government's Exhibit 32 that's been

2    marked for identification and tell us what it is and how you

3    recognize it.

4    A.   That would be the spot trace.

5    Q.   And do you recognize it because of markings on a property

6    receipt that are contained in the packaging?

7    A.   That would be correct.

8    Q.   And is that the spot trace that, in fact, you found

9    floating in the water on the bales on that day?

10   A.   That is correct.

11        MS. ANTON:   At this point, the Government moves 32 into

12   evidence.

13        THE COURT:   Be admitted.

14        (Government's Exhibit 32 admitted into evidence.)

15        MS. ANTON:   Permission to publish, Your Honor.

16        THE COURT:   All right.

17   BY MS. ANTON:

18   Q.   Now as I take Government's 32 out of the evidence bag, it's

19   also wrapped in aluminum foil?

20   A.   That is correct.

21   Q.   Could you tell the ladies and gentlemen of the jury why it

22   also is wrapped in aluminum foil?

23   A.   Because it sends and transmits a signal, again, for the

24   safety of *Mellon* and her crew not being possibly tracked, it's

25   wrapped in aluminum foil.  We heard from other units who have

1    experts on board that said this is the best practice to ensure

2    that the safety of the ship and not being counter-tracked.

3    Q.   And is this something that you do as part of your standard

4    practice?

5    A.   That would be correct.

6    Q.   So I put the spot trace on the Elmo, kind of hard to see

7    it, it looks like the picture but is this how it looked on the

8    day that you guys -- that you took it out of the water?

9    A.   That is correct.

10   Q.   Did you have to take a battery or something out of the spot

11   trace?

12   A.   Yes, I did not supervise them pulling anything off.  I did

13   supervise them take it apart, but as far as everything else I

14   was looking at the contraband and making sure that everything

15   wasn't taken away from the area.  Again, my role as the weapons

16   officer is to ensure that the process is smooth and that

17   nothing is lost and everything is accounted for.

18   Q.   When we are talking about everything being accounted for,

19   I'm going to show you Government's Exhibit 17, which already is

20   in evidence.

21        Is Government's Exhibit 17 a photograph that was taken of

22   the bales, which were the jettison field, that were recovered

23   on October 18th, from that Panga?

24   A.   That is correct.

25   Q.   All right.  And so, if you could explain to us, just the

1    dimensions it's kind of hard to see in the photo, it looks like

2    there are numerous different suitcase size packages in

3    different material, is that an accurate statement?

4    A.   Yes, ma'am.

5    Q.   How tall are each of these piles, approximately?

6    A.   You see that box back there, when I stand up to that box

7    the box comes just a little bit above my head, basically the

8    box that says "warning."  So if I stand next to that --

9    Q.   I'm sorry, the box that says what?

10   A.   That says "warning," right there, that's our affidavit gun

11   mount, when I stand to that gun mount, I have about six inches

12   there when you reach to the top.

13   Q.   How tall are you?

14   A.   I'm about five feet-five inches.

15   Q.   Sorry about that, I didn't mean to pry at all.

16   A.   No worries.

17   Q.   So these bales are a good couple of feet off the ground?

18   A.   Yes, ma'am.

19   Q.   And is this the deck of the Coast Guard Cutter *Mellon*?

20   A.   That is correct.

21   Q.   All right.  And why do you all photograph it once you pull

22   it back up onto the *Mellon*?

23   A.   Well, we photograph it first and we bring it on board so it

24   shows what it is that we did collect before any rep samples are

25   taken, before anything is taken apart, just so it shows the

1    process about when it was brought on board to the time we hand

2    it off.

3    Q.   And is this everything that you found in that jettison

4    field?

5    A.   That is correct.

6    Q.   So you didn't find any tarp in the jettison field?

7    A.   No, I did not find a tarp.

8    Q.   Did you see any tarp as you were transiting to the jettison

9    field?

10   A.   No, ma'am.

11   Q.   Once these items are put onto the Coast Guard Cutter

12   *Mellon*, is there a standard practice and procedure that the

13   crew members go through to determine, at least presumptively,

14   what this is?

15   A.   Yes, for the sake of the majority of the crew, which is

16   known as contraband, we train specific members onboard the ship

17   to handle the contraband.  They're loaded down with latex

18   gloves, full length sleeves, pants, masks, so that whatever it

19   is, it doesn't get into their system, and we keep the amount of

20   hands that handle this contraband to a minimum, despite the

21   amount that we'll bring on.

22        It's always brought to the fantail aft part of the ship,

23   and it was accounted for, the rep sample is done there, which

24   is done by our specialist who has done this for many years, and

25   from there this specific set was brought, actually right where

1    the camera -- where this angle was shot, we have what we have,

2    what we call is our sea-with-magazine, which is a locked space

3    at all times, you have to sign in and sign out, add a time

4    stamp whenever anyone goes into the space, and walk directly

5    into there.

6    Q.   I want to go back to something you said.

7         You said a "rep sample"?

8    A.   Yes.

9    Q.   Can you explain to us what a rep sample is?

10   A.   A rep sample is -- basically, we take a small bevel and

11   open up one of the packages, and one of the keys, and they will

12   take a small bit of whatever the element is and put into what

13   we call a NIK test, and this NIK test is approved -- from

14   FLETC, approved, and we have been trained how to use it.  It

15   basically has a chemical that will break down whatever element

16   we put into it and it will tell us what it's comprised of.

17   Q.   Is this important for you all to know since you have now

18   brought it aboard your cutter which is your living space, for

19   all intents and purposes?

20   A.   Yes, ma'am.

21   Q.   So was that done in this case and a determination made

22   presumptively to see what you were dealing with?

23   A.   Yes, ma'am.

24   Q.   And what was it, presumptively?

25   A.   Cocaine.

1    Q.   Now, did the Coast Guard go and open up every single one of

2    those sacks and inspect what was in each and every item?

3    A.   No, ma'am.

4    Q.   Did you just inventory it?

5    A.   That's correct, ma'am.

6    Q.   And once you presumptively determine that it's cocaine, is

7    there a process that you have to go through with the Drug

8    Enforcement Association to get a number or to document it in

9    some way?

10   A.   Yes, ma'am.  Once we received that it's positive,

11   presumptively positive, we relay that to our commanding officer

12   and from there and it gets sent off to whoever is in charge of

13   our unit at the time, who's District 11.  From there it goes

14   through another channel and they come back with what we call an

15   FDIN number, and that number is dedicated to just this case.

16   Q.   So it's assigned its own special number and  kept in its

17   own special locked quarters aboard the cutter?

18   A.   That is correct.

19   Q.   Now, since we're talking about numbers, and assignments,

20   can you tell us how are the detainees who were taken off the

21   boat, the defendants, how were they processed into the *Mellon*?

22   A.   The process, again, this was our first one so it was the

23   first time the crew had done it.  As soon as they come on board

24   we bring them up to -- we have two levels so we have the main

25   deck which is where the fantail is and we have what we call the

1  boat deck, and that is where the helo launches, the helicopter,

2  excuse me.

3       So when I go to the boat deck right where the Welin Lambie

4  davit is, we exit them, we take them off the ship or the small

5  boat, bring them alongside the hanger, we have our qualified

6  boarding officers also onboard the ship, and the boarding team

7  members that are there, they conduct a search incident to

8  arrest, which we call an SIA, which basically ensures that they

9  don't have any contraband, weapons or means of escape,

10  basically for the crew members because we don't know anything

11  about these individuals.

12       From there once our boarding team members and boarding

13  officers, who are also qualified through our program and

14  through FLETC, the school in Charleston, South Carolina, they

15  then go through our medical screening through our corpsmen on

16  board, which is basically our doctor.

17       From there they get a medical history, it's filled out on a

18  form that's been approved by the Coast Guard.  Once they go

19  through that form, we bring them inside the skin of the ship

20  once we deem that there's no health risk, they're not, they

21  don't pose a threat to the ship or the crew.

22       We then go through, ask them their name, date of birth,

23  where they're from, we have them write that on a sheet of

24  paper, we have them take a picture with that sheet of paper in

25  front of them, it's a front and side profile, so it shows what

1    they were wearing at the time when we brought them on the ship

2    and that's also for accountability purposes for us as well to

3    show that none of their personal effects were lost.

4        Once we have given them that, we basically give them to

5    another station that has them strip down, put them into Tyvek

6    suits, and we then take accountability of all of their personal

7    effects that they had on them, tags, jewelry, money, cell

8    phones, stuff like that, even the clothing that they were

9    wearing.

10   Q.  So you mentioned when they go through this process there's

11   some sort of medical evaluation?

12   A.  Yes, ma'am.

13   Q.  And was that done in this case?

14   A.  Yes, ma'am.

15   Q.  And are there records kept about the evaluation with the

16   doctor?

17   A.  Yes, ma'am.

18   Q.  Is that your standard protocol?

19   A.  That is standard protocol.

20   Q.  Is that done for purposes of diagnosing what ailments these

21   detainees may have at the time?

22        MS. PINERA-VAZQUEZ:  Objection, speculation.

23        THE COURT:  Overruled.

24   BY MS. ANTON:

25   Q.  So the medical records are part of your records; right?

1   A.   That is correct.

2   Q.   And in this case, you're familiar with all the records in

3   this case, correct?

4   A.   That is correct.

5   Q.   And you assisted in processing these detainees through what

6   you have just described?

7   A.   That is correct.

8   Q.   And each of them were taken to see your nurse -- nurse or

9   doctor?

10  A.   Doctor, we call them corpsmen, but they're basically our

11  version of a nurse, doctor, they pretty much can do everything

12  on the ship.

13  Q.   Did the doctor or nurse conduct an interview with them to

14  determine how long they had been at sea?

15  A.   That is correct.

16  Q.   And do you know how long each of them told the nurse or the

17  doctor that they had been at sea?

18  A.   Three days.

19  Q.   And is that documented on the medical records of each of

20  these defendants?

21  A.   That is correct.

22  Q.   That are contained in the Coast Guard Cutter *Mellon's* file?

23  A.   Yes, ma'am.

24  Q.   And after the detainees go through the medical process and

25  their belongings are processed, are they at some point given

1    some type of identification to wear while they're aboard your

2    vessel so you will know who they are?

3    A.   Yes, ma'am.

4    Q.   Can you explain to us?

5    A.   So we have three different forms of identification that we

6    will put onto their Tyvek suit and what we have is wristbands,

7    different color wristbands.  Each case has a specific color.

8    From there what we put is the FDIN number, if we have it in

9    time, and what we call a missile number.  Basically, any type

10   of law enforcement activity the Coast Guard does, we put into a

11   program called Missile.  It's basically our way of being able

12   to track/show what the Coast Guard does.  So we put the missile

13   number, which is a local record for the Coast Guard, and then

14   the FDIN number, if it's there in time.  Obviously, if we get a

15   little bit later after the processing, we put the FDIN number

16   with them on their Tyvek suit and on their wristband.

17   Q.   So the FDIN number that you're talking about, is that the

18   same number that was assigned to these bales of cocaine?

19   A.   Yes, ma'am.

20   Q.   So while they're on the Coast Guard cutter, they're linked

21   by number to the bales that were interdicted?

22   A.   Yes, ma'am.

23   Q.   Okay.  You've explained that they were given some kind of

24   Tyvek suits to wear.  Can you explain to us what exactly is

25   that?

1   A.   Basically -- are you familiar with like a regular old paint

2   suit type thing, it's a onesie, like a coverall type deal, it

3   has a hood to protect them from the sun, it covers basically

4   from -- it's way too big for you, so they're not that exposed

5   for the sun.  We put them on the ship inside the hanger so

6   they're not sitting out in the sun.

7   Q.   So that's my next question, once they have gone through

8   this intake process and the defendants are assigned that number

9   that you were mentioning and given their Tyvek suits, where is

10  it on the Coast Guard cutter that you're able to house these

11  detainees?

12  A.   Right in the helicopter, the hanger that we have on the aft

13  part of the ship.

14         MS. PINERA-VAZQUEZ:  Your Honor --

15         MR. do CAMPO:  We are having problems with the

16  interpreter, some of the equipment.

17         THE INTERPRETER:  Problems with the interpreter.

18         THE COURT:  Please continue.

19         MS. ANTON:  Thank you.

20  BY MS. ANTON:

21  Q.   Can you describe like how large that area is?

22  A.   I don't know if you're familiar with our Dauphins?

23  Basically, it's an Aero France helicopter, not as large as the

24  Blackhawks.  I don't know if you guys are familiar with those.

25  It can that size of a helicopter inside with the blades folded.

1      So it's a pretty wide area that you can fit a significant

2   amount of things in there.

3   Q.   And how is it that they are secured in that area?

4   A.   So we have leg shackles, we do do a comfort test when we

5   put the shackles on there so they're able to move freely and

6   does not rub up against the skin.  Obviously, if they're moving

7   the shackles are going to touch the skin, but it's there so

8   that it's not rubbing and grinding or creating basically like a

9   crease on the skin, so it's there as comfortably as shackles

10  can be.

11  Q.   So they're not handcuffed?

12  A.   They're not handcuffed.

13  Q.   And are shackled in both legs?

14  A.   They're shackled on one leg and we give them our yoga mats

15  so they're not laying down on what we have is nonskid,

16  basically, as you can see on this picture, it's a rough, rigid

17  material that prevents you when the sea state gets a little bit

18  rougher that you'll see in the Eastern Pacific where it's nice,

19  so that you're not sliding when you're walking on the decks.

20  Q.   So they're provided with some type of bed to sleep on?

21  A.   That is correct.

22  Q.   There's no cells or a jail type brig facility that you keep

23  them in on the Coast Guard Cutter *Mellon*?

24  A.   No, ma'am.

25  Q.   They are all kept together in this large area?

1   A.   That is correct.

2   Q.   Are they all shackled with their leg shackled together?

3   A.   Basically, what we have is we have little cufflinks that

4   are used that when the helicopter is inside the hanger, it

5   basically supports the helicopter from tipping over when we

6   take rough seas so we will take a chain and take it from one

7   cufflink from the beginning of the hanger all the way to the

8   aft end of the hanger toward the stern.  From there, we'll take

9   each individual shackle, each member has their own shackle and

10  we will put it up against this -- or connect it to the

11  strain -- or the chain that we have connected from one cufflink

12  to the next, so they have freedom of mobility, just not

13  anywhere they like to go.

14  Q.   So they're not restrained to one position?

15  A.   That's correct.

16  Q.   And can you tell us a little bit about how they're treated

17  on the *Mellon* in terms of medical care, food, bathing, and just

18  a general overview of what they have on the ship?

19  A.   Yes.

20       MR. ABRAMS:  Relevance, Judge.

21       THE COURT:  Overruled.

22       THE WITNESS:  So when we have them on the ship, we give

23  them two square meals a day, meals consist of rice and beans,

24  we follow a Coast Guard approved instruction, some of the

25  spices and stuff that we use in our food may aggravate them so

1    in order to ensure that they are receiving the proper nutrients

2    we give them rice and beans and water, twice a day, the water,

3    we have a water jug there for them at any point in time they

4    would like water, and we shower them when they request.

5         Any time they would like to see the corpsman, they can

6    request any time for medical and the corpsman responds quickly.

7    Q.   Is there someone who is assigned or a group of people who

8    are assigned some type of detainee watch where their actions

9    are monitored?

10   A.   That is correct.

11   Q.   Was that done in the case?

12   A.   Yes.

13   Q.   Is, in fact, a logbook prepared of what's going on with the

14   detainees while they're on the boat?

15   A.   Yes, ma'am.  From the time they're brought onboard the ship

16   until the time that we take them off the ship, every --

17   basically every event that they do is logged in this book, any

18   time someone goes to see the corpsman, every time they are fed,

19   anything we take the group and they go and use the facilities,

20   it's logged.

21   Q.   Now you mentioned until the time you take them off of the

22   ship, so let's talk about that.  You all are in the middle of

23   the Eastern Pacific at this point in time?

24   A.   Yes, ma'am.

25   Q.   So is there standard policy that once you do an

1    interdiction, you immediately go to the closest port?  How does

2    that work?

3    A.   Basically, the process that we follow is we hold them

4    onboard the ship until we receive word from, I'm going to say,

5    District 11 in our case.  Once we find out that there's an

6    agency that is going to take the case, whether that's the home

7    country themselves or the United States, once we get word of

8    that, they will give us what we call a disposition message.

9    That message will tell us which port of the call that we will

10   be stopping in to hand the individuals off to, or to another

11   unit that's heading home to the United States, and they'll stop

12   at the next port of call and drop them off with this specific

13   agency that's going to be taking the case.

14        The Cutter *Mellon* does not have any say when it comes to

15   when and how, it's all determined outside the ship *Mellon*.

16   Q.   So can you tell us when and how long it ultimately took for

17   these defendants to get into the port of call and how that

18   happened?

19   A.   As far as -- when we were to dispo this case, it was not

20   very long before they were off *Mellon*.  I would have to look,

21   again, to see the exact dates but it was not very long that

22   they were off our ship and onto the *Vigilance*.

23   Q.   You said off your ship and onto *Vigilance*.  Is it another

24   Coast Guard cutter?

25   A.   Yes, it is.

1   Q.   Is it similar to the *Mellon*?

2   A.   They're a 210-foot vessel.  We're 378 feet.

3   Q.   So it's a slightly smaller boat?

4   A.   Slightly smaller boat, same mission, just a smaller

5   platform.

6   Q.   Why were they transferred to that boat?

7   A.   They were heading through the canal up to the Florida and

8   that's where they reside.

9   Q.   So the *Vigilance* was already on course to go through the

10  Panama Canal, you're saying, and make its way into Florida?

11  A.   That is correct.

12  Q.   Specifically, into Key West?

13  A.   I don't know where they went from there, I just know that

14  the disposition manager said that we are handing them off to

15  them, so we handed everything we had to that cutter -- excuse

16  me, to that boat, excuse me.

17  Q.   So this is like a mid-ocean transfer?

18  A.   That is correct.

19  Q.   And when you say you handed everything over, so the

20  defendants, all seven of them, were then transferred to another

21  ship.

22       What about the bales of cocaine?

23  A.   All we gave to them and what we're required to do per

24  Coast Guard policy is to hand a ten kilogram sample, so we give

25  them ten kilograms which comes off the NIK test that we

1   described earlier, and that's what goes into the case,

2   everything else is kept off board *Mellon* until we receive

3   another disposition message that says the bulk, what we call

4   it, bulk contraband is offloaded to either a specific port of

5   call or to another unit.

6   Q.   So the contraband, the drugs, are separated?

7   A.   That is correct.

8   Q.   You are describing it as a representative sample, which was

9   the ten kilos, stays with the seven defendants as they make

10  their way into the port of call?

11  A.   That is correct.

12  Q.   And that's still linked to the seven people by virtue of

13  the number that was assigned to it?

14  A.   That is correct.

15  Q.   And what's the reason for that, how many Coast Guard

16  cutters are there generally out there in this area?

17  A.   Honestly, at any one time it could range between one to

18  four different units that are there.  It really just depends on

19  the time of year and what's going on with policy, anything like

20  that, it could be mass migration in the Caribbean, calls for

21  some of our units to be in Caribbean and the Eastern Pacific,

22  it could be, you know, a storm heading up in the Bering Sea so

23  they request two of our units to be up there, it really depends

24  on what's going on in the world and where they need our units

25  to be.

1  Q.  So you mentioned units, four, is that what you said; four

2  or five?

3  A.  It could be between one and four at any point in time.

4  Q.  When you say one and four at any point in time, is that one

5  to four cutters we're talking about?

6  A.  One to four cutters at a time.

7  Q.  Are you talking when one to four cutters patrolling the

8  whole globe or are you just talking in the Eastern Pacific?

9  A.  Just the Eastern Pacific.

10  Q.  So those assets are shifted as needed; is that a fair

11  statement?

12  A.  That's a fair statement.

13  Q.  So the decision was made to transfer them.  Now you

14  remained on the Coast Guard Cutter *Mellon*?

15  A.  That is correct.

16  Q.  And can you tell us then what happened to the remainder of

17  the drugs that stayed, the "bulk load" you referred to it as?

18  A.  The bulk load was kept and what I mentioned earlier, the

19  sea-with-magazine kept under lock and key under my supervision.

20     Like I said, we have a sign-out, time stamp that whoever

21  goes in there states the time that they opened in, locked and

22  signed it.

23     At this time nobody went into that space, I didn't

24  authorize anyone to go into that space, so we have the sign-out

25  sheet that will show that people did not go in and out of that

1   space.

2       The reason why people go into that space is to check the

3   magazine temperatures, basically to ensure that it's not

4   getting too hot and the ammunition will go off.

5   Q.   Ultimately, did the rest of this load, the bulk load get

6   transferred to another vessel?

7   A.   It did.

8   Q.   And which vessel was that?

9   A.   That would be the Coast Guard cutter *Hamilton*.

10  Q.   And why was it transferred ultimately to the *Hamilton*?

11  A.   It was transferred to the *Hamilton* so they could off-load

12  it into Florida.

13  Q.   And when you're transferring this bulk load to another

14  Coast Guard vessel, are you completing property receipts and

15  chain of custody logs?

16  A.   That is correct.

17  Q.   Are you maintaining the authenticity and the, for lack of a

18  better world, purity of your chain of custody?

19  A.   That is correct.

20  Q.   I want to go back to briefly talk to you about when you

21  were first dispatched to the Panga as cover, and *Mel-I* was

22  already there.   Did you have a chance -- were you there long

23  enough to make any observations about the Panga and the people

24  on the Panga?

25  A.   Just that there were seven people on board plus our three

1    boarding team members that went over, the boarding officer,

2    assistant boarding officer or boarding team member, and our

3    interpreter, everyone seemed to be, you know, cool, calm

4    collected, there wasn't anything going on, they had positive

5    control over the Panga itself and the crew members that were on

6    board.  So it wasn't anything too out of the ordinary there.

7    There wasn't any threat, so to speak.

8    Q.  Did you have the opportunity to observe anything that was

9    on the boat?

10   A.  Not particularly, no.  I just know that it was -- it looked

11   like a Panga, it wasn't really anything on there, just the

12   members themselves.

13   Q.  So you didn't actually go onto the Panga?

14   A.  I did not go onto the Panga, no.

15            MS. ANTON:  One moment, please, Your Honor.

16            Thank you, I have no further questions.

17            THE COURT:  Cross.

18                         CROSS-EXAMINATION

19   BY MR. ABRAMS:

20   Q.  Good morning, sir.

21   A.  Good morning.

22   Q.  When you arrived at the -- when you arrived at our boat, on

23   Mel-II, was the -- were the three individuals from Mel-I

24   already on board?

25   A.  I can't really attest to it, it was quite a long time ago.

1    I can't remember if they waited until we arrived on scene.  I

2    believe they waited until we arrived on scene until they went

3    and took over just to make sure that we were there for cover.

4    Q.   When you went -- when you guys approached our boat, were

5    you -- was *Mel-I* in radio contact what Mellon II?

6    A.   Yes.

7    Q.   So you guys -- you guys talked, I assume, before you left

8    *Mellon* to go to the boat?

9    A.   We directed contact *Mellon* itself and we radioed back and

10   forth.

11   Q.   So when *Mel-I* approached our boat, if there was an issue

12   you would have known about it; right?

13   A.   That is correct.

14   Q.   And when you approached, you were responsible for security?

15   A.   That is correct.

16   Q.   Right?  And you agree with me that security is -- or the

17   safety of yourself and your crew is really of paramount

18   importance when you're doing an interdiction such as this?

19   A.   Yes, sir.

20   Q.   So, and you described, I guess -- well, tell me a little

21   bit about what you and your crew were wearing.

22   A.   So when we are on pursuit missions we have -- we wear

23   helmets, we have body armor, we have our weapons belt that has

24   a baton, normally has OC spray, but dealing with internationals

25   we don't have the OC spray because it's considered chemical

1   warfare, and then our pistol and handcuffs and also a

2   flashlight.

3   Q.  All right.  And is it fair to say you go in anticipating

4   the worst?

5   A.  It's always better going in anticipating the worst, but

6   always hoping for the best.

7   Q.  Right, and then you can calm it down a little bit.

8   A.  Of course, it's always -- we always like to deescalate a

9   situation, it's one thing that we pride ourselves in is not

10  going in and hammering down, but to merely kind of expect the

11  unexpected, but treat everyone as if they hadn't done anything

12  wrong unless they show actions or motives otherwise.

13  Q.  Okay.  And in this case, they didn't show actions or

14  motivations otherwise; correct?

15  A.  No, sir.

16  Q.  And therefore, things could deescalate a little bit and

17  calm down?

18  A.  Yes, sir.

19  Q.  Would enable you to go, in fact, do something else?

20  A.  Yes, sir.  Once *Mellon* had been -- once they were on scene,

21  like I said, our small boats travel a little bit faster than a

22  bit 378-foot boat can, once *Mellon* was somewhat in sight and

23  they could see the small boat and we had said, safe scene, then

24  that's when we're able to have that discussion to say, are we

25  going -- where are we going to go next?

1   Q.   You approached our boat, this isn't the first boarding that

2   you've done, boarding mission that you have been involved with;

3   right?

4   A.   Correct.

5   Q.   Including controlled substances?

6   A.   This would be the first one I had with a controlled

7   substance.  My background is more in District 1 which is Maine,

8   New Hampshire to Connecticut, New Jersey, New York with marine

9   environmental protection with regard to fisheries.

10  Q.   So you weren't involved in, like, interdictions before in

11  drug cases?

12  A.   Not with respect to drug cases.

13  Q.   Have you been trained in interdictions in regard to drug

14  cases?

15  A.   Yes, sir.

16  Q.   Particularly, in the geographic region that you were

17  dealing with?

18  A.   I've had patrols in District 7 in the Caribbean and that is

19  an area that has been known for this type of activity.

20  Q.   And through your training, you're aware of the types of

21  boats that are involved?

22  A.   Yes, sir.  They do range, because they're not really made

23  by one specific company, but yes, it's -- you know, we refer to

24  them as go-fast or Pangas, basically the Coast Guard term for

25  it.

1   Q.   Are you aware through your training of the number of people

2   that usually occupy a boat that's running drugs?

3   A.   Yes, usually, from my training and experience is between

4   three and four.

5   Q.   And isn't it true, based on your training and experience,

6   that it is really unusual to find seven people on a boat that

7   is involved in running drugs?

8   A.   Yes, sir.

9   Q.   Now, go back a little bit.  How long were you on scene at

10  our boat before you were tasked with the debris field?

11  A.   I don't remember the duration of the time.  We're not

12  really watching the time while we're out there.  It was quite a

13  bit of some time that we were there just to make sure that the

14  scene was safe.

15  Q.   Okay, and during the time you were there, you didn't

16  observe anything that caused you to think it was unsafe, did

17  you?

18  A.   No, sir.

19  Q.   You were then dispatched from the scene where our boat was

20  to the debris field?

21  A.   Yes, sir.

22  Q.   All right.  And you are asked some questions about a tarp,

23  and I guess I'll be a little bit repetitive here, but you

24  didn't see a tarp while you were on scene with our boat, did

25  you?

1    A.   No, sir.

2    Q.   And while you traveled between our boat and where you were

3    told to go to locate the debris field, did you see any kind of

4    tarp-like object floating in the water?

5    A.   No, sir.

6    Q.   When you arrived at the debris field -- how long did it

7    take you to locate it, do you know, or is this another one of

8    those time --

9    A.   I would say this, being 30 miles away, it was quite a bit

10   of time, even though we were hammering down on that throttle,

11   it was still some time to get there.

12   Q.   Now, you don't know, based on your own personal knowledge,

13   how what was in the debris field got there, do you?

14   A.   That is correct, no.

15   Q.   You don't know if it came off of our boat?

16   A.   From seeing the aerial video from -- from when I got on

17   scene, no, I just know there's a debris field and what I was

18   told, from seeing the video and coming off the Panga, knowing

19   that it came off a Panga.

20   Q.   Well, you know it came off of a Panga; correct?

21   A.   Yes, sir.

22   Q.   It could have been ours, it could have been another one;

23   you don't know?

24   A.   I can't speculate to that, sir.

25   Q.   Okay.  And when you were -- this is a pretty big job

1  picking up all the packages floating in the debris field?

2  A.  Yes, sir.

3  Q.  And they were connected together?

4  A.  All connected together, yes, sir.

5  Q.  How long did it take you to pick all those out of the

6  water?

7  A.  I would say probably between an hour, hour-and-a-half to

8  get them up.  They're not light, by themselves, probably

9  between 50 to a hundred pounds, and then adding that they have

10  been sitting in the water for some time, that water likes to

11  get saturated.  So you're picking up whatever's in that bag

12  plus the seawater.

13  Q.  I was going to ask you that, were these all -- can you tell

14  me -- do you know as to the integrity of all the packages that

15  you picked up, did some of them absorb water?

16  A.  The packages themselves, no, but the wrapping, yes.  It was

17  drenched with water, but the packaging itself, it's -- whoever

18  packaged it they know what they're doing, they know not to get

19  anything -- water- sealed.

20  Q.  Were each of those packages examined individually that you

21  know that for sure?

22  A.  Just the sample itself.

23  Q.  That was the -- when that NIK test?

24  A.  That NIK test, that's correct, yes, sir.

25  Q.  But the rest of the -- let me ask you:  When the NIK test

1   was performed, and that -- please, if you could, describe for

2   the jurors what happens when a NIK test is performed.

3   A.   So when a NIK test is performed, we either receive a

4   positive or a negative.  So a positive will give us any one of

5   numerous types of chemical reactions, it will say what it is

6   the element that we put into this NIK test.

7        We need to have two positive back to back NIK tests in

8   order for it to be presumptive any type of material.

9   Q.   Well, what I'm asking you is, I just put it back on the

10  board, Government Exhibit 17.  When you perform a NIK test, I

11  guess we start with one of these bales; right?

12  A.   Yes, sir.

13  Q.   All right, and what happens to the bale?  When you want to

14  do a NIK test, what do you do?

15  A.   So we will take out -- we will chose randomly one of the

16  bales.  Inside the bale, depending on the size, depend on how

17  many different keys are in there, we will chose one key, which

18  is basically one block, and we will take a rep sample, rep

19  being representative sample.

20  Q.   When you say one key, are you referring to one kilogram?

21  A.   Yes, just one block.

22  Q.   So if we are talking about approximately a thousand

23  kilograms there, then we're potentially talking about a

24  thousand individually wrapped packages; is that right?

25  A.   That would be correct, sir.

1    Q.   I know this would be a monumental task, but do you know if

2    those one thousand kilos were each examined individually to

3    make sure that the integrity of the wrapping was constant?

4    A.   No, sir, we left them in the packages that they came in,

5    like I said the rep sample is mere just a representative sample

6    of what is there.

7    Q.   Do you know when those -- well, do you know what time those

8    packages were brought onboard the *Mellon*?

9    A.   No, sir, as far as the time it's just -- time means nothing

10   when we're out there, we're on patrol.

11   Q.   The sun is still up?

12   A.   The sun is still up, it is setting.

13   Q.   Now, you said that after -- well, how big is *Mel-II*?

14   A.   *Mel-II*, 23-and-a-half feet, *Mel-I* is 24 feet.

15   Q.   Is it fair to say that *Mel-II* is pretty similar in length

16   to our boat?

17   A.   Their boat was a little bit bigger.

18   Q.   About how many bigger?

19   A.   You guys were 26, 27 feet, approximate; right?

20   Q.   So about an additional two feet, more or less?

21   A.   More or less, yes, sir.

22   Q.   Now --

23   A.   Probably about three feet, three or four feet longer.

24   Q.   If a sketch of *Mel* -- of our boat was done, it would show

25   26 feet, would that sound about; right?

1    A.   I didn't do the sketch.

2    Q.   Now, you said that after you -- and when I say you, I'm

3    referring to you and the other individuals of your team on

4    *Mel-II*, recovered what is depicted in Government's Exhibit 17,

5    you had to travel -- you had to go back to the *Mellon* slowly.

6    Is that right?

7    A.   Yes, sir.

8    Q.   And that was because of the weight of the drugs; is that

9    right?

10    A.   Yes, sir, and also the weight of our equipment and where

11    we're -- how much the boat is pretty much positioned is that we

12    have the coxswain up front, and four individuals in the back

13    closer off to the sponson, which is the edge of that small

14    boat.

15    Q.   How long were the gentlemen who were taken off of our boat

16    maintained on the *Mellon*?

17    A.   Like I said, sir, I would have to take a look at the exact

18    dates but it was not that long, sir.

19    Q.   But by "not that long," what -- I know days kind of flow

20    into each other when you're out on the water, is what you're

21    saying.

22    A.   The reason I'm saying not that long is my experience when

23    I -- down in D-7, when we had migrants on board, they could be

24    there for anywhere between seven and 27 days, depending on when

25    we had an agent come out and do basically an interview to find

1    out where they're actually from and whether or not the country

2    was going to bring them back, and once we had that process done

3    then, you know, again the disposition message would go out and

4    say, okay, you're going to hand this individual back.

5         It kind of comes along the same lines of that, it's

6    completely out of my control or Mellon's control.

7    Q.   Do you have any idea -- this may be an unfair question --

8    how long they were aboard *Vigilance* after they were on board

9    your vessel?

10   A.   No, sir, I would not know that, sir.

11   Q.   While they were on board your vessel -- well, you described

12   the processing of the individuals when they came to your boat,

13   you said first they were searched when they came on board; is

14   that right?

15   A.   Yes, sir.

16   Q.   Then there was a medical screen?

17   A.   Yes, sir.

18   Q.   And then there they're questioned, their name, date of

19   birth, where they're from?

20   A.   Yes, sir, that's the administration portion of it.

21   Q.   Then a photo?

22   A.   Yes, sir.

23   Q.   And then they're given over to another station for

24   clothing?

25   A.   Yes, sir.

1   Q.   Is that right?

2   A.   Now that process is done one person at a time so the

3   process does take a bit of time, that's, again, to ensure that

4   each individual gets their time that they need in order to do

5   the medical screening and that they're able to write their name

6   and not rush, and then also for the accountability for their

7   personal effects not to get mixed up between each of the crew

8   members.

9   Q.   Is this process done in the same place of the ship or are

10  they taken to different places?

11  A.   No, sir, it's done in the same place.

12  Q.   And where were they first brought on the ship, onto the

13  *Mellon*?

14  A.   They were brought on on the right side of the ship, where

15  the Welin Lambie davit is.  Our safest davit is a dual-point,

16  so it doesn't cause a rock or anything like that, more or less

17  it's for the safety of whoever's on board *Mel-II*.

18       But again, they were not on my ship -- excuse me, my small

19  boat, they were on *Mel-I*.

20  Q.   Now you said -- I guess that I'm jumping around here a

21  little bit, I don't want to be too repetitive of other

22  things -- there was a mid-ocean transfer of the seven guys from

23  *Mellon* to *Vigilance*; correct?

24  A.   Yes, sir.

25  Q.   *Vigilance* was then transiting the Panama Canal?

1    A.   Yes, sir.

2    Q.   Do you know how long it takes *Vigilance* or a cutter to

3    transit the canal?

4    A.   No, sir, unfortunately, I never got that pleasure to be

5    able to do that.

6    Q.   It's pretty cool?

7    A.   I hear it's pretty cool to go, I just never had that

8    opportunity to go.

9    Q.   Do you know how long it takes to transit from, I guess, the

10   Atlantic side of the Panama Canal to South Florida?

11   A.   Nonstop?  Probably, God, it depends on like how fast

12   they're going, if they're going, we'll say hammer down, those

13   210s are over 50 years old, we're lucky they're still going,

14   probably 12 knots if they're hammering down, otherwise it

15   ranges between six and 10 knots, so probably four, five days.

16   Q.   And do you know if after *Mellon* transferred the guys to

17   *Vigilance*, *Vigilance* did this in a straight shot or whether

18   *Vigilance* made stops?

19   A.   That I cannot attest to, I just know that once they

20   actually transfer, they signed for it and acknowledged that

21   everything was there, they were heading home, and by home I

22   mean going to the eastern seaboard side of the United States.

23   Q.   Would safety protocols require that they were shackled as

24   you described the entire time?

25   A.   Not when they go onboard the small boats that they are

1    actually transferred, they have type 3 PFDs, the personal

2    floatation devices, the nice orange things that you see all the

3    kids wearing, and then we send them off to the other ship and

4    then from there, the same process, just to make sure that they

5    don't have any weapons or means to escape, anything to harm

6    anyone else on the ship, it's just basic protocol, and then

7    from there, wherever they decide to put them on a 210, 210-foot

8    boat ask not have a helo hanger, so it really depend on where

9    they put a tarp, whether that's on the foremost part of the

10   ship or the aft part of the ship, the fantail.

11   Q.   Have you worked on a 210?

12   A.   I did.  My first unit, the *Reliance*, was a 210-foot boat.

13   Q.   How are detainees secured on a 210-foot boat.

14   A.   I always had migrants, so unless they posed a threat to us

15   or acted unruly, they would be free to move about.

16   Q.   Based on your experience on a 210, if someone was

17   suspected of having been involved in criminal activity and you

18   needed to secure them, how would you do that?

19   A.   Leg shackles.

20        MR. ABRAMS:  I have nothing further, Judge.

21                       CROSS-EXAMINATION

22   BY MR. RODRIGUEZ:

23   Q.   Officer Hames, how are you, sir?

24   A.   Good, sir.

25   Q.   I just have a few follow-up.  You were asked how long

1    *Mel-II* was and I believe you said 22-and-a-half or

2    24-and-a-half feet?

3    A.   *Mel-II* is 23-and-a-half feet.

4    Q.   23-and-a-half?

5    A.   Yes, sir.

6    Q.   And what kind of motors does it have?

7    A.   I'm sorry, sir?

8    Q.   What are the engines on it, the motors?

9    A.   Actually, I completely forgot what engine they had on

10   there.  I could look it up.

11   Q.   How fast can it go, maximum?

12   A.   Maximum, if she's on a good day, probably between like --

13   Q.   Good, calm day.

14   A.   She could probably get it to about 40 knots.

15   Q.   So on the day in question we're all talking about, you were

16   on the *Mellon* and you were released in the *Mellon* about 30

17   nautical miles away from the Panga?

18   A.   Approximately, yes, sir.

19   Q.   So then it took you how long to get to that location?

20   A.   Like I said, from my ship it took a little bit longer.

21   Again, time-wise, I couldn't tell you, we're not really staring

22   at our watches when we're hammering down to get to a specific

23   target of interest.

24   Q.   You had a mechanical problem?

25   A.   Yes, sir.

 1   Q.   That slowed you down?

 2   A.   It slowed my ship down, but did not slow the contact vessel

 3   down.

 4   Q.   By the time you got there, the *Mel-II* -- the *Mel-I*, I'm

 5   sorry, was already at scene?

 6   A.   Were already at scene and both boats were dead in the

 7   water.

 8   Q.   When you got there, did you take photos from your vessel to

 9   the Panga and *Mel-I*?

10   A.   Not that I can recall, excuse me, sir, no.

11   Q.   Was there anyone on your vessel that had a camera that

12   could take pictures?

13   A.   Like I said, I had the GoPro, no one, like I said, I can

14   recall that took any photos.  Our guys pretty much just had a

15   boarding kit, but no one got into that boarding kit.  Basically

16   what's in there is we wanted handcuffs, we had the little flex

17   wraps they use for cuffs for officer safety, but they're not

18   cuffed when they get on the small boat, we tend not to use

19   that, we also have cameras in waterproof casing so the camera

20   doesn't get destroyed, and then if we're in -- dealing with

21   U.S. vessels we have what we call a 4100 form basically just

22   fills out stating the nationality of the vessel, the master's

23   name, the owner of the vessel and what we did on that vessel.

24   Q.   Did you take any pictures of the jettison field?

25   A.   Of the jettison field, no, I believe all we had was just

1    that aerial video.

2    Q.  So as you're recovering those packages, we don't have

3    photos of that?

4    A.  No, sir, at least not one that we took.

5    Q.  You didn't take any pictures?

6    A.  No, sir.

7    Q.  And as you told counsel, on your way back to the *Mellon*,

8    you had to be slow because you had all these packages on board;

9    correct?

10   A.  Yes, sir, it was my call to go slow just because of the

11   time of day, we did not have communications with *Mellon*,

12   basically we're limited to the range of our radios.  By the max

13   that we could probably stretch is between 15 to 18 nautical

14   miles for our radio so once we loss our aerial asset who was

15   basically the eye in the sky, the relay, I'm sure you know how

16   radios work, the higher the antenna, the longer range, the

17   longer distance that signal can be sent, so and once we lost

18   that aerial asset, we basically took the last known position

19   and head straight for it.

20   Q.  And how many people were on board; four?

21   A.  I have five.

22   Q.  Five people?

23   A.  Five people.  I said four, I forgot the boat engineer.

24   Q.  So five person plus the items you took from the ocean?

25   A.  That's correct, sir.

1   Q.   You took it slow, those were your words?

2   A.   Yes, sir.

3   Q.   Now, the packages themselves, you said they were all joined

4   together and how were they wrapped?

5   A.   Basically in a potato sack-type material and it was

6   wrapped, all of them were intertwined and then taped together

7   with that red and white rope.

8        Everything that was in that debris field was all tied

9   together with that same rope.

10  Q.   But my question is a little bit more -- it's my fault.

11       You said that the outer wrapping was -- got filled with

12  seawater, some of the outer wrapping, the wrapping around the

13  bales, correct?

14  A.   Basically it was sitting in the water, so it just had some

15  water on.

16  Q.   But was there a lining, a liner between the outside

17  packages and the inside packages that had the contraband,

18  that's my question really?

19  A.   That much I can't speculate to.  The members that actually

20  took -- when they took the representative sample, they can

21  attest to what was -- when they opened it up.

22  Q.   So you don't know the condition of the packages that

23  actually contained the contraband?

24  A.   All I saw was when we brought it on when we did the rep

25  sample, like I said, my position onboard the ship is I am there

1    to make sure that the process is moving and everything is

2    accounted for, I have field experts that are trained to do

3    specific jobs, and my job is merely just to supervise.

4    Q.   On Exhibit 17, I think you said those packages around the

5    bales are packages from the *Mellon*, these colorful packages?

6    A.   You mean those that are onboard the *Mellon*?  Yes, those are

7    on *Mellon*.

8    Q.   Those are from the *Mellon*?

9    A.   No, those aren't from, that's from the debris field that

10   was brought on *Mellon*.

11   Q.   Those are the original packages?

12   A.   Yes, those are the original packages, sir.

13   Q.   Within those packages are the other packages that contain

14   the contraband, I'm trying to understand exactly?

15   A.   Yes, sir, whatever's in that from the rep sample they

16   pulled from one of those individual bales, yes, that's what's

17   in there.

18   Q.   Now on the way to the debris field, you said you didn't

19   come across a tarp, did you come across a box of any sort?

20   A.   No, sir.

21   Q.   When the individuals are brought on board, you indicated,

22   as you did to counsel, that they are eventually given a medical

23   screening?

24   A.   Yes, sir.

25   Q.   Should there be a problem, a person is quarantined if they

1   have a disease of some sort?

2   A.   We never really experienced anyone with a disease, I'm sure

3   that we probably -- if they had something that was severe

4   enough that we didn't want to have spread, we would probably

5   put them off from the rest of the group, but not far.  If they

6   were the only case they had the entire helo hanger that we

7   could have put them, if there was something, but nothing came

8   up in any of the medical records, sir.

9   Q.   They were clearly chained; correct?

10  A.   They were shackled on the leg, yes, sir.

11  Q.   The *Mellon* remained in that area south of Mexico for how

12  long after this detention?

13  A.   We were there -- what day did we get home?  We were there

14  until early December.

15  Q.   So you remained there from October to December?

16  A.   Throughout pretty much that Eastern Pacific, yes, sir, not

17  that one specific area but we did transfer around the Eastern

18  Pacific.

19  Q.   That's my question, what was the range that you were

20  traveling, how far north did you go?

21  A.   We did not go any further south than the Galapagos, north

22  traveling all the way from Seattle, so I would say our area op

23  is no north of Tijuana and no south of the Galapagos.

24  Q.   The *Vigilance* or the *Vigilant*?

25  A.   We have so many Vs I couldn't even tell you, sir.

1    Q.   The vessel on which --

2    A.   The other Coast Guard cutter, yes, sir.

3    Q.   That was a cutter that was heading south towards the canal?

4    A.   They were heading -- from that position they would have

5    been heading south to the canal, yes, sir.

6    Q.   Let's take a look at this map for a second.  This is

7    Exhibit 41  -- make sure I don't trip over this -- just for

8    purposes of our geography lesson for the day, where was the

9    *Mellon*, more or less?

10   A.   More or less -- I'd have to take a look at the name of the

11   place.  I believe -- I thought the name was Maclaka (phonetic)

12   -- was on here.

13          MR. ENCINOSA:  We are having a technical problem with

14   the translation.

15          COURTROOM DEPUTY:  He's not using a microphone, we need

16   the hand-held.

17          THE WITNESS:  Do you mind if I see the first page of

18   that, that's the exact location of where it was.

19          THE INTERPRETER:  Your Honor, we can hear the officer

20   better with his own microphone.  Thank you.

21          THE WITNESS:  I think that's right.

22          MR. ENCINOSA:  Are you looking for a map?

23          THE WITNESS:  No.

24          Do you have the nautical chart?  We were just south of

25   there.

1    BY MR. RODRIGUEZ:

2    Q.   Using this map, can you point it out so the jury can see

3    it?

4    A.   Do you want me to walk to them and show them?

5    Q.   What is the biggest city nearby?

6    A.   Acapulco.

7    Q.   Where is the Panama Canal?

8    A.   Panama Canal is down there.

9    Q.   So this other vessel that you're talking about met up with

10   you south of Acapulco?

11   A.   Yes, sir.

12   Q.   And went all the way south to the canal and then went up to

13   Florida?

14   A.   Yes, sir.

15   Q.   The middle of the United States is closer on that side;

16   right?

17   A.   Yes, sir.

18   Q.   And they were -- you don't know how long they were on this

19   other vessel; correct?

20   A.   No, sir.

21   Q.   And you don't know the conditions of the -- that they were

22   placed on in the other vessel?

23   A.   No, sir, I cannot speculate.

24   Q.   You can only testify as to what happened on the *Mellon*?

25   A.   Yes, sir.

1    Q.   By the way, when -- do you speak Spanish?

2    A.   No, sir, no, sir, very broken.  Probably order a cerveza.

3    Q.   When you want a beer?

4    A.   Oh, yeah.

5    Q.   You know the important stuff?

6    A.   Bano, probably another good one to another you can probably

7    look for the sign but you will get it.

8         MR. RODRIGUEZ:  Thank you, Officer, I have no further

9    questions.

10                          CROSS-EXAMINATION

11   BY MR. CHAMBROT:

12   Q.   Good afternoon, sir.

13   A.   Good afternoon, sir, how are you.

14   Q.   You should have been here on Monday, we had somebody

15   looking for beer, too.

16        Quickly, when you say hammering on the throttle, is that

17   something like putting the pedal to the metal?

18   A.   Pretty much, yes, sir.

19   Q.   So you leave he *Mellon*, you do escorts on the Panga to make

20   sure the *Mel-I* is okay?

21   A.   Yes, sir.

22   Q.   And then from there you leave to the debris field?

23   A.   Yes, sir.

24   Q.   Hammering on the throttle?

25   A.   Yes, sir.

1    Q.   Going as fast as you can?

2    A.   Going as fast as that boat will take us.

3    Q.   Did it take more than an hour to get there?

4    A.   Oh, it definitely took more than an hour to get there, I

5    would say.

6    Q.   More than two hours?

7    A.   I know it was definitely longer than an hour, just because

8    going 30 knots and, like I said, it was probably over 30,

9    you're probably going a mile a minute, pretty much, so it will

10   take you, you're going 30 knots, every six minutes you're going

11   three miles.

12   Q.   And you went 30 miles?

13   A.   Roughly, give or take, probably a little bit more.

14   Q.   So it took you maybe --

15   A.   Probably a little over an hour, hour, hour-and-a-half.

16   Q.   Hour, hour-and-a-half?

17   A.   There were times when we actually had to slow down just

18   because some of the -- taking the wave, you don't want to take

19   it over too much, like I said, we were having mechanical

20   issues, so I didn't want that prop to come out of the water.

21   Q.   So fast with periods of slowing down over an hour to get

22   there?

23   A.   Correct.

24   Q.   But fast is over 30 knots?

25   A.   Correct, correct, sir.

1   Q.   Now you pick up the load.  Once you're full, were you able

2   to put two other crewman and about 20 barrels of fuel on your

3   boat, would they have fitted?

4   A.   On my boat, no.  All that was there in the debris field is

5   what's in that picture.

6   Q.   You're loaded, you picked up?

7   A.   We would have picked up.

8   Q.   Now could we put another two bodies in there and 20 barrels

9   of fuel?

10  A.   I could sit people on top of what was there.  I mean, you

11  could see -- in another exhibit, you can see how we have

12  everyone loaded.

13  Q.   But it would be very difficult?

14  A.   The reason why it would be difficult is because we have

15  stationary seats and we have an A-frame that is there for when

16  we roll to protect the members onboard the ship.

17  Q.   Correct.

18  A.   The design of our ship is not for handling cargo or be able

19  to relax and move around but to sit rigidly and be able to

20  ensure the safety of the crew members on board.

21  Q.   But it would have been kind of tight, very tight?

22  A.   It would have been tight for us.  We are only eight feet at

23  the breadth, which is from side to side, and that A frame takes

24  up about seven and-a-half of that so...

25  Q.   You stated that the transceiver was duct-taped?

1    A.   Yes, sir.

2    Q.   And that duct-tape was removed?

3    A.   It was removed, yes, sir.

4    Q.   Did you save it or did someone save it, the duct-tape?

5    A.   No, sir, we don't have that, no.

6    Q.   So it wasn't processed for fingerprints or anything of that

7    nature?

8    A.   Not that I'm aware, sir.

9         MR. CHAMBROT:  I hope you find your beer.  Have a good

10   day.

11        THE WITNESS:  Yes, sir.  Thank you.

12                      CROSS-EXAMINATION

13   BY MR. BERRIO:

14   Q.   Good afternoon, Officer Hames?

15   A.   Good afternoon.

16   Q.   My name is want Juan Berrio, I represent Jose Candelario

17   Perez-Cruz.  Nice to meet you.

18   A.   Nice to meet you, sir.

19   Q.   You indicated that going over the boarding site to the

20   debris field you were going about 30 knots per hour?

21   A.   Yes, sir.

22   Q.   And then you said that you loaded all this contraband and

23   all this evidence onto your OTH, over-the-horizon?

24   A.   Yes, sir.

25   Q.   And then that you had to travel back slowly, very slowly;

1   is that correct?

2   A.   I wouldn't say very slowly, but we traveled at a safe speed

3   as not to endanger the crew members because they weren't --

4   can't go as fast and that's commonly our policy, you have can't

5   go anything over 20 knots if we don't have anyone seated into a

6   seatbelt, and in order to fit all those bales on there, we had

7   to lift the aft two seats.

8        So for safety of the crew members, safety of myself, safety

9   of ensuring that we didn't lose anything on transit, we didn't

10  go anything over, probably six or seven knots.

11       Also, like I said, we lost radio comm so I was not going to

12  risk anybody's life just to get this thing on board *Mellon*.

13  Q.   Great, you should be commended for that, that was very

14  smart, very good.

15       You traveled back six to seven knots with all that cargo on

16  there?

17  A.   Yes, that's correct, sir.

18            MR. BERRIO:  All right.  I have no further questions.

19            THE WITNESS:  All right.

20                          CROSS-EXAMINATION

21  BY MR. do CAMPO:

22  Q.   Good afternoon, sir.

23  A.   Good afternoon.

24  Q.   I just want to clarify your testimony on direct

25  examination.  You said when you stand here next to this warning

1    sign your head reaches to the top of the sign?

2    A.  No, there's probably about another six inches; right there.

3    Q.  So would you say your head reaches to the bottom of the

4    sign?

5    A.  Give or take.

6    Q.  About that, and you're five-and-a-half feet tall,

7    approximately?

8    A.  Five-and-a-half feet, sir, sir.

9         MR. do CAMPO:  Thank you, no further questions.

10        MS. PINERA-VAZQUEZ:  Your Honor, can I have a moment,

11   since I don't have hard copies of the photos, I'm going to try

12   to --

13        MR. do CAMPO:  Shouldn't be too difficult to do.

14        MS. PINERA-VAZQUEZ:  I'm just going to use the computer

15   that's already here then.  Sorry, officer.

16        THE WITNESS:  No worries.

17        MS. VIAMONTES:  So the record's clear, which exhibit is

18   this?  We stipulated the admission of these photographs, but

19   just so the record's clear, is it marked as an exhibit?

20        MS. PINERA-VAZQUEZ:  Yes, Judge, I am going to go

21   ahead, pursuant to the Court's ruling, mark for the record, the

22   photograph that's in two disks, Ortiz Defense Exhibit 4 and/or

23   Ortiz Defense Exhibit 5.

24        THE COURT:  Be admitted.

25        (Defendant Valecillo-Ortiz Exhibits 4 and 5 admitted

1   into evidence.)

2           MS. PINERA-VAZQUEZ:  Thank you, Judge.

3                       CROSS-EXAMINATION

4   BY MS. PINERA-VAZQUEZ:

5   Q.   How are you, Officer Hames?

6   A.   I good, how are you, ma'am?

7   Q.   Enjoying your time in Key West?

8   A.   You could say that.

9   Q.   Let me just get exactly right what your role was.  You were

10  the commander on the *Mel-II*; right?

11  A.   That is correct, ma'am.

12  Q.   And you're also, if I heard you correctly, in charge of

13  when the debris is collected or any other evidence, you take it

14  to the location on the cutter where it's processed?

15  A.   I'm in charge of the overall process of it.  So basically I

16  designed -- streamlined the entire process, Coast Guard policy

17  what other units were doing for best practice to ensure the

18  best accountability, and basically just fair treatment of

19  everything that's going on, making sure nothing's lost in

20  detail.

21  Q.   So that all the evidence is preserved if down the road we

22  find ourselves in this situation?

23  A.   Correct.

24  Q.   And you have been doing this for quite a while?

25  A.   Yes, ma'am.

1    Q.   On the U.S. Coast Guard *Mellon*, is there a particular room

2    or location on the cutter where that's done?  For instance, is

3    there a lab?

4    A.   No, ma'am, there's no lab.  Basically we have our portable

5    kits, there's no specific lab.  Basically, like I said, these

6    NIK tests are presumptions that are used in order to facilitate

7    the movement of this contraband so that it is or can be taken

8    to a lab for further --

9    Q.   So what you're saying is, is there a room where these

10   portable kits are done, like a separate room or is it in the

11   middle of the deck or where exactly would the testing be done?

12   A.   So the majority of the time the testing was done right

13   there on the fantail so that we can see where the contraband

14   was taken from and down in the East Pacific the time we were

15   there the sea state and the weather was favorable not to, you

16   know, send sea spray over the side and there wasn't heavy

17   winds, but in the case that did happen, we would take it inside

18   the skin of the ship or we have the LE staging area or the LE

19   locker area which is another space that is locked and secured.

20   Q.   Okay.  And, you've looked at some of the photographs in

21   this case --

22   A.   Yes, ma'am.

23   Q.   -- before coming here?  Have you seen these before?

24   A.   Yes, ma'am.

25   Q.   And these are photos of the interdiction; right?

1   A.   These are the photos of *Mel-I*.

2   Q.   That's *Mel-I,* okay.

3   A.   These are photos that are taken from Coast Guard *Mellon*.

4   Q.   Okay.  So now to go back to when you got to the jettison

5   field --

6   A.   Yes, ma'am.

7   Q.   It -- it took you about an hour-and-a-half, you started

8   boarding all the bales, let's call them bales; is that okay?

9   A.   Yes, ma'am.

10   Q.   Bales onto your Zodiac, heavy, 50 to 100 pounds because of

11   the water, you said?

12   A.   I would approximate the weight between 50 and 100 pounds.

13   Q.   And sometimes you would have to use -- I assume one or two

14   guys would have to pull it on top; right?

15   A.   Each one of us pulling out a bale at a time.

16   Q.   How long did you say to get all the bales?

17   A.   Definitely over an hour.

18   Q.   Here's some of the bales I want to show you.  These are the

19   bales the picture the Government showed you before just from

20   another perspective?

21   A.   Yes, ma'am.

22   Q.   Do they always come in these colorful packages?

23        MS. ANTON:  Objection, Judge, calls for speculation.

24        THE COURT:  If he knows.

25   BY MS. PINERA-VAZQUEZ:

1    Q.   If he knows.

2    A.   I really couldn't speculate as to if it means anything, it

3    would only be an assumption.  I don't want to make any

4    assumptions.

5    Q.   No, I don't want you to make any assumptions.  How about --

6    but this is what you found in the water, in other words, you

7    guys didn't put them into these colorful bales, they came like

8    this?

9    A.   Yes, ma'am.

10   Q.   And these did not have these colorful coverings, did it?

11   A.   No, ma'am.

12   Q.   These just look brown; right?

13   A.   Like a brown.

14   Q.   Black or brown, actually, you can see it better than I can,

15   and I believe that's the picture that is Government Exhibit 17;

16   right?

17   A.   I believe so.

18   Q.   I think you said that sign was pretty much -- you're

19   higher, taller on that sign, I would say about three feet

20   height?

21   A.   Yes, ma'am, that's just a stack of three high.  Actually

22   there it's four high, but usually when we have them initially

23   it's three high.  This was just to get them all so it's not

24   like a crazy two pictures to show the one portion of

25   contraband.

1    Q.   There's that little round thing down here, do you see that?

2    A.   Yes, ma'am.

3    Q.   That's almost like a spaceship.  I mean, I call it a

4    spaceship because I don't know what it is.  What did you call

5    it?

6    A.   We call it an FAD GPS tracker.

7    Q.   We will get to that in a second, I have some questions

8    about that.

9         (Technical equipment issue)

10            THE WITNESS:  Today's technology.

11   BY MS. PINERA-VAZQUEZ:

12   Q.   Sometimes it's better to have paper, I know.

13            That NIK test you were talking about -- am I saying it

14   right?

15   A.   NIK, yes, ma'am.

16   Q.   N-I-K?

17   A.   Yes, ma'am?

18   Q.   Which stands for narcotic --

19   A.   Identification kit.

20   Q.   Narcotic identification kit.  Now is that you doing it or

21   somebody else?

22   A.   No, ma'am, that would be one of my specialists for that.

23   Q.   And you use gloves because that way -- first of all, you're

24   getting cocaine on your hands, if it's cocaine?

25   A.   Yes, ma'am.

1   Q.   And also that way there's no question that the only

2   substance was whatever substance you put in that little

3   package?

4   A.   Yes, ma'am.  And also so that whatever's on there doesn't

5   get soaked into the individual's skin because you don't know

6   what it is.

7   Q.   So you don't test positive?

8   A.   You don't know what it is, you don't want that on your

9   skin, you know.

10  Q.   You took pictures of the testing as you go along?

11  A.   Yes, ma'am, both positive and negative if it comes out.

12  Q.   Another picture?

13  A.   Yes, ma'am.

14  Q.   Again, another one, these are positive and negative for

15  cocaine; right?

16  A.   That is correct, ma'am.

17  Q.   Let's take a look at this picture.  This picture is in

18  front of a piece of paper; right?

19  A.   Yes, ma'am.

20  Q.   It says 18th of October, 2016, 1912, what is that?

21  A.   1912, that's military time for 7:12 in the afternoon or

22  evening, excuse me.

23  Q.   Fishing vessel one; right?

24  A.   Yes, ma'am.

25  Q.   Because this was taken off fishing vessel one; right?

1    Right?

2    A.   Well, it's the Panga, yes, ma'am.

3    Q.   Do you know if it was taken off fishing vessel two?

4    A.   There is no number two, ma'am.

5    Q.   Well, do you know -- how do you there was no number two?

6    A.   We were only told there was one target of interest in the

7    area.

8    Q.   Right, but -- and you don't know that this was taken off

9    fishing vessel number one?

10   A.   So basically we do that because in the military we label

11   everything, sometimes we over-label everything, so even if we

12   have only one person we put them as label zero one, so...

13   Q.   Right, but that doesn't say zero one, that actually has the

14   number sign one, which what did you get off -- maybe you didn't

15   get anything off fishing vessel two, maybe nothing; fair

16   enough?

17          MS. ANTON:   Your Honor, I'm going to object, that's

18   argumentative and a mischaracterization of what he just said.

19          THE COURT:   Sustained.

20   BY MS. PINERA-VAZQUEZ:

21   Q.   So your testimony is fishing vessel number one, that's

22   where you got this testing packet; right?  I mean, the -- I

23   guess the cocaine that proved positive in this packet; right?

24   A.   So as I stated earlier, it came with what we call FDIN

25   number so with that FDIN number that's contraband, the

1    contraband came from this Panga.

2    Q.   From fishing vessel number one?

3    A.   That's correct.

4    Q.   Okay, fair enough.  All right.  Let's talk about the -- is

5    this the spot tracker?

6    A.   Spot trace, yes, ma'am.

7    Q.   I'm sorry, trace.

8    A.   We call it a tracker, but the name of it is a spot trace.

9    A.   That's okay, we it's a spot trace, we call it a tracker.

10   Q.   When you got this, and I believe we saw a picture, it was

11   wrapped in duct-tape?

12   A.   It was electrical cap duct-tape, yes, ma'am.

13   Q.   We know you didn't keep the duct-tape; right but you did

14   protect it --

15       You did take the time to put this foil over it so it

16   wouldn't get -- transmit any signals; right, or receive any

17   signals?

18   A.   That is correct.

19   Q.   And you put it in a plastic bag, an evidence bag?

20   A.   That is correct, ma'am.

21   Q.   And you did that possibly to see if it could be tested for

22   fingerprints; right?

23   A.   We do that because it is a smaller item, unlike the bales

24   are that big dome that we had there, so it was put in evidence

25   bags so that, one, it's held for accountability; two, we know

1    where it is at all times; three, it doesn't get lost.

2    Q.   It looks like a rough surface and it could have been tested

3    for fingerprints, couldn't it?

4    A.   Sure.

5    Q.   But it wasn't; right?

6    A.   Like I said, my deal on *Mellon* is I'm told, hey, there's

7    something here, we go and retrieve it, we make sure

8    everything's accounted for, I hold it secure and then when I

9    receive the disposition message, I hand it off to whoever needs

10   to go and have it, whatever they may do with it.

11   Q.   Officer Hames, I'm not saying it was your responsibility

12   I'm just saying --

13   A.   I'm just clarifying that who knows what they do with it.

14   My job and the job of *Mellon* is to go out and we find out

15   whatever it is that we're told to go find, and if there's

16   something there we make sure that everything is held

17   accountable and make sure that nothing's lost.

18   Q.   All right.  You haven't seen any fingerprint results, have

19   you?

20   A.   No, ma'am.

21        MS. PINERA-VAZQUEZ:  Your Honor, may I approach the

22   spaceship?

23        THE COURT:  All right.

24        THE WITNESS:  Do you want me to pull it out.

25        MR. ENCINOSA:  Do you need --

1    BY MS. PINERA-VAZQUEZ:

2    Q.   So the spaceship, was this found with the drugs; right?

3    A.   That is correct, ma'am.

4    Q.   So, I'm sorry to be so close but I'm putting it in front of

5    you.  Now when it was in the water, was it floating like this

6    or was it inside some sort of container?

7    A.   No, ma'am, it was floating just like this.

8    Q.   And that's a waterproof container?

9    A.   I would hopefully hope it was if that's what they're using

10   it for.

11   Q.   It looks like a transmitter?

12   A.   Yes, ma'am.

13   Q.   If a transmitter gets wet, it's not going to transmit

14   anything; right?

15   A.   Yes.  Electronics subject to the saltwater will shut done.

16   Q.   So if you can just take a look inside, you're stronger so

17   can you flip it so the jury can see it?  In there it looks like

18   a flat surface; right?  Do you know if fingerprints were taken

19   of that flat surface?

20   A.   Not that I'm aware of, ma'am.

21   Q.   You never seen any fingerprint results; right?

22   A.   No, ma'am.

23   Q.   If you obtained custody of the tracker and the spaceship

24   those were sent in sealed containers to, I guess, here,

25   Key West, to here in Miami -- I mean, I'm sorry, in Key West?

1  A.   Like I said, I don't know what happened to them when they
2  got to the other unit, what happened to them when they got to
3  the final destination, I can only attest to what we did on
4  board *Mellon*.
5  Q.   Right, but they said in sealed protective evidentiary bags,
6  so that they're obviously not tampered with?
7  A.   That's correct, ma'am.
8  Q.   So when they gotten to Key West, they could have been
9  tested for fingerprints because they could have been tested for
10 fingerprints because they had been properly sealed and
11 preserved?
12        MS. ANTON:   Objection, he already said he doesn't know.
13        THE COURT:   Sustained.
14 BY MS. PINERA-VAZQUEZ:
15 Q.   How about the bales of cocaine, those weren't tested for
16 fingerprints either; right?
17 A.   Not that I'm aware of, ma'am.   Like I said, anything that
18 happens off *Mellon* I have no idea.
19 Q.   Well, you haven't seen any fingerprint results for anything
20 in this case?
21 A.   Correct, for anything.
22 Q.   Or DNA, for anything?
23 A.   Anything.
24        MS. PINERA-VAZQUEZ:   Okay, thank you.
25

```
 1                        CROSS-EXAMINATION

 2   BY MR. ENCINOSA:

 3   Q.   Good morning, Lieutenant.

 4   A.   Good afternoon, how are you?

 5   Q.   You mentioned that you work in District 7 and you did a lot

 6   of migrant work there.

 7   A.   So, for District 7 that's just south of Florida.

 8   Q.   South of Florida?

 9   A.   South of Florida.

10   Q.   That's between here and Cuba, Haiti?

11   A.   Yes, sir.

12   Q.   The Bahamas?

13   A.   Yes, sir.

14   Q.   And basically, when you talk about migrants, that's people

15   that are trying to come to the United States; is that correct?

16   A.   That is correct, sir.

17   Q.   And the United States Coast Guard, they played a major role

18   in trying to stop people from entering the United States that

19   are not supposed to enter; correct?

20   A.   That is correct, sir.

21   Q.   And people come by water, they come by land, they come by

22   air, any way they can; right?

23   A.   Yes, sir.

24   Q.   When you were in the Pacific, did you also have any

25   encounters with any migrants coming in?
```

1   A.   No, sir.

2   Q.   Are you aware that there's also a migrant problem coming in

3   from Central America and South America?

4   A.   By water or land, sir?

5   Q.   By land, water.

6   A.   So my jurisdiction is on the water, anything that happens

7   over land I cannot speculate to or speak of.

8   Q.   So you're not aware of any people wanting to come to the

9   United States, that's what you're telling the jury, from

10  Central and South America; right?

11       MS. ANTON:   Your Honor, I'm to object to the

12  mischaracterization.   The witness said he is not able to

13  testify as to land, only as to water.

14       THE COURT:   All right.   Sustained.

15  BY MR. ENCINOSA:

16  Q.   Let me ask you, you talked about some records that is kept

17  when they bring the gentlemens to the *Mellon*; right?

18  A.   Yes, sir.

19  Q.   And they give him --

20  A.   Yes, sir.

21  Q.   First of all, they shackled them and put them in the back

22  of the boat?

23  A.   In a covered portion of the ship, yes, sir.

24  Q.   But they're outdoors; right?

25  A.   No, sir, they're indoors, that hanger --

```
 1   Q.   Yeah?

 2   A.   -- It is fully enclosed, it has a gate that lifts up and

 3   down and we leave it open so that they can see the sun and then

 4   close it at night when we have the blue lights on.

 5   Q.   But it's like they're outside with a roof on; right?

 6   A.   No, it's still inside the ship.

 7   Q.   And they get feed -- you don't want to feed them any food

 8   that might upset them?

 9   A.   Correct, sir.

10   Q.   You feed them rice and beans; right?

11   A.   Yes, sir.

12   Q.   Because you don't want to feed them normal food because it

13   could upset them; right?

14   A.   So you're saying rice and beans aren't normal food?

15   Q.   No, I'm hungry right now, I could use some, but I think you

16   are going to have throw in some tostones and picadillo, too,

17   okay?  All right.  Then I will go for it, okay?

18   A.   All right, all right.

19   Q.   Now, when this individual -- did you ever meet Mr. Lucas,

20   Mr. Jose Lucas?

21   A.   Not personally, no, sir.

22   Q.   Okay, but you testified as to the medical records or

23   something?

24   A.   Yes, sir.

25   Q.   And you were asked by the prosecutor; right?
```

1   A.   I'm sorry, sir?

2   Q.   When you were asked by the prosecutor, you didn't do the

3   medical?  You're not involved with medical; right?

4   A.   No, sir, I'm not involved when it comes to the questions

5   because that is between the corpsman and the individuals

6   themselves, and there is also an interpreter there so that

7   nothing is lost.

8   Q.   Okay.

9   A.   So all I do is I review to make sure all questions are

10  asked and there's no stone left unturned.

11  Q.   Okay.  Now let me ask you, you also said there was a

12  picture taken of the individual and nationality and things like

13  that; right?

14  A.   Yes, sir.

15  Q.   And it's date of birth; right?

16  A.   Yes, sir.

17  Q.   That's at the beginning when they're put on the boat;

18  right?

19  A.   That's after we have insured that they're safe and they're

20  not a threat to the ship or the crew, and it's after they're

21  done with the medical screening.

22  Q.   Okay.  Now in this particular case with regards to

23  Mr. Lucas, are you aware that he is from Ecuador?

24  A.   No, sir.

25  Q.   If I give you the documents would that help you refresh

1    your memory?

2    A.  Yes, sir.

3          MR. ENCINOSA:  May I approach, Your Honor?

4          THE WITNESS:  Do you have a color copy, one that --

5    BY MR. ENCINOSA:

6    Q.  Let me just ask you, with regards to the individual named

7    Jose Lucas, does that help refresh your memory whether or not

8    he's from Ecuador?

9    A.  Sir, when it comes to this, they could tell us anything

10   they want.

11   Q.  Okay.

12   A.  So they can sit here and they can lie to us, say it's a

13   different name, different nationality.  We cannot speculate as

14   to whether or not this information they give us is true, they

15   write down their name, date of birth and their nationality

16   so...

17   Q.  But the information given is Jose Lucas from Ecuador;

18   right?

19   A.  That's what it says on that sheet of paper that he wrote.

20   Q.  Exactly, it doesn't say Jose Lucas from Mexico; right?

21   A.  No, sir, it says Ecuador.

22   Q.  May I get -- thank you.

23          Also with regard to, you talked about the medical records,

24   would this help you refresh your memory when this individual

25   said he hadn't eaten for a couple of days?

1    A.   Is that what it reads on that medical record, sir?

2    Q.   Huh?

3    A.   Is that what it reads on that medical record?

4    Q.   Yes.

5    A.   So as soon as they come onboard the ship, we will feed them

6    if they haven't been fed.

7    A.   But you would agree that's on the medical record; right?

8    A.   I would have to read what is on that medical record, sir.

9         MR. ENCINOSA:  May I approach, Your Honor?

10        THE COURT:  All right.

11        THE WITNESS:  Would you like me just to hold on to that

12   so you can ask questions?

13   BY MR. ENCINOSA:

14   Q.   That's all right, I need to walk.

15        MR. ENCINOSA:  May I approach, sir?

16        THE COURT:  All right.

17        THE WITNESS:  Yes, it does say that, it just says he

18   hadn't eaten in two days.

19   BY MR. ENCINOSA:

20   Q.   It also said he had abdominal pains, right, mild abdominal

21   pains; right?

22   A.   It says mild abdominal pains, sir.

23   Q.   I'm just going to get it for the last time.

24   A.   I will leave that open for you.

25   Q.   I appreciate it.  Who came up with the idea of putting the

1    aluminum foil on this?

2    A.   That would be one of our specialists who was on another

3    ship who had vast experience being down in the area and that

4    there's a community that talks about best practices, and the

5    aluminum foil assist not only being inside the skin of the

6    ship, our older ships are made of actual steel, back when

7    America used to make steel, so it's thick.  So even when I'm in

8    home port, I still can't get a signal from my cell phone, so

9    that's pretty much just there as a secondary precaution.

10   Q.   Was the battery taken out when it got to the -- or kept in?

11   A.   It was taken out once it was brought onboard the ship.

12   Now --

13   Q.   And it was for the safety that it was put on; right?  For

14   the ship's safety; right?

15   A.   It was there so that if it somehow had second mechanism we

16   were not aware of, it would be in aluminum foil which would

17   distort the signal and then put inside the skin of the ship,

18   good luck for getting a signal.

19   Q.   And that would make sense for ship safety; right?

20   A.   That is correct, sir.

21   Q.   But it's been like eight months already; right?

22   A.   Yes, sir.

23   Q.   You didn't find a device like this, this was for ship's

24   safety, this -- we're in trial here, it was uncovered, somebody

25   might know where we are, where this spot is right now; right?

1   A.   Sir, I don't know what -- I'm not an expert when it comes

2   to that.

3   Q.   You didn't find this device with this aluminum paper on it,

4   did you?

5   A.   No, sir, we put that on there.

6   Q.   Okay.  This is just -- you brought the aluminum paper just

7   to show that you were concerned for the safety of the boat;

8   right?

9   A.   That is correct, sir.

10  Q.   This is not needed for trial; right?

11  A.   I can't speculate to that, sir.

12  Q.   Now, you talked about some programs that you have and you

13  can track this thing to the computer or something?

14  A.   Yeah, basically if you have the number to it you can find

15  out where it is on the globe.  If it has a signal, you can

16  track it.

17  Q.   You can find out, you get on your computer and you find out

18  where this device is right now?

19  A.   Yes, sir.

20  Q.   So if somebody was looking at a computer, they will find

21  out we are in court in Key West; right?

22  A.   If it has power.

23  Q.   Okay, and somebody wanted to track that load; right?

24  A.   If they put it out on those, I would assume they would want

25  to know where the cargo is.

1    Q.   And computers have specific numbers; right?

2    A.   IP addresses you mean?

3    Q.   Yeah.

4    A.   IP, yes every computer has an IP address.

5    Q.   Everything that you got into evidence, you marked it and

6    you put it in a property room, right, in the ship?

7    A.   That is correct.

8    Q.   And that's to preserve it; right?

9    A.   That is correct.

10           MR. ENCINOSA:  I have no further questions.  Thank you.

11           THE COURT:  Redirect.

12                        REDIRECT EXAMINATION

13   BY MS. ANTON:

14   Q.   Officer Hames, defense counsel was asking you a lot of

15   questions about this spot tracker and the safety of your

16   Coast Guard cutter.

17        Are there any other mechanisms that you do inasmuch as the

18   bales of cocaine are concerned to see if there's any other

19   trackers contained within there?

20   A.   Yes, ma'am, we have like a little metal detector wand that

21   will trace over each bale to make sure there is nothing else

22   hidden inside.  We have received information from other units

23   that had actually been tracked and they had thought they had

24   taken everything out because there was something that was

25   inside one of the bales that they did not open.

1        Like I said, we only open up one bale to get a

2   representative sample so from those practices we had a metal

3   detecting wand and went over it to make sure we could not be

4   counter-intel tracked.

5   Q.  As to the issue of the medical records, you've now reviewed

6   those medical records?

7   A.  Yes, ma'am.

8   Q.  Did any of those seven defendants say they had been at sea

9   for 12 days?

10  A.  No, ma'am, each one said three.

11  Q.  Let's talk a little bit about saltwater.  You spent a great

12  deal of your career dealing with saltwater?

13  A.  Yes, ma'am.

14  Q.  Would you agree with me that it is corrosive?

15        MS. PINERA-VAZQUEZ:  Objection, leading.

16        THE COURT:  Overruled.

17  BY MS. ANTON:

18  Q.  What does it do to your boat?

19  A.  Well, steel does not like saltwater, that's for sure.

20  Q.  Creates rust?

21  A.  All the time.

22  Q.  So you had a chance now to look at the spot trace in

23  addition do the buoy which is Government's 33; right?

24  A.  That's correct.

25  Q.  Both of those things were floating in the saltwater; right?

1  A.  Yes, ma'am.

2  Q.  And you're not exactly sure how long they were floating

3  there?

4  A.  No, ma'am.

5  Q.  It took you how long to get out to the jettison field?

6  A.  From the time we were at the Panga, probably just a little

7  over an hour, I would say an hour, hour-and-a-half.

8  Q.  So you know at least an hour-and-a-half they were floating

9  in the saltwater?

10  A.  Yes, ma'am.

11  Q.  Both of those items?

12  A.  Yes, ma'am.

13  Q.  So they were wet?

14  A.  Yes, ma'am.

15  Q.  And clearly, you did not process anything for fingerprints?

16  A.  Yes, ma'am.

17  Q.  Any wet items for fingerprints?

18  A.  No, ma'am.

19  Q.  Let's talk about this fishing vessel number one, defense

20  counsel wanted to imply that there was fishing vessel number

21  two.

22        MS. PINERA-VAZQUEZ:  Objection.

23        THE COURT:  Rephrase your question.

24  BY MS. ANTON:

25  Q.  How many Pangas were there that day on October 18th in the

1    Eastern Pacific that jettisoned 36 bales of cocaine that were

2    brought onto the Coast Guard *Mellon*?

3                MS. PINERA-VAZQUEZ:  Objection, Your Honor.

4                THE COURT:  Overruled.

5    BY MS. ANTON:

6    Q.  How many?

7    A.  Only one.

8    Q.  Only one.  And is that indicated by your picture of fishing

9    vessel number one?

10   A.  That is correct.

11   Q.  Now, when you were bringing all of those bales as in

12   Government's 17, the big bales, when you were bringing them on

13   the over-the-horizon back to the Coast Guard *Mellon.*  You

14   picked them out of the water, they were very heavy?

15   A.  Yes, ma'am.

16   Q.  Were they drenched in water?

17   A.  They were sitting in the water for quite some time, so yes,

18   they were surrounded in water, they're going to be wet, yes,

19   ma'am.

20   Q.  So was that fabric that was on the outer layer containing

21   some of that water?

22   A.  Yes, ma'am.

23   Q.  Do you think it's fair to say they were heavier than when

24   they were dry?

25   A.  Definitely.

1   Q.   But, nonetheless, you managed to load those all on to your

2   small 23-foot over-the-horizon boat?

3   A.   That is correct.

4   Q.   With five crew members?

5   A.   That is correct.

6   Q.   And a big A-frame?

7   A.   That's correct.

8   Q.   And the seats?

9   A.   And the seats.

10   Q.   That is a pretty shallow vessel; is that fair?

11   A.   That is correct.  The draft of the vessel is only 22

12   inches.

13   Q.   Can you explain what that means, the draft of the vessel?

14   A.   The draft goes from the pre-board, which sits underneath

15   the sponson, to basically the keel, which is what keeps the

16   ship upright, so from that portion of the bottom of that ship

17   is only 22 inches.

18   Q.   And how does that compare to the draft of the Panga that

19   you saw?

20   A.   I don't actually know what the draft of that Panga looks

21   like.

22   Q.   I'm going to put up on the Elmo Government's Exhibit 11.

23   That's a picture of the Panga.  That's the boat that you saw

24   that day; right?

25   A.   Yes, ma'am.

1   Q.   Is that boat deeper than the *Mellon* -- *Mel-II* that you were

2   on?

3           MR. CHAMBROT:   Objection, Your Honor, no foundation,

4   speculation.

5           THE COURT:   If he knows.

6   BY MS. ANTON:

7   Q.   Can you see that boat in the picture?

8   A.   Yes, ma'am.

9   Q.   Do you spend your career on the ocean?

10  A.   Yes, ma'am.

11  Q.   Do you spend your career dealing with boats?

12  A.   Yes, ma'am.

13  Q.   Are you in the United States Coast Guard?

14  A.   Yes, ma'am.

15  Q.   Have you seen a boat like that before?

16  A.   I have, ma'am.

17  Q.   Is that typically referred to as a Panga?

18  A.   That is correct, ma'am.

19  Q.   Have you been inside one of those boats before?

20  A.   I have, ma'am.

21  Q.   And how does that compare in terms of depth to the OTH boat

22  that you were on?

23  A.   It's significantly deeper.

24  Q.   Is that boat, the Panga, I'm referring to in Government's

25  11, is that designed to carry fish or cargo?

1    A.   Yes, ma'am.

2    Q.   Is it designed to transport those items?

3    A.   Yes, ma'am.

4    Q.   Is your over-the-horizon designed to carry cargo?

5    A.   No, ma'am.

6    Q.   Or fish?

7    A.   No, ma'am.

8    Q.   You said that you were going pretty slowly back to the

9    cutter when you had it all on the vessel.

10        You guys weren't in a hurry, were you?

11   A.   No, ma'am.

12   Q.   Did you have some deadline that you had to meet?

13   A.   No, ma'am.

14   Q.   Were you carrying a load and you had to make a drop-off?

15   A.   I was just carrying it right to *Mellon*.

16   Q.   *Mellon* say you had to be back at a certain time?

17   A.   No, ma'am.

18   Q.   Were you trying to avoid detection?

19   A.   No, ma'am.

20   Q.   So you were just leisurely going back to the *Mellon* trying

21   to maintain of the integrity of your cargo?

22   A.   Like I said, safety and security of the ship, my crew and

23   the evidence that we had on board.

24        MS. ANTON:   Thanks, I have no further questions.

25        THE COURT:   Okay.   Thank you, you may step down.

 1              (Witness excused.)

 2              THE COURT:  We will go ahead and recess for lunch and

 3      ask that you be back at 10-minutes of 2:00.

 4              COURTROOM DEPUTY:  All rise.

 5              (Jury exited courtroom at 12:52 p.m.)

 6              (Lunch recess taken from 12:52 p.m. to 1:50 p.m.)

 7              (Jury entered courtroom at 1:50 p.m.)

 8              MS. VIAMONTES:  At this time, the United States of

 9      America calls United States Coast Guard Officer Rutledge.

10              COURTROOM DEPUTY:  Raise your right hand, please.

11              Do you solemnly swear the testimony you're about to

12      give is the truth, the whole truth, and nothing but the truth,

13      so help you God?

14              THE WITNESS:  Yes, ma'am.

15              COURTROOM DEPUTY:  Thank you, please be seated.

16              Would you please state your full name for the record

17      and also spell it.

18              THE WITNESS:  Sure.  Jason Brian Rutledge, J-A-S-O-N,

19      Brian, B-R-I-A-N, Rutledge, R-U-T-L-E-D-G-E.

20              (OFFICER JASON BRIAN RUTLEDGE, being sworn, testified

21      as follows:)

22                          DIRECT EXAMINATION

23      BY MS. VIAMONTES:

24      Q.  Good afternoon, Officer Rutledge.

25      A.  Hi, ma'am.

1   Q.   Sir, can you please introduce yourself to the members of

2   the jury and tell them where you work and in what capacity?

3   A.   Sure, no problem.  My name is Jason Rutledge, United States

4   Coast Guard, and working with the Coast Guard now for about 17

5   years.  I first started in Cape Canaveral, Florida, on a 210 as

6   a fireman, just doing fireman things.  From then, I went to

7   machine technician school in Yorktown, Virginia.

8        After there, I went to my first assignment as a mechanic up

9   in Coast Guard Cutter *Abbie Burgess* up in Rockland, Maine.  I

10  was up there, did buoy attending, 9/11 happened, and after

11  9/11, I went to Tactical Narcotics Team North in Virginia.

12       From Tactical Narcotics Team North, I went to MSST 11-02,

13  which is Maritime Security & Safety Team, where I became the --

14  I went to school to become a boarding officer and coastal

15  officer with law enforcement.

16       When I was there, I had the opportunity to go to Auburn

17  University where I trained and studied to become one of the

18  first dog handlers since World War II.  I was an explosive dog

19  handler, I did a lot of missions up in New York.

20       From mid-2002, I was requested to go into Securities

21  Response Team One, where we just worked with Tom Rich and kind

22  of just traveled the United States, making certain everything

23  was secure at the time.

24       From Securities Response Team One, I got selected to go to

25  the Enhanced Maritime Security & Safety Team.  My specialty was

1   explosives and radiation and detection capabilities.

2        From Enhanced Maritime Security & Safety Team, I was then

3   brought over to marine -- I'm sorry -- Maritime Security

4   Response Team, which is also out of Chesapeake, Virginia.

5   There I was just working on -- I went from anti-terrorism to

6   counterterrorism, and that's all I did for approximately five

7   years.

8        In the meantime, my wife pretty much explained to me that I

9   needed to change my choices.  I was getting a little bit older,

10  I needed to slow down a little bit and become a father.

11       And from there I went to Cleveland, Ohio, working in the

12  Great Lakes.  I was in charge of all law enforcement on the

13  Great Lakes, which was a lot of fun and a little bit different

14  than working on counterterrorism.

15       And from there I went to Maritime Law Enforcement Training

16  Center where I was actually an instructor for Boarding Officer

17  School, boarding team member, counterdrugs, video detection, as

18  well as port and waterways coastal security.

19       After that time of five years, my son was getting ready to

20  go to college.  I got the --

21            THE COURT REPORTER:  Slow down, please.

22            THE WITNESS:  I'm sorry.

23  BY MS. VIAMONTES:

24  Q.  Slow down just a bit, because we have interpreters

25  interpreting.

1    A.   Where was I at?

2         Son's in college, I was going to Coast Guard Cutter *Mellon*,

3    which was a nice place to go, I was born and raised in Seattle

4    and it's a great ship to be on, I'd do it.

5         Right now, I'm in charge of the law enforcement, I'm the

6    specialist for law enforcement, and pretty much it was more of

7    like preemptive search and rescue, we just make certain that

8    overall we take care of the search and rescue cases in Florida.

9    Q.   All right.  Great.  That was a mouthful.

10        You've been in the Coast Guard for a while.

11   A.   Yes, I've had interesting career.

12   Q.   How many years, 17?

13   A.   Over 17.

14   Q.   Now, back in October of 2016, were you on the Coast Guard

15   *Mellon*?

16   A.   Yes, I was.

17   Q.   What was your responsibility on the *Mellon*?

18   A.   My responsibility on the *Mellon* that day was to make

19   certain that my team was functioning smoothly in accordance

20   with policy as well as the boarding officer's recommendations.

21   Q.   You were in charge of law enforcement operations on the

22   *Mellon*?

23   A.   Commanding officer, I just advise.  I'm kind of like Paul

24   Blart from Mall Cop, I just observe and report.

25   Q.   Do you have a scooter?  Hover board?

1  A.  I don't think I'm allowed to.

2  Q.  When you're on the *Mellon*, do you actually go out and join

3  the boarding team over-the-horizon?

4  A.  At times I do, at times I do.

5  Q.  Back in October 2016?

6  A.  No.

7  Q.  October 18th, did you join the boarding team to go out to

8  the Panga?

9  A.  No, I did not.

10  Q.  On that particular mission, what was your role?

11  A.  My role in that particular mission was just to make certain

12  that the detection capabilities for the ION scan were done

13  appropriately.

14  Q.  ION scan.  Let's talk about that.

15  A.  Cool.

16  Q.  Tell the members of the jury what an ION scan is?

17  A.  ION scan is a device sold by Smith Detection, it costs

18  about $46,000, it's the exact same machine they use at the

19  airport.  Essentially what it does is that when they take a

20  swab, it goes into the machine and the machine is kind of like

21  apple pie.

22      So when you smell apple pie, grandmother's apple pie or

23  your wife's apple pie, you're smelling like the apples, you're

24  smelling the cinnamon, you're smelling, you know, the baking

25  soda and flour all together, it's one apple pie, and we don't

1   have the capability amongst ourselves to actually pick out the

2   apple.

3        What this machine does once he get the apple pie and that

4   situation gets all IONs, all little particles, so to speak,

5   they can pick out exactly what particle based upon how it's

6   programmed.  So in this situation, it picked out cocaine.

7   Q.   Now, were you on the Panga?  Did you conduct the swipes of

8   the vessel?

9   A.   No.  No, ma'am.

10  Q.   Did you receive the swipes from the Panga vessel?

11  A.   Yes, ma'am.

12  Q.   Did you receive the swipes in reference to this case in

13  connection with this case?

14  A.   Yes, ma'am.

15  Q.   When you receive the swipes, what do you do with them?

16  A.   When I receive the swipes in a sterile environment what I

17  do is I take the swipes, process -- I have a little piece of

18  paper which I write one through whatever.

19  Q.   Let me ask you, is there something you do before you

20  receive the swipes to get your work station ready?

21  A.   Oh, yeah.

22  Q.   Tell us about that.

23  A.   To get the machine ready, actually the instrument sits in a

24  -- it has to be kept in a temperature-controlled environment.

25  It's hot, we're on a ship.  So essentially what it is, I make

1   sure that the area is completely sanitized, it's clean, and

2   then I actually swipe the area, I swipe the machine and I swipe

3   the cells and I process that inside the machine.

4   Q.   When you say you swipe the area, do you use the same

5   process that's used on the Panga vessel to swipe the vessel?

6   A.   There's no process, they're the same.

7   Q.   You wipe it?

8   A.   One direction.

9   Q.   Swipe it, and you put that swipe of your work station into

10  the ION instrument?

11  A.   Yes.

12  Q.   Now, let's talk a little bit about the instrument that you

13  use on Coast Guard Cutter *Mellon*.   Can you describe that

14  instrument to the members of the jury?

15  A.   Sure, no problem, it's a Smith Detection ION Scan 500DT, DT

16  stands for dual detection.

17  Q.   What does that mean, dual detection?

18  A.   So the machine itself could detect both popular explosives

19  and narcotics at the same time.

20  Q.   In this particular case, did you set it to detect narcotics

21  or explosive?

22  A.   I don't set anything.

23  Q.   It can detect both?

24  A.   Yes, ma'am.

25  Q.   Now, once your work station is clean and you receive

1    samples from the target of interest, what do you do?

2    A.   Once I receive them, I have a little piece of paper, I

3    write out one through five or one through whatever number that

4    I received, and I literally take the sample and put it inside

5    the machine, I have gloves on, put it inside of the machine,

6    press analyze and a little ampule thing comes up, it burns the

7    sample, so to speak, it goes through the process and after that

8    it comes up either alert or non-alert, so it's either good to

9    go or not.

10   Q.   Now, the samples that you receive, can you explain to the

11   members of the jury how you receive them, what condition they

12   are in or what they look like when you receive them?

13   A.   Sure.  The samples themselves are inside of latex gloves,

14   the samples physically look like, like acne removal, the paper

15   of acne removal, like Oxy-10 kind of, the little piece of

16   paper.  They're bent up, sometimes they're dirty, sometimes

17   they're white, it's a typical swab or a piece of paper that you

18   would find -- TSA uses the exact same ones, it's a common

19   industry swab.  They're inside of --

20   Q.   Is each one -- each swipe that's used on the vessel, is it

21   packaged in a separate latex glove when you receive it?

22   A.   Each one is separate, they're separate and they're numbered

23   separately.

24   Q.   Did you receive eight swipes from the target of interest in

25   this case?

1    A.   Yes, yes.

2    Q.   Now, did you run each of these swabs through the

3    instrument?

4    A.   Yes.

5    Q.   Tell -- explain to the members of the jury what you do in

6    between one sample and the next.

7    A.   Okay.  So swab goes through -- gives the results yes or

8    no-type thing.  If it's yes, at that time it comes out the

9    machine -- I would have to put a clear sample in, it does

10   what's called a clear up or a bake out and verifies what's

11   good, it goes through a process until it's clean.  It has to

12   have two clean samples before you put anything else in it.

13   Q.   All right.  Let me stop you there, if I may, Officer

14   Rutledge.

15   A.   Yes, ma'am.

16   Q.   So in between swipe one and swipe two, do you do something

17   to make sure that the Smith 500 ION scan detector is clean

18   between the two swipes?

19   A.   If they're -- in your example between swipe one and swipe

20   two, if they're clean, no, I don't do anything different.

21   Q.   If you have a positive --

22   A.   Yep.

23   Q.   -- do you do something to clear out the instrument before

24   you put another sample back in?

25   A.   Yeah, there's a clear out procedure, essentially, once it

1    has something that's positive, I put new gloves on, clean the

2    procedure out until it comes back through.

3    Q.   When you place the swabs individually through the ION scan

4    machines in this case did one of the swipes from the target of

5    interest come back detecting cocaine?

6    A.   From the boat?

7    Q.   Yes.

8    A.   Not that -- I believe it came back for MDMA.

9    Q.   Let me approach with Government's Exhibit 38.

10        I am showing you what's been from the marked as

11   Government's exhibit 38.  Do you recognize it?

12   A.   Yes, ma'am.

13   Q.   What is it?

14   A.   This is photocopies of the printed results from the

15   machine.

16   Q.   And are those photocopies true and accurate copies of the

17   printout that you obtained from the ION scan machine when you

18   performed the exam?

19   A.   Absolutely exact same, my handwriting's on it.

20        MS. VIAMONTES:  I move Government's exhibit 38 into

21   evidence.

22        MS. PINERA-VAZQUEZ:  No objection.

23        THE COURT:  Be admitted.

24        (Government's Exhibit 38 admitted into evidence.)

25        MS. VIAMONTES:  Permission to publish, Your Honor.

1              THE COURT:  All right.

2    BY MS. VIAMONTES:

3    Q.  Aside from the ION scan swipes that you received from the

4    target of interest, that were taken from the target of

5    interest, did you perform your own ION swipes?  Did you take

6    swipes of individuals?

7    A.  Yes.

8    Q.  So, when -- after the Panga target of interest was

9    intercepted, eventually were the occupants of that vessel

10   brought on to the Cutter *Mellon*?

11   A.  Yes, ma'am.

12   Q.  Did you have an opportunity to meet the seven people that

13   were on the target of interest on the Cutter *Mellon*?

14   A.  I don't know if "meeting" would be the right word but --

15   Q.  Did you interact with them briefly?

16   A.  Yes, ma'am.

17   Q.  For what purpose?

18   A.  For the sole purpose of being sure there was no evidence or

19   means of escape meaning for the ION detection.

20   Q.  Did you perform ION scan swipes on each of the seven

21   subject taken from the target of interest?

22   A.  Yes, ma'am.

23   Q.  Tell the members of the jury how you do that?

24   A.  Essentially, what it is, is I don't know Spanish, I can't

25   speak Spanish, I don't read Spanish, I don't do any of that,

1    however I'm a very good communicator when it comes to just

2    relationships, so essentially it was -- it was that simple.

3    Q.   And just for the record, you're -- can you tell us what

4    you're doing, in terms of your hand motions?  Can you just

5    editorialize it, if you will?

6    A.   Sure, most people actually communicate via nonverbal.

7    Q.   But what did you do with these subjects?

8    A.   I pointed to the person and I pointed to my hand and put my

9    hand out and then I actually just demonstrated on my hand and

10   then that's how they came out.

11   Q.   So you demonstrated that you were going to swipe and then

12   you asked for the subject's hands?

13   A.   I didn't ask verbally.  I asked nonverbally.

14   Q.   And did you swipe each of the seven subjects' hands?

15   A.   Yes.

16   Q.   And did you swipe their clothing?

17   A.   Yes.

18   Q.   And any of those swipes come back positive for cocaine?

19   A.   Yes, ma'am.

20   Q.   And did you note on the top when a sample comes back

21   positive for a substance, such as cocaine, do you note where

22   that sample was coming from?

23   A.   Yes, ma'am.

24   Q.   And do you note that on the top of the printout?

25   A.   Yes, ma'am.

1  Q.   Did you use the same process as you previously described to

2  the jury when using the ION scan machine in reference to the

3  samples taken from the vessel?

4  A.   Yes, ma'am.

5  Q.   So do you make sure the instrument is clean in between

6  different samples?

7  A.   Yes, ma'am.

8  Q.   And was your work space clean?

9  A.   Yes, ma'am.

10  Q.   And referring to -- that may be too much there.

11      Can you see your handwritten note at the top of this

12  printed receipt?

13  A.   Yes, ma'am.  Yes, ma'am.

14  Q.   And what does that handwritten note say?

15  A.   "Sample 18, person 3, hand."

16  Q.   And at the bottom, is this where we see the result of that

17  ION scan?

18  A.   Actually, I don't know what any of what that means, the

19  bottom, go back to the top.

20  Q.   Okay.

21  A.   Right there, stop, it just says, "alarm, cocaine."  That's

22  me.

23  Q.   In between samples or when you go to use the ION scan

24  machine, does the instrument itself check to see if it's

25  calibrated?

1    A.   Not based on my training and experience.

2    Q.   You don't know?

3    A.   No, no.

4    Q.   And now, on Page 2, I'm showing you page two of

5    Government's Exhibit 38.  At the top of this receipt, do you

6    see your handwriting?

7    A.   Yes, ma'am.

8    Q.   What does it say?

9    A.   "Sample 13, person 3, clothes."

10   Q.   And what is the result?

11   A.   "Cocaine, 25 percent."

12   Q.   This other receipt here, what does your handwritten note

13   say?

14   A.   "Sample 6, port, boat, bow," it looks like my initials,

15   sorry.

16   Q.   And this one doesn't have a positive for cocaine?

17   A.   No, MDMA, two percent.

18   Q.   Now let's talk a little bit about the contraband brought

19   onto the Cutter *Mellon*.

20   A.   Sure.

21   Q.   How did that arrive?

22   A.   Essentially, it came to via a small boat over to the --

23   small boat, OTH, rib, and came back over to the *Mellon* and I

24   was monitoring it as it was coming onboard the vessel.

25   Q.   I'm placing on the Elmo what has been moved into evidence

1   has Government's Exhibit 17.  Do you recognize it?

2   A.   Oh, yeah, yes, ma'am.

3   Q.   What does Government's Exhibit 17 show?

4   A.   It shows the back part of the boat with a bunch of

5   contraband, two fishing pole holders, a fad or fish identifier

6   is the big round thing, a breathing pipe, a red line on the

7   deck, nonskid.

8   Q.   Are these bales of narcotics that you saw brought on the

9   Cutter *Mellon* on October 18th, 2016?

10  A.   Yes, ma'am, yes, ma'am, yes, ma'am.

11  Q.   When those bales came on, did you assist in counting them?

12  A.   Counting them, yes, ma'am.

13  Q.   Did you assist in storing them?

14  A.   Yes, ma'am.

15  Q.   Did you assist in weighing them?

16  A.   Yes, ma'am.

17  Q.   Did you get a rough estimate as to the total weight of the

18  narcotics, the contraband brought -- suspected contraband

19  brought onto the *Mellon*?

20  A.   Yes, ma'am, very gross estimate.  Yes, ma'am.

21  Q.   And what was gross estimate of this weight?

22  A.   I don't recall.

23  Q.   Okay.

24  A.   I can tell you that there's double bales and single bales

25  there but I don't remember every single number.

1    Q.   When you weigh it, do you take a relative sample from it or

2    when you weigh it did you take a representative sample from it?

3    A.   Yes, ma'am.

4    Q.   And were you there to witness when they took 10 kilos as a

5    representative samples from those bales?

6    A.   Yes, ma'am.

7    Q.   Where were those bales stored?

8    A.   They were actually --

9    Q.   On the *Mellon*?

10   A.   They were stored actually in an ammo locker which is right

11   towards the back of the boat.

12   Q.   Is that locked?

13   A.   Oh, yes, ma'am.

14   Q.   Can anybody get to it?

15   A.   Only if you have access, ma'am.  It's a place where bullets

16   are stored so.

17   Q.   I'm sorry?

18   A.   It's 's a place where bullets are stored, so maybe four

19   people maybe have access to that area.

20   Q.   Officer Rutledge, when did you the ION swipes on the

21   defendants' hands and on their clothing, can you smell them?

22   A.   Can I smell --

23   Q.   Can you smell any odor emanating from them?

24   A.   So the clothing was not on the persons when I swiped them,

25   the clothing was separated because I did it after the

1   processing and the clothing had a very distinctive odor that I

2   was familiar with.

3   Q.   What was that?

4   A.   Boat fuel.

5            MS. VIAMONTES:  Nothing further, Your Honor.

6            THE COURT:  Cross.

7                           CROSS-EXAMINATION

8   BY MR. ABRAMS:

9   Q.   Good afternoon, sir.

10  A.   Howdy.

11  Q.   You were not out at our guys' boat to do the swipes for the

12  ION scan in this case, were you?

13  A.   I never left Coast Guard Cutter *Mellon*.

14  Q.   Somebody else did the swipes, an individual trained by you

15  perhaps?

16  A.   Yes, sir, I trained numerous people.

17  Q.   I think this was Higgins?

18  A.   Yes, sir, but I trained thousands of people.

19  Q.   And you would agree with me, when doing ION scans or doing

20  swipes that are used for ION scans, it's very important to

21  protect the integrity of the swipe for testing; right?

22  A.   Yes, sir.

23  Q.   Because you know from your experience that there's also the

24  danger of contamination?

25  A.   Absolutely.

1    Q.   That's one of the reasons why, when you use your machine

2    and you get a positive, that you do several tests to make sure

3    it's registering negative before you put in another unknown; is

4    that right?

5    A.   Yes, sir.

6    Q.   Because you don't want to get a false positive based on

7    residue from a prior test?

8    A.   Sure, makes sense.

9    Q.   Is that right?

10   A.   It's logical.

11   Q.   Now, ION scans measure -- well, we talked about -- or you

12   talked about the 500DT, the machine?

13   A.   Yes, sir.

14   Q.   Measure controlled substances in what are called nanograms

15   or one billionth of a gram; is that right?

16   A.   Sounds about right.

17   Q.   Size of the particle you can't see?

18   A.   No, sir.

19   Q.   In fact, for all we know, there could be something on this

20   podium right now, you can't see it, I go like that, can't see

21   it, you swipe my hand, that's positive?

22   A.   I don't know.

23   Q.   You don't know; right?  If there was something on here,

24   perhaps maybe yes, maybe no?

25   A.   I'm not going to say either way.  I mean, you could have

1    something on your hand and then you touched it, either way, I

2    don't know.

3    Q.   The boat, our boat did not test positive for cocaine; is

4    that right?

5    A.   MDMA.

6    Q.   That means --

7    A.   It did not test positive for cocaine, there was no alarm

8    for cocaine.

9    Q.   And in your experience as someone who trains people to do

10   the ION scans, you tell them where to test; right?

11   A.   No.

12   Q.   You don't?

13   A.   No.

14   Q.   You don't think that -- you don't tell them -- well, you

15   want to check areas of the boat that are more commonly handled

16   perhaps than other spots?

17   A.   That's different.

18   Q.   How do you train them?  How do you know where to test?

19   A.   I explain to people you go places that will likely have

20   been touched by something so whatever their imagination is of

21   touching something, one person might have a different

22   definition than another.

23   Q.   I'm just going to throw up, for example, Government

24   Exhibit 9.  Do you see these little handles sticking up here?

25   A.   Yeah.

1    Q.   The control lever for the engines depicted in Government's

2    Exhibit 8?

3    A.   Okay.  I don't -- okay, sure.

4    Q.   Would that be an area that you would think is worthy of

5    testing because it would be handled in the normal operation of

6    the boat?

7    A.   Based on my training and experience, yes, but I can't tell

8    everyone else to do that.

9    Q.   Do you know -- I know you got eight numbered examples from

10   the officer who did the swipes.

11   A.   Yes, sir.

12   Q.   Do you know where those samples were taken from?

13   A.   Originally, no.

14   Q.   Do you know now?

15   A.   I do now.

16   Q.   Where were they taken?

17   A.   I don't know where all of them were taken, just that one,

18   the reason is, is because I don't know.  I mean, I don't have

19   an answer of why that would be.  I don't want to know.  I mean,

20   it's not my business, it's not my case.  I just know if the

21   sample goes green or the sample's red.

22   Q.   Well, you're the guy that's responsible for running the

23   test; right?

24   A.   I'm the person responsible for running the test.

25   Q.   And you want to make sure that the test swab that you're

1   running is perhaps the most accurate, whether it come out

2   positive or negative than it can be for what you're doing?

3   A.   That's not true.

4   Q.   It isn't?

5   A.   Not necessarily.  I make sure that the machine is running

6   correctly per actually from instruction.  How they get the

7   samples is up to their training and experience, that's not

8   my -- I can't speak about them.

9   Q.   So you don't care where the swipes are taken?

10   A.   That's based upon where they believe it's most possible.

11   My experience and training is different from theirs.

12   Q.   I know I asked this already, there was no positive test for

13   cocaine on our boat?

14   A.   Correct.

15   Q.   Okay.  Did you have anything to do with the transportation

16   of the seven guys from our boat to *Mellon*?

17   A.   No.

18   Q.   Did you have anything to do with the transportation of the

19   cocaine from the jettison field to *Mellon*?

20   A.   No.

21   Q.   How about the loading of the cocaine from *Mel-II* onto the

22   *Mellon*?

23   A.   No, I mean, no, I wasn't there for that.

24   Q.   Okay.  By the way, do you know when  the coke was brought

25   onboard the *Mellon*?

1   A.   It was getting dark.

2   Q.   Now, you'd agree with me, just as it is important to

3   protect the integrity of the swabs on the boat that was tested,

4   it's also important to protect the integrity of the swabs that

5   are done on the individual?

6   A.   Yeah, integrity is integrity.

7   Q.   Okay.  And integrity of the sample is important?

8   A.   Yeah.

9   Q.   Whether it's a person or an item of clothing?

10  A.   Yeah, it doesn't matter.  It's the same thing.

11  Q.   And would you also agree with me that the more you can do

12  to minimize contamination of that sample, the better the

13  integrity of the sample?

14  A.   Explain that.

15  Q.   It's better if -- if you are going to test -- okay.  In

16  terms of our case, if you have a question -- if you have a

17  question about whether or not there's cocaine on this pen --

18  A.   Okay.

19  Q.   -- it's sitting on the table right now and you have a

20  question whether there is cocaine on the pen --

21  A.   Okay.

22  Q.   -- you would agree with me that your sample, the integrity

23  is preserved better by testing it right from the table as

24  opposed to my picking it up, my handing it to one of my

25  co-counsel, who then pass it down the lane and then hand it to

1    you and then you want to test it for cocaine; is that right?

2    A.   Okay, I understand, yeah.

3    Q.   So here you have -- you testified that when the seven guys

4    were brought onboard the boat, you took a swab of everyone's

5    hand; right?  Is that right?

6    A.   Yeah.

7    Q.   And then you checked their clothing as well?

8    A.   Uh-huh.

9    Q.   They were no longer wearing their clothing at the time?

10   A.   Right.

11   Q.   And you determined that one hand and one set of clothing

12   tested positive?

13   A.   Correct.

14   Q.   Is that right?  All right.  Now, at what point are you

15   involved with the seven guys?

16   A.   You just said I just tested them.

17   Q.   When?

18   A.   When I just tested them.  After the processing.

19   Q.   Okay, that's it.  Let's talk about the processing.  So

20   they're brought onboard the boat and they're subject to a

21   search; is that correct?

22   A.   Absolutely.

23   Q.   Did you conduct the search?

24   A.   No, sir.

25   Q.   After the search, they're conducted to a medical screen?

1    A.   Yes, sir.

2    Q.   Did you conduct the medical screen?

3    A.   No.

4    Q.   After the medical screen, they are providing a medical

5    history to the -- or perhaps during the medical screen they're

6    providing a medical history to the medical staff of the *Mellon*?

7    A.   Yes, that's per policy.

8    Q.   Are you part of that?

9    A.   No.

10   Q.   Then they're taken inside the ship?

11   A.   Yes, sir.

12   Q.   Right?  And they are asked their names, their date of

13   birth, and where they're from?

14   A.   That's policy, yes, sir.

15   Q.   Then they're photographed?

16   A.   That's policy, sir.

17   Q.   Are you part of the taking them inside the ship, taking

18   their name, date of birth and where they're from or the

19   photograph?

20   A.   No, sir, as far as policy, I just observe and report.

21   Q.   How many different people are involved during this process?

22   A.   Best guesstimate would be 20, based on skill set.

23   Q.   Okay.  And that's after they're on board?

24   A.   Yes, sir.

25   Q.   Right?  Additionally, when the guys are transported from

1    their boat to the *Mellon*, they're transported on a boat with

2    five other members of your vessel, or five other crewman of

3    your vessel, the crew of *Mel-I*, which transported them to the

4    *Mellon*; right?

5    A.   So you're asking me if the personnel were on *Mel-I* with the

6    five people?

7    Q.   I'm talking about the five other people who had contact

8    with the seven guys?

9    A.   Sounds about right, I guess, I don't remember witnessing

10   any.

11        MS. VIAMONTES:   Objection, Your Honor, it calls for

12   speculation.   He already testified he wasn't on the OTH.

13        THE COURT:   Sustained.

14   BY MR. ABRAMS:

15   Q.   Do you know how many crew go out on *Mel-I* or *Mel-II* when

16   they go out to do a law enforcement interdiction?

17   A.   For crewmen it would be four.

18   Q.   How about if they need an interpreter?

19   A.   That's including the interpreter at times.

20   Q.   And you agree with me, I say that a lot -- that one of the

21   primary functions of Coast Guard is safety; right?

22   A.   Yes, sir.

23   Q.   And when you are transporting people your concern --

24   whether they're in custody or they're someone you encounter on

25   high seas who's having a problem with their pleasure craft,

1    that it doesn't matter, you're looking after their personal

2    safety, you don't want them to fall overboard and drown; right?

3    A.   Yes, sir, that's overarching basic Coast Guard principle.

4    Got it.

5    Q.   That's pretty much the principle of what the Coast Guard

6    does, right, is safety rescue and --

7    A.   Yes.

8    Q.   -- taking care of people?

9    A.   Yeah.

10   Q.   Is it fair to say the crew of *Mel-I* in the transporting the

11   seven guys to the *Mellon* are going to have some kind of contact

12   with them to make sure they have safety vests or life jackets

13   and make sure that they are not going to fall off *Mel-I* and go

14   into the water?

15   A.   Yes, sir.  That is Coast Guard procedure, I didn't witness

16   that, what you're saying is implied, we put life jackets on

17   people to help them.

18   Q.   Do you know -- oh, and then, once *Mel-I* gets to -- and this

19   is just generic -- when *Mel-I* gets to your boat, the people

20   have to get off of *Mel-I* and get onto your boat; is that right?

21   A.   Yeah, you got to -- yeah, yeah.

22   Q.   Now do they climb a Jacob's ladder or something?

23   A.   No.

24   Q.   Or the cranes pull *Mel-I* up?

25   A.   Normally, we just literally -- it's like an amusement ride

1    at Disney World.  We have this machine and it is designed by

2    the same people that make roller coasters, it's hooked in there

3    and (indicating) and they just walk right off.

4    Q.   So you climb off?

5    A.   No, that's not what I said at all.

6    Q.   You said walk off?

7    A.   That's what I said.  There's a difference between climbing

8    and walking.

9    Q.   Okay.  So someone gets off the boat and this is probably a

10   little higher, but I reach and touch and climb off -- walk off?

11   A.   We have places all over the place, they don't -- all over,

12   it's a 50-year-old ship.

13   Q.   How long, if you know, was it between the time the seven

14   guys were taken off of their boat and their hands and clothing

15   was tested by you?

16   A.   I don't know.  I didn't witness that.  I know that I was

17   tired and hungry, but that's all I know is what I know.  I

18   didn't witness that.

19   Q.   Were you aware of what time *Mel-I* and *Mel-II* left the

20   *Mellon*?

21   A.   I don't recall, no.

22   Q.   You were notified at some point that Mel-I was coming in

23   with seven guys and you were going to need to test them; right?

24   A.   Yeah.

25   Q.   How long between the time you were notified that *Mel-I* was

1    coming in for people to test and the time you actually got to

2    test them?

3    A.  I don't remember.

4    Q.  An hour, two hours?

5    A.  I don't remember.

6    Q.  This is going to sound real silly.  When the seven guys

7    were brought over from their boat to Mel -- to the *Mellon*, on

8    *Mel-I*, were their hands wrapped in bags to protect the

9    integrity of anything on their hands the same way that the

10   swipes were protected with the rubber gloves that you tested

11   from the little boat?

12   A.  So, wait -- hold on a second.  So you're asking me if their

13   hands have the same rubber gloves that the swipes had?

14   Q.  No, I'm asking you if you did anything to protect their

15   hands.

16   A.  I wasn't on that boat, I was on *Mellon*.

17   Q.  When you saw them, was there any kind of protective wrap on

18   their hands?

19   A.  No.

20   Q.  What I'm asking you is, when you got the swipes from our

21   boat --

22   A.  Yes.

23   Q.  -- you got them in rubber gloves?

24   A.  Yes, sir.

25   Q.  The swab is in the rubber glove and wrapped on the rubber

1    glove, right, to make sure there's no outside contamination?

2    A.   Right.

3    Q.   So what I'm asking you is what was done with regard to

4    these seven guys and their clothing to make -- to similarly

5    protect the integrity of the sample that you were going to take

6    and test to see if there was cocaine?

7    A.   That doesn't make sense, because the sample is a sample and

8    a person is a person.

9    Q.   Right.

10   A.   They're not related.

11   Q.   All right.  Here's my point.  Never mind.  We're going to

12   pretend, all right.

13   A.   Sure.

14        MS. PINERA-VAZQUEZ:  Use the spaceship.

15        MR. ABRAMS:  That's all right.

16   BY MR. ABRAMS:

17   Q.   A brick of cocaine was placed on this podium, it just sat

18   there?

19   A.   All right.

20   Q.   A brick of cocaine was taken away?

21   A.   All right.

22   Q.   It's not here anymore, I'm looking, I don't see anything on

23   here.  I'm talking to you, I put my arm like this; right where

24   the Coke was, all right?

25   A.   Right.

1    Q.   I bring my jacket to you, you test it?

2    A.   Okay.

3    Q.   A good chance my jacket is going to test positive for coke,

4    isn't it?

5    A.   It's about the machine.

6    Q.   Well, you're familiar with transference; right?

7    A.   Yes, I am.

8    Q.   And transference essentially is that if you put a

9    controlled substance on something, remove the controlled

10   substance, somebody else touches it, then that somebody else

11   who touches it may or may not test positive for cocaine?

12   A.   Sure.

13   Q.   All right.  Similarly, the seven guys coming off the boat,

14   bare-handed during the transportation on *Mel-I*, during --

15   walking off of *Mel-I* and touching a handle, going into the ship

16   for the -- being patted down, the medical screening, the

17   history, and providing information and the photograph, who

18   happened to touch a wall, a hatch, the floor, if there was

19   something on it at sometime they could be tested positive;

20   right?

21   A.   Absolutely, you're not -- yeah, you're not wrong.  The ship

22   was underway for a couple -- no less than a couple of weeks and

23   wind and salt spray kind of blow things, it's like going

24   through a car wash -- I mean --

25   Q.   Okay.

1   A.   The ship's -- it's not clean, but it's not dirty.

2   Q.   Okay.   We're not talking like a big patch of dirt on the

3   floor, we're talking microscopic here; right?

4   A.   You said -- sure.

5   Q.   So you'd agree with me -- and here I'm talking about

6   integrity of samples again -- that in regard to the -- you want

7   to avoid contaminated samples; right?

8   A.   At all costs.

9   Q.   So you would agree with me that the sample, the hand

10  samples, the clothing samples, when determining whether or not

11  these men had cocaine on that vessel, would have been much more

12  reliable if you did your swipes or your testing of the clothing

13  and the hands on the boat as opposed to waiting until who knows

14  how much longer later until they were on your boat, had contact

15  with at least 20 people, and went through all that various

16  testing?

17  A.   I'm just looking for weapons, evidence and means of escape,

18  and the reason is because the machine does explosives and

19  narcotics.   I want to make certain that I go home to my family

20  and if I've got a machine that can help me do that, why not?

21  Q.   Does that mean the answer to my question is yes?

22  A.   I don't even remember your question, it was so off.

23  Q.   My question is that the sample and the testing would be

24  much more reliable taken closer to the scene where they were

25  arrested as opposed to taking them someplace else and testing?

1    A.   Okay, sure, no problem.

2    Q.   So as far as we know, if -- if there was anything, again,

3    something we couldn't see and this was just one person brushed

4    up against something --

5    A.   You can't see a nanogram, but go ahead.

6    Q.   Right, that's what I'm saying, all the more reason, I don't

7    see anything there and I brushed up against that.  This is

8    after they were off the boat.  You don't know where the cocaine

9    got on that person's hand or that person's clothing; is that

10   right?

11   A.   I just know the machine said positive cocaine.

12   Q.   Okay, so that means right?

13   A.   I'm not saying that.  I'm saying the machine -- based on my

14   training and experience the machine said cocaine.

15   Q.   And where did that cocaine get on that person's hand and

16   that person's clothing?

17   A.   I don't know, same thing happens to TSA all the time.  The

18   same thing happens overseas all the time.

19   Q.   By the way, does your machine that you know that kilograms

20   of cocaine -- well, you -- did you look at any of the packages

21   or any of the bales after the wrapping on one of the bundles

22   was open?

23   A.   Yes, sir.

24   Q.   It was packaged in kilo quantities?

25   A.   Commonly done.

1    Q.   NIK test?

2    A.   NIK test, yeah.

3    Q.   Now, you know from your experience that cocaine is packaged

4    in certain -- that cocaine has a different quality; right?

5    A.   Yes, sir, my training and experience, absolutely.

6    Q.   It could be like one percent pure versus a hundred percent

7    pure; right?

8    A.   Yeah, it's like water.

9    Q.   Now, does your machine in any way enable you to determine

10   whether the quality, the percentage purity of the cocaine that

11   your machine tested positive for was the same as what was

12   contained in the packages?

13   A.   I have no idea.  All I know is cocaine -- I'm Paul Blart,

14   like I literally, I got the mic, I observe and report, the

15   mic's here, I observe and report, that's it.  I'll cop the heck

16   out of it.

17   Q.   When you tested the clothing, was the clothing taken from a

18   bag?  Where did you get the clothing from?

19   A.   The clothing -- I got the clothing after processing.

20   Q.   Who did you get it from?

21   A.   In a bag.  The bags were all in an area in the flight deck,

22   in the flight area.

23   Q.   And do you know who put the clothing in the bags?

24   A.   No, I do not.

25          MR. ABRAMS:  Thank you.  Nothing further, Judge.

```
 1                THE WITNESS:  You're welcome.
 2                          CROSS-EXAMINATION
 3     BY MR. RODRIGUEZ:
 4     Q.   Good afternoon, Officer, how are you?
 5     A.   Better than I deserve.
 6     Q.   Other than the identification as to person Number 3, you
 7     didn't identify that person beyond that; correct?
 8     A.   That's correct.
 9     Q.   Now, how long have you been on this Mellon?
10     A.   Approximately a year.
11     Q.   During this year, how many interdictions have there been of
12     cocaine?
13     A.   Eight.  Eight.
14     Q.   All right.  And prior to your arrival on the Mellon, you
15     don't know how many other interdictions there have been of
16     cocaine, correct?
17     A.   They have been awarded eight or nine prior.
18     Q.   Now, have you -- are you aware of the collection of cocaine
19     from debris fields, the jettison fields in the ocean?
20     A.   The process or --
21     Q.   The fact that you guys collect it from the ocean?
22     A.   Oh, yeah, now I am.
23     Q.   And you're aware that you use the over-the-horizon
24     inflatables to bring in the cocaine; correct?
25     A.   Correct, yes, sir.
```

1   Q.   I'm going to show you Government's Exhibit Number 12.

2   Well, first of all, let me show you Government's Exhibit 17.

3   Is that the cocaine that was brought through the *Mellon* on this

4   case?

5   A.   That's the contraband.

6   Q.   And I'm going to show you Exhibit Number 12.   Does that

7   show you that cocaine being brought to the *Mellon* on one of the

8   over-the-horizon vessels?

9   A.   It looks similar, yeah.

10  Q.   So these vessels are being used to transport the cocaine;

11  correct?

12  A.   Yes, sir.

13  Q.   These are also the vessels that are used to transport

14  people arrested at sea?

15  A.   You know, I've never arrested.   I've only detained, but go

16  ahead.

17  Q.   I'm not asking whether you did.   But are you aware whether

18  the detainees are picked up on these vessels and brought to the

19  *Mellon*?

20       MS. VIAMONTES:   Objection, Your Honor, that would call

21  for hearsay and speculation.   He testified he wasn't out on the

22  over-the-horizon.

23       THE COURT:   Sustained.

24  BY MR. RODRIGUEZ:

25  Q.   Have you been present when the detainees were brought to

 1   the *Mellon* on one of these over-the-horizon vessels?

 2   A.   Through my entire --

 3   Q.   Yes.

 4   A.   Yeah.  No problem.

 5   Q.   That was the answer I wanted to know.  Thank you very much.

 6                        CROSS-EXAMINATION

 7   BY MR. CHAMBROT:

 8   Q.   Good afternoon, sir.

 9   A.   Hi.

10   Q.   One second.  Sir, you stated that there was no positive

11   cocaine identification on the boat; correct?

12   A.   On --

13   Q.   The samples from the boat?

14   A.   Correct.

15   Q.   And it was -- and the MDMA?

16   A.   MDMA was the sample, yep.

17   Q.   Okay.  Isn't it actually MDA?

18   A.   MDA.

19   Q.   There's a difference, are you aware of that?

20   A.   MDA?

21   Q.   There's a difference between MDA, molly and MDA which is a

22   stimulant to keep people from falling asleep?

23            MS. VIAMONTES:  Objection, Your Honor, beyond the

24   scope, beyond the scope of expertise.  He's not a chemist.

25            MR. CHAMBROT:  Judge, he testified --

1            THE COURT:  Overruled.

2    BY MR. CHAMBROT:

3    Q.   There's a difference between MDA and MDMA, correct?

4    A.   Yes.

5    Q.   So when the boat tested two percent positive for MDMA which

6    is molly, that's not the case, it was for a stimulant called

7    MDA; correct?

8    A.   So you -- yeah, you're right; correct.

9    Q.   Now, the rest of the folks tested negative for cocaine.  So

10   six of the seven, clothing in hands were negative; correct?

11   A.   That's correct.

12   Q.   And the one that tested positive, the alarm came off at 14

13   percent; correct?

14   A.   According to that sheet, yeah, I don't know what that 14

15   percent is a representation of, I just know it's -- under

16   alarm.

17   Q.   That's a percentage sign, so there has to be the strength

18   of it?

19   A.   No, not to my reading.

20   Q.   What could it be then?

21   A.   I don't know, I don't work at Smith, I didn't make the

22   machine.  I just know that based on my training and experience,

23   cocaine was positive, it showed me alarm, 14 percent is

24   something that's outside the scope of my training.

25   Q.   Got you.  And the rest of the numbers --

1    A.   No clue.

2    Q.   -- are also outside of your scope?

3    A.   Scope of training.

4    Q.   Okay.  Are you the person in charge of maintaining the

5    machine, the Smith 500?

6    A.   I am the person in charge, yes.

7    Q.   Is there a maintenance protocol for that maintenance?

8    A.   There is.

9    Q.   How often does it get calibrated?

10   A.   Calibrated is done at the factory, I don't calibrate it.

11   Q.   You don't maintain it?

12   A.   We clean it, the machine literally says clean whatever item

13   it is, it doesn't say plug me obviously or check this, it

14   tells you -- I -- it's -- it's like when you turn on your TV

15   and it says enter your time, that's what the machine does, it

16   does all that.

17   Q.   Okay.  So how do you know if it's -- how if you don't

18   calibrate it, how do you know that it's accurate?

19   A.   Through science, Smith Detection's theory.

20   Q.   Okay.  There's science and how do we keep the science pure

21   if we don't calibrate and test to make sure that it's accurate?

22   A.   It's outside my scope.  All I do is observe and report.

23   Q.   Do you sometimes take samples of pure cocaine, a hundred

24   percent, 90 percent, and put it to the machine to see if it's

25   accurate, just to test the machine?

1    A.    I've never done that.

2    Q.    Okay, how long have you been operating that machine?

3    A.    About a year.

4    Q.    And all you have done to that machine is cleaned that

5    machine?

6    A.    No, I've used it as designed.

7    Q.    You used it and you cleaned it?

8    A.    Used it as designed.

9    Q.    Okay, so you don't know if it's accurate or not?

10   A.    I use it as it's designed.

11   Q.    During that year, have you ever contacted the manufacturer

12   or took it to be calibrated by the people that service those

13   machines?

14   A.    No.

15   Q.    Have you ever had anybody from Smith 500 company come in

16   and say, hey, test this to see if it's accurate?

17   A.    Nope.

18   Q.    Okay.  So you're doing tests on a machine that doesn't get

19   calibrated, tested, nor --

20   A.    That's not what I said.

21   Q.    Okay.  What did you say?

22   A.    I use the machine as it's designed.  If the machine is

23   designed, this cup is an example, so this cup, if it's

24   designed, you put water in it and you drink it, you use it as a

25   cup.

1    Q.   Okay.

2    A.   But I don't have to clean the cup because it's implied that

3    it's clean, it's ready to be used.  It's -- that's the way it's

4    designed.

5    Q.   Okay.  But what if that cup had something that you were

6    going to test and you needed to make certain that whatever you

7    were testing was pure, clean, and accurate?  What if somebody

8    spat on that cup and now you drank from it?

9    A.   That's the risk we take, but being that it's $46,000 and

10   been proven by numerous agencies, you pretty -- you want to go

11   with the science on this one.

12   Q.   So it's $46,000, and you think somebody should just make

13   sure that it's working properly?

14   A.   I just said -- I literally just told you that I'm

15   responsible for that.

16   Q.   But you don't test it, you don't have it maintained, all

17   you do is use it and clean it, correct?

18   A.   Is -- so you're confusing because maintenance and

19   cleaning -- cleaning is the maintenance.

20   Q.   Okay.

21   A.   So what are you asking me?

22   Q.   So let's say now I need an oil change and I take my car to

23   the car wash, my car was clean, did I maintain it or did I wash

24   it?

25   A.   Did your car tell you to get an oil change?

1    Q.   It's an old car, it's a '78 Corvette, it doesn't have a

2    computer, it doesn't tell me anything, I have to use my common

3    sense.

4    A.   I'm saying, sometimes it does come down to common sense,

5    like you just said.

6    Q.   And in this case, over a year, you had no one take a look

7    at this machine to make sure that one of these gentlemen who

8    supposedly is testing positive for cocaine truly had cocaine on

9    their hands?

10   A.   Didn't tell me to, so I didn't do it.

11   Q.   So you were waiting for the machine to tell you?

12   A.   Yes, sir.

13   Q.   Okay.

14   A.   If -- yeah.

15   Q.   That's fine.  Now, what was downloaded from the boat?  In

16   other words, what was the sequence, did you unload and work on

17   clearing and storing and testing the cocaine before you took

18   the hand samples?  Or did you take the hand samples -- did you

19   deal with the guys first and then did you deal with the

20   cocaine?

21   A.   They're totally unrelated.

22        So, as a law enforcement person in charge, I monitored

23   that, the transactions of cocaine when they're doing the

24   testing, the procedures, stuff like that.  I monitored that.

25        The reason I monitored that is because the person that was

1    doing it was one of my prior students, having been an

2    instructor at FLETC, it's a unique opportunity, he was one of

3    my students, so it was kind of like a father and son

4    interaction.

5        So go back to your question.

6    Q.  I know they're unrelated, but they relate to you?

7    A.  Yeah.

8    Q.  So my question is, if you deal with the cocaine first while

9    these guys were being processed, or did you deal with the guys

10   first and then go back to your friend that you trained and then

11   after that work with the cocaine?  What was the timing

12   sequence?

13   A.  I don't remember.

14   Q.  Okay.

15   A.  It was getting dark.  I know I was tired and hungry.

16   Q.  It was getting dark and you were getting hired and hungry

17   when you were doing the cocaine?

18   A.  You're saying -- I didn't do the cocaine.

19   Q.  I'm sorry, and you didn't do the guys either, I take that

20   back, okay.

21   A.  Whoa, whoa.

22   Q.  Does not go there.

23       Now, when you handled the cocaine --

24   A.  Yeah.

25   Q.  -- was that -- was it dark and you were hungry?

1   A.   When the cocaine is being processed, in that picture it was

2   still light out, so I witnessed that.  It was dark, so it would

3   have been later, it would have been later, if that's what

4   you're asking me, the personnel.

5         MR. RODRIGUEZ:  I have no further questions.  I didn't

6   mean to embarrass you.

7                         CROSS-EXAMINATION

8   BY MR. BERRIO:

9   Q.   Good afternoon, Officer Rutledge.  How are you?

10  A.   Fair enough, sir.

11  Q.   My name is Juan Berrio, I represent Jose Candelario Perez-

12  Cruz, nice to meet you.

13        We've never spoken before?

14  A.   Never seen each other, never spoken.

15  Q.   You have met with the prosecution to discuss what would be

16  happening here today?

17  A.   Sure.

18  Q.   You reviewed the photographs and evidence in this case?

19  A.   Yes, sir.

20  Q.   So you feel you're well-versed as to what happened that

21  day, your recollection of what you did, and you viewed the

22  evidence that has been provided to you?

23  A.   Yes, sir.

24  Q.   And you testified that these gentlemens were cooperative,

25  they complied with your request to do these ION scan tests?

1    A.    Yeah, I had no problems.

2    Q.    These swipes?

3    A.    (Nods head affirmatively.)

4    Q.    Is that a yes?

5    A.    Yes.

6    Q.    You testified that there were eight samples taken from the

7    vessel?

8    A.    Yes, sir.

9    Q.    And there was seven samples taken from the hands?

10   A.    Yes, sir.

11   Q.    Is that seven samples for each one of them, is one swab

12   used for each hand or does each hand get its own swab?

13   A.    No, it's one per person.

14   Q.    So I take one swab and then I do one hand and do the either

15   hand on the person?

16   A.    No, it's one per person.

17   Q.    With one swab?

18   A.    One swab per person.

19   Q.    So with the one swab I swipe both his hands?

20   A.    No, I only swipe one.

21   Q.    On, you're only swipe one hand?

22   A.    Es.

23   Q.    So we're talking when eight samples on the vessel, seven

24   samples on the hand?

25   A.    One per person, yes.

1    Q.   And then seven samples on the -- no, I'm sorry, eight

2    samples on the vessel, seven samples on the hand, one per

3    person, seven samples on the clothing?

4    A.   That's what my statement -- yeah, that sounds right.

5    Q.   That sounds right?

6    A.   That sounds correct.

7    Q.   So in total there are 22 samples in total?

8    A.   Sure, rough math.

9    Q.   Let's add them up, eight on the vessel?

10   A.   Okay.

11   Q.   Plus seven on the hands?

12   A.   So 14 plus 8 is 22, yeah.

13   Q.   Fifteen and then plus another two is 22, okay.

14        So in total 22 samples are taken, and if I understand you

15   correctly, of the 22 samples, only two came back positive for

16   cocaine?

17   A.   Yes, sir.

18   Q.   And that is on one of the people that was detained out of

19   the seven people; right?

20   A.   Yes, sir.

21   Q.   Nothing on the boat?

22   A.   No.

23   Q.   Okay.  And this is, I guess, the readings here?

24   A.   Yes, sir.

25   Q.   And this is the cocaine, it says 14 percent; is that

1  correct?

2  A.  That's what it says, yes, sir.

3  Q.  And how high does that percentage go, triple digits does it

4  go into?

5  A.  I don't know.

6  Q.  Have you seen one higher than 14 percent?

7  A.  Oh, yeah, I've seen lots.  I don't know what it means, but

8  I've seen the number.

9  Q.  Have you seen it in the triple digits?

10  A.  I -- no, no, no.

11  Q.  But it goes a lot higher than 14, you've seen?

12  A.  I've seen them a lot higher than 14, I don't know what it

13  means, though.

14  Q.  A lot higher than 25 percent?

15  A.  Yeah.

16  Q.  Okay.

17  A.  I don't know what it means, I mean --

18  Q.  It could mean, though, that the higher the reading, the

19  higher the concentration of the cocaine?

20        MS. VIAMONTES:  Objection, calls for speculation.

21        THE COURT:  Sustained.

22  BY MR. BERRIO:

23  Q.  You testified that this machine is very sensitive, very

24  precise?

25  A.  Yes.

1   Q.   It would detect a nanogram on an item of clothing, on a

2   hand?

3   A.   It will detect what it's designed to detect.

4   Q.   Okay, but it could be a nanogram very small, you can't see

5   it with your eyes?

6   A.   That's based on -- yeah, you can't see it.

7   Q.   So it's a precise machine?

8   A.   It's a precise instrument.

9   Q.   So it can pick up residue that's been on a surface for a

10  day; right?

11  A.   The instrument's very accurate.

12  Q.   Two days, if the residue is there, it's been there for two

13  days, it can pick it up?

14  A.   I don't know of any definition of how long.

15  Q.   So it could be there for a week and it could pick it up?

16  A.   Yeah, it just says it's there or not, the exact same thing

17  happens at the airport.

18  Q.   It could be ten days and if it picks it up, it could mean

19  that the residue was there for ten days?

20  A.   Exact same thing.

21  Q.   And in this case, you recall the photo, did you recall this

22  photo?

23  A.   I've seen that photo.

24  Q.   And these are these seven gentlemen here that are detained

25  or accused in this case?

1   A.   Yes, sir.  I can't see all of them, but it sounds accurate.

2   Q.   Okay.  And do you see them -- they seem -- well, no, let me

3   rephrase that.

4        Do you know where they got these life jackets from?

5   A.   Coast Guard Cutter *Mellon*.

6   Q.   Do you know -- and they put those life jackets on them so

7   that they're safe and secure to go back to the *Mellon*; right?

8   A.   Their safety is paramount, yes, sir.

9   Q.   And they're placed on them before, obviously, they get back

10  to the *Mellon*; right?

11  A.   Yes, sir.

12  Q.   And they were out on the *Mellon* for about five hours with

13  these life jackets?

14  A.   Pardon me?

15  Q.   They're out there a while with these life jackets on before

16  they return to the *Mellon*?

17  A.   So you asked me about being out in five -- on *Mellon* and

18  then you're saying -- so --

19  Q.   I'm sorry, on the Panga with the other two *Mellon*, there's

20  *Mellon-I, Mellon-II* and then big *Mellon*?

21  A.   So there's *Mel-I*, and *Mel-II* and then *Mellon*.

22  Q.   I'm sorry, I never dealt with the *Mellon* before.

23  A.   That's fine.

24  Q.   So there was the Panga, they're out there at the sea, they

25  have two *Mellons* next to them, and they take these jackets over

1    to them and they place them on these gentlemen?

2    A.   That's normal, yes.

3    Q.   That's what is there.  They could have been out there for

4    maybe five hours before they made it back to the *Mellon*, the

5    main ship where you're at?

6    A.   It is normal procedure that if someone does not have a life

7    jacket, we will provide it for them.

8    Q.   These weren't new life jackets, were they?

9    A.   I can't -- I don't know.

10   Q.   They could have been on the *Mellon* for a while before these

11   people used them; right?

12   A.   I don't know.

13   Q.   Okay, but they could have been on the *Mellon*?

14        MS. VIAMONTES:  Objection, asked and answered, calls

15   for speculation.

16        THE COURT:  If he knows.

17   BY MR. BERRIO:

18   Q.   These life jackets, they were taken and provided to them by

19   the boarding teams?

20   A.   I don't know, I didn't witness it.

21   Q.   But you say that these are *Mellon* life jackets?

22   A.   They look -- they're a Coast Guard life jacket, I can't see

23   close enough to see if they're identified as *Mellon* life

24   jackets.

25   Q.   Well, if they are *Mellon* life jackets, it would have an

1  insignia saying that they're *Mellon*?

2  A.  They will have -- usually, it's written on the white inside

3  if it's *Mellon* so we can identify them.  Right now there is

4  just a coast guard insignia, life saving systems.

5  Q.  Do you know if these gentlemen had those life jackets on

6  before they were boarded?

7  A.  No, I was never over there.

8  Q.  And if these life jackets had some residue on them of

9  cocaine, and these gentlemen put them on themselves, based on

10  your transferring testimony, that cocaine could transfer to

11  their clothing; right?

12  A.  So are you asking me on transference --

13       MS. VIAMONTES:  Objection, Your Honor.  Asks for

14  speculation.  He is not an expert in that area.

15       THE COURT:  Overruled.

16  BY MR. BERRIO:

17  Q.  Transference, you discussed transference.  If these

18  gentlemen take these life jackets and put them on like they

19  have right there, and there's transference of the residue,

20  transference from the life jacket to their clothes, and then

21  you later on examine their clothing, you could possibly pick up

22  residue of cocaine through the machine?

23  A.  So, I think I understand your question, but let me I'm

24  going to kind of rephrase it back, so if I were to put your

25  jacket on and I wear it around town and I had a machine that

1    could detect whatever cologne you're wearing, okay, and it

2    comes back to you, are you asking me that.

3    Q.   No, I'm asking you if I give you my life jacket -- my

4    jacket here today, and you put it on --

5    A.   Yes, sir.

6    Q.   -- and you put it on for some time and this jacket has

7    cocaine residue on it?

8    A.   I like cocaine -- I was going to say cologne.

9    Q.   Let's say I like cocaine, too.

10   A.   Okay, let's go with -- okay, whatever.

11   Q.   And before lunch I had a party.

12   A.   Okay, interesting.

13   Q.   And, you know, I used cocaine.

14   A.   That's pretty wild, go ahead.

15   Q.   And it got on my jacket.

16   A.   And then I wore that jacket.

17   Q.   And then I let you borrow my jacket.

18   A.   That's possible.

19   Q.   And then you take my jacket off when -- later on during the

20   night?

21   A.   Okay.

22   Q.   And then I decide that I'm going to test you and I'm going

23   to test your clothing --

24   A.   Sure.

25   Q.   -- to see if you have, with the machine, with our ION scan

1    to see if you have -- maybe, maybe you have cocaine now,

2    residue cocaine on your uniform.

3    A.   Sure.

4    Q.   With the ION scan test, it could detect cocaine on your

5    uniform?

6    A.   Based on the story that you said, my training and

7    experience, that is possible, that's true.

8    Q.   With the transference?

9    A.   I don't know what word verbiage you're using, but based on

10   the story, that makes sense, yeah.

11            MR. BERRIO:  I have no further questions.

12            MR. do CAMPO:  I have no questions for this witness.

13                        CROSS-EXAMINATION

14   BY MS. PINERA-VAZQUEZ:

15   Q.   Officer Rutledge, this is your first time testifying?

16   A.   It is.

17   Q.   I'm going to make it brief.  The first swipe that you

18   tested came back negative for cocaine from the vessel; right?

19   A.   From the small one, yes.

20   Q.   From the vessel?

21   A.   From the TOIs, yes.

22   Q.   I'm sorry?

23   A.   From the target of interest or the Panga, whatever you want

24   to call it.

25   Q.   Right, from the Panga.

1   A.   Yeah, yeah.

2   Q.   Call it what it is, the Panga.

3   A.   Got it.

4   Q.   Right; you'll agree with me.

5   A.   Right.

6   Q.   Then I believe on direct examination, the prosecutor showed

7   you this document Number 3 which had three strips, one, two and

8   three; correct?

9   A.   Yes, ma'am.

10  Q.   And you've had an opportunity to do this before; right?

11  A.   Do what?

12  Q.   Review these strips before?

13  A.   Yes, ma'am.

14  Q.   And the one that came back from the boat, the one right

15  near, I'm pointing to this one; right, came back negative for

16  cocaine?

17  A.   Yes, ma'am.

18  Q.   So let's go to the first strip.

19  A.   Okay.

20  Q.   Which shows that it came back 14 percent positive for

21  cocaine.  Do you know who tested positive for cocaine from the

22  three gentlemen?

23  A.   No, ma'am.

24  Q.   Is there any way that any paper or any report that would

25  help you remember who tested positive?

1    A.   So my eyes on top, it says person number 3, person number 3

2    is identified on a spreadsheet that was an Excel spreadsheet.

3    Q.   If I showed you that spreadsheet, would that help you

4    remember who it was that tested positive?

5    A.   Yeah, whatever number 3 is, I mean --

6    Q.   Is that the spreadsheet that you were talking about?

7    A.   One, two, three, yes, ma'am.

8    Q.   And who would that be?

9    A.   According to this, it's a surname Garcia, surname, I don't

10   speak Spanish, so hear me out.

11   Q.   But you can read; right?

12   A.   Yeah.

13   Q.   Okay.

14   A.   Garcia-Solar Gabriel.

15   Q.   That's Number 3; right?

16   A.   That's Number 3.

17   Q.   That's not Martin Ortiz my client; correct?

18   A.   I don't know who your client is.

19   Q.   My client is Martin Ortiz?

20   A.   I couldn't identify anybody.

21   Q.   Maybe you can listen to my question before you try to

22   answer it.   My question is, my client is Martin Ortiz and

23   Number 3 is not Martin Ortiz; correct?

24   A.   Correct, Number 3 is not Martinez, whatever you said.

25   Q.   Martin.

1    A.   Number 3 on this is Garcia.

2    Q.   Now if I go to the next one, which is the clothing that

3    also has --

4    A.   Number 3.

5    Q.   -- the person on the spreadsheet who tested positive;

6    right?

7    A.   It's got Garcia, yes, ma'am.

8    Q.   And that is not Martin Ortiz; right?

9    A.   Nope.

10   Q.   And, in fact, Martin Ortiz, my client, tested negative when

11   you swiped his hand for cocaine; right?

12   A.   There was nothing evident at that time.

13   Q.   Because had there been something evident, it would

14   obviously be in your report?

15   A.   Yes, ma'am.

16   Q.   Right?

17   A.   Yes, ma'am.

18   Q.   And when you tested my client Martin Ortiz's clothing for

19   cocaine, they also tested negative; right?

20   A.   I would be testing for everything, not just cocaine,

21   weapons, drugs and safety.

22   Q.   Well, we're talking about cocaine because that's what he

23   was charged with; right?

24        So what exactly, when you tested his clothes they tested

25   negative for cocaine; right?

1   A.   Nothing was present that could be tested at that time.

2   Q.   Wow, I don't understand your answer, let me think about

3   this.

4        So basically what you're telling us is that there's two

5   types of responses from the ION scanner $46,000 machine, one is

6   nothing can be tested at that time or, two is negative or three

7   is positive?  I mean, is there a response -- excuse me, let me

8   finish -- is there a response of nothing can be tested at this

9   time, is there such a response?

10  A.   No, ma'am.

11  Q.   So the response is it's either negative, right, or

12  positive; correct?

13  A.   It says alert or no results.

14  Q.   Okay, but as far as your report, you tested my client

15  Martin Ortiz's clothes and they tested negative for the

16  presence of cocaine; correct?

17  A.   I --

18            MS. VIAMONTES:  Objection, asked and answered.

19            MS. PINERA-VAZQUEZ:  He hasn't answered, Judge.

20            THE COURT:  Go ahead and answer it.

21            THE WITNESS:  I'm sorry, what do you want me to do?

22            THE COURT:  You can answer.

23            THE WITNESS:   I tested all personnel, one through 7.

24  BY MS. PINERA-VAZQUEZ:

25  Q.   Okay, and only one came back positive; right?

1    A.   Number 3, yes, ma'am.

2    Q.   Which means all other six came back negative; correct?

3    A.   No results.

4    Q.   And what does "no result" mean to you?

5    A.   Based upon my training and experience if the machine says

6    no results that means no results.

7    Q.   Okay, but what does no result mean?  That means that

8    there's no cocaine; correct?

9    A.   No, it just means that there's no result.

10   Q.   It's hard for you to say that there's no cocaine equals no

11   result; right?  Is that a difficult concept for you?

12           MS. VIAMONTES:  Objection, Your Honor, argumentative.

13           THE COURT:  Sustained.

14   BY MS. PINERA-VAZQUEZ:

15   Q.   Now, had there been a result and that result would have

16   been positive, it would be on that sheet; right?

17   A.   On this sheet?

18   Q.   Yeah.  It would have been on one of those strips; right?

19   A.   If it was listed alarm.

20   Q.   And the alarm is that it's positive, right, for cocaine?

21   A.   Yeah.

22   Q.   So no alarm blew when you tested my client's clothes;

23   right?

24   A.   It just said no results.

25   Q.   And everybody else's said no results; right?

1    A.   The machine has two things, it's either alarm or no

2    results.

3    Q.   So when you say it tested positive for cocaine, it's not

4    really positive, it just says alarm, it doesn't say cocaine,

5    it's says alarm; right?  It's either alarm or no result,

6    correct?

7    A.   No, that's not.

8    Q.   I thought that's what you just said?

9    A.   No, it goes alarm and then there's the results of the

10   alarm.

11   Q.   Okay, and the alarm has results?

12   A.   Which is that.

13   Q.   So if there's no results, then?

14   A.   Outside the parameters that's the way the machine is.

15   Q.   That was hard.  All right.

16        MS. VIAMONTES:  I'm going to object to commenting.

17   That's not a question.

18        THE COURT:  Sustained.

19   BY MS. PINERA-VAZQUEZ:

20   Q.   Now, so out of the 24 swipes that you did, only -- and I

21   say you, that you tested, you tested -- actually, that the ION

22   scanner machine tested, only two came back with results;

23   correct?

24   A.   I thought it was twenty -- I'm pretty certain the number

25   was 22, 24, I thought it was 22, though.

```
 1   Q.   I'm sorry, I thought it was, 8, 7 and 7, maybe it is 22,

 2   you're right, it's 22.  So of the 22, only 20 came back with no

 3   results?

 4   A.   That sounds right.

 5           MS. PINERA-VAZQUEZ:  Thank you.

 6           THE WITNESS:  No problem.

 7           MR. ENCINOSA:  I don't have any questions, Your Honor.

 8           THE COURT:  Redirect.

 9                     REDIRECT EXAMINATION

10   BY MS. VIAMONTES:

11   Q.   Officer Rutledge, I'm placing on the Elmo Government's

12   Exhibit 38 which is in evidence.  Do we have a sample here from

13   person Number 3 from the hands?

14   A.   Yes, ma'am.

15   Q.   And was that an alarm for cocaine?

16   A.   It was an alarm.

17   Q.   And do we have another strip here?

18   A.   Yes, ma'am.

19   Q.   With an alarm as well?

20   A.   Yes, ma'am.

21   Q.   Is that from the vessel?

22   A.   Yes, ma'am.

23   Q.   Is that MDA?

24   A.   Can you zoom in?

25   Q.   Sure.
```

1    A.   Yeah, it's MDA.

2    Q.   And then do we have a third alarm which is also from person

3    three?

4    A.   Yes, ma'am.

5    Q.   And is that an alarm and then the result of cocaine?

6    A.   Yes, ma'am.

7    Q.   Now, you take a look at to determine who person three was,

8    you took a look at an Excel spreadsheet; right?

9    A.   Yes, ma'am, here.

10   Q.   And I have a copy of that Excel spreadsheet.  Does that

11   Excel spreadsheet accurately -- is it an accurate copy of what

12   you relied upon when you produced your results and you wrote

13   your handwritten notes?

14   A.   Yes, ma'am.

15   Q.   And did you rely on that in putting who this belonged to?

16   A.   Yes, ma'am.

17   Q.   Who the positive result belonged to?

18   A.   Yes, ma'am.

19        MS. VIAMONTES:  Your Honor, at this time, the

20   Government moves Government's Exhibit 65 -- is this -- let me

21   approach.

22   BY MS. VIAMONTES:

23   Q.   Officer, I've handed you a copy of that Excel spreadsheet.

24   It's premarked as Government's Exhibit 65.

25   A.   It is, ma'am.

1  Q.  Is that an accurate copy of that Excel spreadsheet?

2  A.  Yes, ma'am.

3         MS. VIAMONTES:  Your Honor, at this time the Government

4  moves Exhibit 65 into evidence.

5         THE COURT:  Be admitted.

6         (Government's Exhibit 65 admitted into evidence.)

7         MS. VIAMONTES:  Permission to publish, Your Honor.

8         THE COURT:  All right.

9  BY MS. VIAMONTES:

10  Q.  Do you see here, the person number 3?

11  A.  Yes, ma'am, band Number 3, yes, ma'am.

12  Q.  Band Number 3, does that say the first name, Gabriel,

13  surname one Garcia and surname two, Solar?

14  A.  It does, ma'am.

15  Q.  So when you refer to the ION scan printout person number 3,

16  does that pertain to Mr. Gabriel Garcia-Solar?

17  A.  Yes, ma'am.

18  Q.  Now we talked a lot about the ION scan instrument that you

19  use on the Cutter *Mellon*, the Smith 500, and it was compared to

20  a car.

21         Is it more like a '78 Corvette or more like a 2017 Tesla?

22  A.  Tesla, I would say more like Bugatti, but go ahead.

23  Q.  There you go.  Is it more like a modern vehicle that tells

24  you when something's wrong with it?

25  A.  Yes, ma'am.

1    Q.    Does it self-calibrate the Smith 500?

2    A.    It does everything inside internally.

3    Q.    And have you used the modern Xerox copy machine?

4    A.    Yes, ma'am.

5    Q.    Have you had a paper jam?

6    A.    Yes, ma'am.

7    Q.    Have you had to remove a paper jam?

8    A.    Yes, ma'am.

9    Q.    Does the modern Xerox copy machine tell you where that jam

10   is?

11   A.    Yes, ma'am.

12   Q.    Or do you have to look for it like we used to look for it

13   30 years ago?

14   A.    No, ma'am.

15   Q.    Now the tests that are conducted on the Smith 500, these

16   are screening tests; right, presumptive tests, similar to the

17   NIK test?

18   A.    As far as like when we're doing to the machine or actually

19   scanning like -- explain what you're talking about.

20   Q.    What I mean is, these aren't confirmatory tests to test the

21   purity of cocaine, for example?

22   A.    No, ma'am, not to my knowledge.

23   Q.    It's a screening test?

24   A.    Yes, that's it.

25   Q.    Like when someone goes to the doctor to get screened for

1    certain illnesses?

2    A.   Exactly the same.

3    Q.   If the screening comes back positive, does that necessarily

4    mean they have the illness?

5    A.   No, ma'am.

6    Q.   Many times there are other -- further investigation is

7    done; right?

8    A.   Absolutely, ma'am.

9    Q.   So the ION Smith 500, is this a screening or presumptive

10   test to see if further investigation is necessary?

11   A.   It's just a screening device, that's it.

12   Q.   When someone goes to the airport and they walk through TSA

13   and they're swabbed, if that screening has an alert does that

14   necessarily mean that they were touching a bomb earlier?

15   A.   No, it just means it was present at the time detected.

16   Q.   If it comes back negative, does it mean they definitely

17   didn't touch a bomb earlier?

18   A.   No, ma'am.

19   Q.   Now, are you have familiar with masking agents or chemicals

20   that can be used to throw off --

21   A.   Yes, ma'am.

22   Q.   -- the Smith 500?

23   A.   Yes, ma'am.

24   Q.   What are some of them?

25          MR. ABRAMS:  Objection, not on cross.

```
 1              MR. ENCINOSA:  Objection, beyond the scope.

 2              THE COURT:  Overruled.

 3   BY MS. VIAMONTES:

 4   Q.  What are some of them?

 5   A.  So that means, yes, answer?

 6   Q.  You can answer, sir.

 7   A.  So we have lemon juice, bleach, gasoline, diesel fuel oil,

 8   green grade fuel oil, I've seen banana oils, I've seen lots of

 9   different acids, lots of different fuel and acid base

10   combinations.

11   Q.  Gasoline's one of them?

12   A.  Absolutely.

13   Q.  Before your crew, the boarding crew leaves the Mellon, do

14   you test them before they leave?

15   A.  Yes, ma'am.

16   Q.  Do you swab their hands and their person?

17   A.  I swab their persons, yes, ma'am.

18   Q.  Now let's talk a little bit about the Cutter Mellon.

19        Do you and the rest of the crew on the Cutter Mellon take

20   great pride in the Cutter Mellon?

21   A.  Absolutely, ma'am.  Yes, ma'am.

22   Q.  It's a great ship?

23   A.  I love it.

24   Q.  Do you guys take care of the Cutter Mellon?

25   A.  Absolutely, ma'am.
```

1    Q.   Do you use clean the Cutter *Mellon*?

2    A.   Absolutely, ma'am.

3    Q.   Do you just spew cocaine all around the Cutter *Mellon* and

4    leave it all over the place --

5    A.   No, ma'am.

6    Q.   -- for it to contaminate life vests and over-the-horizon

7    vessels?

8    A.   No, ma'am.

9    Q.   Do you have crew members that it's their job just to clean

10   the decks of the *Mellon*?

11   A.   Yes, ma'am.

12   Q.   To clean the over-the-horizon?

13   A.   Yes, ma'am.

14   Q.   Now, back in October 18th, 2016, was this interdiction the

15   first interdiction during this deployment?

16   A.   Yes, ma'am.

17   Q.   Prior to that, how long had the Cutter *Mellon* been back at

18   port in Washington, back at the home base?

19   A.   Prior to that, so it was --

20   Q.   Prior to your deployment, how long were you guys home?

21   A.   Man, I want to say, maybe 60 days, 70 days, roughly.

22   Q.   On the day you performed the ION scan test in reference to

23   this case --

24   A.   Yes, ma'am.

25   Q.   -- was the ION scan Smith 500 that's on the Cutter *Mellon*

1   functioning and operating properly?

2   A.  Yes, ma'am.

3        MS. VIAMONTES:  Nothing further, Your Honor.

4        THE COURT:  There's one area that she got into that was

5   not discussed on the original direct examination, the masking

6   issue.  Does anybody want to ask any questions about that?

7        MR. ABRAMS:  Yes, sir.

8        MR. ENCINOSA:  Yes, Your Honor.

9                    RECROSS-EXAMINATION

10  BY MR. ABRAMS:

11  Q.  Sir, you testified about various things that are used to

12  mask the presence of controlled substance on the vessel?

13  A.  Yes, I did.

14  Q.  And you listed a whole --

15  A.  Yes, ma'am -- yes, sir.

16  Q.  And you listed a whole lot of different things?

17  A.  Yes, sir.

18  Q.  Do you have any information with regard to this case that

19  that was done in regard to this matter?

20  A.  As far as was it -- are you asking me was it done or are

21  you asking --

22  Q.  Do you know?

23  A.  I believe it was done, yeah.

24  Q.  I'm asking you what you know, not what you believe.

25  A.  Oh, what I know?

1    Q.   Yeah.

2    A.   I didn't see anyone witness -- do anything, so I don't --

3    Q.   Let me ask you something, with respect to gasoline, you

4    would agree with me that gasoline has a pretty intense smell,

5    doesn't it?

6    A.   Yes, sir.

7    Q.   That means whether it's spilled or whether it's in a

8    stationary, solid container, it still smells?

9    A.   Sure.

10   Q.   Ever get gasoline on your shoe by accident?

11   A.   Oh, yes, sir.

12   Q.   Smell a little bit?

13   A.   Yes, sir.

14   Q.   Even just from a small quantity?

15   A.   Yes, sir, and then it vaporizes.

16   Q.   It vaporizes over time?

17   A.   Sure.

18        MR. ABRAMS:  Okay.  Thank you.

19        MR. ENCINOSA:  May I?  Thank you, Judge.

20                    RECROSS-EXAMINATION

21   BY MR. ENCINOSA:

22   Q.   Good afternoon, sir.

23   A.   Hi.

24   Q.   Sir, if an individual had put gasoline on his body to mask

25   this odor, you would have a duty to make sure he doesn't catch

1    fire, do you?

2    A.   Yes, sir.

3    Q.   And that's something that the crew is trained for, make

4    sure nobody's hurt, either from hazardous materials; is that

5    correct?

6    A.   Yes, sir.

7    Q.   Have you seen the report in this case there was no hazmat

8    problems inside the Panga boat?

9    A.   No, I --

10   Q.   Would you like to see it to maybe refresh your memory?

11   A.   Yeah.

12        MS. VIAMONTES:  Your Honor, I'm going to object.

13        THE COURT:  I think this is outside the scope.  I think

14   it was a very specific area of masking that she inquired into

15   which I'm giving an opportunity to inquire about that.

16        MR. ENCINOSA:  Okay.

17   BY MR. ENCINOSA:

18   Q.   Hazmat would be gasoline too; right?

19   A.   Gasoline is hazmat, should be hazmat, yeah.

20   Q.   Let me ask you, you claimed that you smelled gasoline on

21   their clothes; right?

22   A.   I believe it was -- no, I believe it was marine fuel.

23   Q.   Marine fuel?

24   A.   Yeah.

25        MS. VIAMONTES:  Judge, I'm going to object.

1          THE WITNESS:  Yeah.

2          MS. VIAMONTES:  This is beyond the scope of recross --

3    of redirect.

4          THE COURT:  Well, I think you got into this area of

5    masking whether it's worth getting into or not, I think in

6    fairness they ought to be able to ask questions about masking.

7          THE WITNESS:  The topic of masking?

8    BY MR. ENCINOSA:

9    Q.  Marine fuel, you said?

10   A.  I have to look at my statement to confirm.

11   Q.  Do you have it with you?

12       Let me ask you.  Let me move along, okay.

13         MS. PINERA-VAZQUEZ:  Is this it?

14         MR. ENCINOSA:  May I approach, Your Honor?

15         THE COURT:  All right.

16   BY MR. ENCINOSA:

17   Q.  Boat fuel; right?

18   A.  That's correct.

19   Q.  Not gasoline; right?

20   A.  Correct.

21   Q.  It's some other odor; right?

22   A.  No, that's not what I said.

23   Q.  It's boat fuel.

24   A.  Boat fuel.

25   Q.  Now you said that the clothing there was soil and boat

1   fuel; right?

2   A.   There was one particular one but, wait, looking at my

3   statement -- yep, the clothing was soiled with the odor similar

4   to fuel odor consistent with boat fuel, yes, sir.

5   Q.   One particular one; right?

6   A.   It says all detainees.

7   Q.   All detainees; right?  So that's important to know; right?

8   You wrote it in your report?

9   A.   Uh-huh.

10  Q.   What happened to their clothes?  Did you preserve their

11  clothes?

12  A.   That's not my -- I don't do that.

13  Q.   You don't do that?

14  A.   I was just there for.

15  Q.   Do you know where their clothes are?

16  A.   I was just there --

17       MS. VIAMONTES:   Judge, I object, I think this goes

18  beyond the scope of recross.

19       THE COURT:   Sustained.

20  BY MR. ENCINOSA:

21  Q.   Sir, let me show you, if I can actually put it here,

22  Government's Exhibit 18.   That's pretty clean clothes they have

23  on; right?

24  A.   Visually, they look clean, yes, sir.

25  Q.   They look very clean; right?

1    A.    Uh-huh.

2    Q.    They don't look soiled in anything; right?

3    A.    In that picture, no they don't look soiled.

4    Q.    They don't look soiled; okay.

5          MR. ENCINOSA:  I have no further questions.

6          THE COURT:  I have one question that didn't come up.

7    On your, you called it your Bugatti machine, does that machine

8    track the date and time of the test?

9          THE WITNESS:  It has the capability of doing date and

10   time, yes, sir.

11         THE COURT:  So does that -- the item that was admitted

12   into evidence that showed your reports, those little printout

13   strips.

14         THE WITNESS:  Yes, sir.

15         THE COURT:  Does that show the date and time reported

16   it on?

17         THE WITNESS:  It does show the date and time but not

18   for that date and time.  It has the capability, sir, to do

19   that, we don't program it in, though, we just buy the machine

20   and use the machine.

21         THE COURT:  So if you do -- if there were 22 strips --

22         THE WITNESS:  Yes, sir.

23         THE COURT:  -- you couldn't tell in which sequence?

24         THE WITNESS:  Yes sir, they're all -- every procedure

25   is serialized, kept.

```
1              THE COURT:  So can you tell whether you did the tests
2    on the boat first --
3              THE WITNESS:  Yes, sir.
4              THE COURT:  -- versus clothes?
5              THE WITNESS:  Yes, sir.
6              THE COURT:  And can you tell that -- but you cannot
7    tell the time of day --
8              THE WITNESS:  Correct.
9              THE COURT:  -- that first test occurred and when the
10   last test occurred?
11             THE WITNESS:  Correct.
12             THE COURT:  But you can tell the sequence.
13             THE WITNESS:  I can tell the sequence; right, it's one
14   through whatever.
15             THE COURT:  Any other questions for this witness?  If
16   not step down.
17             (Witness excused.)
18             THE COURT:  Call your next witness.
19             MS. ANTON:  Yes, Your Honor.  The United States calls
20   Jeannette Perr.
21             COURTROOM DEPUTY:  Raise your right hand, please.
22             Do you solemnly swear the testimony you're about to
23   give is the truth, the whole truth, and nothing but the truth,
24   so help you God?
25             THE WITNESS:  I do.
```

1          COURTROOM DEPUTY:  Thank you.  Please be seated.

2     Please state your full name for the record and also spell it.

3          THE WITNESS:  Jeannette Perr, P, as in Paul, E-R-R.

4          COURTROOM DEPUTY:  Thank you.

5          (FORENSIC CHEMIST JEANNETTE PERR, being sworn,

6     testified as follows:)

7                         DIRECT EXAMINATION

8     BY MS. ANTON:

9     Q.  Good afternoon.

10    A.  Good afternoon.

11    Q.  Would you please introduce yourself to the ladies and

12    gentlemen of our jury and tell them where you work and how long

13    you have worked there?

14    A.  My name is Jeanette Perr.  I am a senior forensic chemist

15    with the Drug Enforcement Administration Southwest Laboratory

16    in Miami, Florida.  I've been employed with them since

17    September 2005.

18    Q.  And would you be able to go into a little bit of your

19    background, educational experience and training that qualifies

20    you to do the job that you do?

21    A.  I have a Bachelor's degree from Ohio University in Athens,

22    Ohio with a major in forensic chemistry and a minor in biology,

23    and I have a Ph.D. in chemistry from Florida International

24    University in Miami, Florida.

25    Q.  And as a forensic chemist with the DEA lab in Miami, what

1    does your day-to-day job duty entail?

2    A.   My day-to-day duties entail analyzing evidence for the

3    presence of controlled substances and also coming to court and

4    testifying, assisting agents in the field when needed like

5    that.

6    Q.   Have you been doing that since 2005?

7    A.   Yes, I have.

8    Q.   Are you a senior forensic chemist at the lab?

9    A.   Yes, I am.

10   Q.   Have you testified as an expert in court before?

11   A.   Yes, I have.

12   Q.   I'm sorry, go ahead.

13   A.   Forty-eight times.

14   Q.   So if your job as a forensic chemist with the DEA lab, you

15   regularly analyze different substances that come in for

16   evaluation?

17   A.   Correct.

18   Q.   Do you also ever assist in the field?

19   A.   Yes, I do.

20   Q.   Could you explain some of that to us?

21   A.   I would assist in the field for clandestine laboratory

22   investigations, that's investigation where there were --

23   someone was manufacturing a controlled substance, like

24   methamphetamine clandestinely hidden, I've assisted looking for

25   trace evidence, residue of cocaine, residue from other drugs

1   that could be from a vehicle or a boat or a plane, for example.

2   Q.   And when you mentioned trace evidence, would that be

3   evidence pertaining to very small particles?

4   A.   Very small particles, something that you would not be able

5   to see with the naked eye, for example.

6   Q.   And do you have any familiarity with a ION scan, an ION

7   scan machine?

8   A.   Yes.

9   Q.   Could you tell us?

10   A.   ION scan instrumentation is brand name of instrumentation

11   for ION-mobility spectrometry, half of my Ph.D. research was

12   with ION-mobility spectrometry, my undergraduate research was

13   with ION-mobility spectrometry.

14   Q.   Do you have a specific familiarity with an ION scan machine

15   manufactured by Smith, the 500DT?

16   A.   Yes, I do.

17   Q.   And how do you have that familiarity?

18   A.   Just under the work that I have done.

19   Q.   Do you also have a patent that you developed in regards to

20   that machine?

21   A.   The patent I have is to connect a sampling device to an

22   ION-mobility spectrometry instrumentation.  The patent was

23   focused mainly on sampling large volumes, which things like

24   luggage, for explosives or any other compounds that would be

25   amenable to ION-mobility spectrometry.

1   Q.   Could you explain to us, maybe without getting overly

2   scientific, how the ION scan machine works?

3   A.   The way I explain ION-mobility spectrometry is I use the

4   example of a lazy river, right, a lazy river, everything's

5   floating down, people are in those small inner tubes floating

6   down the lazy river.  The IONs are swimmers swimming against

7   the river upstream so they really have to work to get there.

8        The IONs are attracted upstream and they have to swim to

9   get there, depending on how strong of a swimmer they are, they

10  will reach upstream at different rates.  Depending on what gets

11  in their way and the size and shape of the swimmer, they'll

12  have different paths going upstream in the river, so the

13  swimmers, swimming upstream would be the IONs and then

14  everything else moving down that lazy river would be the

15  atmosphere and other things that are present in the

16  instrumentation.

17  Q.   And when we're talking about trace evidence, would you --

18  how would you characterize trace evidence, is it something

19  that's durable that will be there for a while that we can

20  depend upon?

21  A.   What I teach my class, I teach a couple forensic classes at

22  Florida International University, FIU, and what I teach my

23  students about trace evidence is it depends on how the violence

24  of contact, how violent that exchange was.

25       So if I just touch this, I'm leaving evidence behind, it's

1    not as violent if I were to punch this table and scratch it in

2    some way, the more violent the contact, the greater the

3    exchange of evidence, the more time that goes by after that

4    exchange has occurred the less evidence that is going to be

5    present.

6        If I wash it away or I move it around a lot, that trace

7    evidence is going to get lost.

8    Q.  So did I hear you correctly when you said time, the length

9    of time that goes by while that's sitting there also affects

10   it?

11   A.  Correct, the length of time and the exchange and then if

12   there's any cleanup.  All those are factors that can affect how

13   long trace evidence would remain deposited.

14   Q.  Would atmospheric factors also affect it, whether it's very

15   humid or raining or dry, would that come into play as well?

16   A.  Yes.

17   Q.  Specifically talking about the ION -- the Smith ION 500DT

18   machine, did you have the ability to review documents that were

19   generated from that machine, specifically the one used in this

20   case?

21   A.  Yes, I did.

22   Q.  Did you review the calibration logs from that machine?

23   A.  Yes, I did.

24   Q.  Can you tell us a little bit how that machine calibrates?

25   A.  The machine is calibrated with a standard known as the

1    "verific" standard, and that compound present in the standard

2    has, basically, kind of like certified swimmers.

3         These swimmers going upstream we know are going to reach

4    the end goal at a particular time.  And those -- if we have

5    those swimmers come out and they match up with that time, the

6    instrument calibrates correctly.

7    Q.   And when you reviewed the calibration logs from the machine

8    used in this case, were you able to come to an opinion as to

9    whether or not it was accurately calibrated?

10   A.   Yes.

11   Q.   And what was that opinion?

12   A.   That it was accurately calibrated.

13   Q.   Did you also have the ability to view -- I'm going to put

14   on the Elmo Government's 18 in evidence.  I will zoom out so

15   you can see the whole document first, and then I'm going to

16   zoom in.

17        Did you have the ability to review Government's Exhibit 18?

18   A.   Yes, I did.

19   Q.   So I want to ask you some question about Government's

20   Exhibit 18 and tell me if you're having a hard time reading it.

21   Okay.

22        So Government's 18 is a compilation of strips that print

23   out from the ION scan machine; is that correct?

24   A.   Correct.

25   Q.   They're just photocopies onto the same page; is that true?

1  A.   To the best of my knowledge, those are photocopies of the

2  strips, yes.

3  Q.   So let's start with the first scan.  And that's dated

4  October 19th of 2016, it says, "Sample type, normal," it has a

5  methodology, an analysis type, and then it indicates alarm and

6  cocaine with a percentage.

7       Would you be able to give us sort of a walk-through of what

8  all of that means?

9  A.   When the instrument is run, the sample's taken, it's just

10 basically looking to see what swimmers reached that angle at a

11 particular time.

12      So if the swimmer reaches the end goal at the same time

13 that cocaine comes out, it would alarm for cocaine.  It has to

14 be -- for that alarm to happen it has to be over a certain

15 strength, a certain amount for it to say cocaine is there.

16      In this case, I looked at the Government's Exhibit -- is it

17 18?

18 Q.   38.

19 A.   -- 38, and the data that was present that I was able to

20 observe, I would form the conclusion that it indicated cocaine

21 was present.

22 Q.   And next to cocaine on this printout, it indicates a

23 percentage, 14 percent.  Do you know what that percentage is?

24 A.   It's the strength of the signal.  It doesn't mean it's 14

25 percent pure cocaine, it's just the strength of the signal

1   coming across.

2   Q.   Now, does that machine have some kind of numerical

3   threshold for the strength of the signal, for example, if it

4   were at two percent, would it still set off an alarm and say

5   cocaine?  Is there a minimum strength it has to be?

6   A.   There is a minimum strength.  If it doesn't reach above a

7   certain level, it will not say alarm, cocaine 14 percent.

8   Q.   So if the machine were to print out a receipt, I'll call it

9   a receipt for lack of better words, that says no results, what

10  does that mean to you?

11  A.   If it comes out with no results, for me, I would go through

12  and look at the data and look to see if maybe there's some

13  swimmers that are cocaine or some other drugs, they just

14  weren't strong enough to reach that threshold for the software

15  to say yes or no.

16  Q.   So is it fair to say when the receipt comes out and says no

17  results, that does not necessarily mean it's negative?

18  A.   Correct.  It could be present, but just at a very low

19  level.

20  Q.   So it could be there, just not enough there?

21  A.   Correct.

22  Q.   So I'm going to move on to the next part of this exhibit.

23       So this is also dated October 19th, with a time stamp on it

24  and this one indicates -- can you read it there -- MDA with a

25  two percent alarm.

1       You're a forensic chemist, right, do you know what MDA is?

2   A.   MDA is short term for methylenedioxyamphetamine.

3   Q.   And is that a controlled substance?

4   A.   Yes.

5   Q.   And does MDA have properties chemically that are similar to

6   cocaine?

7   A.   As far as the effects on the body, they're different.  But

8   they are chemical compounds that I test for in the lab, cocaine

9   and MDA, methylenedioxyamphetamine.

10  Q.   So when this ION scan prints out that there's two percent

11  of this chemical compound known as MDA, it's indicating there's

12  not a lot of it?

13  A.   Correct.  In this particular receipt, there's a couple of

14  different types of swimmers that also come out at the same time

15  as MDA, so even though it is indicating MDA is present, there

16  could possibly something else be there.

17  Q.   On the last page of our exhibit, again, dated October 19th,

18  it signals an alarm and then an alert for cocaine, 25 percent.

19  What does that mean to you?

20  A.   That indicates the presence of cocaine.

21  Q.   Now, we talked about the fragility of these IONs and this

22  evidence, and how it was affected by things in the atmosphere.

23       Are there other things that can affect it, some other type

24  of masking agents, anything that you could do to it to mask it

25  or hide it?

1    A.   Correct.   There are other substances out there that can

2    interfere with the instrumentation, the detection.

3    Q.   Would gasoline be one of those?

4    A.   Gasoline, possibly could interfere.

5    Q.   Now, if I were to tell you that someone was swiped, right,

6    because you have to be swiped in order to put these results in

7    the ION machine?

8    A.   Correct.

9    Q.   If someone was swiped, and they were out at sea for a long

10   time, let's say five hours before the swipe was done in a small

11   boat, 25-foot boat, if that means anything to you, they were

12   then put on another boat and taken to a large

13   Coast Guard cutter, where more time passed, they touched life

14   jackets, they possibly touched each other, would you be shocked

15   to find that some of the samples that were on them could

16   possibly be degraded and could disappear?

17   A.   Any time you increase the time and the amount of movement

18   from any trace evidence exchanged, there is a potential for a

19   loss of evidence.

20        So no, I would not be surprised.

21   Q.   You wouldn't be surprised?

22   A.   No.

23        MS. ANTON:   Permission to approach, Your Honor.

24        THE COURT:   All right.

25        MS. ANTON:   I'm showing defense counsel what's marked

1    as Government's 39, the ION calibration log.

2    BY MS. ANTON:

3    Q.   Can you just take a look at Government's Exhibit I just

4    handed you, I think it's 39.  Do you recognize those as the

5    logs you referred to and reviewed in preparation for testimony

6    in this case?

7    A.   Yes.

8    Q.   And those are the exact ones that you reviewed, in fact;

9    right?

10   A.   There is some more data here, but, yes.

11   Q.   Are there something called plasma grams that are involved?

12   A.   Yes, here are the plasma grams.

13   Q.   And those fairly and accurately depict the information that

14   you saw in regards to the case; right?

15   A.   Correct.

16        MS. ANTON:  At this time, the Government moves 39 into

17   evidence.

18        MS. PINERA-VAZQUEZ:  No objection.

19        THE COURT:  Be admitted.

20        (Government's Exhibit 39 admitted into evidence.)

21   BY MS. ANTON:

22   Q.   I'm going to ask you about all the scientific plasma grams

23   and all the other things here that you understand.

24        But these are the reports that were generated by that

25   machine that led you to the conclusion that it was, in fact,

1   calibrated and working properly?

2   A.   Correct.

3          MS. ANTON:   Thank you, I have no further questions.

4          THE COURT:   Cross.

5                        CROSS-EXAMINATION

6   BY MR. ABRAMS:

7   Q.   You gave me the image of salmon --

8   A.   Swimming upstream.

9   Q.   -- swimming upstream.  I'm sitting here getting hungry now

10  thinking about salmon.  I have some questions to ask you

11  concerning the ION scans.  Maybe I'll go backwards a little

12  bit.

13         The hypothetical that you just heard about being on a boat,

14  several hours passing, the person traveling over water from one

15  boat to another boat, and then ultimately being tested, you

16  were asked if you would be surprised if they didn't test

17  positive at that point?

18  A.   Correct.

19  Q.   And you said you wouldn't be?

20  A.   I would not be surprised that after all that time and all

21  that movement, if they had trace evidence on them, that it was

22  some drug, that it was no longer detected by the instrument,

23  no, I would not be surprised.

24  Q.   Let me add to that hypothetical a little bit.

25         The question is whether or not the person at point A has

1    come into contact with the controlled substance.

2        The person at point A is then put on a boat, transferred

3    across the water, during the transfer process that person comes

4    into contact with five other people, and they put -- they

5    change the person's clothing or they put something on them, he

6    comes into physical contact with him, then goes on to another

7    boat and while on this other boat then has contact with

8    somewhere around 20 additional people, and an hour or so after

9    that, is tested as to whether or not there are trace elements

10   of cocaine either on his hands or on his clothing.

11       Now, where is the integrity of the test better to determine

12   whether, when this person was on the boat and point A, had

13   cocaine on them, while they're still on the boat or a couple

14   hours later after all this contact with other people and they

15   are then tested after contact with others?

16   A.   The -- just like I teach my class, when it comes to trace

17   evidence you try and sample as close to the point of where you

18   encounter it as possible.  But the other thing you have to

19   consider is safety.

20       So they were on one boat, they were to go to another boat,

21   maybe there was a safety issue, I don't know, with the boat, I

22   don't know with the testing, but that is some of the things

23   that I take into play when I'm sampling for an ION scan.

24   Q.   Okay, we all agree that safety is important, but all things

25   being equal now we're talking about integrity of the sample,

1    okay.

2        So, I believe you're saying that while on the boat, you're

3    going to get a better sample or a better indication of whether

4    a person on a boat was in contact with cocaine than sometime

5    later when they've had contact with others and they're on a

6    boat, hours have passed and then they're tested.

7    A.   Correct.  If they have been exposed at point A, it's better

8    to test as close as you can to that; but if you test at point B

9    it's the best thing you can do, that's what it is.

10   Q.   Can the test which is done at point B, rule out that

11   somewhere between point A and point B someone who did not have

12   cocaine on them at point A somehow was exposed and then tested

13   positive at point B?

14   A.   So at point A there's no cocaine, and point B there's no

15   cocaine, but somewhere in between those two they're exposed to

16   cocaine, the instrument can't tell when they were exposed, it

17   just says --  indicates that it's there or it indicates there

18   might not be something there.

19   Q.   Would you call that -- I don't know -- you'll help me with

20   the phraseology here, would that be like a contamination of the

21   sample, or what would you call that, when there are other

22   influences that can affect your original sample?  Is there a

23   term for that?

24   A.   I don't know -- as far as what I consider my sample.  My

25   sample is what I have possession at that time.  So if I have

1    possession of a sample and I contaminate it with something,

2    that's what I would consider contamination.

3        If there's something in the environment that contacts the

4    sample before it gets to me, I would not call that

5    contamination, that's exposure, that's something beyond my

6    control, I would not know.

7        There's another point I wanted to add, but -- when it came

8    to that question but I forgot.

9    Q.  Well, it's possible, and correct me if I'm wrong, I would

10   say, more likely, over the passage of time that someone going

11   between point A and point B, they're not tested until they get

12   to point B, it's possible, depending on the exposure, the

13   contact to others, whatever else they might come in contact

14   with, it is possible that person here who didn't have anything

15   on their person, if they were tested here, when they get here,

16   point B, depending on who and what they had contact with could

17   test positive?

18   A.  If you knew what they had contact with was cocaine, then

19   yes, that's possible.

20   Q.  Somebody has contact with this podium -- I'm sorry, it's a

21   lectern, correct.

22   A.  Okay.

23   Q.  And Judge Martinez, and they put something down on here

24   that had cocaine on it, right, I don't have any coke on me,

25   at least I hope I don't, all right, I walk by here, I'm asking

1    you questions and as I'm questioning you I go like this and

2    then you test me, I could test positive -- my jacket could test

3    positive for cocaine, is that right?

4    A.   It would depend on how many is there and how effective that

5    transfer is.  The instrumentation, the ION-mobility

6    spectrometry instrumentation is a trace level detection

7    instrumentation, it's very, very, very low levels.  It can

8    detect the presence of controlled substances at a lower level

9    than what I can confirm at the lab.

10        So it is slightly better at detecting substances, but it is

11   not confirmatory.  It indicates cocaine is here.  It indicates

12   a drug is here.  But it doesn't -- I can't take it, take the

13   results and say, yes, it's cocaine, I need to do further

14   testing from that.

15        But the limits of detection of this instrumentation, very,

16   very good.

17   Q.   There's violent contact with this podium, all right, we've

18   got a hundred kilogram sample that is put down on here, really

19   hard, all right, as opposed to my having a little something on

20   my hand and going like that, same thing.

21   A.   If a hundred kilograms of cocaine were to come in contact

22   with that lectern, yes, that would test positive.

23   Q.   You were asked some questions about things or items that

24   could interfere with the detection of cocaine; right?

25   A.   Correct.

1   Q.   You talked about, I guess --

2   A.   Yes.

3   Q.   And you also said with respect to the two percent MDA, it

4   could possibly be something else?

5   A.   Yes.

6   Q.   It's also possible there isn't anything else; right?

7   A.   There was a peak present so there was something there,

8   whether that was MDA or another compound, that's why it is a

9   presumptive technique, it indicates this could possibly be MDA.

10  Q.   That's the keyword, possibly?

11  A.   Correct, correct.

12  Q.   So if there's something in there that interferes with

13  detection and there's a possibility when you test, the ION scan

14  isn't going to detect any?

15  A.   There is a possibility.  For the swimmers to be created and

16  swim upstream, they have to be tapped to go into the pool.  If

17  they're not tapped and ready to go and pushed into that water,

18  they won't swim up.

19       So how the swimmers get tapped is through this chemical we

20  call the reagent ION, how many times that reagent ION taps

21  things that aren't swimmers, it taps other things, will

22  determine partially how many swimmers go upstream.

23       The reagent ION, the way the instrumentation works is kind

24  of specialized to look for drugs or explosive in the skin, so

25  it's trying to tap those swimmers but sometimes it is consumed

1   by other things and it won't work.

2   Q.   And that's the masking thing that you were talking about?

3   A.   It could be considered a masking, yes.

4   Q.   But isn't it also true that if you don't find anything

5   going upstream, it could simply be because there aren't any

6   swimmers?

7   A.   Correct.  If there's not cocaine there and I were to test

8   the surface, the instrumentation, because it's so sensitive and

9   it's not present there would indicate that it's not present.

10  Q.   And finally, in order to test positive for Coke, you don't

11  need -- you don't need a -- we don't need a pancake of cocaine

12  here on the podium, on the lectern, do we?

13  A.   No, a very, very small amount, a trace amount.

14  Q.   Trace amount.  In fact, it's my understanding, again,

15  correct me if I am wrong, that the ION scans measure in

16  nanogram quantities; is that correct?

17  A.   Nanogram and picogram levels, yes.

18  Q.   How small is a picogram?

19  A.   This is a way to put it into kind of an easy example, a

20  sugar packet is one gram, and in one gram you have a thousand

21  milligrams.  If I were to take one of those milligrams, that's

22  three zeros behind it, I go to nanograms, I add another three

23  zeroes, go to picograms, add another three zeroes.  So we're

24  talking about 12 zeros.

25       It's a very, very small amount.  If you can imagine, it's

1    less than a crystal of sugar.

2    Q.   Essentially that's a crystal of sugar split about a

3    thousand times; correct?

4    A.   Very small amount.

5    Q.   Something you're not going to be able to see?

6    A.   Correct.

7    Q.   Even with all the cleaning techniques and weather and

8    stuff, it's very possible on that boat, particularly on a boat

9    that deals with cocaine on a reasonably regular basis, there

10   could be a picogram or something else that remains that

11   someone, if touched, could then test positive for?

12   A.   It goes back to the violence of contact and the amount of

13   time that's passed.  So if a ship at one point handled cocaine

14   and then it's no longer there, a great amount of time is

15   passed, there's been cleaning, it just comes down to the

16   possibility, is it still present or not?  It's, again, a very,

17   very small amount.

18        It could also be if it's captured in the clothing in some

19   way.  If, you know, I break a piece of glass, there's glass

20   that goes everywhere, sometimes the glass will fall into my

21   person, it will fall into my pockets, to the cuff of my pants,

22   the cuff of my shirt, it really depends when it comes to trace

23   evidence all the different factors that could play into it.

24   Q.   So there's the possibility that trace evidence, a very

25   small quantity, which we can't see, can remain over an extended

1    period of time?

2    A.   Over an extended period of time, I would say no.

3    Q.   What's --

4    A.   Trace evidence doesn't stick around.  With time and contact

5    it moves away.

6    Q.   That's time and contact, what if there's no contact?

7    A.   If it's like, for example, a dead body and the dead body

8    doesn't get up and move, then the trace evidence is still

9    there, I would expect the trace evidence to still be there, but

10   if the dead body's in, like, a room, if I leave the dead body

11   out in the street and there's wind and there's, you know, all

12   kinds of things blowing around, that would remove the trace

13   evidence.

14   Q.   I moved my office in 1992 from Fort Lauderdale to Miami and

15   I still have a box sitting in my office that I never bothered

16   to open.  If there was something sitting in the bottom of that

17   box in my office which is in a nice, dry place unaffected by

18   weather, something is still going to be there; right?

19   A.   Yes.

20            MR. ABRAMS:  Thank you.

21                       CROSS-EXAMINATION

22   BY MR. RODRIGUEZ:

23   Q.   Good afternoon, Ms. Perr.

24   A.   Good afternoon.

25   Q.   I just have a few follow-up questions.  The ION 500, you

1    called it?

2    A.   The ION scan, yes.

3    Q.   It doesn't do what's called fingerprinting, does it?

4    A.   No, it does not.

5    Q.   Can you explain what fingerprinting is?

6    A.   Fingerprinting as in the traditional fingerprint from your

7    hand?

8    Q.   Well, in a sense that it can't compare one sample with

9    another.

10   A.   Oh, chemical fingerprinting is a type of profiling.

11        So in that scenario, I could be looking at isotopes of that

12   sample to source it to a particular geographical region.  I

13   could be looking at chemical solvents used in the processing of

14   it to source it to a particular manufacturing method.  That

15   could be chemical fingerprinting.

16   Q.   But this particular instrument doesn't do that?

17   A.   No, it does not.

18   Q.   In fact, chromatography gas spectrometry does that?

19   A.   Yes.

20   Q.   And let me ask you another few questions about what would

21   be optimal results for the ION scan.  Wouldn't it be fair to

22   say that this machine needs to be kept in a very stable

23   electrical area?

24   A.   As far as an electrical area, yes.  It should be grounded.

25   You shouldn't have any instrumentation exposed to lightning or

1    anything like that.

2    Q.   And you should also minimize humidity to it?

3    A.   The ION scan is very capable at operating at different

4    humidity levels all the way from the mountain down to sea

5    level, it just has to be calibrated.

6    Q.   In fact, there's a drying agent that should be changed when

7    it changes color; right?

8    A.   Yes, on the top of the instrumentation is filter, filled

9    with drying material and if it's been exposed to water too

10   long, it will change color, that's an indicator that it needs

11   to be changed to prevent, let's say, the lazy river from

12   getting too wet, that would be an example.

13   Q.   And the operator of this particular instrument, when he is

14   testing samples brought in, say, from a boarding party and the

15   Coast Guard, should check the boarding team?

16   A.   As far as analyzing --

17   Q.   -- prior to their leaving the vessel?

18   A.   To see if they've picked up trace evidence?

19   Q.   Yeah.

20   A.   That could be one possibility, yes.

21   Q.   In fact, he has to check himself?

22   A.   Yes.

23   Q.   To make sure he doesn't have trace evidence?

24   A.   Yes.

25   Q.   That's because residue could affect the results?

1    A.   Residue could affect the results.  If the sample isn't

2    clean or has been exposed to other things, it could affect the

3    results, yes.

4    Q.   So you agree that the accuracy of any readout is dependent

5    upon the person who properly follows the procedures?

6    A.   Yes, it's dependent on the human running the

7    instrumentation, it's dependent on the instrumentation

8    functioning correctly.  There's a couple different factors,

9    yes.

10   Q.   So if there's garbage in, there's garbage out?

11   A.   Correct.

12        MR. RODRIGUEZ:  Thank you.  I have no further

13   questions.

14                      CROSS-EXAMINATION

15   BY MR. CHAMBROT:

16   Q.   Good afternoon, Ms. Perr.

17   A.   Good afternoon.

18   Q.   Would you agree that over a ton of cocaine on a small boat

19   going very fast and being pounded constantly would leave a good

20   sample of cocaine on the boat?

21   A.   As far as a large amount of powder, I would say not.

22   Q.   Not powder, samples?

23   A.   Sampling, it's all going to depend.  If it's jumping up and

24   down, you have a lot of exchange and there's powder left on the

25   outside, it would be deposited, yes, but then you also have all

1   these other factors, the wind blowing and rain and waves, so

2   it -- really, it just depends on what happened to that sample.

3   Q.   Okay.   So now, supposedly, the crew picks up these bales,

4   they're heavy, put it on their chest and toss them overboard.

5   Would that leave traces on their bodies?

6   A.   If there was a trace on the outside of that bale and it

7   came into contact with their person, yes, a trace could be

8   exchanged.

9   Q.   So there's a very good possibility that a large amount of

10  cocaine on a boat that's pounding will leave traces?

11  A.   There is a possibility, yes.

12  Q.   And there's a very good possibility that the individuals

13  tossing and picking up these bales and tossing them -- one

14  after the other, would leave traces on their body?

15  A.   There is a possibility, yes.

16          MR. CHAMBROT:   Thank you, no further questions.

17                      CROSS-EXAMINATION

18  BY MR. BERRIO:

19  Q.   Good afternoon, Ms. Perr.   How are you?

20  A.   Good, how are you?

21  Q.   Good.   My name is Juan Berrio, I represent Jose Candelario

22  Perez-Cruz.

23          We never met before?

24  A.   No.

25  Q.   So let me just ask you, the ION scan machine, it will tell

1   you what kind of drug it is testing positive for; right?

2   A.   It indicates a drug will be present.  It could indicate

3   cocaine is there, it doesn't just say positive or negative, it

4   says what type of drug, so cocaine.

5   Q.   So it will tell you cocaine positive or if it's heroin, it

6   will tell you heroin?

7   A.   Correct.

8   Q.   If it it's MDA it will tell you MDA; right?

9   A.   Correct.

10  Q.   MDA is not cocaine; right?

11  A.   Correct, not cocaine.

12  Q.   And let me just add to Mr. Chambrot's hypothetical about

13  these people picking up the bales and throwing them into the

14  water.  You saying that the contact is rough there so it's more

15  likely that there could be some residue that transfers?

16  A.   Correct.  Any time that you have a greater increase of that

17  contact the more trace evidence is going to be exchanged.  So

18  picking it up, holding it against the chest, it provides for a

19  greater contact.

20  Q.   How about if we put a tarp over that, over the people and

21  the bales, put a tarp over it and they're clutching to the

22  bales or they're rubbing up against the bales, there's less

23  room for this transfer of the residue to escape, if we have

24  like -- if we put it into a Ziploc bag?

25  A.   It really just all depends on what comes into contact with

1    the actual surfaces that are being exchanged.

2    Q.   Okay.  But it's less likely that the residue will escape if

3    we have a tarp over the bales, over the individuals that are

4    riding in a boat for about an hour; right?

5    A.   I would think so.  If you're blocking out more of the

6    environment, there will be less of those factors coming into

7    play.

8         MR. BERRIO:  Okay.  I have no further questions.

9                    CROSS-EXAMINATION

10   BY MR. do CAMPO:

11   Q.   Good afternoon, Dr. Perr.

12   A.   Good afternoon.

13   Q.   Dr. Perr, these machines, the ION scanning machines that

14   we're talking about, they're similar to the ones that the TSA

15   uses at the airport; correct?

16   A.   Correct.

17   Q.   And at the airport they're predominantly looking for --

18   they'll swab an individual or a suitcase to see if there is any

19   trace of explosives; right?

20   A.   Correct.

21   Q.   And that sometimes generates what's called a false

22   positive; right?

23   A.   Correct.

24   Q.   Because the -- some of the compounds in common everyday

25   items, let's just say fertilizer, are similar to the compounds

1    that you'll find in explosives; right?

2    A.   Correct.   The nitrates in the fertilizer, nitrates in the

3    explosive.

4    Q.   And similarly, when you're talking about cocaine, for

5    instance, there are some substances that are commonly known to

6    have -- be impregnated with cocaine that if you come into

7    contact with them, you can potentially test positive; right?

8    A.   As far as common substances that could be containing,

9    cocaine, I'm not aware of any.

10   Q.   How about currency?

11   A.   Currency is contaminated actually with cocaine at small,

12   small levels.   Sometimes, it depends on -- they did a study, it

13   depends on the dollar bill amount, like a 20 versus a five

14   versus a single, may alarm in the instrumentation to cocaine.

15   Q.   And if somebody's handling currency, it's potential that

16   they can get the trace amounts of the cocaine from their

17   hands -- from the bills, from the currency onto their hands?

18   A.   I haven't seen it where somebody's handled currency and

19   then tested positive for cocaine, I haven't.

20   Q.   But the ION scan, as you have already testified, is

21   extremely sensitive?

22   A.   Correct, and that is why it can detect the cocaine on the

23   currency.

24   Q.   And, theoretically, if somebody touched currency, that

25   small nanogram quantity could transfer to the hands?

1    A.   That transfer of the cocaine that's present in the dollar

2    bills, transferring to a person and then being able to swab and

3    recover that back enough to test for the instrumentation, I

4    would say is unlikely.

5    Q.   Is it impossible?

6    A.   It's not impossible, but I would say it's very unlikely.

7    Q.   And if it did happen it would result in a very weak showing

8    or a weak test; right?

9    A.   If it did exchange and the small amount that was present on

10   the dollar bill managed to transfer to the period of time and a

11   hundred percent of that extremely small amount got onto the

12   person and then a hundred percent of that was recovered and

13   tested on the instrument, you would see a signal for cocaine.

14   Q.   My question was, it can measure not the purity of the drug

15   but the strength of what's found; right?

16   A.   Correct.

17   Q.   And if there was a transfer of the sort that I'm suggesting

18   but somebody handled currency and then tested positive, it

19   would result in a weak result; correct?

20   A.   The cocaine that's present on currency is already at the

21   bottom end of the detection limit of the instrumentation.  So

22   the instrumentation is really kind of getting close to that

23   edge where it may not see it.

24        To have a transfer of a very small amount to another

25   surface and a very small amount and, remember, trace evidence

1   depends on the violence of contact and also the time and

2   duration.  That's why I would say it was unlikely as far as

3   impossible, I would not say it's impossible, but highly

4   unlikely.

5           MR. do CAMPO:  Thank you.

6           MS. PINERA-VAZQUEZ:  I have no questions.  Thank you.

7           MR. ENCINOSA:  I have no questions.

8           THE COURT:  Redirect.

9                       REDIRECT EXAMINATION

10  BY MS. ANTON:

11  Q.   Ms. Perr, not to beat a dead horse, as they say, you have

12  been exposed to a lot of hypothetical questions, if this, then

13  that; right?  The bottom line is that this ION scan is not a

14  confirmatory test; correct?

15  A.   Correct.

16  Q.   It's rather a presumptive test?

17  A.   Right, it indicates this may be present.

18  Q.   So at the airport when it sounds off, when I go through and

19  they swipe my luggage and they swipe my hands for explosives

20  and it tests positive, they then do further investigation;

21  right, to see if, in fact, there is something to corroborate

22  that?

23  A.   Correct.

24  Q.   Like if I have a ticking something in my bag and a long

25  cord?

1  A.  Please don't have something in your bag, yes.

2  Q.  And if there's nothing there, then you get on the plane;

3  right?

4  A.  Correct.

5  Q.  But if there's something there, then you go to further

6  examination?

7  A.  Correct, you might not get on the plane that you intended

8  to get on.

9  Q.  But you will get on a plane?

10  A.  Yes.

11  Q.  So it is possible that you get a positive and that it's not

12  truly a positive result?

13  A.  Correct.

14  Q.  But that positive would only mean that you look to other

15  suspicious circumstances; right?

16  A.  Yes, correct.  For example, methamphetamine.  Common in

17  clandestine laboratories, smoking, nicotine will alarm for the

18  same as methamphetamine but that would prompt me still to do

19  further investigation, is it methamphetamine, is it nicotine?

20  Q.  Was that person in a tobacco factory or was that person in

21  a meth house somewhere on the floor?

22  A.  Correct.

23  Q.  And those circumstances would be something that you use,

24  right, as a trained investigator when you're doing this to

25  determine whether or not they have been exposed to this

1    controlled substance?

2    A.   Yes, and further investigation, a laboratory would have

3    actually confirmed the presence of the drug there.

4    Q.   Right.  And the ideal place to perform this test would be

5    in a laboratory with a person or a sample that had just been

6    swiped and put directly into the machine with everyone wearing

7    gloves, wrapped in plastic, in a vacuum, sort of in a bubble,

8    the perfect situation?

9    A.   Yes.

10   Q.   It would not be on the high seas in the middle of the

11   Eastern Pacific Ocean in a very small boat?

12        MR. ABRAMS:  Objection, leading.

13        THE COURT:  Sustained.

14   BY MS. ANTON:

15   Q.   Would it be possible to get an ideal sample like that in a

16   situation where you're on the high seas in a small boat with a

17   lot of wave spray coming at you and a lot of people?

18   A.   As far as of the --

19   Q.   Ideal?

20   A.   -- ideal, no.

21   Q.   And then if it took a long time to get from point A to

22   point B, would that further make it less than ideal?

23   A.   Less than ideal.

24   Q.   Then again, that's just a presumptive test?

25   A.   Correct.

 1              MS. ANTON:  Thank you, no further questions.

 2              (Witness excused.)

 3              THE COURT:  Let's go ahead and take our afternoon

 4     recess for about 10 minutes.

 5              (Jury exited courtroom at 4:08 p.m.)

 6              THE COURT:  Let me ask the Government, I have your

 7     witness list and I count six more witnesses left.  Are you

 8     intending on calling all of them?

 9              MS. ANTON:  Judge, I would like to streamline that

10     process and call fewer, but I've asked for stipulations from

11     defense counsel as to some things and it seems that if they're

12     not willing to stipulate to the drugs, so I am trying to

13     eliminate some witnesses off of that list.

14              THE COURT:  I'm not trying to tell you what to do.  I

15     just -- for informational purposes, I just want to know, do you

16     know, so at least from that answer it sounds like, yes, I am

17     still planning on calling six witnesses?

18              MS. ANTON:  Yes.  Yes.

19              THE COURT:  And the second part of that is, can you

20     tell or estimate what you think those six witnesses will last,

21     time-wise?

22              MS. ANTON:  They'll definitely be much quicker than the

23     first set of witnesses, and I would anticipate that by

24     tomorrow, tomorrow by lunch, I would anticipate getting

25     through.  Of course, it depends on cross-examination.

1           THE COURT:  Of course, of course okay.

2           MR. ABRAMS:  Judge, in regard to witnesses, the

3   Government actually hasn't called seven on their list, and we

4   would ask they at least produce -- in case we want to call

5   her -- Officer Barajas, who's the Coast Guard interpreter.

6           THE COURT:  Well, you know -- you can't make them call

7   witnesses.

8           MR. ABRAMS:  We just want her to be available for us to

9   call.

10          THE COURT:  Is she available?

11          MS. ANTON:  Judge -- well, the problem is these

12  Coast Guard guys are underway and it's very difficult to get

13  the Coast Guard in.  No one advised me they wanted to adopt our

14  list or that they wanted anybody.

15          THE COURT:  I don't think that's practical --

16          MS. PINERA-VAZQUEZ:  The problem is, Judge, it goes to

17  our proffer argument.  Again, that's going to start the proffer

18  argument for the record.  It goes to the proffer argument.

19          THE COURT:  Okay.  We will take our recess.

20          (Recess taken from 4:10 p.m. to 4:20 p.m.)

21          COURT SECURITY OFFICER:  All rise.

22          (Jury entered courtroom at 4:20 p.m.)

23          THE COURT:  Please be seated, everyone.

24          THE JUROR:  We have one more, Your Honor.

25          THE COURT:  Oh, one more.  Okay.

 1              (Jury entered courtroom at 4:21 p.m.)

 2         THE COURT:  Before the Government calls their next

 3    witness, just let me remind you, if -- you know, I schedule

 4    these breaks when we get to the end of a witness's testimony.

 5         But as I mentioned to you at the beginning of the

 6    trial, if you need a break at any time other than that just,

 7    you know, give me a signal, or whatever, and I'll certainly

 8    accommodate whatever your requests are.

 9         So if I'm -- just because my bladder apparently doesn't

10    have a time limit on it doesn't mean that other people might

11    not need to take a break.  Okay.

12         So, anyway, call your next witness.

13         MS. VIAMONTES:  Thank you, Your Honor.

14         At this time, the United States calls Elizabeth Atkins,

15    the chemist.

16         COURTROOM DEPUTY:  Raise your right hand, please.

17         Do you solemnly swear the testimony you're about to

18    give is the truth, the whole truth, and nothing but the truth,

19    so help you God?

20         THE WITNESS:  I do.

21         COURTROOM DEPUTY:  Thank you.  Please be seated.

22    Please state your full name and spell it for the record.

23         THE WITNESS:  Elizabeth Ann Adkins, E-L-I-Z-A-B-E-T-H,

24    A-N-N, A-D-K-I-N-S.

25         COURTROOM DEPUTY:  Thank you.

1              (FORENSIC CHEMIST ELIZABETH ANN ADKINS, being sworn,

2      testified as follows:)

3                              DIRECT EXAMINATION

4      BY MS. VIAMONTES:

5      Q.   Good afternoon, Ms. Adkins.

6      A.   Good afternoon.

7      Q.   Could you please tell the members of the jury where you

8      work and in what capacity.

9      A.   I work at the Drug Enforcement Administration in Miami,

10     Florida, and I'm a senior forensic chemist.

11     Q.   What are the duties of a senior forensic chemist?

12     A.   I analyze exhibits that are assigned to me, I report my

13     findings and testify in court when I'm needed.

14     Q.   Can you briefly describe your training and your educational

15     background in order to hold your position as a senior forensic

16     chemist with the DEA?

17     A.   I have a Bachelor's of Science degree in forensic chemistry

18     from Ohio University.  I attended, approximately, six weeks of

19     basic chemist school in Quantico, Virginia, and then I had

20     approximately six months of in-house training.

21     Q.   How long have you worked as a chemist with DEA?

22     A.   Sixteen years.

23     Q.   Have you ever testified -- have you ever been allowed to

24     give an opinion as an expert in the field of

25     forensic chemistry?

1   A.   Yes.

2   Q.   How many times?

3   A.   About 125 times.

4   Q.   Now, did you have occasion to review a sample that was

5   submitted or brought to the DEA lab by HSI Agent Dave

6   Villanucci with Case Number -- if I may, your lab number is

7   2016-SFL 4-05818?

8   A.   Yes.

9   Q.   Do you remember when that sample was brought to you?

10  A.   I checked it out of the evidence vault on January 4th,

11  2017.

12  Q.   And is that the day you performed your laboratory test on

13  it?

14  A.   Yes.

15  Q.   Now, tell the members of the jury what you do in order to

16  prepare to analyze the sample?  What's the first thing you do?

17  A.   Well, the first thing I do is I -- well, I receive a DEA-7,

18  which is a report of the drug property collected or seized, and

19  I make sure the information on there, including the

20  case number, the exhibit number and the laboratory number match

21  the evidence that I have retrieved from the vault.

22       And then I get a gross weight, which, in this case, was the

23  weight of all the kilos in the box, and then I do a net weight,

24  which is just the weight of the suspected drug itself.

25  Q.   And what was the weight of the suspected drugs itself?

1    A.   It was 10,016 grams.

2    Q.   Is that 10 kilos?

3    A.   Yes, a little over 10 kilos.

4    Q.   Can you tell us when you received the sample how it was

5    packaged?

6    A.   It was compressed white powder that was wrapped in multiple

7    layers.

8    Q.   Multiple layers of what?

9    A.   Like plastic, and inside there was rubber and different

10   colors.

11   Q.   Once you weigh the substance, do you remove the packaging?

12   A.   Yes.

13   Q.   And do you take the powder out of the packaging and

14   separate it?

15   A.   Yes.

16   Q.   Now, in order to do your testing, do you test the entire

17   10 kilograms?

18        MR. do CAMPO:  Your Honor, I'm going to object.  I

19   don't want to elevate form over substance, but I don't believe

20   this witness has been tendered as an expert.

21        THE COURT:  Okay.  You can go ahead and tender.

22        MS. VIAMONTES:  Your Honor, the Government tenders

23   Elizabeth Adkins as an expert in forensic chemistry.

24        MR. do CAMPO:  Your Honor, could I just voir dire

25   Ms. Adkins on her educational background?

 1              THE COURT:  Sure.

 2                        VOIR DIRE EXAMINATION

 3   BY MR. do CAMPO:

 4   Q.  Can you just tell the jury what your educational

 5   qualifications are as a forensic chemist?

 6   A.  Yes.  I have a Bachelor's of Science degree in forensic

 7   chemistry from Ohio University.

 8   Q.  Is that all?

 9   A.  Yes.

10              MR. do CAMPO:  Thank you, Your Honor.  I have no

11   further voir dire.

12              THE COURT:  All right.  For the 126th time, she's

13   recognized as an expert.

14              THE WITNESS:  Yes.

15                        DIRECT EXAMINATION   (continued)

16   BY MS. VIAMONTES:

17   Q.  Ms. Adkins, the sample you received, was it from Dave

18   Villanucci?

19   A.  Yes.

20   Q.  I mispronounced his name; correct?

21   A.  Yes.

22   Q.  And he's a special agent with his?

23   A.  Yes.

24   Q.  Now, where were we?

25        You had mentioned that you take off the wrapping, right,

1    and you separate the actual powdery substance?

2    A.   Yes, from the packaging.

3    Q.   What do you do next?

4         Well, I had asked you, do you test the entire 10 kilograms?

5    A.   Yes.  I actually took a portion from each one and screened

6    it by using a color test; and then the gas chromatograph mass

7    spectrometer, to make sure they all were the same; before, I

8    took a portion from each of the 10 and combined it and ground

9    it and sieved it into a more homogenous representative sample

10   to perform further analysis.

11   Q.   All right, that was a mouthful.  Let's break it down a

12   little bit.

13        The gas chromatograph mass spectrometer --

14   A.   Yes.

15   Q.   -- you mentioned that instrument?

16   A.   Yes.

17   Q.   Can you describe what that instrument is and how you use

18   it, to the members of the jury?

19   A.   Well, a small portion of powder is dissolved in methanol

20   and it's put into a little glass vial, and then it's introduced

21   into the instrument via syringe.  And it's a box and it has

22   like a column in it that looks like a thin piece of spaghetti

23   that's coiled inside.

24        And it's kind of like a race.  The molecules come out at

25   different times, depending on how they adhere to the substance

1    in the column, they'll come out at difference times.

2        And once they exit the columns, it hits the gas -- or the

3    mass spectrometer portion, which is hit with electrical charge,

4    which breaks up the molecule, and there's a pattern with the

5    pieces that form from this breakage.

6        And each compound, be it caffeine, cocaine, et cetera, have

7    a unique pattern that results from this, and they're also

8    compared to a known standard.

9    Q.   The gas chromatograph mass spectrometer, does it detect

10   different substances?

11   A.   Yes.

12   Q.   Can it detect cocaine?

13   A.   Yes.

14   Q.   And does it do it by comparing the graph that the substance

15   produces to the known graph that cocaine would produce?

16   A.   Yes.  I -- as a forensic chemist, I look at the standard

17   of -- for example, cocaine, and I form an opinion if it's the

18   substance or not by comparing the two.

19   Q.   And does that instrument actually produce a graph that you

20   analyze?

21   A.   Yes.

22   Q.   And in order to do that, you had mentioned, it breaks up

23   the molecules?

24   A.   Yes.

25   Q.   Now, does each substance have a unique pattern or unique

1    output that the gas chromatograph mass spectrometer produces?

2    A.   Yes.

3    Q.   And does cocaine have its own graph that's unique to

4    cocaine?

5    A.   Yes.

6              MS. VIAMONTES:   Permission to approach, Your Honor?

7              THE COURT:   All right.

8              MS. VIAMONTES:   Your Honor, would it be okay to hand

9    the witness scissors so that she can cut into it?

10             THE COURT:   Sure.

11             MS. VIAMONTES:   May I use the hand-held?

12             THE COURT:   All right.

13   BY MS. VIAMONTES:

14   Q.   Now, Ms. Adkins, I've handed you what's been pre-marked as

15   Government's Exhibit 34 at the very top.

16        Would you mind using those scissors -- and it's comprised

17   of two boxes.  Would you mind using those scissors and opening

18   Government's Exhibit 34 and taking a look at it?

19        Is this how you received the item that you were referring

20   to in reference to this case, the 10 kilograms of cocaine, did

21   you receive in those two boxes?

22   A.   I actually received it in one box; and this box here is a

23   box from the laboratory that I had to create to put everything

24   back into it.

25   Q.   Okay.  So you placed it back into this box?

```
 1   A.   Yes.

 2   Q.   Now, if you could take a look at -- is there a reason why

 3   some is in one box and another portion is in a separate box?

 4   A.   I couldn't fit it all back into the original box, so I

 5   created a new box.

 6   Q.   All right.  I had previously asked you if you test every

 7   single portion of the 10 kilograms.

 8        What I mean is, do you consume the entire 10 kilograms in

 9   your testing?

10   A.   No.

11   Q.   Or do you take a representative sample from the entire

12   10 kilograms?

13   A.   Yes, I take a representative sample.

14   Q.   Now, Governments Exhibit 34, is that the 10 kilograms that

15   you analyzed in your laboratory in Miami, Florida?

16   A.   Yes.

17   Q.   Aside from the -- when you performed your analysis on --

18   these 10 kilograms -- the gas chromatograph mass spectrometer,

19   did it come back positive for a substance?

20   A.   Yes.

21   Q.   And what was that?

22   A.   Cocaine.

23   Q.   Aside from the gas chromatograph, did you perform any other

24   tests on the 10 kilograms?

25   A.   Yes.
```

1    Q.   What did you perform?

2    A.   And after I performed my representative sample from the 10,

3    I performed the gas chromatograph mass spectrometer analysis

4    again, a gas chromatograph, and then an infrared

5    spectrophotometer analysis.

6    Q.   All right.  Can you explain that to the members of the

7    jury?

8    A.   The infrared spectrophotometer is an instrument that

9    introduces infrared lights to the substance and how it reacts

10   to infrared light.  It performs a -- or it does -- it has

11   another pattern that is also unique for each component.

12        So cocaine is actually cocaine.  This one distinguishes the

13   difference between cocaine hydrochloride and cocaine base.

14   Q.   So cocaine hydrochloride, is that powder cocaine?

15   A.   Yes.

16   Q.   As opposed to cocaine base, which is like crack cocaine?

17   A.   Yes.

18   Q.   The infrared testing you just explained, is that a

19   confirmatory test to confirm the tests you did initially on the

20   gas chromatograph?

21   A.   It's a confirmatory test.

22   Q.   And that also came back positive for cocaine?

23   A.   Yes.

24   Q.   What else did you do to test these 10 kilograms?

25   A.   That was the end of the chemical analysis.

1    Q.   Is there a color test component?

2    A.   Yes.  That was done originally as a screening test.

3    Q.   Is that a screening, or presumptive test, before you do the

4    gas chromatograph?

5    A.   Yes.  I did that with the gas chromatograph mass

6    spectrometer first to make sure they're all the same.

7    Q.   Do you do anything to ensure that the sample you're testing

8    is a true representative sample of the entire 10 kilograms, to

9    make sure it's homogeneous?

10   A.   Yes.

11   Q.   What do you do?

12   A.   I grind it into a powder and then I sieve it and --

13   Q.   What does that mean?  You sift it or sieve it?

14   A.   I sieve it.  It kind of looks like a flour sifter.  I sieve

15   it through a mesh screen to get it to a small particle size.

16   Q.   And once you do that, is the substance that you're testing

17   now considered to be homogeneous?

18   A.   Yes.

19   Q.   Now, after you complete your test, your analysis, do you

20   write a report?

21   A.   Yes, I generate a report.

22   Q.   And your report, is it reviewed by your peers or your

23   superiors?

24   A.   Yes, a supervisor will review all the reports that go

25   through.

1    Q.   And before your report becomes final, does your supervisor

2    have to agree in your opinion and agree that you performed the

3    test according to protocol and procedures?

4    A.   Yes.

5    Q.   And did your supervisor sign off on your report?

6    A.   Yes.

7    Q.   After your report is complete, what do you do with the

8    cocaine that's remaining?

9    A.   I give it a reserve weight, which is the weight of

10   everything that's remaining, and then I placed it in the bags

11   there and the two boxes.

12   Q.   And what was the reserve weight of the sample in reference

13   to this case?

14   A.   10,005 grams.

15   Q.   Still over 10 kilos of cocaine?

16   A.   Yes.

17   Q.   And do you seal it back up?

18   A.   Yes.

19   Q.   And do you put your initials on it when you seal it?

20   A.   Yes.

21   Q.   So, looking at that cocaine, can you find your initials on

22   it?

23   A.   Yes.

24   Q.   Would you mind doing that if you haven't done so already?

25   A.   My handwriting and signature and everything is on --

1   Q.   Pardon me.  I'm sorry.

2   A.   On the box that I created, I made an evidence receipt,

3   which has the case number, the exhibit number, my signature,

4   how much the box weighed, and the lab number in my handwriting

5   on it.

6        And in the inside packaging here, this is my handwriting

7   here, and probably on -- on the bottom of the boxes is sealed

8   where the tape meets that I have a signature and date and all

9   the information on those, too.

10  Q.   The seal that you're referring to with the tape, am I

11  pointing that at the bottom of the box, the second box of

12  Government's Exhibit 34?

13  A.   Yes.

14  Q.   Government's 34, is this the same cocaine that you tested

15  in reference to this case?

16  A.   Yes.

17  Q.   That you received from HSI Agent Villanucci?

18  A.   Yes.

19        MS. VIAMONTES:  Your Honor, at this time, the

20  Government moves Government's 34 into evidence.

21        THE COURT:  Be admitted.

22        (Government's Exhibit 34 admitted into evidence.)

23        MS. VIAMONTES:  Permission to publish, Your Honor.

24        THE COURT:  All right.

25        MS. VIAMONTES:  Can I put it on the floor on a box,

1   Your Honor?

2          THE COURT:  You can, but why don't you go ahead and

3   show it to the jury before you do that.

4          Do you have one of them know that's a brick?

5          MS. VIAMONTES:  Let me see, Judge.

6          THE COURT:  That's the one right on top there.

7          MS. VIAMONTES:  Yep, I do.

8          MS. VIAMONTES:  Do you mind opening this one or can you

9   open this one?

10         THE WITNESS:  Sure.

11         MS. VIAMONTES:  Permission to publish this portion,

12  Your Honor.

13         THE COURT:  All right.

14  BY MS. VIAMONTES:

15  Q.  Ms. Adkins, is this the condition that the cocaine was in

16  when you received it, wrapped multiple times like this?

17  A.  Yes, except for that tape that -- I put that there because

18  I had to open it to get that portion out.

19  Q.  But you left the packaging on this one?

20  A.  Yes.

21  Q.  And the other portions of the 10 kilograms, you packaged it

22  in the evidence package and removed the packaging it came in?

23  A.  Yes.  The other nine, they were removed.

24  Q.  All right.  And this is one kilo of cocaine, approximately?

25  A.  Yes.

```
 1   Q.   Is this typically how they're shipped?

 2   A.   Yes.

 3   Q.   And did you retain the packaging that those other kilos

 4   came in?

 5   A.   Yes.

 6   Q.   You don't receive 940 kilos of cocaine, to test all 940

 7   kilos; do you?

 8   A.   No.

 9   Q.   You're given a representative sample?

10   A.   Yes.

11   Q.   Is that what happened in this case?

12   A.   Yes, it is.

13              MS. VIAMONTES:  No further questions, Your Honor.

14              THE COURT:  Cross.

15              MR. ABRAMS:  No questions, Judge.

16              MR. RODRIGUEZ:  Just a couple questions, Your Honor.

17                        CROSS-EXAMINATION

18   BY MR. RODRIGUEZ:

19   Q.   Were these the only items you were asked to test?

20   A.   Yes.

21   Q.   The packaging, did it have evidence of being tested for

22   fingerprints?

23   A.   No.

24              MR. RODRIGUEZ:  Thank you.  I have no further

25   questions.
```

316

```
1            MR. CHAMBROT:  No questions.

2            MR. BERRIO:  No questions.

3            MR. do CAMPO:  No questions.

4                         CROSS-EXAMINATION

5    BY MS. PINERA-VAZQUEZ:

6    Q.  I believe the counselor just asked you about fingerprints.

7    Was it tested for any DNA?

8    A.  No, not that I'm aware of.

9    Q.  And when you received these packages, they had no

10   particular markings on them; correct?

11   A.  Correct.

12   Q.  In other words, you have no idea who these belonged to;

13   correct?

14   A.  Correct, for both of them.

15           MR. ENCINOSA:  No questions, Your Honor.

16           THE COURT:  Any redirect?

17           MS. VIAMONTES:  No, Your Honor.

18           THE COURT:  Thank you.  You may step down.

19           (Witness excused.)

20           THE COURT:  Call your next witness.

21           MS. ANTON:  The United States calls HSI Agent David

22   Villanucci.

23           MS. VIAMONTES:  Do you mind if I remove the packages?

24           THE COURT:  Please.

25           COURTROOM DEPUTY:  I don't see him on the witness list.
```

1          MS. ANTON:  I believe he may have been left off in

2     error on the witness list.

3          THE COURT:  Okay.

4          MS. ANTON:  A quick review.  I will file an amended

5     witness list.  Defense counsel was on notice, he's the leading

6     case agent.

7          THE COURT:  Okay.  I don't need it.

8          COURTROOM DEPUTY:  Raise your right hand, please.

9          Do you solemnly swear the testimony you're about to

10    give is the truth, the whole truth, and nothing but the truth,

11    so help you God?

12         THE WITNESS:  I do.

13         COURTROOM DEPUTY:  Thank you.  Please be seated.

14         Would you please state your full name for the record

15    and also spell it.

16         THE WITNESS:  David Villanucci.  That's V, as in

17    Victor, I-L-L-A-N-U-C-C-I.

18         COURTROOM DEPUTY:  Thank you.

19         (HSI AGENT DAVID VILLANUCCI, being sworn, testified as

20    follows:)

21                    DIRECT EXAMINATION

22    BY MS. ANTON:

23    Q.  Good afternoon.

24    A.  Good afternoon.

25    Q.  Would you please introduce yourself to the ladies and

1    gentlemen of our jury and tell them who you work for and how

2    long you've been there.

3    A.   Sure.  My name is David Villanucci.  I'm a special agent

4    for the Department of Homeland Security, and I have been since

5    2002.  Over the course of those 15 years, I served in the main

6    office in New York City in the money laundering division.

7         And then I moved to Fort Lauderdale where I served for nine

8    years in airport narcotics, and then for three years I served

9    in seaport narcotics in Fort Lauderdale, also.  And currently,

10   I work for the Office of Professional Responsibility.

11   Q.   Okay.  So back in October of last year, were you working in

12   narcotics then?

13   A.   I was in the seaport, correct.

14   Q.   And as part of your job duties, working the seaport, did

15   you have the occasion to become involved with this interdiction

16   on the high seas that happened October 18th?

17   A.   Yes, I did.

18   Q.   Okay.  Can you give us a brief synopsis of what you do,

19   what your duties consist of being a narcotics agent in the

20   seaport?

21   A.   Well, specifically, we're -- we work on narcotics

22   interdictions at Port Everglades, which is in Port Everglades.

23   However, anything, seaport, or ocean-going in that area, or

24   assigned to our office, we work those investigations.

25   Q.   So you work investigations down here in Key West, also?

1    A.   Yes, yes.

2    Q.   If it involves the seaport?

3    A.   That's all part of the Miami area of responsibility.

4    Q.   Okay.  And so let's talk about specifically in this case.

5         Were you at some point contacted regarding this

6    interdiction and did you come down here to Key West in October

7    of last year -- or November of last year?

8    A.   I did become involved in the investigation, however, I was

9    not -- I did not come to Key West.

10   Q.   Okay.  So how did you become in this investigation?

11   A.   Through my supervisor, he told me -- he gave me the lead

12   and I worked it from there.

13   Q.   Okay.  And as the lead investigator when you got the case,

14   were you in charge of making sure that this case was moving

15   along once it got state-side?

16   A.   Yes.

17   Q.   Okay.  And did you have another team of agents working with

18   you down here in Key West?

19   A.   Yes, I did.

20   Q.   Okay.  At some point during this investigation, late last

21   year, did the U.S. Coast Guard Cutter *Vigorous* come into port

22   in Key West?

23   A.   Yes.

24   Q.   And when that Coast Guard cutter came into port, were 10

25   kilos of cocaine, a representative sample, off-loaded from that

1    boat in relation to this case?

2    A.   Approximately, 10 kilos, yes.

3    Q.   Were seven detainees also off-loaded from that boat?

4    A.   Yes, ma'am.

5    Q.   Okay.  And did you assist in any way with the

6    representative sample of cocaine?

7    A.   I did.

8    Q.   And what did you do with that?

9    A.   Upon taking custody of it, I brought it to the DEA lab for

10   analysis.

11   Q.   And you signed property receipts when you gave it to the

12   property room at the DEA lab?

13   A.   I did.

14   Q.   Okay.  Let's talk about the other half or part of the

15   narcotics in this case; a bulk sample, the remainder of the

16   kilos in this case, came in on a different ship?

17   A.   It did.

18   Q.   Can you tell us about that?

19   A.   It came in on the Coast Guard Cutter *Hamilton* on December

20   15th, I believe, December 15th, 2016, into Port Everglades.

21   Q.   Okay.  Into Port Everglades.

22        And were you notified that that cutter was coming in with

23   the remainder of the narcotics seized from the interdiction you

24   were the lead investigator on?

25   A.   Yes.

1   Q.   And what did you do once you found out that, approximately,

2   930 kilos were now coming into Port Everglades?

3   A.   Well, a load of that size required more than just a simple

4   two-agent transport, so I had to put a team together of people

5   in my group, and we met the cutter at the port where we took

6   custody of it from them, and then an armored motorcade down to

7   Miami seized-property warehouse where it was weighed and

8   stored.

9   Q.   And that was transported from Fort Lauderdale down to a

10  warehouse in Miami --

11  A.   Correct.

12  Q.   -- where it was stored?

13  A.   Yes, ma'am.

14  Q.   Okay.  And do you have the approximate weight of that load?

15  A.   Yes.  The weight was 1,075.5 kilograms, 930 bricks.

16  Q.   930 bricks, did you say?

17  A.   Bricks, correct.

18  Q.   Okay.  In this investigation, did you also conduct an

19  inquiry into some evidence relating to a Spot Trace GPS

20  Tracker?

21  A.   Yes, I did.

22  Q.   And were you actually given the physical Spot Trace Tracker

23  or were you just given the information from the tracker?

24  A.   Well, both.

25  Q.   Both.  Then I'm going to show you Government's Exhibit 12

1    on the Elmo.  It's easier for you to see it there.

2        -- Exhibit 32 on the Elmo, this is a Spot Trace Tracker

3    that's been entered into evidence.

4        Is there information regarding serial numbers and that type

5    of information contained on this device?

6    A.   Yes.  If you take the compartment off where the batteries

7    would go, there should be some kind of serial number there.

8            MS. ANTON:  Permission to approach.

9            THE COURT:  All right.

10   BY MS. ANTON:

11   Q.   Well, it looks like you need a screwdriver to take it off,

12   so I'm not going to ask you to take it apart.

13       However, is that the Spot Trace Tracker -- and I have all

14   the accompanying bags that were with it.

15       Let me pass that to you.

16       Is that the Spot Trace Tracker that came into your

17   possession in regards to this interdiction?

18   A.   Yes.

19   Q.   And you know that from reviewing the different property

20   receipts and chain of custody that are inside that bag?

21   A.   That's my writing.

22   Q.   Okay.  So when you got this, what did you do with it, in

23   terms of an additional investigation?

24   A.   Well, the way Spot Trace maintains their historical

25   information is by sending a subpoena, a business subpoena for

1    records pertaining to the account that this device was

2    associated with.  So we put together a subpoena for business

3    records for that specific account.

4    Q.   Okay.  So is Spot Trace a manufacturer?

5    A.   It's the brand of GPS.  Global Star is the actual company.

6    Q.   Okay.  So when we say "Spot Trace Tracker," it's really

7    just the manufacturer and the company?

8    A.   I'm sorry.  So the subpoena was Global Star, they're the

9    ones who maintained the information.

10   Q.   And so you were able to take the identifying information

11   off of that device and put it into a subpoena and send it to

12   Global Star, the company that makes and monitors that device?

13   A.   That's correct.

14   Q.   Do you have knowledge as to how a Spot Trace Tracker works?

15   A.   I know it's a GPS and battery-operated, that's probably as

16   far as I know.

17   Q.   That's the extent of it.

18        So when you served that legal process on the company Global

19   Star, did you ultimately get reciprocal documents back?

20   A.   We did.

21   Q.   And did those documents that you received back contain

22   information as to who might be the subscriber; is that the

23   right terminology?

24   A.   Correct, it was subscriber information, and also the

25   "pings" -- for lack of a better word -- for the GPS.

```
 1          MS. ANTON:  At this time, the Government moves to admit
 2   Government's Exhibit 35 into evidence, which is a business
 3   record, and I move to admit it under 902(11).
 4          MS. PINERA-VAZQUEZ:  No objection.
 5          (Government's Exhibit 35 admitted into evidence.)
 6          THE COURT:  Admitted.
 7          MS. ANTON:  Permission to publish.
 8          THE COURT:  All right.
 9   BY MS. ANTON:
10   Q.  When you sent the legal process to Global Star, did you
11   receive documents back with a business record authenticity on
12   it from the company?
13   A.  That's correct, yes.
14   Q.  And is that what I'm showing you here, certification of
15   domestic records of regularly conducted activity?
16   A.  Correct.
17   Q.  So these are the documents that the company that's in
18   control of that spot tracer gave you; right?
19   A.  Yes.
20   Q.  Now, why were you interested in knowing who that tracker
21   was registered or assigned to?
22   A.  Well, because in furtherance of the investigation, of
23   course, we wanted to follow all leads and it would -- since the
24   tracker was with the narcotics, we wanted to know who the
25   tracker belonged to.
```

 1   Q.   You thought maybe it could give you a lead as to that?

 2   A.   Sure.

 3   Q.   And so when you received this information, did it, in fact,

 4   contain a name of a person?

 5   A.   Yes.

 6   Q.   And what is that information?

 7   A.   Lizeth Yorrea.

 8   Q.   Did it also have an address?

 9   A.   Yes.

10   Q.   And is that address indicated on Government's Exhibit 35

11   that's now on the Elmo?

12   A.   Yes, it did.

13   Q.   Is that an address in Bogota, Colombia?

14   A.   Yes.

15   Q.   And does it give an e-mail and two phone numbers, as well

16   as an account number, for someone named Lizeth Yorrea?

17   A.   Yes.

18   Q.   Once you received that information, what did you do, in

19   terms of following up?

20   A.   Well, what we did was, we -- the name is very common,

21   "Lizeth Yorrea," so it was essentially impossible to track down

22   which Lizeth Yorrea that was.  The address on the subscriber

23   information came back to what appeared to be an abandoned

24   building in Colombia, it didn't appear that anybody was living

25   there.

1          The e-mail address, we were able to find that e-mail

2     address attached to certain social media.  However, the

3     profiles in the social media appeared to be made up and not

4     real people -- not a real person, leading us to believe that

5     the tracker -- much like what we would call a "burner phone" --

6     was just set up by a fictitious name, so there's nothing we

7     could do with it.

8     Q.   Okay.  So you investigated this information and,

9     unfortunately, weren't able to get any further as to who may

10    have been subscribing to that tracker?

11    A.   Correct.

12    Q.   But, nonetheless, Global Star, the company, provided you

13    with documentation -- and I will just put a sampling of it up

14    here -- in response to your legal process, the subpoena; right?

15    A.   Yes.

16    Q.   Okay.  And the documentation that Global Star provides to

17    you and that you requested from them was simply a download

18    extraction of what information they had pertaining to that

19    device; right?

20    A.   Yes.

21    Q.   And then you didn't do anything further with that?

22    A.   As far as plotting the points?

23    Q.   Right.

24    A.   I did not.

25    Q.   You did not.  When you say "plotting the points," so could

1    you describe for the jury what information was contained in

2    these documents?

3    A.   They're global positions.

4    Q.   I'm sorry?

5    A.   Global positions.

6    Q.   Okay.  So GPS points were contained in that tracker?

7    A.   Right.

8    Q.   Which you would expect because it was a tracker; right?

9    A.   That's what it is, right.

10   Q.   And you're not an expert in that?

11   A.   I'm not.

12   Q.   So as far as then plotting the points, you didn't do

13   anything additional?

14   A.   No.

15   Q.   And were you working in conjunction with other agents on

16   this case or did they take part in other parts of the

17   investigation?

18   A.   Absolutely, yes.

19        MS. ANTON:  Okay.  Great.  I have no further questions

20   then right now for Agent Villanucci.  Thank you.

21                    CROSS-EXAMINATION

22   BY MR. ABRAMS:

23   Q.   Good afternoon, sir.

24   A.   Good afternoon.

25   Q.   I'll be kind of brief.

1      Any connection that you're aware of -- well, you're the

2   case agent in this case; correct?

3   A.   One of them.

4   Q.   One of them, along with Special Agent Kenney?

5   A.   Yes, sir.

6   Q.   And as such, that means you have an overall working

7   knowledge of this case, whether it's based on what you

8   personally have done or what you've learned as a result of

9   talking to others; is that right?

10  A.   I think I have a good knowledge of the case, yes.

11  Q.   Okay.  I'm just going to ask you a little bit about

12  Government Exhibit 35.

13      What's the connection between -- it sounds real general --

14  Ms. Garcia-Solar and Lizeth Yorrea?

15  A.   I'm sorry?

16  Q.   Do you know of any connection between Mr. Garcia-Solar and

17  Lizeth Yorrea?

18  A.   I don't.  However, as stated before, believing that this is

19  equivalent to what we call a "burner phone," I wouldn't expect

20  it to be associated with any of the defendants because that's

21  the whole purpose of it, is so that it can't be tracked back to

22  any individual, any specific person.

23  Q.   Okay.  Are you aware from this particular spot tracker

24  where it was sold?

25  A.   I'm not, no.

```
 1   Q.  Do you know as a result of your investigation in this case
 2   whether any time during his life Mr. Garcia-Solar has set foot
 3   in Colombia?
 4   A.  I don't know Mr. Garcia-Solar, personally, I don't know if
 5   he's been in Colombia.
 6        MR. ABRAMS:  Okay.  Thank you.
 7                       CROSS-EXAMINATION
 8   BY MR. RODRIGUEZ:
 9   Q.  Good afternoon, sir.
10   A.  Good afternoon.
11   Q.  The only information you have on the spot tracker was a
12   Colombia connection, correct, not Mexico?
13   A.  On the spot tracker, correct.
14        MR. RODRIGUEZ:  Thank you.  I have no questions.
15                       CROSS-EXAMINATION
16   BY MR. CHAMBROT:
17   Q.  Good afternoon.
18   A.  Good afternoon.
19   Q.  I think we met in Miami?
20   A.  I think we did.
21   Q.  Now, a very simple question that's been asked as to the
22   other two defendants.  There's nothing linking my client to
23   Colombia or you have no knowledge that he's been to Colombia;
24   correct?
25   A.  There's nothing linking --
```

1    Q.   You have no knowledge that my client has been to Colombia?

2    A.   I don't know if he's been to Colombia, no.

3            MR. CHAMBROT:   Thank you.

4                        CROSS-EXAMINATION

5    BY MR. BERRIO:

6    Q.   Good afternoon, Agent Villanucci.

7    A.   Good afternoon.

8    Q.   My name is Juan Berrio.  I represent Jose Candelario

9    Perez-Cruz.  We've never met before; right?

10   A.   Unless you were at the discovery conference in Miami, I

11   don't know if you were there.

12   Q.   Oh, we did, we did.

13   A.   Right.

14   Q.   You've changed.  No, you haven't changed; have you?

15   A.   I think I had a beard back then.

16   Q.   You had a beard, oh, that might be it.  Okay.

17          Agent Villanucci, like the other defendants before my

18   client, you have no evidence that this Lizeth Yorrea knows

19   Mr. Perez-Cruz, right, no evidence to that effect?

20   A.   Well, as stated, I have no evidence that they're connected.

21   But if it is, in fact, a burner phone, then I wouldn't expect

22   there to be any connection.  As a matter of fact, after

23   speaking with Global Star, the company which here, in the

24   United States, they would require a credit card to open up one

25   of these accounts.

1       But in places like South America, where not many people

2   have credit cards, you can actually open the account just on

3   cash, making it even easier for this to be not traced back to

4   the person who owns it, so...

5   Q.   No evidence?

6   A.   None, no.

7   Q.   And no evidence that this same person or this fictitious

8   person ever contacted Mr. Perez-Cruz at any time?

9   A.   No, sir.

10  Q.   And no evidence that Mr. Perez-Cruz has ever been to

11  Colombia either?

12  A.   I don't know.

13       MR. BERRIO:   Thank you.

14       MR. do CAMPO:   I have no questions for this witness.

15                       CROSS-EXAMINATION

16  BY MS. PINERA-VAZQUEZ:

17  Q.   Agent Villanucci?

18  A.   Yes, ma'am.

19  Q.   Agent Villanucci, going back to -- I believe you testified

20  that you didn't have any evidence that this Lizeth Yorrea is

21  related or knows any of the defendants; right?

22  A.   Correct.

23  Q.   In fact, is she -- do you know if -- actually, I'm assuming

24  it's a she, but do you even know if she exists?

25  A.   Well, as I stated in direct, there was many, many Lizeth

1    Yorreas in Colombia, so to be able to say which one is this

2    one, we weren't able to do that.

3    Q.   And did you physically -- did I hear you say you physically

4    went to this location in Bogota, Colombia?

5    A.   No, ma'am, I did not, no.

6    Q.   Did you send someone to go?

7    A.   Well, our Intel analyst did a work-up on it, and that's the

8    conclusion they came with.  If somebody physically went there

9    from our office down in, I'm not aware of that.

10   Q.   In fact, you don't even know if this person was in Colombia

11   when they actually ordered this spot tracer; right?

12   A.   I can't speak to Global Star, and if -- I don't know how

13   that would work.

14   Q.   This simply shows who it was registered to; right?

15   A.   According to Global Star, that's the person the account

16   belongs to, yes.

17           MS. PINERA-VAZQUEZ:  I have no further questions.

18                          CROSS-EXAMINATION

19   BY MR. ENCINOSA:

20   Q.   Good afternoon, Agent.

21   A.   Good afternoon.

22   Q.   Let me ask you this:  Were you able to determine that the

23   account number was, in fact, a real account number -- were you

24   able to determine that the account number was, in fact, a real

25   account number?

1   A.   That was a real account number, yes.

2   Q.   And would that account number, whoever it was behind the

3   scene that was doing this, could actually get on a computer;

4   right?

5   A.   You mean, and track it?

6   Q.   And track it?

7   A.   I'd be guessing.  I think so.  I think they can, yes.

8   Q.   Did you get any -- try to get any records to see who was

9   tracking this Spot?

10   A.   Global Star does not maintain any IP addresses, if that's

11   what you're asking, they don't maintain that information.

12   Q.   Now, Global Star, they're out of where, California, or

13   where?

14   A.   Yes.

15   Q.   But the device, the Spot, is made in Fort Lauderdale;

16   right?  Are you aware of that?

17   A.   The physical Spot Trace device?

18   Q.   Yes.

19   A.   I don't know where this was made, I don't know.

20   Q.   Did you try to find out how -- if you could retrieve that

21   information somehow?

22   A.   What, the computer information?

23   Q.   Yes.

24   A.   Well, it would be Global Star who would maintain it, and

25   they don't maintain it.

1    Q.   They don't maintain it?

2    A.   They don't.

3    Q.   So, if anybody buys that thing anywhere around the world,

4    there's no records linking any computers to it?

5    A.   At least not in South America.  I can't speak to North

6    America.

7    Q.   Okay.  You can speak to North America, but not

8    South America?

9    A.   Did I say it backwards?  I specifically asked Global Star

10   if they maintained the IP address information, and they told me

11   they did not.

12   Q.   Now, you have nothing to suggest that Mr. Lucas has any

13   connection with this Spot device; correct?

14   A.   The same as before, I wouldn't have expected him to, but

15   no, I don't.

16          MR. ENCINOSA:  No further questions.

17          THE COURT:  Any redirect?

18                    REDIRECT EXAMINATION

19   BY MS. ANTON:

20   Q.   Agent, so, basically, you've testified that this could be a

21   completely fictitious person, and you weren't actually able to

22   find the Lizeth Yorrea who signed up for this account?

23   A.   I believe it's a completely fictitious person.

24   Q.   And because in Latin America you don't need to put a credit

25   card number, there were no additional records for you to

1    subpoena from a credit card company to determine who it was?

2    A.   No.

3            MS. PINERA-VAZQUEZ:  Objection, leading.

4            MR. ABRAMS:  Objection, leading.

5            THE COURT:  Sustained.

6    BY MS. ANTON:

7    Q.   Let me ask you that in a non-leading way.

8        Were you able to do any follow-up since there was no credit

9    card information?

10   A.   No.

11   Q.   Is that because you didn't have any credit card information

12   to further subpoena?

13   A.   Yes.

14   Q.   So then did you also try to get some kind of IP address?

15   A.   I did.

16   Q.   When we say "IP address," do you know what we're talking

17   about?

18   A.   That's the address that each computer sends out when it's

19   on the internet on certain sites.

20   Q.   So if the person who existed that was tracking this was

21   going on the computer and tracking it, there would be evidence

22   of that IP address; right?

23   A.   Yes.

24   Q.   Okay.  And you wanted to know that information?

25   A.   Absolutely.

 1   Q.   Why did you want to know that information?

 2   A.   Because we'd love to know who was tracking the spot tracer.

 3   Q.   Who was tracking 940 kilos of cocaine?

 4   A.   Yes.

 5   Q.   That would be of interest to the Department of Homeland

 6   Security?

 7   A.   Absolutely.

 8   Q.   Now, you said that you contacted Global Star to try to get

 9   this information.

10        Did it matter to you, or at all, that it's made -- if it

11   is -- in Fort Lauderdale, the device?

12   A.   No, I didn't ask that.

13   Q.   You contacted the legal department and served legal

14   process?

15   A.   We did.

16   Q.   And then you were given back the records, which consisted

17   of global position satellite points of where this tracker went?

18   A.   Yes.

19   Q.   And you subpoenaed it for the relevant time period?

20   A.   Of course, yes.

21   Q.   And when I say "relevant time period," more specifically, I

22   mean to say, for when this load was being shipped from Colombia

23   here?

24        MR. ABRAMS:  Leading.

25        THE COURT:  Sustained.

1   BY MS. ANTON:

2   Q.   When did you subpoena these documents for?

3   A.   We subpoenaed the documents for the time frame pertaining

4   to the account number, when it was turned on, and then,

5   obviously, it would have ended when the device was seized and

6   it stopped transmitting, so the time of this interdiction.

7   Q.   The last defense attorney asked you whether there was any

8   connection between his client and the actual tracker, right,

9   and you indicated that the answer was no.

10       I want to clarify that.

11       Is there a connection between the defendant -- defense

12  counsel's client, which are the seven -- one of the seven

13  defendants sitting here in court today and the actual tracker?

14  A.   Yes.

15  Q.   Okay.  What I think -- and did you understand the question

16  to be, is there a connection between the name on this business

17  record document?

18  A.   I must have, yes, ma'am.

19       MS. ANTON:   Okay.  I just wanted to clarify.  Thank

20  you.  No further questions.

21       THE COURT:   Thank you.  You may step down.

22       THE WITNESS:   Thank you.

23       (Witness excused.)

24       THE COURT:   Call your next witness.

25       MS. ANTON:   Joseph Pfrimmer from the U.S. Coast Guard.

1          COURTROOM DEPUTY:  Raise your right hand, please.

2          Do you solemnly swear the testimony you're about to

3    give is the truth, the whole truth, and nothing but the truth,

4    so help you God?

5          THE WITNESS:  I do.

6          COURTROOM DEPUTY:  Thank you.  Please be seated.

7          Would you please state your full name for the record

8    and spell it.

9          THE WITNESS:  Yes.  Petty Officer Joseph, J-O-S-E-P-H,

10   P-F-R-I-M-M-E-R.

11         COURTROOM DEPUTY:  Thank you.

12         (PETTY OFFICER JOSEPH PFRIMMER, being sworn, testified

13   as follows:

14                         DIRECT EXAMINATION

15   BY MS. ANTON:

16   Q.  I was going to say good afternoon, but it seems it's good

17   evening.

18       Officer Pfrimmer, could you formally introduce yourself to

19   the ladies and gentlemen of our jury and tell them who you work

20   for and in what capacity.

21   A.  Yes.  I work with the U.S. Coast Guard in Miami, Florida.

22   I'm assigned to the District 7 Intelligence Office, and I'm a

23   certified digital forensic examiner.

24   Q.  Can you explain to us what a certified digital forensic

25   examiner is?

1    A.   Yes.   A certified digital forensic examiner is somebody

2    that has been to professional training, and it's the forensic

3    technique to extract and analyze data off of any electronic

4    device.

5    Q.   And how long have you been with the Coast Guard?

6    A.   I've been with the Coast Guard for six years now.

7    Q.   Could you briefly go through some of your background and

8    training with the Coast Guard?

9    A.   Yes.   I joined the Coast Guard in 2011, in May.   And then

10   after boot camp, I went to Gulfport, Mississippi, at a small

11   boat station where I conducted search and rescue and law

12   enforcement operations for three-and-a-half years.

13        And then I went to Yorktown, Virginia, to intelligence

14   specialist "A" School for four months.

15        And then, January of 2015, I reported in Miami, Florida.

16   Q.   And did you receive any specific training from the

17   Department of Defense as to being a certified media collector?

18   A.   Yes, I have.   I'm a certified digital forensic media

19   collector and a Department of Defense certified digital

20   forensic examiner.

21   Q.   Do you have to take continuing education courses as part of

22   that certification?

23   A.   Yes.   Every three years you have to take a knowledge-based

24   test and you also have to prove that you have examined multiple

25   forensic electronic devices and that you're continuing your

1    education in the field.

2    Q.   And so, on a daily basis, do you perform your job duties on

3    a cutter or in an office?

4    A.   In an office.

5    Q.   Okay.  And when you're in your office performing your

6    duties, what types of electronic media are you regularly

7    looking at?

8    A.   We primarily look at cell phones, GPS units, occasionally

9    we'll encounter computer hard drives and satellite cell phones

10   as well.

11   Q.   So pretty much any electronic media?

12   A.   Yes.

13   Q.   And do you do this all day, everyday?

14   A.   Yes.

15   Q.   And have you had occasion to come into court and testify

16   before?

17   A.   Yes, I have.

18   Q.   And have you been tendered as an expert witness in the area

19   of digital forensic extractions?

20   A.   Yes, ma'am.

21   Q.   So let's talk about this case in particular.

22        How did you become involved with this case?

23   A.   I was a -- the electronic devices were hand-delivered on

24   08-November-2016 by HSI agents in Fort Lauderdale, Florida,

25   they delivered them to our office.

1    Q.   When you say the electronic devices were delivered,

2    specifically, what was delivered to you?

3    A.   One hand-held Garmin GPS unit.

4    Q.   And I'm going to show you Government's Exhibit 31.

5         Permission to approach?

6         THE COURT:  All right.

7    Q.   Can you please take a look at that exhibit and tell me

8    whether or not that is the same Garmin hand-held device that

9    was delivered to you?

10   A.   Yes.

11   Q.   And how do you know that?

12   A.   Do you have the chain of custody, so I could verify that as

13   well?

14   Q.   Yes, I do.  Let me grab that for you.

15        I'm going to have those pulled for you, but let's continue

16   talking generally about the Garmin GPS device.  Okay?

17        Does it have a serial number on it?

18   A.   Yes, it does.

19   Q.   Does it have any other identifying features on it?

20   A.   It has a model on it as well.

21   Q.   And are all of those things of particular interest to you?

22   A.   The model could depend -- the make and model could depend

23   what software applications I will use to conduct my forensic

24   examination.

25   Q.   So it's something that you take note of?

1    A.    Yes, ma'am.

2    Q.    Okay.   And once you receive some type of electronic media

3    into your possession from an agency, what's the first thing

4    you do, how do you go about analyzing it?

5    A.    The first thing I'll do, I'll note the make and model of

6    the GPS and the serial number to verify that that is the same

7    make and model GPS, and then I will photograph the unit.

8          And then, before I power-on the device, I will use a signal

9    jammer to ensure that the GPS is not receiving any satellite

10   signals and could potentially could be overriding data.

11         And then I'll power on the device and use a Garmin cable to

12   hook to my forensic work station, and then I'll use three

13   different Garmin applications on my forensic work station to

14   extract the data from the unit.

15   Q.    Okay.   Permission to approach.

16         I'm going to approach and show you the property receipts to

17   perhaps refresh your recollection about the identifying.

18   A.    Thank you.   Yes, ma'am, it's the same make, model and

19   serial number.

20   Q.    So that is the device that you analyzed in connection with

21   this case?

22   A.    Yes, ma'am.

23   Q.    And so let's start with the very basic.

24         You said it was a hand-held Garmin GPS?

25   A.    Yes.

1    Q.    So what exactly is it and what does it do?

2    A.    A GPS unit is an electronic navigation tool that users will

3    use.  It can hold three different types of data, a track log,

4    which is -- it will automatically record your position and the

5    date and time stamp.  That way if you happen to get lost you

6    can re-trace your steps and it will record those all in one

7    log.

8          Every single time the GPS unit is turned on, it will

9    automatically start recording a log, and when you turn it off,

10   it will stop that log and then start it back up the next time

11   you power it on.

12         The next type of data that it will record is a waypoint.

13   Those are user-entered waypoints.  It's like a location site

14   where you can use that to navigate through in the future, if

15   you wish to, or a route, which is a collection of two or more

16   waypoints that you wish to navigate to.

17   Q.    And when you say "GPS," you mean Global Positioning

18   Satellite?

19   A.    Yes, ma'am.  Global Positioning System.

20   Q.    System, sorry.

21         So where is this device getting its information from about

22   where you are?

23   A.    Three or more satellites in the sky.

24   Q.    So is it fair to say that it has to have exposure to the

25   sky?

1    A.   Yes, ma'am.

2    Q.   So once you receive that item into your office you

3    indicated that you put a blocker on it?

4    A.   Yes, ma'am.

5    Q.   And is the reason that you put that kind of blocker on it

6    to preserve the integrity?

7         MR. ABRAMS:   Objection, leading.

8         THE COURT:   Sustained.

9    BY MS. ANTON:

10   Q.   Why do you put a blocker on it?

11   A.   Because the way GPS's store data, once they're full,

12   they're going to start overwriting the oldest data, and you

13   don't want to potentially overwrite evidence and evidentiary

14   value, so we make sure that they are not receiving any

15   additional satellite signals.

16        It's just a precautionary tool that we use.

17   Q.   So you don't want to input any information into that

18   device?

19   A.   No, ma'am.

20   Q.   So after you do that, you indicated that you hooked up some

21   kind of software to it?

22   A.   I use a cable to hook to my forensic work station and then

23   there's software-based applications on my forensic work

24   station.   And there are Garmin tools, like the Garmin map

25   source, Garmin home port, and Garmin map source, they're

1    open-source tools.

2    Q.   Okay.  When you say "open-source," can you specify what you

3    mean?

4    A.   Free.  You can download them from the --

5    Q.   I'm having a hard time hearing you.

6         You said "free"?

7    A.   Yes, ma'am.

8    Q.   So there's some free programs that you're using, but are

9    these free programs that any one of us could use to try to

10   download a GPS device like that?

11   A.   You just have to buy the proper cable depending on the make

12   and model GPS that you're using but, yes, ma'am.

13   Q.   And as long as we made sure to put a blocker on it, we

14   wouldn't disturb any information in that device?

15   A.   Yes, ma'am.

16   Q.   Okay.  So once you use all these different softwares that

17   are available, how does your process work after that?

18   A.   So after I have it in those three applications, I will then

19   save it as a dot GPX file, which is a universal GPS file

20   format; and then from there, I will convert it to a -- in

21   Google Earth, I'll save it as a dot KMZ file.

22        And the reason I view it in Google Earth, it's a more

23   user-friendly format that anybody can double-click or

24   drag-and-drop it into Google Earth and it will automatically

25   apply every position that I extracted.  And that's what I

1   provided to the case agent as well.

2   Q.   Okay.  So if it's not in its Google Earth format, does it

3   just look like a lot of numbers?

4   A.   It would be very difficult to be able to open it, yes,

5   ma'am.

6   Q.   And you indicated that you did that in this case and

7   provided it to the case agent?

8   A.   Yes, ma'am.

9   Q.   Okay.  Did you also printout the raw data?

10  A.   Yes, ma'am.

11         MS. ANTON:  Permission to approach.

12         THE COURT:  All right.

13         MS. ANTON:  I'd like to show you Government's Exhibit

14  64 for identification.

15  BY MS. ANTON:

16  Q.   Officer Pfrimmer, you have Exhibit 64 in front of you for

17  identification.  Do you recognize it?

18  A.   Yes, ma'am.

19  Q.   Is that the Google Earth printout that you were referring

20  to from that Garmin?

21  A.   Yes.  The first page is just an overview of a screenshot

22  taken from Google Earth of the data that was contained.

23  Q.   And the remainder of the composite exhibit, are those the

24  pages of raw data?

25  A.   Yes, ma'am.

1   Q.  Are those the accurate and true downloads from that Garmin

2   device that you have next to you?

3   A.  Yes, ma'am.

4       MS. ANTON:  At this point, the Government would move

5   Government's 34 -- 64, I apologize, Judge, 64 into evidence.

6       THE COURT:  Be admitted.

7       MS. ANTON:  Permission to publish.

8       THE COURT:  All right.

9       (Government's Exhibit 64 admitted into evidence.)

10  BY MS. ANTON:

11  Q.  I'm putting Government's Exhibit 64, which is a composite,

12  on the Elmo.  Can you see that, Officer Pfrimmer?

13  A.  Yes, ma'am.

14  Q.  So is this the one-page overview printout that you

15  indicated you made using the information from that Garmin

16  hand-held device?

17  A.  Yes, ma'am.

18  Q.  Okay.  And we see on this exhibit there's a lot of

19  green-looking dots with the words "active log."

20  A.  Yes, ma'am.

21  Q.  Could you explain to us what it is we're looking at?

22  A.  Yes, ma'am.  Those are the track logs, the different track

23  logs.  Every single time the GPS unit is turned on it is

24  automatically recording your position and it is storing it in

25  those logs.

1          When you turn it off, it will stop recording your position;

2     and then when you turn the GPS unit back on, it is going to

3     start another track log in sequential order.

4     Q.  So you refer to these points as track logs.

5          And how do track logs differ from waypoints, in terms of

6     whether or not the user has to be there?

7     A.  Oh, waypoints does not mean that the user was physically

8     there.  They just wanted to save that location to -- for ease

9     of navigation.

10    Q.  So if I wanted to go to the Federal courthouse and I put in

11    my GPS the Federal courthouse address, would that be a

12    waypoint?

13    A.  Yes, ma'am.

14    Q.  Versus if I turn my GPS on in the courthouse, would that be

15    a track point?

16    A.  Correct.

17    Q.  So you took all the information out of that Garmin and used

18    those programs to create this document; correct?

19    A.  Yes, ma'am.

20    Q.  I'm not going to go through these documents with you, but

21    so the jury can see, the other pages that are contained within

22    this Government's composite exhibit, that's the raw data from

23    that Garmin; right?

24    A.  Yes, ma'am.  Those 113 pages that, I believe, is just the

25    printout version of the KMZ file, which is the Google Earth

1    format, which automatically plots all those positions for you.

2    Q.   Okay.  Now, after you download this information from the

3    Garmin hand-held GPS and you have your copy that you indicated

4    you save on the computer?

5    A.   Yes, ma'am.

6    Q.   Do you check to make sure your copy on the computer is the

7    same as the information that's in that Garmin?

8    A.   Yes, ma'am.  And that's also why we use three different

9    programs.  We verify that all three different Garmin software

10   programs pull the same information as well, too.

11   Q.   Okay.  Because, is it fair to say, you don't want to

12   disturb the information?

13   A.   Yes, ma'am.

14   Q.   And once you completed this extraction, did you then

15   provide the raw data, as well as your GPS Google Earth, one

16   sheet, to another forensic examiner?

17   A.   Yes, ma'am.

18   Q.   And to who was that?

19   A.   That was my former supervisor, Lieutenant Heather Wilson,

20   who is up at JTFI, which is Joint Task Force Investigations, in

21   Washington, D.C.

22   Q.   Okay.  And you were only given the Garmin hand-held device

23   to do give an extraction of; right?

24   A.   Yes, ma'am.

25   Q.   So you did not receive a Spot Trace Tracker?

1   A.   No, I did not.

2   Q.   And you didn't have the reports, the documents from the

3   Spot Trace Tracker?

4   A.   No, I did not.

5   Q.   Okay.  And based on the downloads that you did from that

6   Garmin, when you put in here these active logs, and it says,

7   11, 10, 9, do those numbers have any importance?

8   A.   Does the names of the track logs?  No, because it's an

9   automatic naming convention that the Garmin will name for the

10  next time it's powered on and it starts logging your system.

11       But the metadata associated with those has importance to

12  it; it contains the date and time and the latitude and

13  longitude.

14  Q.   So the user didn't input the words "active log," the Garmin

15  itself is doing that?

16  A.   Correct.

17  Q.   And you indicated that that's a track point?

18  A.   A track log, which contains track points inside the log.

19  Q.   And those track points are not places that the users wished

20  to go, rather, they're places the user actually was?

21  A.   Correct.

22  Q.   And when you plotted this using Google Earth, it's a little

23  bit hard to see on here, but where did those tracks begin?

24  A.   They started at Pico del Monte, Mexico, and headed south

25  approximately 385 nautical miles.

1   Q.   So you said they headed south 385 nautical miles of that

2   part of Mexico?

3   A.   Yes, ma'am.

4   Q.   And so we're talking in the ocean?

5   A.   Yes, ma'am.

6   Q.   And that's evidenced by the blue on your Google Earth?

7   A.   Yes, ma'am.

8   Q.   And is there a start and end time that you were able to

9   plot to and from?

10   A.   Yes, there is.  There was a bunch of dates.  The logs of

11   importance started on the 14th of October, 2016, and I forget

12   the exact time on the 18th, but they went all the way up until

13   the 18th of October.

14   Q.   So from October 14th to October 18th is the relevant time

15   that you plotted here?

16   A.   Yes, ma'am.

17   Q.   Okay.  And when we see an active log memorialized on this

18   document, does that mean that the GPS device was being turned

19   off and on?

20   A.   Yes, ma'am.

21   Q.   Could we have created this active log without turning it

22   off and on, for example, if I just left it on?

23   A.   If you just left it on, it could potentially, with that

24   many days, it could have overwritten a bunch of stuff, so you

25   might not have seen as much.

1        Because if you just turn it on for a few minutes, or 10, 15

2   minutes, it's going to record all those positions.  But when

3   you turn it off, it's not using any data at that point.

4   Q.  So then each point that we see here in blue -- is that

5   blue -- in blue, that's an active log, which seems close on

6   your document, but you're really talking about several hundred

7   nautical miles -- each point in time there means that it was

8   physically, by somebody, turned on?

9   A.  Yes, ma'am.

10        MS. ANTON:  Okay.  Can I have one moment.

11        (Brief pause in the proceedings.)

12   BY MS. ANTON:

13   Q.  Now, you said that you provided all of your extraction to

14   your former supervisor, Heather Wilson?

15   A.  Yes, ma'am.

16   Q.  And does she also work for the Coast Guard?

17   A.  Yes, she does.

18   Q.  Does she work for another agency as well, or is she on a

19   task force that you know of?

20   A.  She's on a task force, yes, ma'am.

21   Q.  And why did you provide her with this information?

22   A.  Because she was assigned to this task force -- his task

23   force doing their joint analysis for the Eastern Pacific drug

24   interdictions.

25   Q.  Okay.  So you provided her your extraction information so

1   that she can do additional investigation on it?

2   A.  Yes, ma'am.

3         MS. ANTON:  Thank you.  I have no further questions.

4         THE COURT:  Okay.  We'll go ahead and recess for the

5   day.  I don't think we can finish with this witness before 5:30

6   anyway.  We will have cross on this witness.

7         MR. ABRAMS:  Can I do it now?

8         THE COURT:  No, I'm just saying your cross is going to

9   take us well passed 5:30.  Okay.  So we'll see you tomorrow

10  morning at 8:30, ladies and gentlemen.

11        (Jury exited courtroom at 5:30 p.m.)

12        (Witness steps down.)

13        THE COURT:  Has the defense had an opportunity to look

14  at the proposed jury instructions?

15        MR. ABRAMS:  I've briefly looked at them, Judge.  They

16  look like the standard instructions in this case.  I would like

17  to work on the verdict form a little bit, though, because right

18  now, it's a little bit suggestive and I have modification I'd

19  like to suggest which is similar to other cases, other Title 46

20  cases that we've done.

21        THE COURT:  Okay.  Anybody else?

22        MR. RODRIGUEZ:  Judge, the only problem I think I have

23  is the flight instruction.  I think the Court needs to hear the

24  rest of the testimony before making that final decision.

25        THE COURT:  Okay.

1          MR. ENCINOSA:  Same here.

2          MR. do CAMPO:  Same here.

3          MS. PINERA-VAZQUEZ:  I would like an opportunity until

4     tomorrow to finish reviewing them.

5          THE COURT:  Try to do that, try to finalize that, not

6     to waste time.

7          And do we have yet any exposure about how long we

8     anticipate the defense case lasting?

9          MR. ABRAMS:  Judge, I intend to play the depositions,

10    the -- well, the recorded testimony that we did in Mexico.  The

11    transcripts are a little over 200 pages.  It's probably going

12    to take us about a -- probably about a day to do.

13         THE COURT:  Okay.

14         MR. ABRAMS:  Maybe a little less than that, but -- I

15    went through some of it yesterday, but I think --  it took us

16    two days to take the depositions, but I think when we do them,

17    like, a little quicker, it will --

18         THE COURT:  What are these depositions of?

19         MR. ABRAMS:  This is the testimony of the four defense

20    witnesses who explained why they went out on the water, why

21    Mr. Garcia-Solar and the three other Mexicans were out on the

22    water, and that is going to dovetail with the defense that is

23    raised by others in this case.

24         THE COURT:  Okay.  All right.  We will see you tomorrow

25    at 8:30.

```
1        (Proceedings adjourned at 5:32 p.m.)

2        (Continued in Day 4 of 5.)

3

4

5                C E R T I F I C A T E

6

          I hereby certify that the foregoing is an
7
     accurate transcription of the excerpt of the.
8
     proceedings in the above-entitled matter.
9

10
     January 21st, 2018    /s/Glenda M. Powers
11   DATE                  GLENDA M. POWERS, RPR, CRR, FPR
                           Official Federal Court Reporter
12                         United States District Court
                           400 North Miami Avenue, 08S33
13                         Miami, Florida 33128

14

15

16

17

18

19

20

21

22

23

24

25
```

**$**

**$46,000** [4] - 200:18, 235:9, 235:12, 251:5

**/**

**'14** [1] - 12:3
**'78** [2] - 236:1, 256:21

**/**

**/s/Glenda** [1] - 355:10

**0**

**08-November-2016** [1] - 340:24
**08S33** [2] - 2:17, 355:12

**1**

**1** [3] - 1:10, 105:20, 145:7
**1,075.5** [1] - 321:15
**10** [30] - 9:11, 15:3, 16:1, 41:6, 92:25, 98:24, 154:15, 211:4, 299:4, 304:2, 304:3, 304:17, 306:4, 306:8, 308:20, 309:7, 309:8, 309:12, 309:14, 309:18, 309:24, 310:2, 310:24, 311:8, 312:15, 314:21, 319:24, 320:2, 350:7, 352:1
**10,005** [1] - 312:14
**10,016** [1] - 304:1
**10-degree** [1] - 18:6
**10-minutes** [1] - 196:3
**100** [2] - 172:10, 172:12
**105** [1] - 3:13
**10:35** [1] - 101:13
**10:37** [1] - 104:11
**10:51** [2] - 104:11, 104:12
**11** [7] - 3:6, 95:5, 128:13, 137:5, 193:22, 194:25, 350:7
**11-02** [1] - 197:12
**113** [1] - 348:24
**114** [1] - 5:7
**115** [6] - 38:3, 57:10, 57:25, 65:18, 82:21

**116** [1] - 5:7
**118** [3] - 5:8, 100:2, 101:22
**11:15** [1] - 74:18
**11:20** [1] - 75:10
**11:25** [1] - 74:22
**11:30** [5] - 75:10, 75:12, 98:16, 98:19, 98:20
**12** [17] - 1:5, 5:8, 24:17, 24:22, 80:17, 80:22, 98:24, 118:4, 118:15, 118:21, 118:23, 154:14, 190:9, 230:1, 230:6, 285:24, 321:25
**12-gauge** [1] - 18:3
**123** [1] - 5:9
**125** [1] - 303:3
**126th** [1] - 305:12
**12:30** [1] - 75:13
**12:52** [2] - 196:5, 196:6
**13** [6] - 12:1, 83:8, 93:7, 99:17, 120:4, 209:9
**131** [4] - 79:2, 101:16, 102:18, 102:22
**139** [1] - 7:2
**14** [16] - 37:17, 120:10, 120:11, 120:17, 232:12, 232:14, 232:23, 240:12, 240:25, 241:6, 241:11, 241:12, 248:20, 274:23, 274:24, 275:7
**142** [1] - 3:13
**14th** [2] - 351:11, 351:14
**15** [8] - 42:20, 69:1, 69:14, 74:23, 121:3, 158:13, 318:5, 352:1
**150** [1] - 77:1
**155** [1] - 3:14
**15th** [2] - 320:20
**16** [1] - 121:24
**164** [1] - 3:14
**167** [1] - 3:15
**168** [1] - 3:15
**169** [1] - 5:19
**17** [17] - 5:8, 118:5, 118:16, 118:21, 124:19, 124:21, 149:10, 151:4, 160:4, 173:15, 192:12, 197:4, 199:12, 199:13, 210:1, 210:3, 230:2
**170** [1] - 3:16

**18** [33] - 15:7, 15:25, 20:6, 22:8, 22:16, 23:2, 23:3, 23:12, 23:24, 27:23, 29:7, 29:19, 32:24, 33:8, 36:24, 39:4, 39:9, 70:15, 72:6, 73:5, 80:6, 87:9, 91:14, 92:18, 96:17, 158:13, 208:15, 265:22, 273:14, 273:17, 273:20, 273:22, 274:17
**181** [1] - 3:16
**189** [1] - 3:17
**18th** [18] - 16:16, 17:24, 19:1, 92:10, 100:15, 106:25, 107:13, 118:10, 124:23, 175:20, 191:25, 200:7, 210:9, 260:14, 318:16, 351:12, 351:13, 351:14
**19** [7] - 5:6, 38:18, 38:20, 39:8, 39:12, 39:24, 40:9
**19-24** [1] - 39:16
**1912** [2] - 175:20, 175:21
**196** [1] - 3:19
**1992** [1] - 287:14
**19th** [3] - 274:4, 275:23, 276:17
**1:50** [2] - 196:6, 196:7

**2**

**2** [2] - 6:1, 209:4
**20** [12] - 22:1, 30:23, 40:3, 41:6, 166:2, 166:8, 168:5, 219:22, 226:15, 254:2, 280:8, 294:13
**200** [3] - 65:22, 107:25, 354:11
**2002** [1] - 318:5
**2004** [1] - 12:4
**2005** [4] - 12:5, 12:6, 268:17, 269:6
**2009** [1] - 105:25
**2010** [1] - 106:4
**2011** [1] - 339:9
**2013** [1] - 7:2
**2014** [1] - 106:5
**2015** [1] - 339:15
**2016** [31] - 15:7, 15:25, 19:1, 20:6, 22:8, 23:3, 23:12, 23:25, 29:7, 29:19, 32:24,

33:8, 36:24, 39:5, 39:9, 91:14, 92:10, 92:18, 96:17, 106:24, 107:13, 114:10, 118:10, 175:20, 199:14, 200:5, 210:9, 260:14, 274:4, 320:20, 351:11
**2016-SFL** [1] - 303:7
**2017** [3] - 1:5, 256:21, 303:11
**2018** [1] - 355:10
**205** [1] - 5:10
**21** [1] - 40:4
**210** [5] - 105:18, 155:7, 155:11, 155:16, 197:5
**210-foot** [4] - 138:2, 155:7, 155:12, 155:13
**210s** [1] - 154:13
**212** [1] - 3:20
**2130** [2] - 98:17, 98:18
**21st** [1] - 355:10
**22** [14] - 40:5, 193:11, 193:17, 240:7, 240:12, 240:13, 240:14, 240:15, 253:25, 254:1, 254:2, 266:21
**22-and-a-half** [1] - 156:1
**229** [1] - 3:20
**23** [1] - 40:7
**23-and-a-half** [3] - 150:14, 156:3, 156:4
**23-foot** [1] - 193:2
**231** [1] - 3:21
**238** [1] - 3:21
**24** [10] - 5:6, 38:18, 38:20, 39:8, 39:12, 39:24, 40:8, 150:14, 253:20, 253:25
**24-and-a-half** [1] - 156:2
**247** [1] - 3:22
**25** [6] - 22:1, 39:1, 39:2, 209:11, 241:14, 276:18
**25-foot** [1] - 277:11
**254** [1] - 3:22
**256** [1] - 5:11
**26** [2] - 150:19, 150:25
**26-foot** [1] - 38:4
**261** [2] - 3:23, 3:23
**268** [1] - 4:6
**27** [2] - 150:19, 151:24
**270** [1] - 17:9
**278** [1] - 5:12

**279** [1] - 4:7
**287** [1] - 4:7
**29** [1] - 5:4
**290** [1] - 4:8
**291** [1] - 4:8
**293** [1] - 4:9
**294** [1] - 4:9
**2:00** [1] - 196:3

**3**

**3** [21] - 1:13, 155:1, 208:15, 209:9, 229:6, 248:7, 249:1, 249:5, 249:15, 249:16, 249:23, 249:24, 250:1, 250:4, 252:1, 254:13, 256:10, 256:11, 256:12, 256:15
**30** [12] - 108:7, 111:25, 112:16, 147:9, 156:16, 165:8, 165:10, 165:12, 165:24, 167:20, 257:13
**302** [1] - 4:12
**305** [2] - 4:12, 4:13
**31** [9] - 5:4, 28:13, 28:16, 29:3, 29:10, 29:12, 37:13, 84:1, 341:4
**313** [1] - 5:13
**315** [1] - 4:13
**316** [1] - 4:14
**317** [1] - 4:16
**32** [8] - 5:9, 112:4, 122:21, 123:1, 123:11, 123:14, 123:18, 322:2
**324** [1] - 5:14
**327** [1] - 4:17
**329** [2] - 4:17, 4:18
**33** [8] - 5:7, 115:24, 116:7, 116:9, 116:17, 116:20, 117:2, 190:23
**330** [1] - 4:18
**331** [1] - 4:19
**33128** [2] - 2:18, 355:13
**332** [1] - 4:19
**33394** [1] - 1:23
**334** [1] - 4:20
**338** [1] - 4:22
**34** [9] - 5:13, 308:15, 308:18, 309:14, 313:12, 313:14, 313:20, 313:22,

347:5
**347** [1] - 5:15
**35** [5] - 5:14, 324:2, 324:5, 325:10, 328:12
**36** [1] - 192:1
**37** [1] - 5:5
**378** [1] - 138:2
**378-foot** [1] - 144:22
**38** [9] - 5:10, 205:9, 205:11, 205:20, 205:24, 209:5, 254:12, 274:18, 274:19
**385** [2] - 350:25, 351:1
**39** [6] - 5:6, 5:12, 278:1, 278:4, 278:16, 278:20
**3d** [1] - 7:1

## 4

**4** [4] - 5:19, 169:22, 169:25, 355:2
**4-05818** [1] - 303:7
**40** [3] - 3:7, 112:4, 156:14
**400** [2] - 2:17, 355:12
**401** [1] - 1:10
**41** [2] - 77:17, 162:7
**4100** [1] - 157:21
**45** [7] - 15:2, 18:17, 63:22, 64:13, 64:21, 64:25, 68:6
**46** [1] - 353:19
**4:08** [1] - 299:5
**4:10** [1] - 300:20
**4:16-CR-10042-KMM** [1] - 1:2
**4:20** [2] - 300:20, 300:22
**4:21** [1] - 301:1
**4th** [1] - 303:10

## 5

**5** [6] - 1:13, 5:19, 6:1, 169:23, 169:25, 355:2
**50** [7] - 3:7, 18:5, 69:10, 148:9, 154:13, 172:10, 172:12
**50-plus** [1] - 106:12
**50-year-old** [1] - 222:12
**500** [11] - 1:22, 204:17, 233:5, 234:15, 256:19, 257:1, 257:15, 258:9,

258:22, 260:25, 287:25
**500-horsepower** [2] - 63:12, 64:1
**500DT** [4] - 202:15, 213:12, 270:15, 272:17
**55** [1] - 3:8
**5:30** [3] - 353:5, 353:9, 353:11
**5:32** [2] - 1:8, 355:1

## 6

**6** [1] - 209:14
**60** [1] - 260:21
**61** [1] - 3:8
**64** [7] - 5:15, 346:14, 346:16, 347:5, 347:9, 347:11
**65** [5] - 5:11, 255:20, 255:24, 256:4, 256:6
**67** [1] - 3:9

## 7

**7** [8] - 105:21, 145:18, 181:5, 181:7, 251:23, 254:1, 338:22
**70** [1] - 260:21
**700** [1] - 1:22
**74** [1] - 3:9
**76-millimeter** [1] - 12:9
**772** [1] - 7:1
**7:12** [1] - 175:21

## 8

**8** [9] - 5:5, 36:15, 37:2, 37:5, 37:12, 37:18, 215:2, 240:12, 254:1
**83** [1] - 3:10
**85** [5] - 38:3, 57:10, 58:1, 65:20, 82:21
**8:28** [1] - 1:8
**8:30** [3] - 1:7, 353:10, 354:25

## 9

**9** [8] - 22:3, 22:5, 35:8, 71:15, 88:21, 98:13, 214:24, 350:7
**9/11** [2] - 197:10, 197:11
**90** [3] - 3:10, 54:1, 233:24
**90-page** [4] - 6:23,

53:22, 56:8, 91:17
**902(11)** [1] - 324:3
**930** [3] - 321:2, 321:15, 321:16
**940** [3] - 315:6, 336:3
**9:30** [1] - 98:19

## A

**A-D-K-I-N-S** [1] - 301:24
**A-frame** [2] - 166:15, 193:6
**a.m** [6] - 1:7, 1:8, 101:13, 104:11, 104:12
**abandoned** [1] - 325:23
**Abbie** [1] - 197:9
**abdominal** [3] - 186:20, 186:22
**ability** [4] - 19:20, 272:18, 273:13, 273:17
**able** [48] - 8:5, 20:20, 28:2, 32:12, 47:20, 48:6, 56:15, 58:2, 68:13, 71:9, 71:22, 110:24, 116:2, 117:2, 117:3, 119:11, 119:13, 120:1, 122:12, 132:11, 133:10, 134:5, 144:24, 153:5, 154:5, 166:1, 166:18, 166:19, 182:12, 264:6, 268:18, 270:4, 273:8, 274:7, 274:19, 286:5, 295:2, 323:10, 326:1, 326:9, 332:1, 332:2, 332:22, 332:24, 334:21, 335:8, 346:4, 351:8
**aboard** [8] - 15:14, 85:15, 109:24, 114:14, 127:18, 128:17, 132:1, 152:8
**above-entitled** [1] - 355:8
**ABRAHAM** [1] - 2:5
**Abrams** [6] - 3:7, 3:13, 3:20, 3:23, 4:7, 4:17
**ABRAMS** [34] - 2:2, 8:1, 8:25, 40:14, 47:18, 50:19, 135:20, 142:19, 155:20, 212:8, 220:14, 224:15,

224:16, 228:25, 258:25, 261:7, 261:10, 262:18, 279:6, 287:20, 298:12, 300:2, 300:8, 315:15, 327:22, 329:6, 335:4, 336:24, 344:7, 353:7, 353:15, 354:9, 354:14, 354:19
**absolutely** [19] - 67:12, 73:25, 83:18, 89:23, 90:16, 99:7, 205:19, 212:25, 218:22, 225:21, 228:5, 258:8, 259:12, 259:21, 259:25, 260:2, 327:18, 335:25, 336:7
**absorb** [1] - 148:15
**Academy** [1] - 106:5
**Acapulco** [2] - 163:6, 163:10
**access** [2] - 211:15, 211:19
**accessible** [1] - 73:22
**accident** [2] - 77:8, 262:10
**accommodate** [1] - 301:8
**accompanying** [1] - 322:14
**accordance** [1] - 199:19
**according** [5] - 75:12, 232:14, 249:9, 312:3, 332:15
**account** [13] - 323:1, 323:3, 325:16, 331:2, 332:15, 332:23, 332:24, 332:25, 333:1, 333:2, 334:22, 337:4
**accountability** [5] - 130:2, 130:6, 153:6, 170:18, 177:25
**accountable** [1] - 178:17
**accounted** [5] - 124:17, 124:18, 126:23, 160:2, 178:8
**accounting** [1] - 106:6
**accounts** [1] - 330:25
**accredited** [1] - 106:19
**accuracy** [1] - 290:4
**accurate** [15] - 125:3, 205:16, 216:1,

233:18, 233:21, 233:25, 234:9, 234:16, 235:7, 242:11, 243:1, 255:11, 256:1, 347:1, 355:7
**accurately** [7] - 36:23, 39:8, 118:12, 255:11, 273:9, 273:12, 278:13
**accused** [1] - 242:25
**acid** [1] - 259:9
**acids** [1] - 259:9
**acknowledged** [1] - 154:20
**acne** [2] - 203:14, 203:15
**act** [1] - 13:18
**acted** [1] - 155:15
**actions** [4] - 13:4, 136:8, 144:12, 144:13
**activated** [1] - 44:10
**active** [6] - 347:19, 350:6, 350:14, 351:17, 351:21, 352:5
**activity** [4] - 132:10, 145:19, 155:17, 324:15
**actual** [10] - 31:7, 34:8, 52:21, 95:15, 187:6, 293:1, 306:1, 323:5, 337:8, 337:13
**add** [7] - 127:3, 240:9, 279:24, 282:7, 285:22, 285:23, 292:12
**adding** [1] - 148:9
**addition** [1] - 190:23
**additional** [9] - 53:2, 93:4, 150:20, 280:8, 322:23, 327:13, 334:25, 344:15, 353:1
**additionally** [3] - 8:1, 18:15, 219:25
**address** [15] - 9:8, 9:13, 189:4, 325:8, 325:10, 325:13, 325:22, 326:1, 326:2, 334:10, 335:14, 335:16, 335:18, 335:22, 348:11
**addresses** [2] - 189:2, 333:10
**adhere** [1] - 306:25
**Adidas** [1] - 24:4
**adjourned** [1] - 355:1

**Adkins** [7] - 301:23, 302:5, 304:23, 304:25, 305:17, 308:14, 314:15
**ADKINS** [2] - 4:11, 302:1
**Administration** [2] - 268:15, 302:9
**administration** [1] - 152:20
**admiral** [6] - 20:2, 20:5, 55:3, 86:8, 86:11, 86:17
**admissible** [1] - 102:1
**admission** [2] - 104:6, 169:18
**admit** [4] - 7:11, 27:11, 324:1, 324:3
**admitted** [28] - 29:11, 29:12, 37:5, 39:15, 39:16, 70:14, 71:14, 116:19, 116:20, 118:18, 118:21, 123:13, 123:14, 169:24, 169:25, 205:23, 205:24, 256:5, 256:6, 266:11, 278:19, 278:20, 313:21, 313:22, 324:5, 324:6, 347:6, 347:9
**ADMITTED** [1] - 5:3
**adopt** [1] - 300:13
**adrenaline's** [1] - 44:8
**advise** [1] - 199:23
**advised** [1] - 300:13
**aerial** [4] - 147:16, 158:1, 158:14, 158:18
**Aero** [1] - 133:23
**affect** [7] - 272:12, 272:14, 276:23, 281:22, 289:25, 290:1, 290:2
**affected** [1] - 276:22
**affects** [1] - 272:9
**affidavit** [1] - 125:10
**affirmatively** [1] - 239:3
**affirmatively)** [2] - 24:8, 88:11
**AFPD** [1] - 2:2
**aft** [12] - 17:1, 21:6, 43:7, 70:24, 71:23, 119:17, 119:19, 126:22, 133:12, 135:8, 155:10, 168:7
**afternoon** [39] - 164:12, 164:13, 167:14, 167:15,

168:22, 168:23, 175:21, 181:4, 196:24, 212:9, 229:4, 231:8, 238:9, 262:22, 268:9, 268:10, 287:23, 287:24, 290:16, 290:17, 291:19, 293:11, 293:12, 299:3, 302:5, 302:6, 317:23, 317:24, 327:23, 327:24, 329:9, 329:10, 329:17, 329:18, 330:6, 330:7, 332:20, 332:21, 338:16
**agencies** [1] - 235:10
**agency** [4] - 137:6, 137:13, 342:3, 352:18
**Agent** [10] - 303:5, 313:17, 316:21, 327:20, 328:4, 330:6, 330:17, 331:17, 331:19, 332:20
**AGENT** [2] - 4:15, 317:19
**agent** [11] - 151:25, 289:6, 305:22, 317:6, 318:3, 318:19, 321:4, 328:2, 334:20, 346:1, 346:7
**agents** [6] - 258:19, 269:4, 276:24, 319:17, 327:15, 340:24
**aggravate** [1] - 135:25
**ago** [2] - 142:25, 257:13
**agree** [24] - 58:6, 72:21, 82:22, 82:24, 83:5, 83:15, 102:17, 143:16, 186:7, 190:14, 212:19, 217:2, 217:11, 217:22, 220:20, 226:5, 226:9, 248:4, 262:4, 280:24, 290:4, 290:18, 312:2
**AGUILAR** [2] - 1:8, 2:5
**AGUILAR-ORDONEZ** [2] - 1:8, 2:5
**ahead** [17] - 6:20, 78:8, 101:8, 103:20, 103:21, 169:21, 196:2, 227:5,

230:16, 246:14, 251:20, 256:22, 269:12, 299:3, 304:21, 314:2, 353:4
**Aid** [1] - 31:12
**aid** [2] - 36:5, 64:4
**aided** [1] - 6:2
**ailments** [1] - 130:20
**aiming** [1] - 45:11
**air** [3] - 111:20, 112:22, 181:22
**air-laps** [2] - 111:20, 112:22
**aircraft** [1] - 83:18
**airline** [1] - 112:18
**airplane** [1] - 42:11
**airport** [7] - 200:19, 242:17, 258:12, 293:15, 293:17, 296:18, 318:8
**alarm** [30] - 6:10, 208:21, 214:7, 232:12, 232:16, 232:23, 252:19, 252:20, 252:22, 253:1, 253:4, 253:5, 253:9, 253:10, 253:11, 254:15, 254:16, 254:19, 255:2, 255:5, 274:5, 274:13, 274:14, 275:4, 275:7, 275:25, 276:18, 294:14, 297:17
**alert** [5] - 203:8, 251:13, 258:13, 276:18
**alleged** [1] - 40:22
**Alliance** [1] - 105:15
**allow** [1] - 14:16
**allowed** [7] - 9:14, 20:2, 62:14, 84:12, 84:13, 200:1, 302:23
**almost** [2] - 106:2, 174:3
**alongside** [3] - 94:18, 122:14, 129:5
**ALONSO** [2] - 1:8, 2:4
**alternate** [1] - 9:11
**aluminum** [13] - 16:22, 117:9, 117:13, 117:14, 117:23, 123:19, 123:22, 123:25, 187:1, 187:5, 187:16, 188:3, 188:6
**amenable** [1] - 270:25
**amended** [1] - 317:4
**Amendment** [1] - 7:7
**Amendment's** [1] - 7:9

**America** [12] - 11:5, 182:3, 182:10, 187:7, 196:9, 331:1, 334:5, 334:6, 334:7, 334:8, 334:24
**AMERICA** [1] - 1:4
**American** [1] - 110:11
**ammo** [1] - 211:10
**ammunition** [1] - 141:4
**amount** [26] - 21:17, 44:7, 50:3, 56:21, 82:22, 99:22, 126:19, 126:21, 134:2, 274:15, 277:17, 285:13, 285:14, 285:25, 286:4, 286:12, 286:14, 286:17, 290:21, 291:9, 294:13, 295:9, 295:11, 295:24, 295:25
**amounts** [1] - 294:16
**ampule** [1] - 203:6
**amusement** [1] - 221:25
**analysis** [9] - 274:5, 306:10, 309:17, 310:3, 310:5, 310:25, 311:19, 320:10, 352:23
**analyst** [1] - 332:7
**analyze** [7] - 34:15, 203:6, 269:15, 302:12, 303:16, 307:20, 339:3
**analyzed** [2] - 309:15, 342:20
**analyzing** [4] - 58:25, 269:2, 289:16, 342:4
**AND** [1] - 1:10
**and-a-half** [1] - 166:24
**angle** [3] - 18:6, 127:1, 274:10
**ANN** [3] - 4:11, 301:24, 302:1
**Ann** [1] - 301:23
**announcing** [1] - 78:19
**annual** [1] - 13:7
**annually** [1] - 13:6
**answer** [11] - 215:19, 226:21, 231:5, 249:22, 251:2, 251:20, 251:22, 259:5, 259:6, 299:16, 337:9
**answered** [3] - 244:14, 251:18,

251:19
**antenna** [2] - 14:16, 158:16
**anti** [1] - 198:5
**anti-terrorism** [1] - 198:5
**anticipate** [3] - 299:23, 299:24, 354:8
**anticipated** [1] - 8:11
**anticipating** [2] - 144:3, 144:5
**ANTON** [81] - 1:20, 9:7, 9:11, 104:14, 105:4, 115:4, 115:20, 115:22, 116:1, 116:5, 116:16, 116:21, 116:25, 117:6, 117:20, 118:1, 118:3, 118:15, 118:19, 118:22, 122:20, 122:24, 122:25, 123:11, 123:15, 123:17, 130:24, 133:19, 133:20, 142:15, 172:23, 176:17, 180:12, 182:11, 189:13, 190:17, 191:24, 192:5, 194:6, 195:24, 267:19, 268:8, 277:23, 277:25, 278:2, 278:16, 278:21, 279:3, 296:10, 298:14, 299:1, 299:9, 299:18, 299:22, 300:11, 316:21, 317:1, 317:4, 317:22, 322:8, 322:10, 324:1, 324:7, 324:9, 327:19, 334:19, 335:6, 337:1, 337:19, 337:25, 338:15, 344:9, 346:11, 346:13, 346:15, 347:4, 347:7, 347:10, 352:10, 352:12, 353:3
**anton** [2] - 3:13, 4:16
**Anton** [7] - 3:17, 4:6, 4:9, 4:20, 4:22, 61:18, 100:24
**anyhow** [1] - 87:21
**anyway** [2] - 301:12, 353:6

apart [4] - 122:7, 124:13, 125:25, 322:12
apologize [2] - 39:21, 347:5
appeal [1] - 104:2
appear [2] - 59:7, 325:24
appearance [1] - 72:11
APPEARANCES [2] - 1:18, 2:1
appeared [2] - 325:23, 326:3
appellate [2] - 103:23, 104:2
apple [7] - 200:21, 200:22, 200:23, 200:25, 201:2, 201:3
apples [1] - 200:23
applications [4] - 341:23, 342:13, 344:23, 345:18
apply [1] - 345:25
appointed [1] - 102:21
appreciate [4] - 80:1, 102:18, 104:9, 186:25
approach [24] - 28:12, 36:11, 38:15, 46:1, 77:11, 94:14, 95:10, 115:20, 118:1, 122:20, 178:21, 185:3, 186:9, 186:15, 205:9, 255:21, 264:14, 277:23, 308:6, 322:8, 341:5, 342:15, 342:16, 346:11
approached [7] - 42:14, 45:25, 120:21, 143:4, 143:11, 143:14, 145:1
approaches [2] - 44:13, 46:6
approaching [4] - 43:11, 44:14, 46:4, 110:22
appropriate [1] - 10:9
appropriately [1] - 200:13
approve [1] - 90:8
approved [4] - 127:13, 127:14, 129:18, 135:24
approximate [5] - 74:20, 75:16, 150:19, 172:12,

321:14
area [37] - 33:4, 58:22, 71:25, 77:20, 78:3, 107:16, 107:23, 124:15, 133:21, 134:1, 134:3, 134:25, 139:16, 145:19, 161:11, 161:17, 161:22, 171:18, 171:19, 176:7, 187:3, 202:1, 202:2, 202:4, 211:19, 215:4, 228:21, 228:22, 245:14, 261:4, 263:14, 264:4, 288:23, 288:24, 318:23, 319:3, 340:18
areas [6] - 33:5, 33:7, 58:14, 58:15, 214:15
argument [3] - 300:17, 300:18
argumentative [3] - 86:14, 176:18, 252:12
arm [1] - 224:23
armed [4] - 25:16, 25:18, 47:1, 47:3
armor [2] - 110:15, 143:23
armored [1] - 321:6
arrest [1] - 129:8
arrested [3] - 226:25, 230:14, 230:15
arrival [1] - 229:14
arrive [1] - 209:21
arrived [10] - 111:2, 111:4, 111:6, 111:11, 112:18, 142:22, 143:1, 143:2, 147:6
artillery [1] - 109:24
aside [4] - 29:17, 206:3, 309:17, 309:23
asleep [1] - 231:22
aspects [1] - 97:24
asserted [1] - 27:3
asset [4] - 41:24, 112:18, 158:14, 158:18
assets [1] - 140:10
assigned [11] - 128:16, 132:18, 133:8, 136:7, 136:8, 139:13, 302:12, 318:24, 324:21, 338:22, 352:22
assignment [1] -

197:8
assignments [1] - 128:19
assist [8] - 27:22, 187:5, 210:11, 210:13, 210:15, 269:18, 269:21, 320:5
assistance [1] - 116:22
assistant [1] - 142:2
assisted [2] - 131:5, 269:24
assisting [2] - 79:19, 269:4
associate's [1] - 106:2
associated [3] - 323:2, 328:20, 350:11
Association [1] - 128:8
assume [8] - 57:4, 65:7, 66:19, 78:2, 78:15, 143:7, 172:13, 188:24
assuming [1] - 331:23
assumption [1] - 173:3
assumptions [2] - 173:4, 173:5
Athens [1] - 268:21
Atkins [1] - 301:14
Atlantic [1] - 154:10
atmosphere [2] - 271:15, 276:22
atmospheric [1] - 272:14
attached [4] - 120:23, 120:25, 326:2
attaches [1] - 119:17
attachments [1] - 105:17
attempting [1] - 96:13
attended [1] - 302:18
attending [1] - 197:10
attention [3] - 15:6, 39:7, 54:2
attest [5] - 65:8, 142:25, 154:19, 159:21, 180:3
attorney [1] - 337:7
Attorney's [1] - 1:21
attorneys [3] - 73:22, 96:13, 97:8
attracted [1] - 271:8
Auburn [1] - 197:16
audio [2] - 42:18, 87:2
AUSA [2] - 1:20, 1:20
authenticity [2] - 141:17, 324:11

authority [6] - 12:23, 13:17, 13:18, 20:5, 47:12, 47:22
authorize [1] - 140:24
automatic [1] - 350:9
automatically [5] - 343:4, 343:9, 345:24, 347:24, 349:1
available [6] - 47:10, 53:2, 54:22, 300:8, 300:10, 345:17
Avenue [2] - 2:17, 355:12
avoid [3] - 49:15, 195:18, 226:7
awaiting [1] - 99:15
awarded [1] - 229:17
aware [24] - 46:9, 49:2, 52:2, 89:24, 145:20, 146:1, 167:8, 179:20, 180:17, 182:2, 182:8, 184:23, 187:16, 222:19, 229:18, 229:23, 230:17, 231:19, 294:9, 316:8, 328:1, 328:23, 332:9, 333:16

# B

bachelor [1] - 106:5
Bachelor's [3] - 268:21, 302:17, 305:6
background [9] - 22:10, 42:25, 105:14, 105:24, 145:7, 268:19, 302:15, 304:25, 339:7
backwards [3] - 45:12, 279:11, 334:9
bag [21] - 28:24, 32:19, 34:2, 36:2, 49:23, 84:21, 84:24, 85:1, 89:10, 89:18, 123:18, 148:11, 177:19, 228:18, 228:21, 292:24, 296:24, 297:1, 322:20
bags [11] - 84:19, 84:21, 85:5, 177:25, 180:5, 223:8, 228:21, 228:23, 312:10, 322:14
Bahamas [1] - 181:12

bake [1] - 204:10
baking [1] - 200:24
bale [6] - 149:13, 149:16, 172:15, 189:21, 190:1, 291:6
bales [48] - 92:1, 114:3, 115:11, 118:8, 119:2, 120:19, 120:24, 122:9, 123:9, 124:22, 125:17, 132:18, 132:21, 138:22, 149:11, 149:16, 159:13, 160:5, 160:16, 168:6, 172:8, 172:10, 172:16, 172:18, 172:19, 173:7, 177:23, 180:15, 189:18, 189:25, 192:1, 192:11, 192:12, 210:8, 210:11, 210:24, 211:5, 211:7, 227:21, 291:3, 291:13, 292:13, 292:21, 292:22, 293:3
ball [1] - 102:6
banana [1] - 259:8
Band [1] - 31:12
band [2] - 256:11, 256:12
Band-Aid [1] - 31:12
bandage [1] - 49:10
bandage-sized [1] - 49:10
bang [3] - 18:4, 44:19
Bano [1] - 164:6
Barajas [8] - 25:15, 25:20, 26:16, 53:24, 60:6, 76:1, 76:12, 300:5
bare [1] - 225:14
bare-handed [1] - 225:14
barrels [2] - 166:2, 166:8
BARRERA [2] - 1:8, 2:4
BARRERA-MONTES [2] - 1:8, 2:4
base [4] - 259:9, 260:18, 310:13, 310:16
based [25] - 10:13, 33:2, 44:9, 64:4, 79:22, 146:5, 147:12, 155:16, 201:5, 209:1, 213:6,

215:7, 216:10, 219:22, 227:13, 232:22, 242:6, 245:9, 247:6, 247:9, 252:5, 328:7, 339:23, 344:23, 350:5

**basic** [4] - 155:6, 221:3, 302:19, 342:23

**basing** [1] - 50:2

**basis** [2] - 286:9, 340:2

**bathing** [1] - 135:17

**baton** [1] - 143:24

**batons** [1] - 12:25

**batteries** [1] - 322:6

**battery** [5] - 112:9, 114:24, 124:10, 187:10, 323:15

**battery-operated** [1] - 323:15

**beans** [6] - 36:1, 135:23, 136:2, 183:10, 183:14

**beard** [2] - 330:15, 330:16

**beat** [1] - 296:11

**became** [2] - 12:4, 197:13

**become** [8] - 85:12, 197:14, 197:17, 198:10, 318:15, 319:8, 319:10, 340:22

**becomes** [1] - 312:1

**bed** [1] - 134:20

**beer** [3] - 164:3, 164:15, 167:9

**BEFORE** [1] - 1:15

**began** [2] - 40:18, 75:8

**begin** [3] - 17:4, 94:11, 350:23

**beginning** [3] - 135:7, 184:17, 301:5

**behalf** [1] - 73:20

**behind** [5] - 71:2, 93:22, 271:25, 285:22, 333:2

**belonged** [4] - 255:15, 255:17, 316:12, 324:25

**belongings** [1] - 131:25

**belongs** [1] - 332:16

**below** [1] - 16:10

**belt** [1] - 143:23

**bench** [6] - 33:18, 33:21, 70:19, 70:20,

71:2, 71:20

**bent** [1] - 203:16

**Bering** [1] - 139:22

**Berrio** [10] - 3:8, 3:15, 3:21, 4:8, 4:18, 61:15, 167:16, 238:11, 291:21, 330:8

**BERRIO** [18] - 2:7, 61:12, 65:14, 67:2, 91:9, 115:2, 167:13, 168:18, 238:8, 241:22, 244:17, 245:16, 247:11, 291:18, 293:8, 316:2, 330:5, 331:13

**best** [12] - 72:24, 93:20, 112:2, 112:3, 124:1, 144:6, 170:17, 170:18, 187:4, 219:22, 274:1, 281:9

**better** [17] - 14:22, 141:18, 144:5, 162:20, 173:14, 174:12, 217:12, 217:15, 217:23, 229:5, 275:9, 280:11, 281:3, 281:7, 283:10, 323:25

**between** [47] - 12:10, 16:20, 26:16, 27:24, 32:12, 69:1, 72:1, 84:16, 98:6, 99:9, 107:24, 112:4, 139:17, 140:3, 146:3, 147:2, 148:7, 148:9, 151:24, 153:7, 154:15, 156:12, 158:13, 159:16, 172:12, 181:10, 184:5, 204:6, 204:16, 204:18, 204:19, 208:5, 208:23, 222:7, 222:13, 222:25, 231:21, 232:3, 281:11, 281:15, 282:11, 310:13, 328:13, 328:16, 337:8, 337:11, 337:16

**bevel** [1] - 127:10

**beyond** [8] - 14:17, 229:7, 231:23, 231:24, 259:1, 264:2, 265:18, 282:5

**big** [23] - 17:1, 18:7, 35:17, 56:6, 56:9,

57:16, 69:2, 69:7, 77:7, 85:17, 86:3, 112:25, 133:4, 147:25, 150:13, 177:24, 192:12, 193:6, 210:6, 226:2, 243:20

**bigger** [3] - 57:21, 150:17, 150:18

**biggest** [1] - 163:5

**bill** [2] - 294:13, 295:10

**billionth** [1] - 213:15

**bills** [2] - 294:17, 295:2

**biology** [1] - 268:22

**birth** [6] - 129:22, 152:19, 184:15, 185:15, 219:13, 219:18

**bit** [46] - 12:14, 24:24, 35:13, 35:25, 48:4, 49:7, 91:1, 122:12, 125:7, 127:12, 132:15, 134:17, 135:16, 143:21, 144:7, 144:16, 144:21, 144:22, 146:9, 146:13, 146:23, 147:9, 150:17, 153:3, 153:21, 156:20, 159:10, 165:13, 190:11, 198:9, 198:10, 198:13, 198:24, 202:12, 209:18, 259:18, 262:12, 268:18, 272:24, 279:12, 279:24, 306:12, 328:11, 350:23, 353:17, 353:18

**black** [3] - 16:11, 17:24, 173:14

**Blackhawks** [1] - 133:24

**bladder** [1] - 301:9

**blades** [1] - 133:25

**Blart** [2] - 199:24, 228:13

**bleach** [1] - 259:7

**blew** [1] - 252:22

**block** [2] - 149:18, 149:21

**blocker** [4] - 344:3, 344:5, 344:10, 345:13

**blocking** [1] - 293:5

**blow** [1] - 225:23

**blowing** [2] - 287:12,

291:1

**blue** [16] - 21:24, 69:6, 87:11, 93:14, 95:17, 96:3, 96:5, 96:6, 96:7, 183:4, 351:6, 352:4, 352:5

**BM** [1] - 109:3

**BM-II** [1] - 109:3

**board** [68] - 12:8, 13:10, 13:16, 15:11, 16:24, 21:6, 21:7, 21:8, 21:9, 21:12, 21:19, 25:24, 30:4, 30:17, 31:2, 31:24, 35:13, 35:22, 36:19, 36:20, 48:6, 48:16, 52:3, 53:10, 55:9, 58:2, 64:7, 64:14, 64:16, 64:21, 93:13, 98:16, 108:16, 109:15, 109:16, 109:19, 111:7, 112:20, 113:21, 114:25, 119:3, 122:6, 124:1, 125:23, 126:1, 128:23, 129:16, 139:2, 141:25, 142:6, 142:24, 149:10, 151:23, 152:8, 152:11, 152:13, 153:17, 158:8, 158:20, 160:21, 166:20, 168:12, 180:4, 193:14, 195:23, 199:25, 219:23

**boarded** [10] - 17:25, 55:8, 74:13, 74:22, 74:25, 75:9, 88:3, 92:20, 92:23, 245:6

**Boarding** [1] - 198:16

**boarding** [66] - 12:5, 12:6, 12:12, 12:17, 12:22, 13:14, 13:16, 13:17, 13:18, 13:21, 13:25, 14:1, 14:3, 21:3, 26:2, 26:8, 29:24, 51:16, 51:24, 52:24, 55:1, 59:23, 66:20, 70:3, 70:5, 79:19, 84:11, 85:3, 86:9, 88:3, 99:12, 106:18, 106:22, 106:23, 107:5, 108:11, 108:15, 108:23, 108:24, 109:4, 109:15, 111:6, 129:6, 129:12, 142:1,

142:2, 145:1, 145:2, 157:15, 167:19, 172:8, 197:14, 198:17, 199:20, 200:3, 200:7, 244:19, 259:13, 289:14, 289:15

**boardings** [2] - 59:18, 62:22

**boards** [2] - 25:13, 106:21

**boat** [202] - 14:13, 14:16, 16:5, 16:6, 17:2, 17:18, 40:19, 41:4, 41:9, 41:15, 41:19, 42:12, 42:14, 43:11, 43:18, 43:19, 44:3, 44:11, 44:13, 44:14, 44:16, 45:25, 46:6, 46:15, 47:20, 48:6, 48:25, 49:2, 56:23, 58:7, 62:21, 63:13, 63:25, 64:2, 64:3, 64:4, 64:5, 64:7, 64:9, 64:10, 67:17, 67:18, 68:1, 70:22, 79:12, 81:15, 85:19, 85:22, 88:1, 88:18, 88:25, 91:15, 91:18, 92:9, 105:11, 105:16, 109:1, 110:21, 110:24, 111:23, 111:24, 112:3, 112:4, 112:5, 113:24, 115:12, 115:18, 118:9, 119:1, 119:4, 119:5, 119:6, 119:9, 119:12, 120:1, 120:21, 128:21, 129:1, 129:3, 129:5, 136:14, 138:3, 138:4, 138:6, 138:16, 142:9, 142:22, 143:4, 143:8, 143:11, 144:22, 144:23, 145:1, 146:2, 146:6, 146:10, 146:19, 146:24, 147:2, 147:15, 150:16, 150:17, 150:24, 151:11, 151:14, 151:15, 152:12, 153:19, 155:8, 155:12, 155:13, 157:18, 158:23, 165:2, 166:3, 166:4, 182:22, 184:17, 188:7, 190:18, 193:2, 193:23,

**borrow** [1] - 246:17
**bothered** [1] - 287:15
**bottles** [5] - 35:14, 35:15, 35:16, 35:17
**bottom** [12] - 21:24, 22:2, 24:14, 169:3, 193:16, 208:16, 208:19, 287:16, 295:21, 296:13, 313:7, 313:11
**Boulevard** [1] - 1:22
**bow** [11] - 19:8, 21:4, 21:5, 21:9, 23:15, 23:16, 32:16, 33:21, 59:21, 119:22, 209:14
**box** [28] - 115:24, 116:2, 117:2, 117:7, 117:13, 125:6, 125:7, 125:8, 125:9, 160:19, 287:15, 287:17, 303:23, 306:21, 308:22, 308:23, 308:25, 309:3, 309:4, 309:5, 313:2, 313:4, 313:11, 313:25
**boxes** [4] - 308:17, 308:21, 312:11, 313:7
**brand** [3] - 29:4, 270:10, 323:5
**breadth** [1] - 166:23
**break** [6] - 104:10, 127:15, 286:19, 301:6, 301:11, 306:11
**breakage** [1] - 307:5
**breaks** [3] - 301:4, 307:4, 307:22
**breathing** [1] - 210:6
**Brian** [2] - 196:18, 196:19
**BRIAN** [2] - 196:19, 196:20
**brick** [3] - 224:17, 224:20, 314:4
**bricks** [3] - 321:15, 321:16, 321:17
**bridge** [1] - 17:7
**brief** [3] - 247:17, 318:18, 327:25
**Brief** [2] - 36:10, 352:11
**briefly** [9] - 8:1, 35:7, 55:21, 105:13, 141:20, 206:15, 302:14, 339:7, 353:15
**brig** [1] - 134:22

**bring** [15] - 7:18, 7:21, 7:25, 8:19, 113:21, 117:4, 125:23, 126:21, 128:24, 129:5, 129:19, 152:2, 182:17, 225:1, 229:24
**bringing** [3] - 112:23, 192:11, 192:12
**broader** [2] - 51:18, 51:20
**broken** [1] - 164:2
**brought** [41] - 9:2, 57:1, 114:25, 115:18, 116:14, 122:14, 122:16, 126:1, 126:22, 126:25, 127:18, 130:1, 136:15, 150:8, 153:12, 153:14, 159:24, 160:10, 160:21, 187:11, 188:6, 192:2, 198:3, 206:10, 209:18, 210:8, 210:18, 210:19, 216:24, 218:4, 218:20, 223:7, 230:3, 230:7, 230:18, 230:25, 289:14, 303:5, 303:9, 320:9
**Broward** [1] - 1:22
**brown** [4] - 56:5, 173:12, 173:13, 173:14
**brushed** [2] - 227:3, 227:7
**BTM** [1] - 84:12
**bubble** [1] - 298:7
**Bugatti** [2] - 256:22, 266:7
**building** [1] - 325:24
**bulk** [7] - 139:3, 139:4, 140:17, 140:18, 141:5, 141:13, 320:15
**bullets** [2] - 211:15, 211:18
**bunch** [4] - 82:15, 210:4, 351:10, 351:24
**bundles** [1] - 227:21
**buoy** [8] - 114:17, 115:6, 116:9, 116:12, 118:9, 120:5, 190:23, 197:10
**Burgess** [1] - 197:9
**burned** [1] - 57:3

**burner** [3] - 326:5, 328:19, 330:21
**burns** [1] - 203:6
**business** [6] - 215:20, 322:25, 323:2, 324:2, 324:11, 337:16
**busy** [1] - 19:11
**buy** [2] - 266:19, 345:11
**buys** [1] - 334:3
**BY** [134] - 2:16, 11:20, 27:7, 27:17, 28:5, 28:14, 29:13, 36:13, 37:11, 38:16, 39:18, 40:14, 47:18, 50:22, 55:18, 58:5, 61:12, 65:14, 67:4, 70:13, 73:3, 74:12, 76:8, 77:9, 77:13, 78:9, 80:4, 81:11, 83:23, 90:23, 91:12, 91:24, 92:15, 95:12, 100:3, 100:13, 100:22, 105:4, 115:4, 115:22, 116:5, 116:25, 117:6, 117:20, 118:3, 118:22, 122:25, 123:17, 130:24, 133:20, 142:19, 155:22, 163:1, 164:11, 167:13, 168:21, 170:4, 172:25, 174:11, 176:20, 179:1, 180:14, 181:2, 182:15, 185:5, 186:13, 186:19, 189:13, 190:17, 191:24, 192:5, 194:6, 196:23, 198:23, 206:2, 212:8, 220:14, 224:16, 229:3, 230:24, 231:7, 232:2, 238:8, 241:22, 244:17, 245:16, 247:14, 251:24, 252:14, 253:19, 254:10, 255:22, 256:9, 259:3, 261:10, 262:21, 263:17, 264:8, 264:16, 265:20, 268:8, 278:2, 278:21, 279:6, 287:22, 290:15, 291:18, 293:10, 296:10,

298:14, 302:4, 305:3, 305:16, 308:13, 314:14, 315:18, 316:5, 317:22, 322:10, 324:9, 327:22, 329:8, 329:16, 330:5, 331:16, 332:19, 334:19, 335:6, 337:1, 338:15, 344:9, 346:15, 347:10, 352:12

## C

**cable** [3] - 342:11, 344:22, 345:11
**caffeine** [1] - 307:6
**calibrate** [4] - 233:10, 233:18, 233:21, 257:1
**calibrated** [10] - 208:25, 233:9, 233:10, 234:12, 234:19, 272:25, 273:9, 273:12, 279:1, 289:5
**calibrates** [2] - 272:24, 273:6
**calibration** [3] - 272:22, 273:7, 278:1
**California** [2] - 20:1, 333:12
**calm** [4] - 142:3, 144:7, 144:17, 156:13
**camera** [9] - 72:13, 72:14, 72:18, 86:25, 87:5, 112:5, 127:1, 157:11, 157:19
**camera's** [1] - 112:15
**cameras** [1] - 157:19
**camp** [1] - 339:10
**Campo** [4] - 3:9, 3:15, 4:9, 4:12
**CAMPO** [21] - 2:8, 67:4, 70:13, 72:24, 73:1, 73:3, 73:17, 133:15, 168:21, 169:9, 169:13, 247:12, 293:10, 296:5, 304:18, 304:24, 305:3, 305:10, 316:3, 331:14, 354:2
**Canada** [1] - 108:20
**canal** [5] - 138:7, 154:3, 162:3, 162:5, 163:12

**bodies** [2] - 166:8, 291:5
**body** [8] - 110:15, 143:23, 262:24, 276:7, 287:7, 287:10, 291:14
**body's** [1] - 287:10
**Bogota** [2] - 325:13, 332:4
**bomb** [2] - 258:14, 258:17
**book** [1] - 136:17
**boot** [1] - 339:10
**border** [1] - 76:23
**born** [1] - 199:3

194:1, 194:7, 194:15, 194:21, 194:24, 205:6, 209:14, 209:22, 209:23, 210:4, 211:11, 212:4, 212:11, 214:3, 214:15, 215:6, 216:13, 216:16, 217:3, 218:4, 218:20, 220:1, 221:19, 221:20, 222:9, 222:14, 223:7, 223:11, 223:16, 223:21, 225:13, 226:13, 226:14, 227:8, 231:11, 231:13, 232:5, 236:15, 240:21, 248:14, 263:8, 264:17, 264:23, 264:24, 264:25, 265:4, 267:2, 270:1, 277:11, 277:12, 279:13, 279:15, 280:2, 280:7, 280:12, 280:13, 280:20, 280:21, 281:2, 281:4, 281:6, 286:8, 290:18, 290:20, 291:10, 293:4, 298:11, 298:16, 320:1, 320:3, 339:11
**boats** [22] - 22:14, 53:7, 58:9, 62:22, 62:24, 63:2, 63:6, 63:8, 65:4, 65:10, 94:1, 108:4, 108:6, 108:8, 108:19, 108:20, 144:21, 145:21, 154:25, 157:6, 194:11, 194:19

**Canal** [5] - 138:10, 153:25, 154:10, 163:7, 163:8

**Canaveral** [1] - 197:5

**Candelario** [5] - 61:15, 167:16, 238:11, 291:21, 330:8

**CANDELARIO** [2] - 1:9, 2:7

**cannon** [1] - 12:9

**cannot** [6] - 117:14, 154:19, 163:23, 182:7, 185:13, 267:6

**cap** [2] - 95:20, 177:12

**capabilities** [2] - 198:1, 200:12

**capability** [3] - 201:1, 266:9, 266:18

**capable** [1] - 289:3

**capacity** [7] - 11:24, 14:23, 52:4, 83:2, 197:2, 302:8, 338:20

**Cape** [1] - 197:5

**captain** [1] - 109:10

**captured** [1] - 286:18

**car** [8] - 64:3, 225:24, 235:22, 235:23, 235:25, 236:1, 256:20

**card** [5] - 330:24, 334:25, 335:1, 335:9, 335:11

**cards** [1] - 331:2

**care** [5] - 135:17, 199:8, 216:9, 221:8, 259:24

**career** [4] - 190:12, 194:9, 194:11, 199:11

**careful** [1] - 89:20

**cargo** [14] - 38:13, 80:17, 80:22, 80:25, 81:14, 93:4, 113:17, 114:14, 166:18, 168:15, 188:25, 194:25, 195:4, 195:21

**Caribbean** [3] - 139:20, 139:21, 145:18

**Carolina** [4] - 12:20, 51:13, 106:19, 129:14

**carrier** [1] - 83:19

**carry** [3] - 38:13, 194:25, 195:4

**carrying** [5] - 9:3, 48:7, 48:11, 195:14, 195:15

**CASE** [1] - 1:2

**Case** [1] - 303:6

**case** [91] - 8:12, 9:3, 9:23, 10:11, 10:23, 22:11, 32:1, 32:4, 34:19, 38:10, 40:17, 52:8, 62:18, 65:1, 79:3, 99:24, 102:3, 102:8, 103:19, 104:2, 114:11, 127:21, 128:15, 130:13, 131:2, 131:3, 132:7, 136:11, 137:5, 137:6, 137:13, 137:19, 139:1, 144:13, 161:6, 171:17, 171:21, 180:20, 184:22, 201:12, 201:13, 202:20, 203:25, 205:4, 212:12, 215:20, 217:16, 230:4, 232:6, 236:6, 238:18, 242:21, 242:25, 260:23, 261:18, 263:7, 272:20, 273:8, 274:16, 278:6, 278:14, 300:4, 303:20, 303:22, 308:20, 312:13, 313:3, 313:15, 315:11, 317:6, 319:4, 319:13, 319:14, 320:1, 320:15, 320:16, 327:16, 328:2, 328:7, 328:10, 329:1, 340:21, 340:22, 342:21, 346:1, 346:6, 346:7, 353:16, 354:8, 354:23

**cases** [10] - 114:6, 114:7, 114:8, 114:9, 145:11, 145:12, 145:14, 199:8, 353:19, 353:20

**cash** [1] - 331:3

**casing** [1] - 157:19

**catch** [4] - 20:20, 20:23, 20:24, 262:25

**caused** [1] - 146:16

**causes** [1] - 22:4

**cautious** [1] - 10:15

**cell** [6] - 116:15, 121:10, 130:7, 187:8, 340:8, 340:9

**cells** [2] - 134:22,

202:3

**Center** [1] - 198:16

**center** [3] - 43:6, 113:13, 120:22

**centimeter** [1] - 56:11

**Central** [2] - 182:3, 182:10

**certain** [16] - 13:1, 195:16, 197:22, 199:7, 199:19, 200:11, 226:19, 228:4, 235:6, 253:24, 258:1, 274:14, 274:15, 275:7, 326:2, 335:19

**certainly** [2] - 10:4, 301:7

**certificate** [1] - 106:21

**certification** [2] - 324:14, 339:22

**Certified** [1] - 6:2

**certified** [8] - 13:4, 273:2, 338:23, 338:24, 339:1, 339:17, 339:18, 339:19

**certifies** [1] - 97:11

**certify** [2] - 97:14, 355:6

**cerveza** [1] - 164:2

**cetera** [6] - 29:2, 32:23, 60:22, 76:7, 307:6

**chain** [8] - 29:1, 85:6, 135:6, 135:11, 141:15, 141:18, 322:20, 341:12

**chained** [1] - 161:9

**CHAMBROT** [16] - 2:5, 55:18, 58:5, 61:10, 91:21, 164:11, 167:9, 194:3, 231:7, 231:25, 232:2, 290:15, 291:16, 316:1, 329:16, 330:3

**Chambrot** [6] - 3:8, 3:14, 3:21, 4:8, 4:18, 61:2

**Chambrot's** [1] - 292:12

**chance** [4] - 51:5, 141:22, 190:22, 225:3

**change** [6] - 58:11, 198:9, 235:22, 235:25, 280:5, 289:10

**changed** [9] - 80:24, 81:12, 81:14, 87:23, 87:24, 289:6,

289:11, 330:14

**changes** [1] - 289:7

**channel** [1] - 128:14

**characterize** [2] - 71:9, 271:18

**charge** [16] - 6:22, 79:15, 79:18, 106:13, 119:2, 128:12, 170:12, 170:15, 198:12, 199:5, 199:21, 233:4, 233:6, 236:22, 307:3, 319:14

**charged** [1] - 250:23

**charging** [1] - 94:7

**Charles** [1] - 7:1

**Charleston** [3] - 12:20, 106:18, 129:14

**chart** [1] - 162:24

**chase** [1] - 15:12

**check** [7] - 141:2, 208:24, 214:15, 233:13, 289:15, 289:21, 349:6

**checked** [2] - 218:7, 303:10

**checklist** [1] - 99:12

**checkout** [1] - 121:10

**chemical** [10] - 127:15, 143:25, 149:5, 276:8, 276:11, 284:19, 288:10, 288:13, 288:15, 310:25

**chemically** [1] - 276:5

**chemicals** [1] - 258:19

**chemist** [14] - 231:24, 268:14, 268:25, 269:8, 269:14, 276:1, 301:15, 302:10, 302:11, 302:16, 302:19, 302:21, 305:5, 307:16

**CHEMIST** [4] - 4:5, 4:11, 268:5, 302:1

**chemistry** [6] - 268:22, 268:23, 302:17, 302:25, 304:23, 305:7

**Chesapeake** [1] - 198:4

**chest** [2] - 291:4, 292:18

**CHIEF** [1] - 1:15

**choice** [1] - 18:24

**choices** [1] - 198:9

**choose** [1] - 10:8

**chose** [3] - 103:13, 149:15, 149:17

**chromatograph** [11] - 306:6, 306:13, 307:9, 308:1, 309:18, 309:23, 310:3, 310:4, 310:20, 311:4, 311:5

**chromatography** [1] - 288:18

**cinnamon** [1] - 200:24

**Circuit** [1] - 7:2

**circumstances** [2] - 297:15, 297:23

**City** [1] - 318:6

**city** [1] - 163:5

**civilian** [1] - 98:18

**CJA** [1] - 102:21

**claimed** [1] - 263:20

**clamps** [1] - 17:17

**clandestine** [2] - 269:21, 297:17

**clandestinely** [1] - 269:24

**clarify** [4] - 73:4, 168:24, 337:10, 337:19

**clarifying** [1] - 178:13

**class** [2] - 271:21, 280:16

**classes** [1] - 271:21

**clause** [1] - 7:6

**clean** [29] - 24:20, 58:14, 58:17, 59:7, 87:12, 202:1, 202:25, 204:11, 204:12, 204:17, 204:20, 205:1, 208:5, 208:8, 226:1, 233:12, 235:2, 235:3, 235:7, 235:17, 235:23, 260:1, 260:9, 260:12, 265:22, 265:24, 265:25, 290:2

**clean-shaven** [1] - 14:20

**cleaned** [2] - 234:4, 234:7

**cleaning** [4] - 235:19, 286:7, 286:15

**cleanliness** [1] - 72:12

**cleanup** [1] - 272:12

**clear** [9] - 95:6, 96:14, 114:23, 169:17, 169:19, 204:9, 204:10, 204:23, 204:25

**clearer** [1] - 97:6

clearing [1] - 236:17
clearly [4] - 11:12, 53:2, 161:9, 191:15
Cleveland [1] - 198:11
click [1] - 345:23
client [14] - 80:9, 80:24, 249:17, 249:18, 249:19, 249:22, 250:10, 250:18, 251:14, 329:22, 330:1, 330:18, 337:8, 337:12
client's [1] - 252:22
climb [3] - 221:22, 222:4, 222:10
climbing [1] - 222:7
clip [5] - 119:19, 119:20, 119:23
close [14] - 24:20, 30:22, 95:7, 95:13, 95:16, 107:21, 121:3, 179:4, 183:4, 244:23, 280:17, 281:8, 295:22, 352:5
close-shaved [1] - 24:20
close-up [1] - 121:3
closer [4] - 117:4, 151:13, 163:15, 226:24
closest [1] - 137:1
clothes [14] - 59:7, 72:12, 87:14, 209:9, 245:20, 250:24, 251:15, 252:22, 263:21, 265:10, 265:11, 265:15, 265:22, 267:4
clothing [37] - 30:24, 130:8, 152:24, 207:16, 211:21, 211:24, 211:25, 212:1, 217:9, 218:7, 218:9, 218:11, 222:14, 224:4, 226:10, 226:12, 227:9, 227:16, 228:17, 228:18, 228:19, 228:23, 232:10, 240:3, 242:1, 245:11, 245:21, 246:23, 250:2, 250:18, 264:25, 265:3, 280:5, 280:10, 286:18
clue [1] - 233:1
clutching [1] - 292:21
co - 217:25

CO [1] - 13:11
co-counsel [1] - 217:25
Coast [101] - 12:1, 12:4, 15:13, 41:23, 55:5, 64:4, 73:7, 76:16, 76:18, 76:21, 77:25, 78:17, 78:19, 78:20, 78:21, 79:1, 92:6, 93:7, 97:11, 97:14, 99:17, 105:10, 105:14, 105:15, 105:24, 106:3, 106:4, 107:1, 107:6, 107:20, 107:22, 108:3, 109:7, 110:7, 110:10, 110:11, 110:14, 110:15, 110:16, 111:9, 115:13, 119:8, 122:10, 125:19, 126:11, 128:1, 129:18, 131:22, 132:10, 132:12, 132:13, 132:20, 133:10, 134:23, 135:24, 137:24, 138:24, 139:15, 140:14, 141:9, 141:14, 145:24, 162:2, 170:16, 171:1, 172:3, 181:17, 189:16, 192:2, 192:13, 194:13, 196:9, 197:4, 197:9, 199:2, 199:10, 199:14, 202:13, 212:13, 220:21, 221:3, 221:5, 221:15, 243:5, 244:22, 277:13, 289:15, 300:5, 300:12, 300:13, 319:21, 319:24, 320:19, 337:25, 338:21, 339:5, 339:6, 339:8, 339:9, 352:16
coast [2] - 15:19, 245:4
coastal [2] - 197:14, 198:18
coasters [1] - 222:2
cocaine [174] - 127:25, 128:6, 132:18, 138:22, 174:24, 175:15, 176:23, 180:15, 189:18, 192:1, 201:6, 205:5,

207:18, 207:21, 208:21, 209:11, 209:16, 214:3, 214:7, 214:8, 216:13, 216:19, 216:21, 217:17, 217:20, 218:1, 224:6, 224:17, 224:20, 225:11, 226:11, 227:8, 227:11, 227:14, 227:15, 227:20, 228:3, 228:4, 228:10, 228:13, 229:12, 229:16, 229:18, 229:24, 230:3, 230:7, 230:10, 231:11, 232:9, 232:23, 233:23, 236:8, 236:17, 236:20, 236:23, 237:8, 237:11, 237:17, 237:18, 237:23, 238:1, 240:16, 240:25, 241:19, 245:9, 245:10, 245:22, 246:7, 246:8, 246:9, 246:13, 247:1, 247:2, 247:4, 247:18, 248:16, 248:21, 250:11, 250:19, 250:20, 250:22, 250:25, 251:16, 252:8, 252:10, 252:20, 253:3, 253:4, 254:15, 255:5, 257:21, 260:3, 269:25, 274:6, 274:13, 274:15, 274:20, 274:22, 274:25, 275:5, 275:7, 275:13, 276:6, 276:8, 276:18, 276:20, 280:10, 280:13, 281:4, 281:12, 281:14, 281:15, 281:16, 282:18, 282:24, 283:3, 283:11, 283:13, 283:21, 283:24, 285:7, 285:11, 286:9, 286:13, 290:18, 290:20, 291:10, 292:3, 292:4, 292:5, 292:10, 292:11, 294:4, 294:6, 294:9,

294:11, 294:14, 294:16, 294:19, 294:22, 295:1, 295:13, 295:20, 307:6, 307:12, 307:15, 307:17, 308:3, 308:4, 308:20, 309:22, 310:12, 310:13, 310:14, 310:16, 310:22, 312:8, 312:15, 312:21, 313:14, 314:15, 314:24, 315:6, 319:25, 320:6, 336:3
coffee [1] - 84:7
coiled [1] - 306:23
coke [3] - 216:24, 225:3, 282:24
Coke [2] - 224:24, 285:10
collect [7] - 51:25, 52:4, 84:13, 114:1, 119:11, 125:24, 229:21
collected [5] - 57:1, 85:3, 142:4, 170:13, 303:18
collecting [4] - 50:17, 50:18, 91:3, 121:17
collection [4] - 52:9, 91:1, 229:18, 343:15
collector [2] - 339:17, 339:19
college [2] - 198:20, 199:2
cologne [2] - 246:1, 246:8
Colombia [15] - 98:7, 325:13, 325:24, 329:3, 329:5, 329:12, 329:23, 330:1, 330:2, 331:11, 332:1, 332:4, 332:10, 336:22
Colombian [1] - 81:6
color [12] - 19:13, 96:2, 96:4, 96:8, 96:10, 132:7, 185:4, 289:7, 289:10, 306:6, 311:1
colored [4] - 96:7, 96:10, 113:10, 113:12
colorful [4] - 160:5, 172:22, 173:7, 173:10
colors [1] - 304:10
column [2] - 306:22,

307:1
columns [1] - 307:2
combinations [1] - 259:10
combined [1] - 306:8
comfort [1] - 134:4
comfortably [1] - 134:9
coming [18] - 46:12, 94:18, 103:10, 147:18, 171:23, 181:25, 182:2, 207:22, 209:24, 222:22, 223:1, 225:13, 269:3, 275:1, 293:6, 298:17, 320:22, 321:2
comm [1] - 168:11
commander [6] - 64:24, 109:2, 109:11, 109:12, 109:25, 170:10
commanding [6] - 13:9, 13:10, 47:21, 55:2, 128:11, 199:23
commands [3] - 13:16, 59:19, 59:23
commended [1] - 168:13
comment [1] - 58:2
commenting [1] - 253:16
commercials [1] - 100:11
committed [1] - 91:4
common [8] - 73:10, 203:18, 236:2, 236:4, 293:24, 294:8, 297:16, 325:20
commonly [4] - 168:4, 214:15, 227:25, 294:5
communicate [1] - 207:6
communicating [1] - 86:19
communication [3] - 14:14, 14:17, 60:5
communications [3] - 86:17, 87:4, 158:11
communicator [1] - 207:1
community [1] - 187:4
company [11] - 145:23, 234:15, 323:5, 323:7, 323:12, 323:18, 324:12, 324:17,

326:12, 330:23, 335:1

**compare** [3] - 193:18, 194:21, 288:8

**compared** [2] - 256:19, 307:8

**comparing** [2] - 307:14, 307:18

**compartment** [2] - 24:15, 322:6

**compass** [2] - 17:9, 17:10

**compel** [1] - 18:19

**compilation** [1] - 273:22

**complete** [6] - 10:16, 14:20, 29:23, 52:23, 311:19, 312:7

**completed** [1] - 349:14

**completely** [5] - 152:6, 156:9, 202:1, 334:21, 334:23

**completing** [1] - 141:14

**compliant** [3] - 21:16, 44:24, 48:2

**complications** [1] - 110:23

**complied** [1] - 238:25

**component** [2] - 310:11, 311:1

**composite** [3] - 346:23, 347:11, 348:22

**compound** [4] - 273:1, 276:11, 284:8, 307:6

**compounds** [4] - 270:24, 276:8, 293:24, 293:25

**compressed** [1] - 304:6

**comprised** [2] - 127:16, 308:16

**computer** [13] - 169:14, 188:13, 188:17, 188:20, 189:4, 236:2, 333:3, 333:22, 335:18, 335:21, 340:9, 349:4, 349:6

**computers** [2] - 189:1, 334:4

**concentration** [1] - 241:19

**concept** [1] - 252:11

**concern** [1] - 220:23

**concerned** [2] - 188:7, 189:18

**concerning** [1] -

279:11

**concluded** [1] - 9:16

**conclusion** [3] - 274:20, 278:25, 332:8

**condition** [5] - 29:5, 89:25, 159:22, 203:11, 314:15

**conditions** [1] - 163:21

**conduct** [8] - 73:10, 129:7, 131:13, 201:7, 218:23, 219:2, 321:18, 341:23

**conducted** [5] - 114:6, 218:25, 257:15, 324:15, 339:11

**conference** [1] - 330:10

**confirm** [3] - 264:10, 283:9, 310:19

**confirmatory** [5] - 257:20, 283:11, 296:14, 310:19, 310:21

**confirmed** [1] - 298:3

**confront** [1] - 7:9

**confrontation** [2] - 7:6, 27:5

**confusing** [1] - 235:18

**conjunction** [1] - 327:15

**connect** [3] - 17:18, 135:10, 270:21

**connected** [7] - 113:3, 113:6, 113:7, 135:11, 148:3, 148:4, 330:20

**Connecticut** [1] - 145:8

**connection** [11] - 201:13, 328:1, 328:13, 328:16, 329:12, 330:22, 334:13, 337:8, 337:11, 337:16, 342:20

**connects** [1] - 119:19

**conscious** [1] - 52:8

**consider** [3] - 280:19, 281:24, 282:2

**considerable** [2] - 43:24, 99:22

**considered** [3] - 143:25, 285:3, 311:17

**considering** [1] - 10:14

**consist** [3] - 113:9,

135:23, 318:19

**consisted** [1] - 336:16

**consistent** [1] - 265:4

**constant** [2] - 121:9, 150:3

**constantly** [1] - 290:19

**consume** [2] - 94:22, 309:8

**consumed** [1] - 284:25

**contact** [41] - 99:19, 99:21, 100:15, 108:10, 108:11, 108:21, 108:22, 143:5, 143:9, 157:2, 220:7, 221:11, 226:14, 271:24, 272:2, 280:1, 280:4, 280:6, 280:7, 280:14, 280:15, 281:4, 281:5, 282:13, 282:16, 282:18, 282:20, 283:17, 283:21, 286:12, 287:4, 287:6, 291:7, 292:14, 292:17, 292:19, 292:25, 294:7, 296:1

**contacted** [5] - 234:11, 319:5, 331:8, 336:8, 336:13

**contacts** [1] - 282:3

**contain** [4] - 108:22, 160:13, 323:21, 325:4

**contained** [11] - 32:7, 123:6, 131:22, 159:23, 189:19, 228:12, 322:5, 327:1, 327:6, 346:22, 348:21

**container** [3] - 179:6, 179:8, 262:8

**containers** [4] - 95:17, 95:19, 95:22, 179:24

**containing** [2] - 192:20, 294:8

**contains** [2] - 350:12, 350:18

**contaminate** [2] - 260:6, 282:1

**contaminated** [5] - 31:18, 32:6, 32:18, 226:7, 294:11

**contaminating** [1] - 60:16

**contamination** [7] - 49:15, 212:24,

217:12, 224:1, 281:20, 282:2, 282:5

**continue** [5] - 7:13, 99:16, 109:18, 133:18, 341:15

**CONTINUED** [1] - 2:1

**continued** [4] - 4:1, 4:13, 6:1, 305:15

**Continued** [1] - 355:2

**continuing** [3] - 20:4, 339:21, 339:25

**contraband** [23] - 112:11, 122:13, 124:14, 126:16, 126:17, 126:20, 129:9, 139:4, 139:6, 159:17, 159:23, 160:14, 167:22, 171:7, 171:13, 173:25, 176:25, 177:1, 209:18, 210:5, 210:18, 230:5

**contraption** [2] - 120:16, 121:4

**control** [10] - 108:13, 111:1, 111:7, 111:12, 142:5, 152:6, 215:1, 282:6, 324:18

**controlled** [14] - 40:23, 145:5, 145:6, 201:24, 213:14, 225:9, 261:12, 269:3, 269:23, 276:3, 280:1, 283:8, 298:1

**convention** [1] - 350:9

**convert** [1] - 345:20

**cool** [4] - 142:3, 154:6, 154:7, 200:15

**cooperating** [1] - 73:2

**cooperative** [2] - 48:12, 238:24

**coordinates** [1] - 111:17

**cop** [1] - 228:15

**Cop** [1] - 199:24

**copies** [8] - 101:17, 101:18, 102:19, 102:24, 103:12, 104:3, 169:11, 205:16

**copper** [4] - 18:11, 18:12, 18:13, 45:1

**copy** [9] - 185:4, 255:10, 255:11, 255:23, 256:1, 257:3, 257:9, 349:3, 349:6

**cord** [1] - 296:25

**corpsman** [4] - 136:5, 136:6, 136:18, 184:5

**corpsmen** [2] - 129:15, 131:10

**correct** [328] - 12:18, 14:8, 16:15, 19:19, 19:23, 23:12, 23:13, 30:17, 32:11, 34:9, 34:14, 34:18, 34:22, 35:23, 36:22, 40:20, 41:14, 42:2, 43:10, 43:23, 44:17, 44:22, 44:25, 45:5, 45:22, 46:22, 47:21, 48:10, 48:22, 49:9, 49:14, 49:16, 49:17, 50:15, 50:18, 51:1, 51:2, 51:19, 51:22, 52:7, 52:11, 52:18, 52:20, 53:4, 53:21, 54:6, 54:7, 54:10, 54:21, 54:23, 54:25, 55:6, 55:7, 55:13, 57:6, 57:7, 57:10, 57:13, 57:17, 58:8, 58:14, 59:3, 59:7, 59:20, 60:2, 60:7, 60:19, 61:9, 61:20, 61:25, 62:4, 62:6, 62:19, 63:11, 63:19, 64:15, 65:5, 65:6, 65:21, 66:5, 67:9, 67:11, 67:15, 68:15, 71:18, 72:4, 72:8, 72:17, 73:6, 73:12, 73:16, 74:20, 76:2, 76:11, 76:17, 76:19, 77:22, 77:23, 79:7, 79:17, 79:19, 80:13, 80:25, 81:16, 81:17, 84:5, 84:10, 84:20, 85:14, 85:20, 86:21, 87:1, 87:3, 88:1, 88:5, 88:8, 88:9, 88:19, 88:24, 89:3, 89:4, 89:5, 89:8, 89:9, 89:11, 90:2, 92:8, 93:1, 94:8, 95:4, 95:21, 97:13, 99:10, 100:25, 110:8, 110:18, 111:3, 111:14, 111:16, 114:19, 115:19, 116:11, 117:10, 120:3, 120:7, 120:18, 121:2, 121:6, 121:19, 121:21, 122:2, 123:7, 123:10, 123:20, 124:5, 124:9, 124:24,

125:20, 126:5,
128:5, 128:18,
131:1, 131:3, 131:4,
131:7, 131:15,
131:21, 134:21,
135:1, 135:15,
136:10, 138:11,
138:18, 139:7,
139:11, 139:14,
140:15, 141:16,
141:19, 143:13,
143:15, 144:14,
145:4, 147:14,
147:20, 148:24,
149:25, 153:23,
158:9, 158:25,
159:13, 161:9,
163:19, 165:23,
165:25, 166:17,
168:1, 168:17,
170:11, 170:23,
175:16, 177:3,
177:18, 177:20,
179:3, 180:7,
180:21, 181:15,
181:16, 181:19,
181:20, 183:9,
187:20, 188:9,
189:7, 189:9,
190:24, 192:10,
193:3, 193:5, 193:7,
193:11, 194:18,
216:14, 218:13,
218:21, 229:7,
229:8, 229:16,
229:24, 229:25,
230:11, 231:11,
231:14, 232:3,
232:7, 232:8,
232:10, 232:11,
232:13, 235:17,
240:6, 241:1, 248:8,
249:17, 249:23,
249:24, 251:12,
251:16, 252:2,
252:8, 253:6,
253:23, 263:5,
264:18, 264:20,
267:8, 267:11,
269:17, 272:11,
273:23, 273:24,
275:18, 275:21,
276:13, 277:1,
277:8, 278:15,
279:2, 279:18,
281:7, 282:9,
282:21, 283:25,
284:11, 285:7,
285:15, 285:16,
286:3, 286:6,
290:11, 292:7,

292:9, 292:11,
292:16, 293:15,
293:16, 293:20,
293:23, 294:2,
294:22, 295:16,
295:19, 296:14,
296:15, 296:23,
297:4, 297:7,
297:13, 297:16,
297:22, 298:25,
305:20, 316:10,
316:11, 316:13,
316:14, 318:13,
321:11, 321:17,
323:13, 323:24,
324:13, 324:16,
326:11, 328:2,
329:12, 329:13,
329:24, 331:22,
334:13, 348:16,
348:18, 350:16,
350:21

correctly [7] - 51:23,
170:12, 216:6,
240:15, 272:8,
273:6, 290:8
correlate [1] - 34:10
correlating [1] - 32:22
corroborate [2] -
100:5, 296:21
corrosive [1] - 190:14
Corvette [2] - 236:1,
256:21
costs [2] - 200:17,
226:8
counsel [15] - 8:12,
98:13, 100:23,
102:2, 102:4, 102:7,
103:18, 158:7,
160:22, 189:14,
191:20, 217:25,
277:25, 299:11,
317:5
counsel's [1] - 337:12
counselor [1] - 316:6
count [2] - 13:22,
299:7
counted [1] - 122:17
counter [2] - 124:2,
190:4
counter-intel [1] -
190:4
counter-tracked [1] -
124:2
counterdrugs [1] -
198:17
counterterrorism [2] -
198:6, 198:14
counting [3] - 30:4,
210:11, 210:12

country [2] - 137:7,
152:1
couple [11] - 20:13,
94:18, 125:17,
185:25, 225:22,
271:21, 276:13,
280:13, 290:8,
315:16
course [14] - 9:20,
12:21, 51:15, 51:16,
51:17, 81:14, 138:9,
144:8, 299:25,
300:1, 318:5,
324:23, 336:20
courses [1] - 339:21
court [13] - 7:10, 7:23,
9:17, 23:11, 52:5,
62:12, 101:1,
188:21, 269:3,
269:10, 302:13,
337:13, 340:15
COURT [179] - 1:1,
6:7, 6:20, 7:25, 8:7,
8:16, 8:19, 8:22, 9:4,
9:6, 9:9, 9:18, 11:3,
27:4, 27:16, 28:4,
28:11, 29:11, 36:12,
37:4, 37:7, 37:10,
39:15, 40:12, 47:17,
65:13, 72:25, 73:18,
74:4, 74:7, 76:5,
77:12, 78:8, 80:3,
81:10, 86:15, 90:21,
91:10, 91:23, 92:13,
95:11, 99:25, 100:8,
100:20, 101:8,
101:14, 101:24,
103:5, 103:9,
103:21, 104:6,
104:10, 104:13,
104:15, 115:3,
115:21, 116:4,
116:19, 116:24,
117:4, 117:18,
118:2, 118:18,
118:20, 122:22,
123:13, 123:16,
130:23, 133:18,
135:21, 142:17,
169:24, 172:24,
176:19, 178:23,
180:13, 182:14,
186:10, 186:16,
189:11, 190:16,
191:23, 192:4,
194:5, 195:25,
196:2, 198:21,
205:23, 206:1,
212:6, 220:13,
230:23, 232:1,

241:21, 244:16,
245:15, 251:20,
251:22, 252:13,
253:18, 254:8,
256:5, 256:8, 259:2,
261:4, 263:13,
264:4, 264:15,
265:19, 266:6,
266:11, 266:15,
266:21, 266:23,
267:1, 267:4, 267:6,
267:9, 267:12,
267:15, 267:18,
277:24, 278:19,
279:4, 296:8,
298:13, 299:3,
299:6, 299:14,
299:19, 300:1,
300:6, 300:10,
300:15, 300:19,
300:21, 300:23,
300:25, 301:2,
304:21, 305:1,
305:12, 308:7,
308:10, 308:12,
313:21, 313:24,
314:2, 314:6,
314:13, 315:14,
316:16, 316:18,
316:20, 316:24,
317:3, 317:7, 322:9,
324:6, 324:8,
334:17, 335:5,
336:25, 337:21,
337:24, 341:6,
344:8, 346:12,
347:6, 347:8, 353:4,
353:8, 353:13,
353:21, 353:25,
354:5, 354:13,
354:18, 354:24
Court [13] - 2:16, 2:17,
6:2, 7:5, 8:10, 8:15,
9:8, 9:23, 102:3,
102:25, 353:23,
355:11, 355:12
Court's [1] - 169:21
Court-Certified [1] -
6:2
courthouse [3] -
348:10, 348:11,
348:14
courtroom [13] -
22:25, 23:4, 62:9,
62:13, 74:2, 101:13,
104:12, 196:5,
196:7, 299:5,
300:22, 301:1,
353:11
COURTROOM [25] -

6:4, 6:9, 11:6, 11:11,
11:16, 101:12,
104:16, 104:21,
162:15, 196:4,
196:10, 196:15,
267:21, 268:1,
268:4, 301:16,
301:21, 301:25,
316:25, 317:8,
317:13, 317:18,
338:1, 338:6, 338:11
cover [8] - 108:1,
108:10, 108:21,
111:7, 111:10,
111:11, 141:21,
143:3
coverage [2] - 33:4,
50:3
coverall [1] - 133:2
covered [2] - 108:12,
182:23
coverings [1] - 173:10
covers [2] - 66:9,
133:3
cowling [1] - 45:4
coxswain [6] - 46:9,
47:2, 64:23, 109:3,
151:12
crack [1] - 310:16
craft [1] - 220:25
crane [2] - 16:12, 17:1
cranes [2] - 93:25,
221:24
Crawford [3] - 6:15,
7:8, 27:1
crazy [1] - 173:24
crease [1] - 134:9
create [3] - 18:17,
308:23, 348:18
created [4] - 284:15,
309:5, 313:2, 351:21
creates [1] - 190:20
creating [1] - 134:8
credit [7] - 72:25,
330:24, 331:2,
334:24, 335:1,
335:8, 335:11
crew [53] - 14:3,
19:10, 19:16, 21:1,
21:4, 21:6, 21:9,
25:23, 26:10, 35:22,
39:4, 46:15, 46:19,
46:25, 54:3, 54:9,
55:24, 56:20, 64:22,
65:24, 68:3, 84:4,
108:6, 108:23,
108:24, 110:1,
119:3, 123:24,
126:13, 126:15,
128:23, 129:10,

129:21, 142:5,
143:17, 143:21,
153:7, 166:20,
168:3, 168:8,
184:20, 193:4,
195:22, 220:3,
220:15, 221:10,
259:13, 259:19,
260:9, 263:3, 291:3
**crew's** [1] - 47:23
**crewman** [6] - 17:15,
17:16, 64:8, 64:11,
166:2, 220:2
**crewmen** [1] - 220:17
**crime** [1] - 91:5
**criminal** [2] - 52:5,
155:17
**Cross** [29] - 3:7, 3:7,
3:8, 3:8, 3:9, 3:9,
3:10, 3:13, 3:14,
3:14, 3:15, 3:15,
3:16, 3:20, 3:20,
3:21, 3:21, 4:7, 4:7,
4:8, 4:8, 4:9, 4:13,
4:14, 4:17, 4:17,
4:18, 4:18, 4:19
**CROSS** [31] - 40:13,
50:21, 55:17, 61:11,
74:11, 83:22,
142:18, 155:21,
164:10, 167:12,
168:20, 170:3,
181:1, 212:7, 229:2,
231:6, 238:7,
247:13, 279:5,
287:21, 290:14,
291:17, 293:9,
315:17, 316:4,
327:21, 329:7,
329:15, 330:4,
331:15, 332:18
**cross** [18] - 3:16, 3:22,
4:19, 7:15, 7:23,
40:12, 67:3, 73:18,
102:1, 102:15,
142:17, 212:6,
258:25, 279:4,
299:25, 315:14,
353:6, 353:8
**CROSS-**
**EXAMINATION** [31] -
40:13, 50:21, 55:17,
61:11, 74:11, 83:22,
142:18, 155:21,
164:10, 167:12,
168:20, 170:3,
181:1, 212:7, 229:2,
231:6, 238:7,
247:13, 279:5,
287:21, 290:14,

291:17, 293:9,
315:17, 316:4,
327:21, 329:7,
329:15, 330:4,
331:15, 332:18
**Cross-Examination**
[29] - 3:7, 3:7, 3:8,
3:8, 3:9, 3:9, 3:10,
3:13, 3:14, 3:14,
3:15, 3:15, 3:16,
3:20, 3:20, 3:21,
3:21, 4:7, 4:7, 4:8,
4:8, 4:9, 4:13, 4:14,
4:17, 4:17, 4:18,
4:18, 4:19
**cross-examination** [6]
- 3:16, 3:22, 4:19,
67:3, 102:1, 299:25
**cross-examine** [2] -
7:15, 7:23
**CRR** [2] - 2:16, 355:11
**CRUZ** [2] - 1:9, 2:7
**Cruz** [8] - 61:16,
167:17, 238:12,
291:22, 330:9,
330:19, 331:8,
331:10
**crystal** [2] - 286:1,
286:2
**Cuba** [1] - 181:10
**cuff** [2] - 286:21,
286:22
**cuffed** [1] - 157:18
**cufflink** [2] - 135:7,
135:11
**cufflinks** [1] - 135:3
**cuffs** [1] - 157:17
**Cummings** [1] - 63:12
**cup** [6] - 234:23,
234:25, 235:2,
235:5, 235:8
**currency** [9] - 294:10,
294:11, 294:15,
294:17, 294:18,
294:23, 294:24,
295:18, 295:20
**custody** [11] - 29:2,
81:20, 85:7, 141:15,
141:18, 179:23,
220:24, 320:9,
321:6, 322:20,
341:12
**cut** [4] - 28:21, 31:20,
308:9
**Cutter** [43] - 12:2,
14:9, 15:15, 15:21,
31:6, 34:13, 35:2,
74:19, 105:10,
107:1, 107:6,
107:20, 107:22,

108:3, 110:16,
115:13, 122:10,
125:19, 126:11,
131:22, 134:23,
137:14, 140:14,
197:9, 199:2,
202:13, 206:10,
206:13, 209:19,
210:9, 212:13,
243:5, 256:19,
259:18, 259:19,
259:20, 259:24,
260:1, 260:3,
260:17, 260:25,
319:21, 320:19
**cutter** [41] - 14:17,
15:13, 19:11, 19:25,
22:10, 23:18, 72:18,
76:21, 82:5, 86:7,
93:12, 93:21, 93:22,
93:25, 98:6, 98:9,
100:1, 105:11,
105:15, 110:17,
110:19, 127:18,
128:17, 132:20,
133:10, 137:24,
138:15, 141:9,
154:2, 162:2, 162:3,
170:14, 171:2,
189:16, 195:9,
277:13, 319:24,
320:22, 321:5, 340:3
**cutters** [2] - 139:16,
140:5, 140:6, 140:7

# D

**D-7** [1] - 151:23
**D.C** [1] - 349:21
**daily** [1] - 340:2
**danger** [4] - 47:23,
93:16, 212:24
**dark** [6] - 98:21,
217:1, 237:15,
237:16, 237:25,
238:2
**data** [16] - 274:19,
275:12, 278:10,
339:3, 342:10,
342:14, 343:3,
343:12, 344:11,
344:12, 346:9,
346:22, 346:24,
348:22, 349:15,
352:3
**DATE** [1] - 355:11
**date** [17] - 29:1, 66:6,
66:8, 129:22,
152:18, 184:15,
185:15, 219:12,

219:18, 266:8,
266:9, 266:15,
266:17, 266:18,
313:8, 343:5, 350:12
**dated** [3] - 274:3,
275:23, 276:17
**dates** [3] - 137:21,
151:18, 351:10
**Dauphins** [1] - 133:22
**Dave** [2] - 303:5,
305:17
**DAVID** [4] - 4:15,
11:15, 104:24,
317:19
**David** [6] - 11:14,
104:23, 104:24,
316:21, 317:16,
318:3
**davit** [8] - 16:25,
17:18, 119:15,
119:25, 129:4,
153:15
**DAY** [1] - 1:13
**day-to-day** [2] - 269:1,
269:2
**days** [20] - 24:18,
24:22, 80:17, 80:22,
99:22, 131:18,
151:19, 151:24,
154:15, 185:25,
186:18, 190:9,
242:12, 242:13,
242:18, 242:19,
260:21, 351:24,
354:16
**DEA** [7] - 268:25,
269:14, 302:16,
302:21, 303:5,
320:9, 320:12
**DEA-7** [1] - 303:17
**dead** [7] - 68:13,
157:6, 287:7,
287:10, 296:11
**deadline** [1] - 195:12
**deadly** [1] - 13:2
**deal** [10] - 96:19,
106:20, 113:14,
133:2, 178:6,
190:12, 236:19,
237:8, 237:9
**dealing** [10] - 46:15,
105:20, 105:21,
115:5, 127:22,
143:24, 145:17,
157:20, 190:12,
194:11
**deals** [1] - 286:9
**dealt** [1] - 243:22
**death** [1] - 100:12
**debris** [28] - 66:23,

66:24, 111:15,
112:20, 112:25,
113:4, 113:14,
113:17, 114:15,
120:15, 120:17,
120:20, 120:22,
146:10, 146:20,
147:3, 147:6,
147:13, 147:17,
148:1, 159:8, 160:9,
160:18, 164:22,
166:4, 167:20,
170:13, 229:19
**December** [4] -
161:14, 161:15,
320:19, 320:20
**decide** [2] - 155:7,
246:22
**decision** [4] - 47:22,
94:7, 140:13, 353:24
**deck** [11] - 25:12,
31:3, 59:9, 59:11,
125:19, 128:25,
129:1, 129:3,
171:11, 210:7,
228:21
**decks** [2] - 134:19,
260:10
**declarant** [2] - 7:10,
7:24
**dedicated** [1] - 128:15
**deem** [1] - 129:20
**deep** [1] - 22:1
**deeper** [1] - 194:1,
194:23
**deescalate** [2] - 144:8,
144:16
**deescalates** [1] - 48:4
**defend** [2] - 12:24,
47:20
**Defendant** [1] -
169:25
**defendant** [2] - 37:15,
337:11
**DEFENDANT'S** [1] -
5:18
**defendants** [35] -
23:24, 25:23, 26:5,
26:9, 26:17, 26:19,
30:15, 30:18, 30:25,
31:1, 31:6, 35:2,
35:5, 38:21, 38:25,
39:9, 54:18, 59:2,
73:20, 93:11, 96:17,
99:2, 100:14,
128:21, 131:20,
133:8, 137:17,
138:20, 139:9,
190:8, 328:20,
329:22, 330:17,

331:21, 337:13
**Defendants** [1] - 6:2
**defendants'** [3] - 6:14, 7:8, 211:21
**defense** [23] - 8:11, 12:23, 53:3, 73:22, 96:13, 97:8, 98:13, 100:23, 102:2, 102:4, 102:7, 103:18, 189:14, 191:19, 277:25, 299:11, 317:5, 337:7, 337:11, 353:13, 354:8, 354:19, 354:22
**Defense** [4] - 169:22, 169:23, 339:17, 339:19
**definitely** [10] - 20:17, 25:9, 44:4, 119:5, 165:4, 165:7, 172:17, 192:25, 258:16, 299:22
**definition** [2] - 214:22, 242:14
**degraded** [1] - 277:16
**degree** [3] - 268:21, 302:17, 305:6
**degrees** [1] - 18:17
**del** [1] - 350:24
**delivered** [5] - 340:23, 340:25, 341:1, 341:2, 341:9
**demonstrated** [2] - 207:9, 207:11
**denoted** [1] - 38:2
**department** [3] - 106:11, 106:12, 336:13
**Department** [4] - 318:4, 336:5, 339:17, 339:19
**dependent** [3] - 290:4, 290:6, 290:7
**depict** [6] - 22:19, 23:14, 36:23, 39:8, 118:12, 278:13
**depicted** [4] - 15:25, 72:11, 151:4, 215:1
**deployed** [6] - 14:4, 40:19, 40:25, 41:1, 41:3, 94:11
**deployment** [2] - 260:15, 260:20
**deposited** [2] - 272:13, 290:25
**depositions** [3] - 354:9, 354:16, 354:18
**Depot** [1] - 102:21

**depth** [3] - 38:9, 194:21
**DEPUTY** [25] - 6:4, 6:9, 11:6, 11:11, 11:16, 101:12, 104:16, 104:21, 162:15, 196:4, 196:10, 196:15, 267:21, 268:1, 268:4, 301:16, 301:21, 301:25, 316:25, 317:8, 317:13, 317:18, 338:1, 338:6, 338:11
**describe** [13] - 14:4, 16:8, 21:23, 24:24, 31:9, 38:9, 105:13, 133:21, 149:1, 202:13, 302:14, 306:17, 327:1
**described** [10] - 38:8, 40:18, 41:4, 45:1, 131:6, 139:1, 143:20, 152:11, 154:24, 208:1
**describing** [1] - 139:8
**description** [1] - 106:9
**deserve** [1] - 229:5
**design** [1] - 166:18
**designed** [17] - 18:8, 18:19, 43:21, 64:22, 170:16, 194:25, 195:2, 195:4, 222:1, 234:6, 234:8, 234:10, 234:22, 234:23, 234:24, 235:4, 242:3
**despite** [2] - 104:3, 126:20
**destination** [1] - 180:3
**destroy** [1] - 52:22
**destroyed** [5] - 52:25, 53:16, 53:20, 57:3, 157:20
**detachment** [2] - 109:5, 109:7
**detail** [2] - 72:22, 170:20
**detained** [3] - 230:15, 240:18, 242:24
**detainee** [1] - 136:8
**detainees** [13] - 114:12, 128:20, 130:21, 131:5, 131:24, 133:11, 136:14, 155:13, 230:18, 230:25, 265:6, 265:7, 320:3
**detect** [13] - 202:18, 202:20, 202:23,

242:1, 242:3, 246:1, 247:4, 283:8, 284:14, 294:22, 307:9, 307:12
**detected** [3] - 20:11, 258:15, 279:22
**detecting** [3] - 190:3, 205:5, 283:10
**Detection** [2] - 200:17, 202:15
**detection** [13] - 195:18, 198:1, 198:17, 200:12, 202:16, 202:17, 206:19, 277:2, 283:6, 283:15, 283:24, 284:13, 295:21
**Detection's** [1] - 233:19
**detector** [2] - 189:20, 204:17
**detention** [1] - 161:12
**determination** [2] - 9:25, 127:21
**determine** [11] - 126:13, 128:6, 131:14, 228:9, 255:7, 280:11, 284:22, 297:25, 332:22, 332:24, 335:1
**determined** [5] - 8:13, 8:15, 9:23, 137:15, 218:11
**determines** [1] - 86:8
**determining** [1] - 226:10
**developed** [1] - 270:19
**device** [31] - 122:3, 187:23, 188:3, 188:18, 200:17, 258:11, 270:21, 322:5, 323:1, 323:11, 323:12, 326:19, 333:15, 333:17, 334:13, 336:11, 337:5, 339:4, 341:8, 341:16, 342:8, 342:11, 342:20, 343:21, 344:18, 345:10, 345:14, 347:2, 347:16, 349:22, 351:18
**devices** [4] - 155:2, 339:25, 340:23, 341:1
**diagnosing** [1] -

130:20
**diametrically** [1] - 43:6
**die** [1] - 114:24
**DIEGO** [1] - 2:7
**diesel** [2] - 63:12, 259:7
**differ** [1] - 348:5
**difference** [8] - 16:20, 84:16, 222:7, 231:19, 231:21, 232:3, 307:1, 310:13
**different** [52] - 13:3, 33:5, 57:8, 57:12, 57:18, 58:10, 63:9, 65:4, 82:21, 93:8, 103:22, 113:10, 125:2, 125:3, 132:5, 132:7, 139:18, 149:17, 153:10, 185:13, 198:13, 204:20, 208:6, 214:17, 214:21, 216:11, 219:21, 228:4, 259:9, 261:16, 269:15, 271:10, 271:12, 276:7, 276:14, 286:23, 289:3, 290:8, 304:9, 306:25, 307:10, 320:16, 322:19, 342:13, 343:3, 345:16, 347:22, 349:8, 349:9
**different-sized** [1] - 58:10
**differentiate** [1] - 32:12
**differently** [1] - 57:12
**difficult** [7] - 57:15, 166:13, 166:14, 169:13, 252:11, 300:12, 346:4
**difficulties** [1] - 6:19
**digital** [13] - 72:13, 72:15, 72:16, 72:18, 72:21, 73:5, 103:12, 338:23, 338:24, 339:1, 339:18, 339:19, 340:19
**digits** [2] - 241:3, 241:9
**dimensions** [1] - 125:1
**dire** [2] - 304:24, 305:11
**Dire** [1] - 4:12
**DIRE** [1] - 305:2
**DIRECT** [8] - 11:19,

105:3, 196:22, 268:7, 302:3, 305:15, 317:21, 338:14
**Direct** [8] - 3:6, 3:13, 3:19, 4:6, 4:12, 4:13, 4:16, 4:22
**direct** [8] - 13:16, 15:6, 51:23, 65:2, 168:24, 248:6, 261:5, 331:25
**directed** [1] - 143:9
**Directed** [1] - 6:9
**direction** [3] - 17:8, 79:14, 202:8
**directly** [4] - 13:25, 122:16, 127:4, 298:6
**dirt** [1] - 226:2
**dirty** [2] - 203:16, 226:1
**disable** [2] - 110:2, 110:5
**disabling** [4] - 18:22, 45:6, 45:8, 45:15
**disappear** [1] - 277:16
**discovery** [3] - 102:3, 102:8, 330:10
**discretion** [2] - 99:10, 99:15
**discuss** [1] - 238:15
**discussed** [6] - 61:24, 62:3, 62:18, 65:1, 245:17, 261:5
**discussion** [3] - 9:10, 9:16, 144:24
**disease** [2] - 161:1, 161:2
**disk** [1] - 102:19
**disks** [1] - 169:22
**Disney** [1] - 222:1
**dispatch** [1] - 111:12
**dispatched** [3] - 109:21, 141:21, 146:19
**dispo** [1] - 137:19
**disposition** [5] - 137:8, 138:14, 139:3, 152:3, 178:9
**disprove** [3] - 91:4, 91:7, 91:25
**dissolved** [1] - 306:19
**distance** [5] - 14:20, 43:24, 43:25, 108:5, 158:17
**distinct** [1] - 19:16
**distinctive** [1] - 212:1
**distinguishes** [1] - 310:12
**distort** [1] - 187:17
**DISTRICT** [3] - 1:1,

1:1, 1:15

**District** [11] - 2:17, 105:20, 105:21, 128:13, 137:5, 145:7, 145:18, 181:5, 181:7, 338:22, 355:12

**district** [1] - 19:25

**disturb** [2] - 345:14, 349:12

**division** [1] - 318:6

**DNA** [3] - 90:10, 180:22, 316:7

**DO** [1] - 2:8

**doctor** [8] - 129:16, 130:16, 131:9, 131:10, 131:11, 131:13, 131:17, 257:25

**document** [21] - 6:23, 53:22, 54:9, 85:17, 85:18, 86:3, 86:6, 86:8, 89:10, 91:17, 91:25, 92:3, 92:5, 128:8, 248:7, 273:15, 337:17, 348:18, 351:18, 352:6

**documentation** [2] - 326:13, 326:16

**documented** [1] - 131:19

**documents** [22] - 8:5, 53:25, 54:10, 54:12, 55:21, 55:24, 56:3, 56:15, 56:18, 56:21, 56:23, 184:25, 272:18, 323:19, 323:21, 324:11, 324:17, 327:2, 337:2, 337:3, 348:20, 350:2

**dog** [2] - 197:18

**dollar** [3] - 294:13, 295:1, 295:10

**dome** [2] - 114:22, 177:24

**domestic** [1] - 324:15

**done** [46] - 35:2, 60:5, 72:19, 80:1, 90:15, 103:24, 105:20, 126:23, 126:24, 127:21, 128:23, 130:13, 130:20, 136:11, 144:11, 145:2, 150:24, 152:2, 153:2, 153:9, 153:11, 171:2, 171:10, 171:11, 171:12, 179:15,

184:21, 200:12, 217:5, 224:3, 227:25, 233:10, 234:1, 234:4, 258:7, 261:19, 261:20, 261:23, 270:18, 277:10, 281:10, 311:2, 312:24, 328:8, 353:20

**dot** [2] - 345:19, 345:21

**dots** [1] - 347:19

**double** [2] - 210:24, 345:23

**double-click** [1] - 345:23

**dovetail** [1] - 354:22

**down** [71] - 13:10, 20:12, 20:15, 28:2, 32:22, 42:11, 46:10, 46:12, 46:13, 54:20, 83:8, 83:13, 88:21, 89:2, 92:4, 94:19, 101:8, 107:12, 116:6, 117:1, 126:17, 127:15, 130:5, 134:15, 144:7, 144:10, 144:17, 147:10, 151:23, 154:12, 154:14, 156:22, 157:1, 157:2, 157:3, 163:8, 165:17, 165:21, 170:21, 171:14, 174:1, 183:3, 185:15, 187:3, 195:25, 198:10, 198:21, 198:24, 217:25, 225:16, 236:4, 267:16, 271:5, 271:6, 271:14, 282:23, 283:18, 286:15, 289:4, 290:24, 306:11, 316:18, 318:25, 319:6, 319:18, 321:6, 321:9, 325:21, 332:9, 337:21, 353:12

**download** [4] - 326:17, 345:4, 345:10, 349:2

**downloaded** [1] - 236:15

**downloads** [2] - 347:1, 350:5

**Dr** [2] - 293:11, 293:13

**draft** [5] - 193:11, 193:13, 193:14,

193:18, 193:20

**drag** [1] - 345:24

**drag-and-drop** [1] - 345:24

**drank** [1] - 235:8

**drawing** [1] - 39:7

**drawn** [2] - 26:13, 47:4

**drenched** [2] - 148:17, 192:16

**drink** [1] - 234:24

**drive** [1] - 63:16

**driven** [1] - 65:7

**driver** [1] - 67:25

**drives** [1] - 340:9

**driving** [1] - 64:23

**drop** [3] - 137:12, 195:14, 345:24

**drop-off** [1] - 195:14

**dropping** [1] - 60:16

**drown** [1] - 221:2

**drowned** [3] - 43:1, 43:4, 43:8

**Drug** [3] - 128:7, 268:15, 302:9

**drug** [13] - 145:11, 145:12, 145:13, 279:22, 283:12, 292:1, 292:2, 292:4, 295:14, 298:3, 303:18, 303:24, 352:23

**drugs** [16] - 74:14, 90:13, 91:14, 91:17, 139:6, 140:17, 146:2, 146:7, 151:8, 179:2, 250:21, 269:25, 275:13, 284:24, 299:12, 303:25

**drums** [6] - 25:4, 35:12, 68:23, 70:1, 70:8, 71:1

**dry** [3] - 192:24, 272:15, 287:17

**drying** [2] - 289:6, 289:9

**DT** [1] - 202:15

**dual** [5] - 119:16, 153:15, 202:16, 202:17

**dual-point** [1] - 153:15

**duct** [10] - 120:14, 121:4, 121:14, 121:15, 166:25, 167:2, 167:4, 177:11, 177:12, 177:13

**duct-tape** [7] - 121:14, 121:15, 167:2,

167:4, 177:11, 177:12, 177:13

**duct-taped** [1] - 166:25

**due** [1] - 25:12

**dumping** [1] - 40:22

**durable** [1] - 271:19

**duration** [2] - 146:11, 296:2

**during** [22] - 8:14, 9:20, 29:18, 41:7, 43:18, 46:1, 51:16, 51:23, 66:20, 99:8, 146:15, 219:5, 219:21, 225:14, 229:11, 234:11, 246:19, 260:15, 280:3, 319:20, 329:2

**duties** [9] - 52:2, 55:5, 106:9, 269:2, 302:11, 318:14, 318:19, 340:2, 340:6

**duty** [4] - 15:9, 51:24, 262:25, 269:1

---

**E**

**e-mail** [3] - 325:15, 326:1

**E-R-R** [1] - 268:3

**E-S** [1] - 104:24

**early** [1] - 161:14

**Earth** [10] - 345:21, 345:22, 345:24, 346:2, 346:19, 346:22, 348:25, 349:15, 350:22, 351:6

**ease** [2] - 46:13, 348:8

**easier** [2] - 322:1, 331:3

**easily** [1] - 30:6

**East** [2] - 1:22, 171:14

**east/west** [1] - 17:10

**Eastern** [7] - 15:17, 15:18, 76:21, 77:14, 98:7, 107:9, 107:10, 134:18, 136:23, 139:21, 140:8, 140:9, 161:16, 161:17, 192:1, 298:11, 352:23

**eastern** [1] - 154:22

**easy** [3] - 24:25, 99:14, 285:19

**eaten** [1] - 185:25, 186:18

**Ecuador** [4] - 184:23, 185:8, 185:17, 185:21

**edge** [2] - 151:13, 295:23

**editorialize** [1] - 207:5

**education** [2] - 339:21, 340:1

**educational** [5] - 105:23, 268:19, 302:14, 304:25, 305:4

**effect** [1] - 330:19

**effective** [1] - 283:4

**effects** [4] - 130:3, 130:7, 153:7, 276:7

**eight** [22] - 31:16, 32:10, 33:1, 34:23, 96:23, 114:6, 114:7, 114:8, 114:9, 166:22, 187:21, 203:24, 215:9, 229:13, 229:17, 239:6, 239:23, 240:1, 240:9, 269:13

**either** [26] - 10:23, 34:5, 57:20, 71:12, 75:21, 87:17, 88:1, 89:14, 90:17, 94:6, 119:24, 139:4, 149:3, 180:16, 203:8, 213:25, 214:1, 237:19, 239:14, 251:11, 253:1, 253:5, 263:4, 280:10, 331:11

**electrical** [5] - 120:14, 177:12, 288:23, 288:24, 307:3

**electronic** [9] - 122:3, 339:3, 339:25, 340:6, 340:11, 340:23, 341:1, 342:2, 343:2

**electronics** [1] - 179:15

**element** [4] - 8:13, 127:12, 127:15, 149:6

**elements** [3] - 6:22, 6:24, 280:9

**elevate** [1] - 304:19

**Eleventh** [2] - 7:2

**eliminate** [1] - 299:13

**ELIZABETH** [3] - 4:11, 301:23, 302:1

**Elizabeth** [3] - 301:14, 301:23, 304:23

**Elmo** [29] - 15:3, 16:1, 22:3, 22:16, 35:8, 37:13, 37:17, 39:1, 39:24, 40:3, 40:4, 40:5, 40:7, 40:8,

40:9, 95:5, 95:6, 95:14, 96:15, 118:23, 124:6, 193:22, 209:25, 254:11, 273:14, 322:1, 322:2, 325:11, 347:12

**emanating** [1] - 211:23

**embarrass** [1] - 238:6

**employ** [9] - 12:24, 13:3, 17:20, 18:2, 18:4, 31:15, 45:9, 45:17, 51:17

**employed** [1] - 268:16

**employment** [1] - 19:7

**empty** [1] - 69:19

**en** [1] - 29:17

**enable** [2] - 144:19, 228:9

**Encinosa** [4] - 3:10, 3:16, 3:23, 4:19

**ENCINOSA** [32] - 2:11, 83:23, 90:19, 162:13, 162:22, 178:25, 181:2, 182:15, 185:3, 185:5, 186:9, 186:13, 186:15, 186:19, 189:10, 254:7, 259:1, 261:8, 262:19, 262:21, 263:16, 263:17, 264:8, 264:14, 264:16, 265:20, 266:5, 296:7, 316:15, 332:19, 334:16, 354:1

**enclosed** [1] - 183:2

**encounter** [5] - 46:15, 109:20, 220:24, 280:18, 340:9

**encounters** [1] - 181:25

**encourage** [1] - 44:24

**end** [11] - 23:21, 119:17, 120:16, 121:4, 135:8, 273:4, 274:12, 295:21, 301:4, 310:25, 351:8

**endanger** [1] - 168:3

**ended** [3] - 75:13, 113:13, 337:5

**endurance** [1] - 107:24

**Enforcement** [4] - 128:8, 198:15, 268:15, 302:9

**enforcement** [23] - 29:24, 30:1, 51:21,

52:3, 52:24, 55:6, 79:15, 79:21, 84:14, 84:15, 99:11, 105:17, 106:17, 109:6, 132:10, 197:15, 198:12, 199:5, 199:6, 199:21, 220:16, 236:22, 339:12

**engine** [14] - 18:12, 18:14, 33:10, 33:11, 33:12, 33:13, 33:14, 42:25, 45:4, 65:18, 65:20, 66:9, 79:9, 156:9

**engineer** [5] - 47:2, 57:20, 63:13, 64:24, 158:23

**engines** [26] - 18:13, 18:21, 18:22, 22:2, 30:4, 33:15, 36:19, 36:20, 36:24, 37:18, 37:25, 45:21, 48:1, 53:15, 54:18, 58:7, 58:10, 63:12, 65:16, 66:6, 66:7, 82:20, 82:21, 88:16, 156:8, 215:1

**Enhanced** [2] - 197:25, 198:2

**enjoying** [1] - 170:7

**ensign** [1] - 110:11

**ensure** [11] - 108:13, 109:14, 124:1, 124:16, 136:1, 141:3, 153:3, 166:20, 170:17, 317:7, 342:9

**ensures** [1] - 129:8

**ensuring** [1] - 168:9

**entail** [2] - 269:1, 269:2

**enter** [2] - 181:19, 233:15

**entered** [6] - 104:12, 196:7, 300:22, 301:1, 322:3, 343:13

**entering** [1] - 181:18

**entire** [13] - 72:18, 98:23, 112:21, 154:24, 161:6, 170:16, 231:2, 304:16, 306:4, 309:8, 309:11, 311:8

**entirely** [2] - 10:9, 10:16

**entitled** [2] - 10:4, 355:8

**envelope** [1] - 28:22

**environment** [4] -

201:16, 201:24, 282:3, 293:6

**environmental** [1] - 145:9

**equal** [3] - 71:10, 71:12, 280:25

**equally** [1] - 71:11

**equals** [1] - 252:10

**equip** [2] - 106:14

**equipment** [16] - 14:22, 26:20, 26:22, 26:24, 27:9, 27:12, 27:18, 27:20, 29:25, 36:3, 36:7, 106:15, 120:2, 133:16, 151:10, 174:9

**equipped** [1] - 112:5

**equipping** [1] - 63:8

**equivalent** [1] - 328:19

**error** [2] - 7:22, 317:2

**es** [1] - 239:22

**escape** [6] - 129:9, 155:5, 206:19, 226:17, 292:23, 293:2

**escorts** [1] - 164:19

**especially** [1] - 9:2

**ESQ** [6] - 2:4, 2:5, 2:7, 2:8, 2:10, 2:11

**essential** [1] - 6:22

**essentially** [9] - 200:19, 201:25, 204:25, 206:24, 207:2, 209:22, 225:8, 286:2, 325:21

**estimate** [7] - 67:19, 69:9, 71:23, 210:17, 210:20, 210:21, 299:20

**et** [6] - 29:2, 32:23, 60:22, 76:7, 307:6

**evaluation** [3] - 130:11, 130:15, 269:16

**evening** [2] - 175:22, 338:17

**event** [1] - 136:17

**eventually** [3] - 85:12, 160:22, 206:9

**Everglades** [5] - 318:22, 320:20, 320:21, 321:2

**everyday** [2] - 293:24, 340:13

**everywhere** [4] - 25:4, 25:5, 71:8, 286:20

**evidence** [122] - 10:25, 15:4, 22:3, 22:17, 28:24, 29:10, 29:12,

30:5, 30:8, 30:10, 30:12, 30:16, 37:2, 37:5, 37:18, 39:13, 39:16, 51:25, 52:4, 52:9, 52:14, 54:24, 72:17, 73:21, 74:3, 77:17, 84:16, 85:2, 85:9, 86:13, 89:8, 90:2, 91:1, 91:3, 94:3, 94:4, 95:6, 101:19, 101:23, 102:18, 116:17, 116:20, 118:16, 118:21, 120:4, 121:18, 122:13, 123:12, 123:14, 123:18, 124:20, 167:23, 170:1, 170:13, 170:21, 177:19, 177:24, 189:5, 195:23, 205:21, 205:24, 206:18, 209:25, 226:17, 238:18, 238:22, 254:12, 256:4, 256:6, 266:12, 269:2, 269:25, 270:2, 270:3, 271:17, 271:18, 271:23, 271:25, 272:3, 272:4, 272:7, 272:13, 273:14, 276:22, 277:18, 277:19, 278:17, 278:20, 279:21, 280:17, 286:23, 286:24, 287:4, 287:8, 287:9, 287:13, 289:18, 289:23, 292:17, 295:25, 303:10, 303:21, 313:2, 313:20, 313:22, 314:22, 315:21, 321:19, 322:3, 324:2, 324:5, 330:18, 330:19, 330:20, 331:5, 331:7, 331:10, 331:20, 335:21, 344:13, 347:5, 347:9

**EVIDENCE** [2] - 3:3, 4:3

**evidenced** [1] - 351:6

**evident** [2] - 250:12, 250:13

**evidentiary** [2] - 180:5, 344:13

**exact** [11] - 15:20,

137:21, 151:17, 162:18, 200:18, 203:18, 205:19, 242:16, 242:20, 278:8, 351:12

**exactly** [15] - 15:16, 59:16, 71:22, 76:9, 98:3, 132:24, 160:14, 170:9, 171:11, 185:20, 191:2, 201:5, 250:24, 258:2, 343:1

**exam** [1] - 205:18

**examination** [8] - 51:24, 102:1, 168:25, 248:6, 261:5, 297:6, 299:25, 341:24

**EXAMINATION** [48] - 11:19, 40:13, 50:21, 55:17, 61:11, 67:3, 74:11, 83:22, 90:22, 105:3, 142:18, 155:21, 164:10, 167:12, 168:20, 170:3, 181:1, 189:12, 196:22, 212:7, 229:2, 231:6, 238:7, 247:13, 254:9, 261:9, 262:20, 268:7, 279:5, 287:21, 290:14, 291:17, 293:9, 296:9, 302:3, 305:2, 305:15, 315:17, 316:4, 317:21, 327:21, 329:7, 329:15, 330:4, 331:15, 332:18, 334:18, 338:14

**Examination** [48] - 3:6, 3:7, 3:7, 3:8, 3:8, 3:9, 3:9, 3:10, 3:10, 3:13, 3:13, 3:14, 3:14, 3:15, 3:15, 3:16, 3:16, 3:17, 3:19, 3:20, 3:20, 3:21, 3:21, 3:22, 3:22, 3:23, 3:23, 4:6, 4:7, 4:7, 4:8, 4:8, 4:9, 4:9, 4:12, 4:12, 4:13, 4:13, 4:14, 4:16, 4:17, 4:17, 4:18, 4:18, 4:19, 4:19, 4:20, 4:22

**examine** [3] - 7:15, 7:23, 245:21

**examined** [4] - 90:12,

148:20, 150:2, 339:24
**examiner** [5] - 338:23, 338:25, 339:1, 339:20, 349:16
**example** [20] - 31:15, 53:3, 60:21, 60:23, 64:7, 76:4, 204:19, 214:23, 234:23, 257:21, 270:1, 270:5, 271:4, 275:3, 285:19, 287:7, 289:12, 297:16, 307:17, 351:22
**examples** [1] - 215:9
**Excel** [6] - 249:2, 255:8, 255:10, 255:11, 255:23, 256:1
**except** [1] - 314:17
**exception** [4] - 42:15, 42:20, 46:25, 47:9
**excerpt** [1] - 355:7
**excessive** [2] - 10:18, 10:23
**exchange** [7] - 26:16, 271:24, 272:3, 272:4, 272:11, 290:24, 295:9
**exchanged** [4] - 277:18, 291:8, 292:17, 293:1
**excuse** [9] - 77:8, 91:22, 129:2, 138:15, 138:16, 153:18, 157:10, 175:22, 251:7
**excused** [6] - 101:20, 196:1, 267:17, 299:2, 316:19, 337:23
**exhibit** [15] - 5:4, 27:23, 166:11, 169:17, 169:19, 205:11, 205:20, 275:22, 276:17, 303:20, 313:3, 341:7, 346:23, 347:18, 348:22
**Exhibit** [103] - 5:5, 5:9, 5:10, 5:11, 5:12, 5:13, 5:14, 5:15, 15:3, 16:1, 22:3, 22:5, 22:16, 23:3, 28:13, 28:16, 29:3, 29:10, 29:12, 35:8, 36:15, 37:2, 37:5, 37:12, 37:13, 37:17, 39:1, 39:2, 40:3, 40:4, 40:5, 40:7,

40:8, 40:9, 70:15, 71:15, 72:6, 73:5, 77:17, 80:6, 84:1, 87:9, 88:21, 95:5, 98:13, 115:24, 116:7, 116:17, 116:20, 117:2, 120:10, 120:11, 121:24, 122:21, 123:1, 123:14, 124:19, 124:21, 149:10, 151:4, 160:4, 162:7, 169:22, 169:23, 173:15, 193:22, 205:9, 205:24, 209:5, 210:1, 210:3, 214:24, 215:2, 230:1, 230:2, 230:6, 254:12, 255:20, 255:24, 256:4, 256:6, 265:22, 273:17, 273:20, 274:16, 278:3, 278:20, 308:15, 308:18, 309:14, 313:12, 313:22, 321:25, 322:2, 324:2, 324:5, 325:10, 328:12, 341:4, 346:13, 346:16, 347:9, 347:11
**exhibits** [8] - 39:8, 39:19, 102:9, 102:13, 102:14, 103:16, 302:12
**EXHIBITS** [2] - 5:3, 5:18
**Exhibits** [13] - 5:6, 5:7, 5:8, 5:19, 38:18, 38:20, 39:7, 39:12, 39:16, 39:23, 118:15, 118:21, 169:25
**existed** [2] - 86:1, 335:20
**exists** [1] - 331:24
**exit** [2] - 129:4, 307:2
**exited** [4] - 101:13, 196:5, 299:5, 353:11
**exonerate** [1] - 30:12
**expect** [6] - 109:20, 144:10, 287:9, 327:8, 328:19, 330:21
**expected** [1] - 334:14
**expensive** [3] - 63:6, 63:7, 94:24
**experience** [22] - 58:9,

83:7, 100:21, 115:5, 146:3, 146:5, 151:22, 155:16, 187:3, 209:1, 212:23, 214:9, 215:7, 216:7, 216:11, 227:14, 228:3, 228:5, 232:22, 247:7, 252:5, 268:19
**experienced** [2] - 12:6, 161:2
**expert** [12] - 58:24, 85:2, 90:11, 188:1, 245:14, 269:10, 302:24, 304:20, 304:23, 305:13, 327:10, 340:18
**expertise** [1] - 231:24
**experts** [2] - 124:1, 160:2
**explain** [27] - 13:11, 14:12, 105:23, 108:8, 109:23, 113:8, 114:20, 117:12, 120:11, 120:19, 124:25, 127:9, 132:4, 132:24, 193:13, 203:10, 204:5, 214:19, 217:14, 257:19, 269:20, 271:1, 271:3, 288:5, 310:6, 338:24, 347:21
**explained** [5] - 30:6, 132:23, 198:8, 310:18, 354:20
**explosive** [4] - 197:18, 202:21, 284:24, 294:3
**explosives** [7] - 198:1, 202:18, 226:18, 270:24, 293:19, 294:1, 296:19
**exposed** [10] - 133:4, 281:7, 281:12, 281:15, 281:16, 288:25, 289:9, 290:2, 296:12, 297:25
**exposure** [4] - 282:5, 282:12, 343:24, 354:7
**extended** [2] - 286:25, 287:2
**extensive** [1] - 112:21
**extent** [1] - 323:17
**exterior** [2] - 110:9, 120:15

**extract** [2] - 339:3, 342:14
**extracted** [1] - 345:25
**extraction** [5] - 326:18, 349:14, 349:23, 352:13, 352:25
**extractions** [1] - 340:19
**extrapolates** [1] - 72:19
**extremely** [3] - 24:2, 294:21, 295:11
**eye** [4] - 13:19, 113:4, 158:15, 270:5
**eyes** [8] - 17:11, 19:9, 19:15, 26:10, 43:15, 96:17, 242:5, 249:1

---

**F**

**fabric** [2] - 34:8, 192:20
**facial** [2] - 24:23, 97:5
**facilitate** [1] - 171:6
**facilities** [1] - 136:19
**facility** [1] - 134:22
**facing** [2] - 43:7
**fact** [26] - 42:11, 42:14, 51:23, 52:25, 81:2, 81:18, 123:8, 136:13, 144:19, 213:19, 229:21, 250:10, 278:8, 278:25, 285:14, 288:18, 289:6, 289:21, 296:21, 325:3, 330:21, 330:22, 331:23, 332:10, 332:23, 332:24
**factors** [7] - 25:3, 272:12, 272:14, 286:23, 290:8, 291:1, 293:6
**factory** [2] - 233:10, 297:20
**FAD** [1] - 174:6
**fad** [1] - 210:5
**fair** [20] - 44:10, 67:21, 78:25, 97:23, 121:12, 140:10, 140:12, 144:3, 150:15, 170:18, 176:15, 177:4, 192:23, 193:10, 221:10, 238:10, 275:16, 288:21, 343:24, 349:11
**fairly** [2] - 118:12,

278:13
**fairness** [1] - 264:6
**fall** [8] - 25:11, 82:9, 221:2, 221:13, 286:20, 286:21
**falling** [1] - 231:22
**falls** [1] - 119:24
**false** [3] - 6:9, 213:6, 293:21
**familiar** [8] - 63:15, 131:2, 133:1, 133:22, 133:24, 212:2, 225:6, 258:19
**familiarity** [3] - 270:6, 270:14, 270:17
**family** [1] - 226:19
**fantail** [5] - 122:16, 126:22, 128:25, 155:10, 171:13
**far** [28] - 59:13, 67:13, 67:16, 76:23, 77:4, 98:3, 111:23, 124:13, 137:19, 150:9, 161:5, 161:20, 219:20, 227:2, 251:14, 257:18, 261:20, 276:7, 281:24, 288:24, 289:16, 290:21, 294:8, 296:2, 298:18, 323:16, 326:22, 327:12
**fast** [20] - 15:1, 44:7, 46:1, 63:4, 63:8, 63:18, 68:2, 82:23, 94:15, 94:20, 94:22, 145:24, 154:11, 156:11, 165:1, 165:2, 165:21, 165:24, 168:4, 290:19
**faster** [3] - 65:9, 108:4, 144:21
**father** [2] - 198:10, 237:3
**fatigue** [1] - 108:6
**fault** [1] - 159:10
**favorable** [1] - 171:15
**FDIN** [7] - 128:15, 132:8, 132:14, 132:15, 132:17, 176:24, 176:25
**features** [2] - 62:18, 341:19
**feces** [3] - 24:9, 80:12, 81:15
**Fed** [1] - 7:1
**fed** [2] - 136:18, 186:6
**Federal** [3] - 348:10,

348:11, 355:11
**federal** [1] - 101:1
**feed** [5] - 183:7,
183:10, 183:12,
186:5
**feet** [21] - 20:13, 22:1,
30:23, 46:3, 105:18,
125:14, 125:17,
138:2, 150:14,
150:19, 150:20,
150:23, 150:25,
156:2, 156:3,
166:22, 169:6,
169:8, 173:19
**feet-five** [1] - 125:14
**fell** [4] - 25:9, 82:2,
82:6, 82:18
**FERNANDO** [2] - 1:9,
2:8
**fertilizer** [2] - 293:25,
294:2
**few** [11] - 35:14, 35:15,
35:20, 51:9, 68:20,
68:21, 155:25,
287:25, 288:20,
352:1
**fewer** [1] - 299:10
**fiberglass** [2] - 16:23,
70:22
**fictitious** [4] - 326:6,
331:7, 334:21,
334:23
**field** [45] - 66:23,
66:24, 70:1, 111:13,
111:15, 112:10,
112:17, 112:21,
112:25, 113:5,
113:14, 114:16,
119:11, 120:15,
120:17, 120:20,
120:22, 124:22,
126:4, 126:6, 126:9,
146:10, 146:20,
147:3, 147:6,
147:13, 147:17,
148:1, 157:24,
157:25, 159:8,
160:2, 160:9,
160:18, 164:22,
166:4, 167:20,
172:5, 191:5,
216:19, 269:4,
269:18, 269:21,
302:24, 340:1
**fields** [2] - 229:19
**fifteen** [1] - 240:13
**fifty** [1] - 69:11
**file** [7] - 82:5, 131:22,
317:4, 345:19,
345:21, 348:25

**filled** [3] - 129:17,
159:11, 289:8
**fills** [1] - 157:22
**film** [2] - 72:14, 88:8
**filter** [1] - 289:8
**filthy** [3] - 24:2, 24:14,
58:19
**final** [3] - 180:3, 312:1,
353:24
**finalize** [1] - 354:5
**finally** [1] - 285:10
**finance** [1] - 106:6
**findings** [1] - 302:13
**fine** [3] - 10:22,
236:15, 243:23
**fingerprint** [4] -
178:18, 179:21,
180:19, 288:6
**fingerprinting** [5] -
288:3, 288:5, 288:6,
288:10, 288:15
**fingerprints** [12] -
90:4, 167:6, 177:22,
178:3, 179:18,
180:9, 180:10,
180:16, 191:15,
191:17, 315:22,
316:6
**finish** [3] - 251:8,
353:5, 354:4
**finished** [3] - 33:21,
75:12, 91:11
**fire** [5] - 45:7, 45:8,
45:13, 45:15, 263:1
**fireman** [2] - 197:6
**first** [51] - 9:21, 17:12,
18:23, 19:3, 36:5,
40:18, 41:7, 41:25,
51:11, 74:13,
108:10, 108:24,
112:19, 114:8,
114:9, 114:11,
125:23, 128:22,
128:23, 141:21,
145:1, 145:6,
152:13, 153:12,
155:12, 162:17,
174:23, 182:21,
197:5, 197:8,
197:18, 230:2,
236:19, 237:8,
237:10, 247:15,
247:17, 248:18,
256:12, 260:15,
267:2, 267:9,
273:15, 274:3,
299:23, 303:16,
303:17, 311:6,
342:3, 342:5, 346:21
**fish** [6] - 13:22,

194:25, 195:6, 210:5
**fisheries** [2] - 105:20,
145:9
**fishermen** [1] - 41:22
**fishing** [13] - 36:3,
115:1, 175:23,
175:25, 176:3,
176:9, 176:15,
176:21, 177:2,
191:19, 191:20,
192:8, 210:5
**fit** [3] - 134:1, 168:6,
309:4
**fitted** [1] - 166:3
**FIU** [1] - 271:22
**five** [29] - 35:16,
38:12, 64:25, 66:2,
119:10, 125:14,
140:2, 154:15,
158:21, 158:22,
158:23, 158:24,
169:6, 169:8, 193:4,
198:6, 198:19,
203:3, 220:2, 220:6,
220:7, 243:12,
243:17, 244:4,
277:10, 280:4,
294:13
**five-and-a-half** [2] -
169:6, 169:8
**five-gallon** [1] - 35:16
**fix** [1] - 110:24
**fixed** [2] - 70:20, 71:1
**flag** [5] - 19:13, 78:19,
79:1, 110:12
**flash** [5] - 18:4, 18:7,
44:19, 44:21
**flashlight** [1] - 144:2
**flat** [2] - 179:18,
179:19
**FLETC** [4] - 106:19,
127:14, 129:14,
237:2
**flex** [1] - 157:16
**flight** [3] - 228:21,
228:22, 353:23
**flip** [1] - 179:17
**float** [1] - 121:1
**floatation** [1] - 155:2
**floating** [11] - 114:22,
123:9, 147:4, 148:1,
179:5, 179:7,
190:25, 191:2,
191:8, 271:5
**floor** [8] - 82:3, 82:15,
117:3, 225:18,
226:3, 297:21,
313:25
**FLORIDA** [1] - 1:1
**Florida** [23] - 1:4,

1:23, 2:18, 138:7,
138:10, 141:12,
154:10, 163:13,
181:7, 181:8, 181:9,
197:5, 199:8,
268:16, 268:23,
268:24, 271:22,
302:10, 309:15,
338:21, 339:15,
340:24, 355:13
**flour** [2] - 200:25,
311:14
**flow** [1] - 151:19
**flowing** [1] - 44:8
**fly** [1] - 110:11
**flying** [1] - 79:7
**focus** [5] - 51:19,
54:2, 54:5, 54:8
**focused** [1] - 270:23
**focusing** [1] - 106:6
**foil** [11] - 117:9,
117:13, 117:14,
117:23, 123:19,
123:22, 123:25,
177:15, 187:1,
187:5, 187:16
**fold** [5] - 32:17, 34:1,
34:25, 49:21, 49:22
**folded** [1] - 133:25
**folks** [2] - 56:23, 232:9
**follow** [8] - 32:24,
70:15, 135:24,
137:3, 155:25,
287:25, 324:23,
335:8
**follow-up** [3] - 155:25,
287:25, 335:8
**following** [3] - 9:16,
78:24, 325:19
**follows** [9] - 9:10,
11:18, 105:2,
196:21, 268:6,
290:5, 302:2,
317:20, 338:13
**food** [7] - 35:24,
35:25, 135:17,
135:25, 183:7,
183:12, 183:14
**foot** [2] - 38:12, 329:2
**foot-six** [1] - 38:12
**footage** [1] - 18:25
**footing** [1] - 25:8
**FOR** [8] - 1:20, 2:2,
2:4, 2:5, 2:7, 2:8,
2:10, 2:11
**Force** [1] - 349:20
**force** [21] - 13:1, 13:2,
13:3, 17:21, 18:1,
19:20, 19:22, 20:3,
20:4, 20:5, 20:10,

20:15, 21:17, 51:15,
51:17, 66:18,
352:19, 352:20,
352:22, 352:23
**forced** [1] - 20:18
**foregoing** [1] - 355:6
**foreign** [1] - 78:16
**foremost** [1] - 155:9
**forensic** [31] - 268:5,
268:14, 268:22,
268:25, 269:8,
269:14, 271:21,
276:1, 302:10,
302:11, 302:15,
302:17, 302:25,
304:23, 305:5,
305:6, 307:16,
338:23, 338:24,
339:1, 339:2,
339:18, 339:20,
339:25, 340:19,
341:23, 342:12,
342:13, 344:22,
344:23, 349:16
**FORENSIC** [3] - 4:5,
4:11, 302:1
**forget** [1] - 351:11
**forgot** [3] - 156:9,
158:23, 282:8
**form** [9] - 51:3,
129:18, 129:19,
157:21, 274:20,
304:19, 307:5,
307:17, 353:17
**formally** [2] - 105:7,
338:18
**format** [4] - 345:20,
345:23, 346:2, 349:1
**former** [2] - 349:19,
352:14
**forms** [2] - 14:14,
132:5
**Fort** [8] - 1:23, 287:14,
318:7, 318:9, 321:9,
333:15, 336:11,
340:24
**forth** [4] - 54:4, 56:8,
86:19, 143:10
**forty** [1] - 269:13
**forty-eight** [1] -
269:13
**forward** [12] - 20:25,
33:13, 33:22, 43:7,
47:8, 70:24, 71:2,
71:5, 71:24, 72:1,
119:20, 119:23
**forwarded** [2] - 72:16,
72:17
**foundation** [1] - 194:3
**four** [21] - 20:4, 60:22,

139:18, 140:1,
140:3, 140:4, 140:5,
140:6, 140:7, 146:4,
150:23, 151:12,
154:15, 158:20,
158:23, 173:22,
211:18, 220:17,
339:14, 354:19
**FPR** [2] - 2:16, 355:11
**fragility** [1] - 276:21
**frame** [4] - 166:15,
166:23, 193:6, 337:3
**framework** [1] - 7:8
**France** [1] - 133:23
**FRANCIS** [1] - 1:20
**Franco** [3] - 84:7,
87:11, 87:15
**FRANCO** [2] - 1:10,
2:11
**free** [5] - 155:15,
345:4, 345:6, 345:8,
345:9
**freedom** [1] - 135:12
**freely** [1] - 134:5
**frequency** [4] - 14:15,
14:16, 14:18
**friend** [1] - 237:10
**friendly** [1] - 345:23
**front** [19] - 8:22,
12:10, 17:1, 18:5,
18:16, 18:17, 45:10,
48:1, 71:3, 71:10,
117:3, 118:5,
119:21, 129:25,
151:12, 175:18,
179:4, 346:16
**fuel** [38] - 14:21, 25:4,
25:6, 25:12, 30:4,
31:2, 35:12, 59:9,
59:11, 68:22, 68:23,
69:21, 70:7, 71:1,
82:2, 82:15, 82:18,
93:2, 93:14, 94:22,
95:19, 95:22, 166:2,
166:9, 212:4, 259:7,
259:8, 259:9,
263:22, 263:23,
264:9, 264:17,
264:23, 264:24,
265:1, 265:4
**full** [16] - 11:12, 29:23,
69:16, 69:19, 99:11,
104:22, 119:4,
119:5, 126:18,
166:1, 196:16,
268:2, 301:22,
317:14, 338:7,
344:11
**fully** [2] - 52:23, 183:2
**fun** [1] - 198:13

**function** [1] - 67:13
**functioning** [3] -
199:19, 261:1, 290:8
**functions** [1] - 220:21
**furtherance** [1] -
324:22
**future** [1] - 343:14

**G**

**GABRIEL** [2] - 1:7, 2:2
**Gabriel** [3] - 249:14,
256:12, 256:16
**Galapagos** [2] -
161:21, 161:23
**gallon** [2] - 35:16
**gallons** [1] - 69:12
**garbage** [2] - 290:10
**GARCIA** [2] - 1:7, 2:2
**Garcia** [11] - 249:9,
249:14, 250:1,
250:7, 256:13,
256:16, 328:14,
328:16, 329:2,
329:4, 354:21
**GARCIA-SOLAR** [2] -
1:7, 2:2
**Garcia-Solar** [7] -
249:14, 256:16,
328:14, 328:16,
329:2, 329:4, 354:21
**Garmin** [28] - 27:21,
29:4, 29:14, 37:8,
37:13, 52:16, 341:3,
341:8, 341:16,
342:11, 342:13,
342:24, 344:24,
344:25, 346:20,
347:1, 347:15,
348:17, 348:23,
349:3, 349:7, 349:9,
349:22, 350:6,
350:9, 350:14
**gas** [19] - 48:23,
48:25, 54:19, 88:12,
94:24, 95:1, 288:18,
306:6, 306:13,
307:2, 307:9, 308:1,
309:18, 309:23,
310:3, 310:4,
310:20, 311:4, 311:5
**gasoline** [16] - 31:2,
48:20, 49:5, 82:12,
87:18, 259:7, 262:3,
262:4, 262:10,
262:24, 263:18,
263:19, 263:20,
264:19, 277:3, 277:4
**gasoline's** [1] - 259:11
**gate** [1] - 183:2

**gathering** [2] - 79:22,
121:18
**gear** [2] - 109:24,
110:13
**general** [2] - 135:18,
328:13
**generally** [3] - 107:7,
139:16, 341:16
**generate** [1] - 311:21
**generated** [2] -
272:19, 278:24
**generates** [1] - 293:21
**generic** [1] - 221:19
**gentleman** [11] - 24:4,
27:24, 27:25, 28:6,
56:7, 72:11, 87:10,
88:4, 88:14, 119:20
**gentlemen** [21] - 9:18,
71:3, 105:8, 109:23,
113:8, 117:12,
118:24, 121:7,
123:21, 151:15,
236:7, 242:24,
244:1, 245:5, 245:9,
245:18, 248:22,
268:12, 318:1,
338:19, 353:10
**gentlemens** [2] -
182:17, 238:24
**geographic** [1] -
145:16
**geographical** [1] -
288:12
**geography** [1] - 162:8
**given** [24] - 20:5,
26:22, 29:2, 68:3,
97:12, 99:5, 102:7,
102:9, 111:17,
111:19, 121:11,
130:4, 131:25,
132:23, 133:9,
152:23, 160:22,
185:17, 315:9,
321:22, 321:23,
336:16, 349:22
**glare** [1] - 22:5
**glass** [4] - 286:19,
286:20, 306:20
**GLENDA** [2] - 2:16,
355:11
**GLENN** [1] - 2:2
**Global** [17] - 323:5,
323:8, 323:12,
323:18, 324:10,
326:12, 326:16,
330:23, 332:12,
332:15, 333:10,
333:12, 333:24,
334:9, 336:8,
343:17, 343:19

**global** [3] - 327:3,
327:5, 336:17
**globe** [2] - 140:8,
188:15
**glove** [10] - 32:17,
34:1, 34:5, 34:25,
49:13, 49:18, 49:21,
203:21, 223:25,
224:1
**gloves** [13] - 31:17,
32:3, 32:7, 32:10,
126:18, 174:23,
203:5, 203:13,
205:1, 223:10,
223:13, 223:23,
298:7
**GN** [1] - 109:4
**GN-II** [1] - 109:4
**go-fast** [1] - 145:24
**goal** [2] - 273:4,
274:12
**God** [8] - 11:9, 104:19,
154:11, 196:13,
267:24, 301:19,
317:11, 338:4
**Google** [10] - 345:21,
345:22, 345:24,
346:2, 346:19,
346:22, 348:25,
349:15, 350:22,
351:6
**GoPro** [12] - 18:25,
42:15, 42:18, 46:5,
51:9, 86:25, 87:4,
88:8, 112:6, 112:7,
112:8, 157:13
**GoPro's** [1] - 43:3
**Government** [34] -
6:25, 7:11, 29:9,
37:1, 39:1, 39:2,
39:11, 73:23, 74:6,
101:16, 101:19,
102:19, 102:20,
103:1, 104:14,
116:16, 118:15,
120:4, 123:11,
149:10, 172:19,
173:15, 214:23,
255:20, 256:3,
278:16, 299:6,
300:3, 301:2,
304:22, 313:20,
324:1, 328:12, 347:4
**GOVERNMENT** [1] -
1:20
**Government's** [99] -
15:3, 22:3, 22:5,
22:16, 23:3, 28:16,
29:3, 29:12, 35:8,
36:15, 37:2, 37:5,

37:12, 37:13, 37:17,
38:18, 38:20, 39:7,
39:12, 39:16, 39:23,
40:3, 40:4, 40:5,
40:7, 40:8, 40:9,
70:14, 71:15, 72:6,
73:5, 77:17, 80:5,
95:5, 98:13, 115:24,
116:7, 116:9,
116:17, 116:20,
117:2, 118:4,
118:21, 118:23,
120:10, 120:11,
120:17, 121:3,
121:24, 122:20,
123:1, 123:14,
123:18, 124:19,
124:21, 151:4,
190:23, 192:12,
193:22, 194:24,
205:9, 205:11,
205:20, 205:24,
209:5, 210:1, 210:3,
215:1, 230:1, 230:2,
254:11, 255:20,
255:24, 256:6,
265:22, 273:14,
273:17, 273:19,
273:22, 274:16,
278:1, 278:3,
278:20, 308:15,
308:18, 313:12,
313:14, 313:20,
313:22, 321:25,
324:2, 324:5,
325:10, 341:4,
346:13, 347:5,
347:9, 347:11,
348:22
**GOVERNMENT'S** [3] -
3:3, 4:3, 5:3
**Governments** [1] -
309:14
**GPS** [48] - 27:21, 28:7,
28:22, 29:4, 37:9,
37:14, 39:21, 40:1,
52:16, 61:1, 61:6,
84:2, 84:18, 85:25,
86:4, 91:7, 113:14,
114:17, 118:9,
120:5, 121:25,
122:19, 174:6,
321:19, 323:5,
323:15, 323:25,
327:6, 340:8, 341:3,
341:16, 342:6,
342:7, 342:9,
342:24, 343:2,
343:8, 343:17,
345:10, 345:12,
345:19, 347:23,

348:2, 348:11, 348:14, 349:3, 349:15, 351:18
**GPS's** [1] - 344:11
**GPX** [1] - 345:19
**grab** [3] - 31:16, 47:12, 341:14
**grade** [3] - 15:23, 15:24, 259:8
**GRADE** [2] - 3:12, 105:1
**Grade** [1] - 105:9
**graduated** [4] - 105:25, 106:1, 106:5, 106:21
**gram** [3] - 213:15, 285:20
**grams** [5] - 278:11, 278:12, 278:22, 304:1, 312:14
**grandmother's** [1] - 200:22
**graph** [4] - 307:14, 307:15, 307:19, 308:3
**grateful** [1] - 73:12
**gray** [2] - 16:12, 21:24
**great** [10] - 56:21, 96:19, 168:13, 190:11, 199:4, 199:9, 259:20, 259:22, 286:14, 327:19
**Great** [2] - 198:12, 198:13
**greater** [5] - 14:20, 33:3, 272:2, 292:16, 292:19
**greatest** [1] - 50:3
**green** [3] - 215:21, 259:8, 347:19
**green-looking** [1] - 347:19
**grind** [1] - 311:12
**grinding** [1] - 134:8
**gross** [3] - 210:20, 210:21, 303:22
**ground** [3] - 7:15, 125:17, 306:8
**grounded** [1] - 288:24
**grounds** [3] - 6:14, 6:15, 27:6
**group** [5] - 122:15, 136:7, 136:19, 161:5, 321:5
**guard** [1] - 245:4
**Guard** [100] - 12:1, 12:4, 15:13, 41:23, 55:5, 64:4, 73:7, 76:18, 76:21, 77:25,

78:17, 78:19, 78:20, 78:21, 79:1, 92:6, 93:7, 97:11, 97:14, 99:17, 105:10, 105:14, 105:15, 105:24, 106:3, 106:4, 107:1, 107:6, 107:20, 107:22, 108:3, 109:7, 110:7, 110:10, 110:11, 110:14, 110:15, 110:16, 111:9, 115:13, 119:8, 122:10, 125:19, 126:11, 128:1, 129:18, 131:22, 132:10, 132:12, 132:13, 132:20, 133:10, 134:23, 135:24, 137:24, 138:24, 139:15, 140:14, 141:9, 141:14, 145:24, 162:2, 170:16, 171:1, 172:3, 181:17, 189:16, 192:2, 192:13, 194:13, 196:9, 197:4, 197:9, 199:2, 199:10, 199:14, 202:13, 212:13, 220:21, 221:3, 221:5, 221:15, 243:5, 244:22, 277:13, 289:15, 300:5, 300:12, 300:13, 319:21, 319:24, 320:19, 337:25, 338:21, 339:5, 339:6, 339:8, 339:9, 352:16
**Guard's** [1] - 76:16
**guess** [13] - 20:15, 69:7, 84:24, 143:20, 146:23, 149:11, 153:20, 154:9, 176:23, 179:24, 220:9, 240:23, 284:1
**guessing** [1] - 333:7
**guesstimate** [1] - 219:22
**guiding** [1] - 112:19
**guilty** [2] - 90:8, 94:5
**Gulfport** [1] - 339:10
**gun** [2] - 125:10, 125:11
**gunner** [2] - 17:19, 17:22
**guy** [3] - 43:9, 87:11, 215:22

**guys** [39] - 18:8, 20:16, 20:24, 47:13, 47:19, 48:12, 93:21, 113:20, 124:8, 133:24, 143:4, 143:7, 150:19, 153:22, 154:16, 157:14, 172:14, 173:7, 195:10, 216:16, 218:3, 218:15, 219:25, 220:8, 221:11, 222:14, 222:23, 223:6, 224:4, 225:13, 229:21, 236:19, 237:9, 237:19, 259:24, 260:20, 300:12
**guys'** [1] - 212:11

# H

**H-I-G-G-I-N-S** [1] - 11:15
**Hadley** [29] - 6:12, 6:16, 6:21, 7:12, 22:9, 25:15, 25:16, 26:16, 47:2, 47:6, 48:6, 48:15, 53:23, 60:13, 62:7, 71:18, 71:19, 71:21, 75:1, 75:3, 75:4, 75:17, 75:20, 76:3, 79:15, 81:23, 88:23, 89:14
**Hadley's** [2] - 28:25, 79:22
**hailer** [1] - 78:20
**hailers** [1] - 94:14
**hair** [2] - 24:23, 97:5
**Haiti** [1] - 181:10
**half** [19] - 38:12, 56:10, 56:13, 56:14, 69:19, 114:2, 114:23, 148:7, 165:15, 165:16, 166:24, 169:6, 169:8, 172:7, 191:7, 191:8, 270:11, 320:14, 339:12
**HAM** [1] - 104:24
**HAMES** [2] - 3:12, 105:1
**Hames** [8] - 104:14, 104:23, 105:9, 155:23, 167:14, 170:5, 178:11, 189:14
**Hamilton** [5] - 63:15, 141:9, 141:10, 141:11, 320:19

**hammer** [1] - 154:12
**hammering** [6] - 144:10, 147:10, 154:14, 156:22, 164:16, 164:24
**Hampshire** [2] - 105:16, 145:8
**hand** [59] - 8:21, 8:24, 11:6, 29:4, 37:14, 43:12, 43:14, 52:16, 55:23, 84:2, 95:7, 95:8, 104:16, 126:1, 137:10, 138:24, 152:4, 162:16, 178:9, 196:10, 207:4, 207:8, 207:9, 208:15, 213:21, 214:1, 217:25, 218:5, 218:11, 226:9, 227:9, 227:15, 236:18, 239:12, 239:14, 239:15, 239:21, 239:24, 240:2, 242:2, 250:11, 267:21, 283:20, 288:7, 301:16, 308:8, 308:11, 317:8, 338:1, 340:23, 341:3, 341:8, 342:24, 347:16, 349:3, 349:22
**hand-delivered** [1] - 340:23
**hand-held** [12] - 29:4, 37:14, 52:16, 84:2, 162:16, 308:11, 341:3, 341:8, 342:24, 347:16, 349:3, 349:22
**handcuffed** [2] - 134:11, 134:12
**handcuffs** [2] - 12:25, 144:1, 157:16
**handed** [16] - 28:15, 36:14, 38:17, 52:17, 53:23, 56:3, 56:4, 56:8, 61:8, 85:18, 138:15, 138:19, 225:14, 255:23, 278:4, 308:14
**handgun** [2] - 109:25, 110:2
**handing** [3] - 54:9, 138:14, 217:24
**handle** [5] - 33:14, 81:21, 126:17, 126:20, 225:15
**handled** [8] - 49:13,

122:15, 214:15, 215:5, 237:23, 286:13, 294:18, 295:18
**handler** [1] - 197:19
**handlers** [1] - 197:18
**handles** [2] - 33:16, 214:24
**handling** [2] - 166:18, 294:15
**hands** [30] - 43:16, 58:16, 58:21, 85:4, 88:7, 122:12, 126:20, 174:24, 207:12, 207:14, 211:21, 222:14, 223:8, 223:9, 223:13, 223:15, 223:18, 226:13, 232:10, 236:9, 239:9, 239:19, 240:11, 254:13, 259:16, 280:10, 294:17, 294:25, 296:19
**handwriting** [4] - 209:6, 312:25, 313:4, 313:6
**handwriting's** [1] - 205:19
**handwritten** [4] - 208:11, 208:14, 209:12, 255:13
**hanger** [9] - 129:5, 133:5, 133:12, 135:4, 135:7, 135:8, 155:8, 161:6, 182:25
**hanging** [1] - 119:21
**hard** [15] - 95:14, 101:17, 102:19, 102:24, 124:6, 125:1, 169:11, 252:10, 253:15, 273:20, 283:19, 340:9, 345:5, 350:23
**harm** [2] - 26:11, 155:5
**hat** [1] - 71:15
**hatch** [1] - 225:18
**hazard** [5] - 52:23, 53:4, 69:7, 93:11, 93:12
**hazardous** [2] - 93:13, 263:4
**hazmat** [4] - 263:7, 263:18, 263:19
**head** [8] - 17:8, 88:8, 88:11, 125:7, 158:19, 169:1, 169:3, 239:3

**headed** [3] - 107:17, 350:24, 351:1
**heading** [7] - 137:11, 138:7, 139:22, 154:21, 162:3, 162:4, 162:5
**heads** [1] - 106:12
**Heady** [1] - 71:17
**health** [1] - 129:20
**hear** [8] - 26:16, 70:11, 154:7, 162:19, 249:10, 272:8, 332:3, 353:23
**heard** [7] - 43:22, 43:25, 44:4, 48:20, 123:25, 170:12, 279:13
**hearing** [2] - 10:11, 345:5
**hearsay** [9] - 6:14, 7:4, 7:14, 26:25, 27:15, 92:11, 115:2, 117:17, 230:21
**Heather** [2] - 349:19, 352:14
**heavier** [1] - 192:23
**heavy** [11] - 64:14, 113:22, 115:10, 115:11, 116:1, 117:11, 119:6, 171:16, 172:10, 192:14, 291:4
**heck** [1] - 228:15
**heel** [1] - 80:2
**height** [2] - 17:3, 173:20
**held** [17] - 7:2, 9:10, 9:17, 29:4, 37:14, 52:16, 84:2, 162:16, 177:25, 178:16, 308:11, 341:3, 341:8, 342:24, 347:16, 349:3, 349:22
**helicopter** [6] - 129:1, 133:12, 133:23, 133:25, 135:4, 135:5
**helm** [2] - 32:16, 33:14
**helmet** [2] - 71:17, 71:19
**helmets** [1] - 143:23
**helms** [3] - 33:10, 33:16, 50:5
**helo** [3] - 129:1, 155:8, 161:6
**help** [18] - 11:9, 30:1, 80:1, 91:7, 104:18, 184:25, 185:7, 185:24, 196:13, 221:17, 226:20,

248:25, 249:3, 267:24, 281:19, 301:19, 317:11, 338:4
**helps** [1] - 31:17
**hereby** [1] - 355:6
**heroin** [2] - 292:5, 292:6
**HF** [1] - 14:14
**hi** [5] - 61:4, 61:5, 196:25, 231:9, 262:23
**hidden** [2] - 189:22, 269:24
**hide** [1] - 276:25
**hiding** [1] - 102:6
**Higgins** [15] - 11:5, 11:14, 11:21, 12:1, 25:18, 28:15, 36:14, 38:17, 39:19, 39:23, 61:13, 74:13, 90:24, 103:7, 212:17
**HIGGINS** [2] - 3:5, 11:17
**high** [19] - 14:15, 14:18, 14:23, 38:6, 41:20, 58:15, 67:14, 105:25, 112:15, 173:21, 173:22, 173:23, 220:25, 241:3, 298:10, 298:16, 318:16
**higher** [9] - 158:16, 173:19, 222:10, 241:6, 241:11, 241:12, 241:14, 241:18, 241:19
**highest** [1] - 50:4
**highly** [1] - 296:3
**himself** [1] - 289:21
**hips** [1] - 38:11
**hired** [1] - 237:16
**historical** [1] - 322:24
**history** [4] - 129:17, 219:5, 219:6, 225:17
**hit** [1] - 307:3
**hits** [1] - 307:2
**hold** [14] - 13:22, 50:5, 80:17, 80:22, 80:25, 81:14, 83:3, 117:4, 137:3, 178:8, 186:11, 223:12, 302:15, 343:3
**holders** [1] - 210:5
**holding** [4] - 16:13, 46:2, 116:15, 292:18
**holstered** [3] - 21:21, 26:14, 26:15
**home** [10] - 137:6, 137:11, 154:21,

161:13, 187:8, 226:19, 260:18, 260:20, 344:25
**Homeland** [2] - 318:4, 336:5
**homogeneous** [2] - 311:9, 311:17
**homogenous** [1] - 306:9
**honestly** [2] - 114:5, 139:17
**Honor** [88] - 6:5, 6:17, 7:13, 8:8, 8:18, 8:24, 9:5, 11:2, 11:4, 27:1, 27:3, 28:1, 29:9, 36:9, 36:11, 37:1, 37:6, 37:9, 38:15, 39:11, 39:17, 40:10, 47:15, 58:3, 65:11, 73:19, 73:20, 77:11, 78:7, 81:8, 86:14, 91:9, 95:10, 99:23, 101:7, 101:25, 102:16, 102:25, 104:8, 115:20, 116:1, 116:23, 118:1, 123:15, 133:14, 142:15, 162:19, 169:10, 176:17, 178:21, 182:11, 185:3, 186:9, 192:3, 194:3, 205:25, 212:5, 220:11, 230:20, 231:23, 245:13, 252:12, 254:7, 255:19, 256:3, 256:7, 261:3, 261:8, 263:12, 264:14, 267:19, 277:23, 300:24, 301:13, 304:18, 304:22, 304:24, 305:10, 308:6, 308:8, 313:19, 313:23, 314:1, 314:12, 315:13, 315:16, 316:15, 316:17
**HONORABLE** [1] - 1:15
**hood** [1] - 133:3
**hook** [2] - 342:12, 344:22
**hooked** [3] - 122:14, 222:2, 344:20
**hooks** [1] - 17:1
**hope** [3] - 167:9, 179:9, 282:25
**hopefully** [2] - 104:3, 179:9

**hoping** [2] - 104:1, 144:6
**horizon** [29] - 14:5, 14:7, 14:11, 14:13, 14:17, 14:19, 14:23, 15:11, 16:3, 16:8, 42:10, 67:11, 67:13, 67:16, 67:18, 67:19, 68:1, 167:23, 192:13, 193:2, 195:4, 200:3, 229:23, 230:8, 230:22, 231:1, 260:6, 260:12
**horizons** [1] - 62:25
**horse** [1] - 296:11
**horsepower** [12] - 37:25, 38:2, 38:4, 53:18, 63:14, 64:6, 64:8, 64:9, 65:18, 65:20, 65:22, 82:21
**hot** [3] - 96:25, 141:4, 201:25
**hour** [28] - 63:22, 64:13, 64:21, 75:13, 75:17, 114:2, 148:7, 165:3, 165:4, 165:7, 165:15, 165:16, 165:21, 167:20, 172:7, 172:17, 191:7, 191:8, 223:4, 280:8, 293:4
**hour-and-a-half** [7] - 114:2, 148:7, 165:15, 165:16, 172:7, 191:7, 191:8
**hours** [11] - 30:19, 96:22, 98:24, 165:6, 223:4, 243:12, 244:4, 277:10, 279:14, 280:14, 281:6
**house** [1] - 133:10, 297:21, 302:20
**housekeeping** [1] - 103:24
**Hover** [1] - 199:25
**howdy** [1] - 212:10
**HSI** [6] - 4:15, 303:5, 313:17, 316:21, 317:19, 340:24
**hull** [8] - 16:11, 16:22, 16:23, 22:1, 33:12, 70:22, 105:16, 110:10
**human** [1] - 290:6
**humid** [1] - 272:15
**humidity** [2] - 289:2, 289:4
**hundred** [14] - 20:13,

23:10, 30:14, 46:18, 94:18, 107:25, 148:9, 228:6, 233:23, 283:18, 283:21, 295:11, 295:12, 352:6
**hundreds** [2] - 102:10, 102:11
**hungry** [6] - 183:15, 222:17, 237:15, 237:16, 237:25, 279:9
**hurry** [1] - 195:10
**hurt** [1] - 263:4
**hydrochloride** [2] - 310:13, 310:14
**hypothetical** [4] - 279:13, 279:24, 292:12, 296:12

**I**

**I-L-L-A-N-U-C-C-I** [1] - 317:17
**idea** [12] - 54:1, 69:11, 69:13, 69:21, 78:24, 81:12, 87:25, 152:7, 180:18, 186:25, 228:13, 316:12
**ideal** [6] - 298:4, 298:15, 298:19, 298:20, 298:22, 298:23
**identification** [17] - 28:16, 29:3, 29:25, 36:15, 37:2, 39:12, 55:25, 110:10, 123:2, 132:1, 132:5, 174:19, 174:20, 229:6, 231:11, 346:14, 346:17
**identified** [2] - 244:23, 249:2
**identifier** [1] - 210:5
**identify** [5] - 116:3, 116:7, 229:7, 245:3, 249:20
**identifying** [3] - 323:10, 341:19, 342:17
**IDs** [1] - 76:7
**if's** [1] - 78:25
**II** [34] - 16:4, 16:14, 16:16, 16:22, 108:17, 108:18, 108:19, 108:21, 109:1, 109:3, 109:4, 109:24, 110:6, 110:23, 113:18, 122:14, 142:23,

143:5, 150:13, 150:14, 150:15, 151:4, 153:17, 156:1, 156:3, 157:4, 170:10, 194:1, 197:18, 216:21, 220:15, 222:19, 243:20, 243:21

**lll** [1] - 108:19

**illness** [1] - 258:4

**illnesses** [1] - 258:1

**image** [5] - 72:16, 72:21, 73:5, 96:14, 279:7

**imagination** [1] - 214:20

**imagine** [3] - 54:8, 73:10, 285:25

**immediately** [4] - 12:4, 94:13, 112:22, 137:1

**implied** [2] - 221:16, 235:2

**imply** [1] - 191:20

**importance** [6] - 56:17, 56:21, 143:18, 350:7, 350:11, 351:11

**important** [10] - 85:24, 86:2, 127:17, 164:5, 212:20, 217:2, 217:4, 217:7, 265:7, 280:24

**impossible** [5] - 295:5, 295:6, 296:3, 325:21

**impregnated** [1] - 294:6

**impression** [1] - 102:6

**in-house** [1] - 302:20

**inasmuch** [1] - 189:17

**inch** [4] - 56:10, 56:13, 56:14, 78:21

**inch-and-a-half** [1] - 56:10

**inches** [7] - 56:10, 56:12, 125:11, 125:14, 169:2, 193:12, 193:17

**incident** [2] - 76:20, 129:7

**include** [1] - 54:8

**included** [3] - 38:25, 44:18, 45:20

**includes** [2] - 29:24, 30:3

**including** [3] - 145:5, 220:19, 303:19

**increase** [2] - 277:17, 292:16

**independent** [1] - 10:24

**indicate** [3] - 110:6, 285:9, 292:2

**indicated** [13] - 114:17, 160:21, 167:19, 192:8, 274:20, 325:10, 337:9, 344:3, 344:20, 346:6, 347:15, 349:3, 350:17

**indicates** [11] - 274:5, 274:22, 275:24, 276:20, 281:17, 283:11, 284:9, 292:2, 296:17

**indicating** [4] - 87:10, 222:3, 276:11, 276:15

**indicating)** [2] - 28:8, 35:17

**indication** [1] - 281:3

**indicator** [1] - 289:10

**indict** [4] - 30:5, 51:25, 54:24, 94:4

**indictment** [3] - 52:5, 94:5, 94:9

**individual** [18] - 48:15, 55:24, 76:9, 84:5, 84:11, 135:9, 152:4, 153:4, 160:16, 183:19, 184:12, 185:6, 185:24, 212:14, 217:5, 262:24, 293:18, 328:22

**individual's** [1] - 175:5

**individually** [8] - 33:23, 38:22, 39:24, 59:5, 148:20, 149:24, 150:2, 205:3

**individuals** [21] - 23:2, 52:17, 54:5, 55:12, 55:23, 59:20, 81:19, 85:19, 85:21, 88:7, 129:11, 137:10, 142:23, 151:3, 151:12, 152:12, 160:21, 184:5, 206:6, 291:12, 293:3

**indoors** [1] - 182:25

**industry** [1] - 203:19

**infirmary** [1] - 82:8

**inflatable** [1] - 86:20

**inflatables** [2] - 53:6, 229:24

**influences** [1] - 281:22

**information** [48] - 19:12, 29:1, 86:7, 117:16, 185:14, 185:17, 189:22, 225:17, 261:18, 278:13, 303:19, 313:9, 321:23, 322:4, 322:5, 322:25, 323:9, 323:10, 323:22, 323:24, 325:3, 325:6, 325:18, 325:23, 326:8, 326:18, 327:1, 329:11, 333:11, 333:21, 333:22, 334:10, 335:9, 335:11, 335:24, 336:1, 336:9, 343:21, 344:17, 345:14, 347:15, 348:17, 349:2, 349:7, 349:10, 349:12, 352:21, 352:25

**informational** [1] - 299:15

**infrared** [5] - 310:4, 310:8, 310:9, 310:10, 310:18

**initial** [2] - 101:4, 108:11

**initials** [3] - 209:14, 312:19, 312:21

**inner** [1] - 271:5

**innermost** [1] - 28:23

**innocence** [1] - 90:6

**input** [2] - 344:17, 350:14

**inquire** [1] - 263:15

**inquired** [1] - 263:14

**inquiry** [1] - 321:19

**inside** [43] - 32:2, 32:3, 54:16, 54:17, 79:12, 84:18, 88:12, 88:18, 89:18, 95:17, 116:2, 117:15, 117:23, 129:19, 133:5, 133:25, 135:4, 149:16, 159:17, 171:17, 179:6, 179:16, 183:6, 187:5, 187:17, 189:22, 189:25, 194:19, 202:3, 203:4, 203:5, 203:13, 203:19, 219:10, 219:17, 245:2, 257:2, 263:8, 304:9, 306:23,

313:6, 322:20, 350:18

**insignia** [2] - 245:1, 245:4

**insinuate** [1] - 102:11

**inspect** [1] - 128:2

**instance** [5] - 99:1, 99:2, 99:11, 171:2, 294:5

**Institute** [1] - 106:1

**instruct** [1] - 102:4

**instructed** [2] - 70:7, 89:11

**instruction** [12] - 8:10, 8:16, 8:20, 9:1, 9:19, 10:3, 55:3, 99:5, 99:16, 135:24, 216:6, 353:23

**instructions** [7] - 9:19, 55:1, 55:2, 79:22, 99:1, 353:14, 353:16

**instructor** [2] - 198:16, 237:2

**instrument** [22] - 201:23, 202:10, 202:12, 202:14, 204:3, 204:23, 208:5, 208:24, 242:8, 256:18, 273:6, 274:9, 279:22, 281:16, 286:16, 289:13, 295:13, 306:15, 306:17, 306:21, 307:19, 310:8

**instrument's** [1] - 242:11

**instrumentation** [19] - 270:10, 270:22, 271:16, 277:2, 283:5, 283:6, 283:7, 283:15, 284:23, 285:8, 288:25, 289:8, 290:7, 294:14, 295:3, 295:21, 295:22

**insured** [1] - 184:19

**intake** [1] - 133:8

**integrity** [18] - 122:11, 148:14, 150:3, 195:21, 212:21, 217:3, 217:4, 217:6, 217:7, 217:13, 217:22, 223:9, 224:5, 226:6, 280:11, 280:25, 344:6

**Intel** [1] - 332:7

**intel** [1] - 190:4

**Intelligence** [1] - 338:22

**intelligence** [1] - 339:13

**intend** [1] - 354:9

**intended** [1] - 297:7

**intending** [1] - 299:8

**intense** [1] - 262:4

**intents** [1] - 127:19

**interact** [1] - 206:15

**interacted** [1] - 91:13

**interaction** [1] - 237:4

**intercept** [1] - 63:9

**intercepted** [1] - 206:9

**intercom** [1] - 88:6

**interdicted** [1] - 132:21

**interdiction** [12] - 98:11, 137:1, 143:18, 171:25, 220:16, 260:14, 260:15, 318:15, 319:6, 320:23, 322:17, 337:6

**interdictions** [6] - 145:10, 145:13, 229:11, 229:15, 318:22, 352:24

**interest** [40] - 17:5, 17:12, 17:25, 19:21, 20:19, 20:23, 21:20, 21:22, 22:7, 25:13, 31:25, 38:1, 38:10, 92:20, 92:25, 93:10, 93:20, 94:15, 95:1, 95:18, 98:14, 107:15, 107:16, 107:21, 108:3, 110:3, 111:2, 156:23, 176:6, 203:1, 203:24, 205:5, 206:4, 206:5, 206:8, 206:13, 206:21, 247:23, 336:5, 341:21

**interested** [2] - 30:13, 324:20

**interesting** [2] - 199:11, 246:12

**interfere** [3] - 277:2, 277:4, 283:24

**interferes** [1] - 284:12

**interior** [1] - 96:4

**interject** [1] - 8:12

**internally** [1] - 257:2

**International** [2] - 268:23, 271:22

**international** [2] - 98:9, 98:11

**internationals** [1] -

143:24
**internet** [1] - 335:19
**INTERPRETER** [4] -
6:17, 70:12, 133:17,
162:19
**interpreter** [22] - 7:9,
7:16, 7:19, 7:22,
21:3, 25:22, 26:3,
26:9, 47:1, 47:10,
48:16, 59:25, 60:1,
75:4, 76:1, 133:16,
133:17, 142:3,
184:6, 220:18,
220:19, 300:5
**Interpreter's** [1] - 7:3
**interpreter/
translator** [1] - 6:13
**interpreters** [1] -
198:24
**Interpreters** [1] - 6:3
**interpreting** [2] -
76:13, 198:25
**intertwined** [1] - 159:6
**interview** [2] - 131:13,
151:25
**introduce** [10] - 11:23,
61:2, 101:18,
101:21, 103:8,
105:7, 197:1,
268:11, 317:25,
338:18
**introduced** [6] -
73:21, 77:7, 77:16,
104:4, 122:7, 306:20
**introduces** [1] - 310:9
**introducing** [2] -
103:1, 103:3
**inventory** [1] - 128:4
**investigated** [1] -
326:8
**investigation** [17] -
30:2, 81:21, 258:6,
258:10, 269:22,
296:20, 297:19,
298:2, 319:8,
319:10, 319:20,
321:18, 322:23,
324:22, 327:17,
329:1, 353:1
**Investigations** [1] -
349:20
**investigations** [3] -
269:22, 318:24,
318:25
**investigator** [3] -
297:24, 319:13,
320:24
**involved** [13] - 145:2,
145:10, 145:21,
146:7, 155:17,

184:3, 184:4,
218:15, 219:21,
278:11, 318:15,
319:8, 340:22
**involvement** [2] -
40:17, 40:18
**involves** [2] - 51:21,
319:2
**ION** [81] - 31:8, 31:9,
31:11, 31:16, 31:18,
31:24, 32:12, 49:7,
50:7, 52:11, 52:14,
52:19, 81:24, 81:25,
89:16, 90:15,
200:12, 200:14,
200:16, 200:17,
202:10, 202:15,
204:17, 205:3,
205:17, 206:3,
206:5, 206:19,
206:20, 208:2,
208:17, 208:23,
211:20, 212:12,
212:19, 212:20,
213:11, 214:10,
238:25, 246:25,
247:4, 251:5,
253:21, 256:15,
256:18, 258:9,
260:22, 260:25,
270:6, 270:10,
270:11, 270:12,
270:13, 270:14,
270:22, 270:25,
271:2, 271:3,
272:17, 273:23,
276:10, 277:7,
278:1, 279:11,
280:23, 283:5,
284:13, 284:20,
284:23, 285:15,
287:25, 288:2,
288:21, 289:3,
291:25, 293:13,
294:20, 296:13
**ION-mobility** [7] -
270:11, 270:12,
270:13, 270:22,
270:25, 271:3, 283:5
**IONs** [5] - 201:4,
271:6, 271:8,
271:13, 276:21
**IP** [8] - 189:2, 189:4,
333:10, 334:10,
335:14, 335:16,
335:22
**irrelevant** [1] - 99:23
**isotopes** [1] - 288:11
**ISRAEL** [1] - 2:11
**issue** [12] - 8:2, 9:2,

9:7, 9:13, 9:24,
103:22, 112:9,
143:11, 174:9,
190:5, 261:6, 280:21
**issues** [4] - 6:18, 9:19,
104:2, 165:20
**item** [10] - 84:18,
85:17, 128:2,
177:23, 217:9,
233:12, 242:1,
266:11, 308:19,
344:2
**items** [13] - 30:1,
52:13, 81:19, 91:3,
118:13, 126:11,
158:24, 191:11,
191:17, 195:2,
283:23, 293:25,
315:19
**itself** [15] - 32:17,
34:7, 52:21, 54:16,
94:2, 94:17, 142:5,
143:9, 148:17,
148:22, 202:18,
208:24, 303:24,
303:25, 350:15

---

## J

**jacket** [14] - 225:1,
225:3, 244:7,
244:22, 245:20,
245:25, 246:3,
246:4, 246:6,
246:15, 246:16,
246:17, 246:19,
283:2
**jackets** [16] - 221:12,
221:16, 243:4,
243:6, 243:13,
243:15, 243:25,
244:8, 244:18,
244:21, 244:24,
244:25, 245:5,
245:8, 245:18,
277:14
**Jacob's** [1] - 221:22
**jail** [1] - 134:22
**jam** [3] - 257:5, 257:7,
257:9
**jammer** [1] - 342:9
**January** [3] - 303:10,
339:15, 355:10
**JASON** [3] - 3:18,
196:18, 196:20
**Jason** [2] - 196:18,
197:3
**Jeanette** [1] - 268:14
**JEANNETTE** [2] - 4:5,
268:5

**Jeannette** [2] -
267:20, 268:3
**jersey** [7] - 24:5, 24:9,
81:2, 81:4, 81:6,
81:7, 87:23
**Jersey** [1] - 145:8
**jet** [1] - 63:15
**jettison** [15] - 111:13,
111:24, 112:10,
112:17, 119:11,
124:22, 126:3,
126:6, 126:8,
157:24, 157:25,
172:4, 191:5,
216:19, 229:19
**jettisoned** [4] - 91:14,
91:17, 92:1, 192:1
**jewelry** [1] - 130:7
**job** [26] - 12:8, 13:21,
17:16, 17:21, 19:8,
19:14, 41:24, 50:10,
59:18, 76:16, 97:14,
97:22, 102:8,
102:10, 106:9,
147:25, 160:3,
178:14, 260:9,
268:20, 269:1,
269:14, 318:14,
340:2
**jobs** [2] - 97:11, 160:3
**JODI** [1] - 1:20
**Joe** [1] - 61:2
**join** [2] - 200:2, 200:7
**joined** [2] - 159:3,
339:9
**joint** [1] - 352:23
**Joint** [1] - 349:20
**Jose** [9] - 61:15,
167:16, 183:20,
185:7, 185:17,
185:20, 238:11,
291:21, 330:8
**JOSE** [8] - 1:9, 1:9,
1:10, 2:4, 2:7, 2:8,
2:11
**Joseph** [2] - 337:25,
338:9
**JOSEPH** [4] - 2:5,
4:21, 338:9, 338:12
**Josh** [1] - 12:1
**Joshua** [1] - 11:14
**JOSHUA** [3] - 3:5,
11:14, 11:17
**JTFI** [1] - 349:20
**JUAN** [1] - 2:7
**Juan** [5] - 61:15,
167:16, 238:11,
291:21, 330:8
**judge** [10] - 74:2,
101:15, 231:25,

263:25, 265:17,
299:9, 300:2,
300:11, 353:22,
354:9
**Judge** [25] - 6:8, 6:11,
8:1, 8:25, 26:25,
27:14, 50:20, 61:10,
72:24, 73:25, 104:9,
135:20, 155:20,
169:20, 170:2,
172:23, 228:25,
251:19, 262:19,
282:23, 300:16,
314:5, 315:15,
347:5, 353:15
**JUDGE** [1] - 1:15
**jug** [1] - 136:3
**jugs** [1] - 95:1
**juice** [1] - 259:7
**July** [2] - 1:5, 12:3
**jump** [1] - 21:6
**jumping** [2] - 153:20,
290:23
**juncture** [1] - 7:13
**Junior** [1] - 105:9
**JUNIOR** [2] - 3:12,
105:1
**jurisdiction** [9] - 8:5,
8:9, 8:11, 8:12, 9:3,
9:22, 9:24, 12:22,
182:6
**jurisdictional** [1] - 8:3
**JUROR** [1] - 300:24
**juror** [3] - 9:11, 10:2,
10:18
**jurors** [1] - 149:2
**jury** [62] - 6:4, 6:6,
7:25, 8:9, 8:10, 8:19,
8:20, 11:24, 12:19,
14:4, 14:12, 20:22,
28:3, 29:21, 31:9,
85:12, 86:12, 89:8,
89:10, 95:14,
101:13, 102:6,
103:12, 103:13,
104:12, 105:8,
109:23, 113:8,
117:4, 117:12,
118:24, 118:25,
120:5, 123:21,
163:2, 179:17,
182:9, 196:5, 196:7,
197:2, 200:16,
202:14, 203:11,
204:5, 206:23,
208:2, 268:12,
299:5, 300:22,
302:7, 303:15,
305:4, 306:18,
310:7, 314:3, 318:1,

327:1, 338:19,
348:21, 353:11,
353:14
**JURY** [1] - 1:13
**Jury** [2] - 6:9, 301:1

# K

**keel** [1] - 193:15
**keep** [17] - 13:19,
14:17, 19:9, 19:14,
26:10, 32:4, 32:18,
54:24, 59:17, 74:2,
89:25, 115:12,
126:19, 134:22,
177:13, 231:22,
233:20
**keeping** [2] - 19:15,
25:8
**keeps** [1] - 193:15
**Kenney** [1] - 328:4
**kept** [15] - 85:1, 88:10,
115:18, 122:12,
128:16, 130:15,
134:25, 139:2,
140:18, 140:19,
182:16, 187:10,
201:24, 266:25,
288:22
**key** [3] - 140:19,
149:17, 149:20
**Key** [12] - 1:4, 138:12,
170:7, 179:25,
180:8, 188:21,
318:25, 319:6,
319:9, 319:18,
319:22
**keys** [2] - 127:11,
149:17
**keyword** [1] - 284:10
**kids** [1] - 155:3
**kilo** [2] - 227:24,
314:24
**kilogram** [3] - 138:24,
149:20, 283:18
**kilograms** [17] -
138:25, 149:23,
227:19, 283:21,
304:17, 306:4,
308:20, 309:7,
309:8, 309:12,
309:14, 309:18,
309:24, 310:24,
311:8, 314:21,
321:15
**kilos** [15] - 139:9,
150:2, 211:4,
303:23, 304:2,
304:3, 312:15,
315:3, 315:6, 315:7,

319:25, 320:2,
320:16, 321:2, 336:3
**kind** [36] - 56:5, 57:15,
106:19, 109:24,
119:21, 124:6,
125:1, 132:23,
144:10, 147:3,
151:19, 152:5,
156:6, 166:21,
197:21, 199:23,
200:20, 203:15,
221:11, 223:17,
225:23, 237:3,
245:24, 273:2,
275:2, 284:23,
285:19, 292:1,
295:22, 306:24,
311:14, 322:7,
327:25, 335:14,
344:5, 344:21
**kindly** [1] - 116:6
**kinds** [1] - 287:12
**kit** [8] - 31:22, 31:24,
32:7, 32:20, 157:15,
174:19, 174:20
**kits** [3] - 36:5, 171:5,
171:10
**KMZ** [2] - 345:21,
348:25
**knots** [17] - 15:2,
63:22, 64:13, 64:21,
64:25, 68:6, 112:4,
154:14, 154:15,
156:14, 165:8,
165:10, 165:24,
167:20, 168:5,
168:10, 168:15
**knowing** [2] - 147:18,
324:20
**knowledge** [9] -
147:12, 257:22,
274:1, 323:14,
328:7, 328:10,
329:23, 330:1,
339:23
**knowledge-based** [1]
- 339:23
**known** [12] - 17:7,
106:19, 111:19,
126:16, 143:12,
145:19, 158:18,
272:25, 276:11,
294:5, 307:8, 307:15
**knows** [9] - 97:22,
172:24, 173:1,
178:13, 194:5,
226:13, 244:16,
330:18, 331:21

# L

**lab** [14] - 171:3, 171:4,
171:5, 171:8,
268:25, 269:8,
269:14, 276:8,
283:9, 303:5, 303:6,
313:4, 320:9, 320:12
**label** [3] - 176:10,
176:11, 176:12
**labeled** [1] - 113:16
**labels** [1] - 64:6
**laboratories** [1] -
297:17
**Laboratory** [1] -
268:15
**laboratory** [7] -
269:21, 298:2,
298:5, 303:12,
303:20, 308:23,
309:15
**lack** [3] - 141:17,
275:9, 323:25
**ladder** [1] - 221:22
**ladies** [12] - 9:18,
105:7, 109:23,
113:8, 117:12,
118:24, 121:7,
123:21, 268:11,
317:25, 338:19,
353:10
**laid** [1] - 72:24
**Lakes** [2] - 198:12,
198:13
**Lambie** [4] - 119:15,
119:17, 129:3,
153:15
**land** [8] - 59:13, 77:5,
98:3, 181:21, 182:4,
182:5, 182:7, 182:13
**lane** [1] - 217:25
**laps** [2] - 111:20,
112:22
**laptop** [1] - 103:13
**large** [12] - 24:15,
42:9, 113:1, 113:3,
115:24, 133:21,
133:23, 134:25,
270:23, 277:12,
290:21, 291:9
**larger** [2] - 14:21, 33:3
**last** [18] - 17:7, 56:6,
76:6, 94:18, 105:15,
106:24, 107:23,
111:19, 158:18,
186:23, 267:10,
276:17, 299:20,
318:11, 319:7,
319:20, 337:7
**last-known** [1] -

111:19
**lasting** [1] - 354:8
**late** [1] - 319:20
**latex** [3] - 126:17,
203:13, 203:21
**Latin** [1] - 334:24
**latitude** [1] - 350:12
**Lauderdale** [8] - 1:23,
287:14, 318:7,
318:9, 321:9,
333:15, 336:11,
340:24
**launched** [2] - 67:7,
67:22, 108:6
**launches** [1] - 129:1
**laundering** [1] - 318:6
**law** [24] - 29:24, 30:1,
51:21, 52:3, 52:5,
52:24, 55:6, 79:15,
79:21, 84:14, 84:15,
99:11, 101:2,
105:17, 106:17,
132:10, 197:15,
198:12, 199:5,
199:6, 199:21,
220:16, 236:22,
339:11
**Law** [1] - 198:15
**lawyer** [1] - 102:21
**lawyers** [1] - 53:3
**layer** [1] - 192:20
**layers** [2] - 304:7,
304:8
**laying** [1] - 134:15
**lazy** [5] - 271:4, 271:6,
271:14, 289:11
**LE** [2] - 171:18
**lead** [8] - 319:11,
319:13, 320:24,
325:1
**leading** [9] - 190:15,
298:12, 317:5,
326:4, 335:3, 335:4,
335:7, 336:24, 344:7
**leads** [2] - 94:4,
324:23
**leaning** [2] - 113:20,
113:21
**learn** [1] - 12:21
**learned** [1] - 328:8
**least** [13] - 10:2, 22:2,
57:6, 67:22, 77:10,
126:13, 158:4,
191:8, 226:15,
282:25, 299:16,
300:4, 334:5
**leave** [13] - 53:4,
93:18, 164:19,
164:22, 183:3,
186:24, 259:14,

260:4, 287:10,
290:19, 291:5,
291:10, 291:14
**leaves** [1] - 259:13
**leaving** [3] - 110:16,
271:25, 289:17
**lectern** [3] - 282:21,
283:22, 285:12
**led** [2] - 41:4, 278:25
**left** [16] - 22:10, 22:21,
22:23, 29:16, 74:18,
143:7, 150:4,
184:10, 212:13,
222:19, 290:24,
299:7, 314:19,
351:1, 351:22,
351:23
**leg** [5] - 134:4, 134:14,
135:2, 155:19,
161:10
**legal** [6] - 9:25,
323:18, 324:10,
326:14, 336:13
**legs** [1] - 134:13
**leisurely** [1] - 195:20
**lemon** [1] - 259:7
**length** [5] - 44:11,
126:18, 150:15,
272:8, 272:11
**less** [15] - 77:19,
150:20, 150:21,
153:16, 162:9,
162:10, 225:22,
272:4, 286:1,
292:22, 293:2,
293:6, 298:22,
298:23, 354:14
**lesson** [1] - 162:8
**letters** [1] - 78:21
**level** [10] - 13:1, 13:2,
67:14, 67:19, 113:4,
275:7, 275:19,
283:6, 283:8, 289:5
**levels** [9] - 13:1, 13:3,
51:15, 51:17,
128:24, 283:7,
285:17, 289:4,
294:12
**lever** [1] - 215:1
**lie** [1] - 185:12
**LIEUTENANT** [2] -
3:12, 105:1
**Lieutenant** [3] - 105:9,
181:3, 349:19
**life** [26] - 47:23, 55:9,
55:12, 168:12,
221:12, 221:16,
243:4, 243:6,
243:13, 243:15,
244:6, 244:8,

244:18, 244:21, 244:22, 244:23, 244:25, 245:4, 245:5, 245:8, 245:18, 245:20, 246:3, 260:6, 277:13, 329:2

**life's** [1] - 47:23

**lift** [3] - 93:22, 120:1, 168:7

**lifts** [1] - 183:2

**light** [4] - 96:6, 148:8, 238:2, 310:10

**lightning** [1] - 288:25

**lights** [4] - 94:12, 94:13, 183:4, 310:9

**likely** [4] - 214:19, 282:10, 292:15, 293:2

**limit** [2] - 295:21, 301:10

**limited** [2] - 67:11, 158:12

**limits** [1] - 283:15

**line** [14] - 45:13, 67:10, 68:5, 68:9, 68:11, 68:16, 98:1, 113:3, 113:6, 113:7, 119:21, 120:23, 210:6, 296:13

**liner** [1] - 159:16

**lines** [1] - 152:5

**lining** [1] - 159:16

**linked** [2] - 132:20, 139:12

**linking** [3] - 329:22, 329:25, 334:4

**list** [7] - 299:7, 299:13, 300:3, 300:14, 316:25, 317:2, 317:5

**listed** [4] - 38:2, 252:19, 261:14, 261:16

**listen** [2] - 73:1, 249:21

**liter** [1] - 35:17

**literally** [5] - 203:4, 221:25, 228:14, 233:12, 235:14

**liters** [4] - 69:9, 69:10, 69:11, 69:22

**lives** [2] - 92:7, 97:24

**living** [2] - 127:18, 325:24

**Lizeth** [10] - 325:7, 325:16, 325:21, 325:22, 328:14, 328:17, 330:18, 331:20, 331:25, 334:22

**load** [13] - 140:17, 140:18, 141:5, 141:11, 141:13, 166:1, 188:23, 193:1, 195:14, 321:3, 321:14, 336:22

**loaded** [10] - 83:8, 83:13, 83:16, 122:13, 126:17, 166:6, 166:12, 167:22, 319:25, 320:3

**loading** [1] - 216:21

**local** [1] - 132:13

**locate** [3] - 66:20, 147:3, 147:7

**located** [3] - 43:4, 43:18, 66:23

**location** [8] - 108:7, 156:19, 162:18, 170:14, 171:2, 332:4, 343:13, 348:8

**locations** [1] - 81:25

**lock** [1] - 140:19

**locked** [5] - 127:2, 128:17, 140:21, 171:19, 211:12

**locker** [2] - 171:19, 211:10

**log** [13] - 278:1, 343:3, 343:7, 343:9, 343:10, 347:19, 348:3, 350:14, 350:18, 351:17, 351:21, 352:5

**logbook** [1] - 136:13

**logged** [2] - 136:17, 136:20

**logging** [1] - 350:10

**logical** [1] - 213:10

**logs** [12] - 141:15, 272:22, 273:7, 278:5, 347:22, 347:23, 347:25, 348:4, 348:5, 350:6, 350:8, 351:10

**longitude** [1] - 350:13

**look** [63] - 13:20, 22:25, 24:2, 24:4, 24:14, 24:17, 28:19, 28:22, 30:10, 35:9, 38:18, 39:25, 54:22, 58:14, 58:15, 100:14, 100:17, 101:5, 111:18, 113:9, 114:5, 116:2, 118:6, 122:19, 123:1, 137:20, 151:17, 156:10,

162:6, 162:10, 164:7, 173:12, 175:17, 179:16, 190:22, 203:12, 203:14, 227:20, 236:6, 244:22, 255:7, 255:8, 257:12, 264:10, 265:24, 265:25, 266:2, 266:3, 266:4, 275:12, 278:3, 284:24, 297:14, 307:16, 308:18, 309:2, 340:8, 341:7, 346:3, 353:13, 353:16

**looked** [19] - 20:12, 23:24, 30:16, 36:24, 39:9, 51:9, 56:5, 64:2, 80:16, 87:11, 97:2, 101:3, 113:10, 118:13, 124:7, 142:10, 171:20, 274:16, 353:15

**looking** [29] - 29:24, 30:8, 33:9, 41:22, 49:25, 71:20, 91:3, 91:6, 92:9, 92:16, 94:3, 94:4, 124:14, 162:22, 164:15, 188:20, 221:1, 224:22, 226:17, 265:2, 269:24, 274:10, 288:11, 288:13, 293:17, 312:21, 340:7, 347:19, 347:21

**looks** [19] - 16:8, 16:11, 46:4, 50:7, 100:10, 100:12, 114:22, 119:4, 124:7, 125:1, 178:2, 179:11, 179:17, 193:20, 209:14, 230:9, 306:22, 311:14, 322:11

**lose** [2] - 66:17, 168:9

**loss** [2] - 158:14, 277:19

**lost** [12] - 41:22, 99:22, 124:17, 130:3, 158:17, 168:11, 170:19, 178:1, 178:17, 184:7, 272:7, 343:5

**loud** [4] - 18:7, 44:1, 78:20, 94:13

**love** [2] - 259:23, 336:2

**low** [3] - 42:11,

275:18, 283:7

**Lowe's** [1] - 113:11

**lower** [2] - 16:25, 283:8

**lowered** [1] - 41:7

**lowers** [2] - 16:12, 17:2

**Lucas** [11] - 84:5, 84:7, 87:11, 87:15, 183:19, 183:20, 184:23, 185:7, 185:17, 185:20, 334:12

**LUCAS** [2] - 1:10, 2:11

**Lucas-Franco** [3] - 84:7, 87:11, 87:15

**LUCAS-FRANCO** [2] - 1:10, 2:11

**Lucia** [1] - 109:4

**luck** [1] - 187:18

**lucky** [1] - 154:13

**luggage** [2] - 270:24, 296:19

**lunch** [2] - 196:2, 246:11, 299:24

**Lunch** [1] - 196:6

## M

**M-16** [14] - 18:2, 18:15, 18:23, 18:24, 19:4, 21:12, 21:16, 43:11, 46:23, 48:8, 88:4, 110:2, 110:4

**ma'am** [288] - 11:10, 12:13, 14:6, 14:10, 14:25, 15:8, 15:14, 15:18, 15:22, 16:2, 16:17, 17:6, 17:23, 19:2, 19:17, 20:7, 20:21, 21:11, 21:21, 22:6, 22:9, 22:18, 22:24, 23:1, 23:10, 23:17, 23:23, 24:6, 24:11, 24:13, 24:19, 25:7, 25:21, 27:13, 28:20, 28:23, 29:8, 29:20, 30:9, 31:5, 32:1, 32:9, 32:25, 33:13, 34:12, 34:20, 35:17, 35:19, 35:21, 36:17, 37:16, 38:14, 38:23, 39:3, 39:6, 39:10, 78:1, 81:13, 82:4, 82:9, 90:25, 92:19, 94:21, 95:9, 95:19, 95:24, 96:12, 96:18, 97:3, 97:6, 98:22, 99:4, 100:16, 118:11, 118:14,

120:9, 125:4, 125:18, 126:10, 127:20, 127:23, 128:3, 128:5, 128:10, 130:12, 130:14, 130:17, 131:23, 132:3, 132:19, 132:22, 134:24, 136:15, 136:24, 170:6, 170:11, 170:25, 171:4, 171:22, 171:24, 172:6, 172:9, 172:21, 173:9, 173:11, 173:21, 174:2, 174:15, 174:17, 174:22, 174:25, 175:4, 175:11, 175:13, 175:16, 175:19, 175:24, 176:2, 176:4, 177:6, 177:12, 177:20, 178:20, 179:3, 179:7, 179:12, 179:20, 179:22, 180:7, 180:17, 189:20, 190:7, 190:10, 190:13, 191:1, 191:4, 191:10, 191:12, 191:14, 191:16, 191:18, 192:15, 192:19, 192:22, 193:25, 194:8, 194:10, 194:12, 194:14, 194:16, 194:18, 194:20, 195:1, 195:3, 195:5, 195:7, 195:11, 195:13, 195:17, 195:19, 196:14, 196:25, 201:9, 201:11, 201:14, 202:24, 204:15, 205:12, 206:11, 206:16, 206:22, 207:19, 207:23, 207:25, 208:4, 208:7, 208:9, 208:13, 209:7, 210:2, 210:10, 210:12, 210:14, 210:16, 210:20, 211:3, 211:6, 211:13, 211:15, 248:9, 248:13, 248:17, 248:23, 249:7, 250:7, 250:15, 250:17, 251:10, 252:1,

254:14, 254:18,
254:20, 254:22,
255:4, 255:6, 255:9,
255:14, 255:16,
255:18, 255:25,
256:2, 256:11,
256:14, 256:17,
256:25, 257:4,
257:6, 257:8,
257:11, 257:14,
257:22, 258:5,
258:8, 258:18,
258:21, 258:23,
259:15, 259:17,
259:21, 259:25,
260:2, 260:5, 260:8,
260:11, 260:13,
260:16, 260:24,
261:2, 261:15,
320:4, 321:13,
331:18, 332:5,
337:18, 340:20,
342:1, 342:18,
342:22, 343:19,
344:1, 344:4,
344:19, 345:7,
345:12, 345:15,
346:5, 346:8,
346:10, 346:18,
346:25, 347:3,
347:13, 347:17,
347:20, 347:22,
348:13, 348:19,
348:24, 349:5,
349:8, 349:13,
349:17, 349:24,
351:3, 351:5, 351:7,
351:16, 351:20,
352:9, 352:15,
352:20, 353:2
**machine** [78] - 197:7,
200:18, 200:20,
201:3, 201:23,
202:2, 202:3,
202:18, 203:5,
204:9, 205:15,
205:17, 208:2,
208:24, 213:1,
213:12, 216:5,
222:1, 225:5,
226:18, 226:20,
227:11, 227:13,
227:14, 227:19,
228:9, 228:11,
232:22, 233:5,
233:12, 233:15,
233:24, 233:25,
234:2, 234:4, 234:5,
234:18, 234:22,
236:7, 236:11,
241:23, 242:7,

245:22, 245:25,
246:25, 251:5,
252:5, 253:1,
253:14, 253:22,
257:3, 257:9,
257:18, 266:7,
266:19, 266:20,
270:7, 270:14,
270:20, 271:2,
272:18, 272:19,
272:22, 272:24,
272:25, 273:7,
273:23, 275:2,
275:8, 277:7,
278:25, 288:22,
291:25, 298:6
**machines** [4] - 205:4,
234:13, 293:13
**Maclaka** [1] - 162:11
**magazine** [3] - 127:2,
140:19, 141:3
**mail** [3] - 325:15,
326:1
**main** [8] - 25:3, 35:12,
73:9, 86:19, 106:13,
128:24, 244:5, 318:5
**Maine** [2] - 145:7,
197:9
**maintain** [11] - 12:8,
20:25, 26:2, 195:21,
233:11, 235:23,
333:10, 333:11,
333:24, 333:25,
334:1
**maintained** [5] - 75:5,
151:16, 235:16,
323:9, 334:10
**maintaining** [3] -
26:10, 141:17, 233:4
**maintains** [1] - 322:24
**maintenance** [4] -
233:7, 235:18,
235:19
**major** [2] - 181:17,
268:22
**majority** [3] - 78:2,
126:15, 171:12
**Mall** [1] - 199:24
**malnourished** [1] -
100:9
**man** [5] - 28:8, 80:7,
80:9, 87:14, 260:21
**managed** [2] - 193:1,
295:10
**management** [1] -
106:6
**manager** [1] - 138:14
**manual** [6] - 63:25,
64:2, 64:3, 64:4,
64:10

**manually** [2] - 113:19,
113:20
**manufactured** [3] -
66:6, 66:8, 270:15
**manufacturer** [3] -
234:11, 323:4, 323:7
**manufacturing** [2] -
269:23, 288:14
**map** [8] - 77:6, 77:7,
77:16, 162:6,
162:22, 163:2,
344:24, 344:25
**marine** [5] - 145:8,
198:3, 263:22,
263:23, 264:9
**Maritime** [5] - 197:13,
197:25, 198:2,
198:3, 198:15
**maritime** [2] - 105:21,
109:6
**mark** [2] - 34:5, 169:21
**Mark** [2] - 108:19
**Mark-II** [1] - 108:19
**Mark-III** [1] - 108:19
**marked** [8] - 115:23,
118:4, 123:2,
169:19, 189:5,
205:10, 277:25,
308:14
**marking** [1] - 103:15
**markings** [5] - 19:13,
110:6, 110:13,
123:5, 316:10
**Martin** [10] - 80:9,
249:17, 249:19,
249:22, 249:23,
249:25, 250:8,
250:10, 250:18,
251:15
**MARTIN** [4] - 1:10,
1:10, 2:10, 2:11
**Martinez** [2] - 249:24,
282:23
**mask** [3] - 261:12,
262:24, 276:24
**masking** [9] - 258:19,
261:5, 263:14,
264:5, 264:6, 264:7,
276:24, 285:2, 285:3
**masks** [1] - 126:18
**mass** [9] - 139:20,
306:6, 306:13,
307:3, 307:9, 308:1,
309:18, 310:3, 311:5
**master's** [1] - 157:22
**match** [2] - 273:5,
303:20
**matching** [1] - 93:15
**material** [7] - 93:17,
125:3, 134:17,

149:8, 159:5, 289:9
**materials** [2] - 93:13,
263:4
**math** [1] - 240:8
**mats** [1] - 134:14
**matter** [8] - 27:3,
117:19, 217:10,
221:1, 261:19,
330:22, 336:10,
355:8
**max** [1] - 158:12
**maximum** [2] -
156:11, 156:12
**McDonald** [1] - 109:8
**MDA** [23] - 231:17,
231:18, 231:20,
231:21, 232:3,
232:7, 254:23,
255:1, 275:24,
276:1, 276:2, 276:5,
276:9, 276:11,
276:15, 284:3,
284:8, 284:9, 292:8,
292:10
**MDMA** [7] - 205:8,
209:17, 214:5,
231:15, 231:16,
232:3, 232:5 310:10
**ME3** [1] - 109:8
**meals** [2] - 135:23
**mean** [48] - 12:11,
20:12, 35:15, 87:6,
93:12, 94:7, 103:2,
125:15, 154:22,
160:6, 166:10,
174:3, 176:22,
179:25, 189:2,
202:17, 213:25,
215:18, 215:19,
216:23, 225:24,
226:21, 238:6,
241:17, 241:18,
242:18, 249:5,
251:7, 252:4, 252:7,
257:20, 258:4,
258:14, 258:16,
274:24, 275:10,
275:17, 276:19,
297:14, 301:10,
309:8, 311:13,
333:5, 336:22,
343:17, 345:3,
348:7, 351:18
**meaning** [4] - 48:10,
105:17, 108:22,
206:19
**means** [26] - 17:15,
93:13, 129:9, 150:9,
155:5, 173:2,
193:13, 206:19,

208:18, 214:6,
226:17, 227:12,
241:7, 241:13,
241:17, 252:2,
252:6, 252:7, 252:9,
258:15, 259:5,
262:7, 274:8,
277:11, 328:6, 352:7
**meantime** [1] - 198:8
**measure** [6] - 13:22,
32:15, 213:11,
213:14, 285:15,
295:14
**measures** [2] - 50:7,
50:8
**mechanic** [1] - 197:8
**mechanical** [3] -
57:19, 156:24,
165:19
**mechanism** [1] -
187:15
**mechanisms** [1] -
189:17
**media** [7] - 326:2,
326:3, 339:17,
339:18, 340:6,
340:11, 342:2
**medical** [32] - 36:7,
129:15, 129:17,
130:11, 130:25,
131:19, 131:24,
135:17, 136:6,
152:16, 153:5,
160:22, 161:8,
183:22, 184:3,
184:21, 185:23,
186:1, 186:3, 186:7,
186:8, 190:5, 190:6,
218:25, 219:2,
219:4, 219:5, 219:6,
225:16
**meet** [8] - 61:21,
100:24, 167:17,
167:18, 183:19,
195:12, 206:12,
238:12
**meeting** [1] - 206:14
**meets** [1] - 313:8
**mel** [1] - 156:3
**Mel** [78] - 16:4, 16:17,
16:18, 16:22, 16:24,
17:14, 17:25, 20:20,
40:19, 41:1, 41:4,
42:21, 43:11, 43:21,
44:13, 67:7, 67:22,
94:11, 108:18,
108:21, 108:22,
109:1, 109:24,
110:6, 110:17,
110:22, 110:23,

111:2, 111:23, 112:5, 122:14, 141:21, 142:23, 143:5, 143:11, 150:13, 150:14, 150:15, 150:24, 151:4, 153:17, 153:19, 156:1, 157:4, 157:9, 164:20, 170:10, 172:1, 172:2, 194:1, 216:21, 220:3, 220:5, 220:15, 221:10, 221:13, 221:18, 221:19, 221:20, 221:24, 222:19, 222:22, 222:25, 223:7, 223:8, 225:14, 225:15, 243:21

**Mel-I** [52] - 16:17, 16:18, 16:22, 16:24, 17:14, 17:25, 20:20, 40:19, 41:1, 41:4, 42:21, 43:11, 43:21, 44:13, 67:7, 94:11, 108:18, 108:21, 108:22, 110:17, 110:22, 111:2, 111:23, 112:5, 141:21, 142:23, 143:5, 143:11, 150:14, 153:19, 157:4, 157:9, 164:20, 172:1, 172:2, 220:3, 220:5, 220:15, 221:10, 221:13, 221:18, 221:19, 221:20, 221:24, 222:19, 222:22, 222:25, 223:8, 225:14, 225:15, 243:21

**mel-II** [1] - 156:3

**Mel-II** [23] - 16:4, 16:22, 108:18, 108:21, 109:1, 109:24, 110:6, 110:23, 122:14, 142:23, 150:13, 150:14, 150:15, 151:4, 153:17, 156:1, 157:4, 170:10, 194:1, 216:21, 220:15, 222:19, 243:21

**Mellon** [160] - 12:2, 13:9, 14:9, 15:14, 15:15, 15:21, 16:14, 16:16, 28:24, 28:25, 29:23, 30:16, 31:6,

34:13, 35:3, 40:18, 42:7, 53:6, 57:1, 61:6, 74:19, 99:3, 99:6, 105:11, 106:7, 106:8, 106:9, 107:1, 107:3, 107:6, 107:20, 107:22, 108:3, 108:17, 110:16, 111:9, 111:12, 112:23, 113:18, 114:25, 115:13, 115:18, 118:9, 119:14, 120:8, 122:10, 123:24, 125:19, 125:22, 126:12, 128:21, 134:23, 135:17, 137:14, 137:15, 137:20, 138:1, 139:2, 140:14, 143:5, 143:8, 143:9, 144:20, 144:22, 150:8, 151:5, 151:16, 153:13, 153:23, 154:16, 156:16, 158:7, 158:11, 160:5, 160:6, 160:7, 160:8, 160:10, 161:11, 162:9, 163:24, 164:19, 168:12, 171:1, 172:3, 178:6, 178:14, 180:4, 180:18, 182:17, 192:2, 192:13, 194:1, 195:15, 195:16, 195:20, 199:2, 199:15, 199:17, 199:18, 199:22, 200:2, 202:13, 206:10, 206:13, 209:19, 209:23, 210:9, 210:19, 211:9, 212:13, 216:16, 216:19, 216:22, 216:25, 219:6, 220:1, 220:4, 221:11, 222:20, 223:7, 223:16, 229:9, 229:14, 230:3, 230:7, 230:19, 231:1, 243:5, 243:7, 243:10, 243:12, 243:16, 243:17, 243:19, 243:20, 243:21, 243:22, 244:4, 244:10, 244:13, 244:21,

244:23, 244:25, 245:1, 245:3, 256:19, 259:13, 259:18, 259:19, 259:20, 259:24, 260:1, 260:3, 260:10, 260:17, 260:25

**Mellon's** [4] - 29:1, 42:9, 131:22, 152:6

**Mellon-I** [1] - 243:20

**Mellon-II** [2] - 108:17, 243:20

**Mellons** [1] - 243:25

**melt** [2] - 18:13, 45:4

**member** [15] - 12:5, 12:12, 12:17, 12:22, 13:14, 19:16, 51:16, 106:23, 109:4, 110:1, 119:18, 121:20, 135:9, 142:2, 198:17

**members** [45] - 11:23, 12:19, 14:4, 20:22, 21:6, 25:23, 29:21, 31:9, 35:22, 39:4, 46:25, 54:9, 65:24, 75:18, 118:24, 119:8, 119:10, 122:15, 126:13, 126:16, 129:7, 129:10, 129:12, 142:1, 142:5, 142:12, 153:8, 159:19, 166:16, 166:20, 168:3, 168:8, 193:4, 197:1, 200:16, 202:14, 203:11, 204:5, 206:23, 220:2, 260:9, 302:7, 303:15, 306:18, 310:6

**memorialized** [1] - 351:17

**memory** [4] - 185:1, 185:7, 185:24, 263:10

**men** [2] - 92:1, 226:11

**mentioned** [24] - 12:12, 17:22, 19:20, 22:22, 38:8, 38:9, 51:12, 52:11, 53:11, 93:10, 95:23, 113:6, 114:7, 114:15, 130:10, 136:21, 140:1, 140:18, 181:5, 270:2, 301:5, 305:25, 306:15, 307:22

**mentioning** [1] - 133:9

**mere** [1] - 150:5

**merely** [2] - 144:10, 160:3

**mesh** [1] - 311:15

**message** [5] - 137:8, 137:9, 139:3, 152:3, 178:9

**met** [8] - 61:16, 61:18, 163:9, 238:15, 291:23, 321:5, 329:19, 330:9

**metadata** [1] - 350:11

**metal** [3] - 164:17, 189:20, 190:2

**meth** [1] - 297:21

**methamphetamine** [4] - 269:24, 297:16, 297:18, 297:19

**methanol** [1] - 306:19

**method** [1] - 288:14

**methodology** [1] - 274:5

**methylenedioxyamphetamine** [2] - 276:2, 276:9

**Mexican** [2] - 78:4, 78:12

**Mexicans** [1] - 354:21

**Mexico** [15] - 15:19, 77:1, 77:21, 77:25, 78:3, 78:24, 98:6, 105:25, 107:8, 161:11, 185:20, 329:12, 350:24, 351:2, 354:10

**Miami** [18] - 2:17, 2:18, 179:25, 268:16, 268:24, 268:25, 287:14, 302:9, 309:15, 319:3, 321:7, 321:10, 329:19, 330:10, 338:21, 339:15, 355:12, 355:13

**mic** [1] - 228:14

**mic's** [1] - 228:15

**Michael** [1] - 104:24

**MICHAEL** [1] - 1:15

**microphone** [3] - 87:10, 162:15, 162:20

**microscopic** [1] - 226:3

**mid** [2] - 138:17, 153:22

**mid-2002** [1] - 197:20

**mid-ocean** [2] - 138:17, 153:22

**middle** [5] - 73:24, 136:22, 163:15, 171:11, 298:10

**midships** [1] - 33:19

**might** [12] - 44:15, 78:24, 183:8, 187:25, 214:21, 281:18, 282:13, 297:7, 301:10, 323:22, 330:16, 351:25

**migrant** [3] - 105:22, 181:6, 182:2

**migrants** [5] - 100:2, 151:23, 155:14, 181:14, 181:25

**migration** [1] - 139:20

**mild** [2] - 186:20, 186:22

**mile** [1] - 165:9

**miles** [16] - 67:20, 67:21, 67:23, 77:1, 107:25, 108:7, 111:25, 112:16, 147:9, 156:17, 158:14, 165:11, 165:12, 350:25, 351:1, 352:7

**Military** [1] - 106:1

**military** [2] - 175:21, 176:10

**milligrams** [2] - 285:21

**mind** [10] - 10:20, 97:6, 117:1, 162:17, 224:11, 308:16, 308:17, 312:24, 314:8, 316:23

**minimal** [2] - 64:22, 122:12

**minimize** [2] - 217:12, 289:2

**minimum** [3] - 126:20, 275:5, 275:6

**minor** [1] - 268:22

**minute** [1] - 165:9

**minutes** [11] - 41:6, 68:20, 68:21, 74:21, 74:23, 75:11, 165:10, 299:4, 352:1, 352:2

**mischaracterization** [2] - 176:18, 182:12

**mispronounced** [1] - 305:20

**missile** [2] - 132:9, 132:12

**Missile** [1] - 132:11

**mission** [12] - 64:23, 64:24, 73:11,

106:16, 109:2,
109:10, 109:12,
109:25, 138:4,
145:2, 200:10,
200:11
**missions** [5] - 14:21,
73:9, 76:17, 143:22,
197:19
**Mississippi** [1] -
339:10
**mixed** [1] - 153:7
**mobility** [8] - 135:12,
270:11, 270:12,
270:13, 270:22,
270:25, 271:3, 283:5
**model** [7] - 341:20,
341:22, 342:5,
342:7, 342:18,
345:12
**modern** [3] - 256:23,
257:3, 257:9
**modification** [1] -
353:18
**MOISES** [2] - 1:8, 2:5
**Moises** [4] - 28:10,
29:6, 29:14, 37:15
**molded** [1] - 70:22
**molecule** [1] - 307:4
**molecules** [2] -
306:24, 307:23
**molly** [2] - 231:21,
232:6
**moment** [7] - 6:17,
36:9, 89:5, 89:6,
142:15, 169:10,
352:10
**Momentary** [1] - 6:19
**Monday** [1] - 164:14
**money** [3] - 102:20,
130:7, 318:6
**monitored** [4] - 136:9,
236:22, 236:24,
236:25
**monitoring** [1] -
209:24
**monitors** [1] - 323:12
**Monte** [1] - 350:24
**MONTES** [2] - 1:8, 2:4
**months** [5] - 105:12,
106:1, 187:21,
302:20, 339:14
**monumental** [1] -
150:1
**MOORE** [1] - 1:15
**morning** [24] - 11:21,
11:22, 28:21, 40:15,
40:16, 50:23, 50:24,
55:19, 55:20, 61:13,
61:14, 67:5, 67:6,
83:24, 83:25, 84:7,

98:19, 101:9, 105:5,
105:6, 142:20,
142:21, 181:3,
353:10
**most** [6] - 42:14,
119:25, 207:6,
216:1, 216:10
**motion** [2] - 6:5, 7:18
**motions** [1] - 207:4
**motivations** [1] -
144:14
**motives** [1] - 144:12
**motor** [6] - 57:15,
57:16, 57:19, 57:21,
57:23
**motorcade** [1] - 321:6
**motors** [7] - 53:15,
57:5, 57:6, 93:6,
93:8, 156:6, 156:8
**mount** [2] - 125:11
**mountain** [1] - 289:4
**mounted** [2] - 43:3,
43:6
**mouthful** [2] - 199:9,
306:11
**move** [21] - 18:20,
19:8, 32:19, 37:4,
63:4, 87:9, 102:1,
102:11, 102:14,
103:11, 116:16,
134:5, 155:15,
166:19, 205:20,
264:12, 272:6,
275:22, 287:8,
324:3, 347:4
**moved** [7] - 33:17,
38:24, 49:3, 70:24,
209:25, 287:14,
318:7
**movement** [4] -
108:14, 171:7,
277:17, 279:21
**moves** [12] - 29:10,
37:2, 39:12, 63:18,
118:15, 123:11,
255:20, 256:4,
278:16, 287:5,
313:20, 324:1
**moving** [8] - 49:5,
68:5, 68:17, 102:14,
134:6, 160:1,
271:14, 319:14
**MPA** [2] - 20:11, 51:11
**MR** [133] - 8:1, 8:25,
40:14, 47:18, 50:19,
50:22, 55:15, 55:18,
58:5, 61:10, 61:12,
65:14, 67:2, 67:4,
70:13, 72:24, 73:1,
73:3, 73:17, 83:23,

90:19, 91:9, 91:21,
115:2, 117:17,
133:15, 135:20,
142:19, 155:20,
155:22, 162:13,
162:22, 163:1,
164:8, 164:11,
167:9, 167:13,
168:18, 168:21,
169:9, 169:13,
178:25, 181:2,
182:15, 185:3,
185:5, 186:9,
186:13, 186:15,
186:19, 189:10,
194:3, 212:8,
220:14, 224:15,
224:16, 228:25,
229:3, 230:24,
231:7, 231:25,
232:2, 238:5, 238:8,
241:22, 244:17,
245:16, 247:11,
247:12, 254:7,
258:25, 259:1,
261:7, 261:8,
261:10, 262:18,
262:19, 262:21,
263:16, 263:17,
264:8, 264:14,
264:16, 265:20,
266:5, 279:6,
287:20, 287:22,
290:12, 290:15,
291:16, 291:18,
293:8, 293:10,
296:5, 296:7,
298:12, 300:2,
300:8, 304:18,
304:24, 305:3,
305:10, 315:15,
315:16, 315:18,
315:24, 316:1,
316:2, 316:3,
316:15, 327:22,
329:6, 329:8,
329:14, 329:16,
330:3, 330:5,
331:13, 331:14,
332:19, 334:16,
335:4, 336:24,
344:7, 353:7,
353:15, 353:22,
354:1, 354:2, 354:9,
354:14, 354:19
**MS** [253] - 6:5, 6:8,
6:11, 6:21, 8:8, 8:18,
8:20, 8:24, 9:7, 9:11,
9:14, 11:2, 11:4,
11:20, 26:25, 27:2,
27:5, 27:7, 27:14,

27:17, 28:1, 28:5,
28:9, 28:12, 28:14,
29:9, 29:13, 36:9,
36:11, 36:13, 37:1,
37:3, 37:6, 37:8,
37:11, 38:15, 38:16,
39:11, 39:14, 39:17,
39:18, 40:10, 47:15,
58:3, 65:11, 73:19,
73:25, 74:6, 74:9,
74:10, 74:12, 76:8,
77:6, 77:9, 77:11,
77:13, 78:6, 78:9,
80:4, 81:8, 81:11,
83:21, 86:14, 90:23,
91:11, 91:12, 91:19,
91:22, 91:24, 92:11,
92:15, 95:10, 95:12,
99:23, 100:3, 100:7,
100:13, 100:19,
100:22, 101:7,
101:10, 101:15,
101:25, 102:16,
103:6, 103:11,
103:20, 104:1,
104:8, 104:9,
104:14, 105:4,
115:4, 115:20,
115:22, 116:1,
116:5, 116:16,
116:21, 116:25,
117:6, 117:20,
118:1, 118:3,
118:15, 118:17,
118:19, 118:22,
122:20, 122:23,
122:24, 122:25,
123:11, 123:15,
123:17, 130:22,
130:24, 133:14,
133:19, 133:20,
142:15, 169:10,
169:14, 169:17,
169:20, 170:2,
170:4, 172:23,
172:25, 174:11,
176:17, 176:20,
178:21, 179:1,
180:12, 180:14,
180:24, 182:11,
189:13, 190:15,
190:17, 191:22,
191:24, 192:3,
192:5, 194:6,
195:24, 196:8,
196:23, 198:23,
205:20, 205:22,
205:25, 206:2,
212:5, 220:11,
224:14, 230:20,
231:23, 241:20,

244:14, 245:13,
247:14, 251:18,
251:19, 251:24,
252:12, 252:14,
253:16, 253:19,
254:5, 254:10,
255:19, 255:22,
256:3, 256:7, 256:9,
259:3, 261:3,
263:12, 263:25,
264:2, 264:13,
265:17, 267:19,
268:8, 277:23,
277:25, 278:2,
278:16, 278:18,
278:21, 279:3,
296:6, 296:10,
298:14, 299:1,
299:9, 299:18,
299:22, 300:11,
300:16, 301:13,
302:4, 304:22,
305:16, 308:6,
308:8, 308:11,
308:13, 313:19,
313:23, 313:25,
314:5, 314:7, 314:8,
314:11, 314:14,
315:13, 316:5,
316:17, 316:21,
316:23, 317:1,
317:4, 317:22,
322:8, 322:10,
324:1, 324:4, 324:7,
324:9, 327:19,
331:16, 332:17,
334:19, 335:3,
335:6, 337:1,
337:19, 337:25,
338:15, 344:9,
346:11, 346:13,
346:15, 347:4,
347:7, 347:10,
352:10, 352:12,
353:3, 354:3
**MSST** [1] - 197:12
**multiple** [4] - 304:6,
304:8, 314:16,
339:24
**must** [2] - 6:25,
337:18
**muster** [3] - 21:4,
23:14, 59:21
**mustered** [2] - 21:9,
23:15

---

**N**

**naked** [1] - 270:5
**name** [39] - 11:12,
23:8, 28:25, 29:4,

61:2, 61:15, 104:22,
104:23, 105:9,
129:22, 152:18,
153:5, 157:23,
162:10, 162:11,
167:16, 177:8,
185:13, 185:15,
196:16, 197:3,
219:18, 238:11,
256:12, 268:2,
268:14, 270:10,
291:21, 301:22,
305:20, 317:14,
318:3, 325:4,
325:20, 326:6,
330:8, 337:16,
338:7, 350:9
**named** [2] - 185:6,
325:16
**names** [3] - 76:6,
219:12, 350:8
**naming** [1] - 350:9
**nanogram** [6] - 227:5,
242:1, 242:4,
285:16, 285:17,
294:25
**nanograms** [1] - 50:9,
213:14, 285:22
**narcotic** [2] - 174:18,
174:20
**narcotics** [13] -
202:19, 202:20,
210:8, 210:18,
226:19, 318:8,
318:9, 318:12,
318:19, 318:21,
320:15, 320:23,
324:24
**Narcotics** [2] - 197:11,
197:12
**narrow** [1] - 7:5
**Nash** [1] - 109:3
**national** [1] - 81:7
**nationality** [4] -
157:22, 184:12,
185:13, 185:15
**nature** [2] - 63:16,
167:7
**nautical** [11] - 67:20,
67:21, 67:23,
107:25, 108:7,
156:17, 158:13,
162:24, 350:25,
351:1, 352:7
**navigate** [2] - 343:14,
343:16
**navigation** [7] - 27:18,
52:23, 53:5, 93:11,
93:12, 343:2, 348:9
**navigational** [8] -

14:22, 26:20, 26:22,
26:24, 27:8, 27:11,
27:20, 29:25
**navigator** [1] - 64:23
**Navy** [1] - 109:7
**near** [4] - 77:21, 78:3,
86:23, 248:15
**nearby** [1] - 163:5
**necessarily** [8] - 23:9,
57:18, 58:17, 58:20,
216:5, 258:3,
258:14, 275:17
**necessary** [6] - 21:15,
44:15, 79:20, 86:9,
86:10, 258:10
**neck** [1] - 103:24
**need** [35] - 8:23,
12:11, 13:21, 20:18,
21:16, 21:17, 41:23,
45:17, 64:5, 64:10,
85:13, 97:4, 100:9,
103:18, 106:15,
106:17, 139:24,
149:7, 153:4,
162:15, 178:25,
186:14, 220:18,
222:23, 235:22,
283:13, 285:11,
301:6, 301:11,
317:7, 322:11,
334:24
**needed** [11] - 17:20,
47:10, 47:11,
140:10, 155:18,
188:10, 198:9,
198:10, 235:6,
269:4, 302:13
**needs** [6] - 8:14,
46:10, 178:9,
288:22, 289:10,
353:23
**negative** [60] - 17:13,
21:13, 24:16, 26:7,
26:14, 26:23, 34:16,
36:4, 40:24, 41:10,
43:13, 45:8, 45:18,
45:24, 46:16, 48:9,
48:10, 53:12, 56:16,
60:4, 62:17, 66:14,
67:1, 69:17, 70:2,
70:25, 72:2, 74:15,
74:17, 75:2, 75:24,
79:13, 84:6, 86:18,
87:22, 88:20, 89:15,
92:17, 93:23, 97:10,
98:25, 149:4,
175:11, 175:14,
213:3, 216:2, 232:9,
232:10, 247:18,
248:15, 250:10,

250:19, 250:25,
251:6, 251:11,
251:15, 252:2,
258:16, 275:17,
292:3
**net** [1] - 303:23
**never** [27] - 45:9,
61:16, 65:7, 66:24,
68:11, 68:12, 70:7,
83:10, 87:13, 87:17,
87:19, 154:4, 154:7,
161:2, 179:21,
212:13, 224:11,
230:15, 234:1,
238:13, 238:14,
243:22, 245:7,
287:15, 291:23,
330:9
**new** [5] - 11:1, 13:8,
205:1, 244:8, 309:5
**New** [7] - 105:16,
105:25, 145:8,
197:19, 318:6
**next** [24] - 18:20,
32:19, 104:13,
125:8, 133:7,
135:12, 137:12,
144:25, 168:25,
204:6, 243:25,
250:2, 267:18,
274:22, 275:22,
301:2, 301:12,
306:3, 316:20,
337:24, 343:10,
343:12, 347:2,
350:10
**Nice** [1] - 167:17
**nice** [8] - 62:24, 63:6,
134:18, 155:2,
167:18, 199:3,
238:12, 287:17
**nicotine** [2] - 297:17,
297:19
**night** [3] - 61:22,
183:4, 246:20
**NIK** [19] - 127:13,
138:25, 148:23,
148:24, 148:25,
149:2, 149:3, 149:6,
149:7, 149:10,
149:14, 171:6,
174:13, 174:15,
174:16, 228:1,
228:2, 257:17
**nine** [3] - 229:17,
314:23, 318:7
**nitrates** [1] - 294:2
**NO** [1] - 1:2
**no-type** [1] - 204:8
**nobody** [1] - 140:23

nobody's [1] - 263:4
**noise** [3] - 18:7, 42:25,
44:21
**non** [2] - 203:8, 335:7
**non-alert** [1] - 203:8
**non-leading** [1] -
335:7
**noncompliant** [7] -
17:20, 18:1, 19:23,
20:3, 44:23, 44:24,
45:11
**none** [2] - 130:3,
331:6
**nonetheless** [2] -
193:1, 326:12
**nonlethal** [3] - 45:6,
45:9, 45:15
**nonskid** [2] - 134:15,
210:7
**nonstop** [1] - 154:11
**nonverbal** [1] - 207:6
**nonverbally** [1] -
207:13
**normal** [7] - 82:9,
183:12, 183:14,
215:5, 244:2, 244:6,
274:4
**normally** [3] - 74:4,
143:24, 221:25
**north** [3] - 161:20,
161:21, 161:23
**North** [6] - 2:17,
197:11, 197:12,
334:5, 334:7, 355:12
**north/south** [1] -
17:10
**note** [11] - 9:13, 10:4,
10:17, 207:20,
207:21, 207:24,
208:11, 208:14,
209:12, 341:25,
342:5
**note-taking** [2] - 9:13,
10:4
**notebook** [1] - 56:5
**notepad** [4] - 10:6,
32:2, 32:20, 32:22
**notes** [23] - 9:12, 9:15,
10:3, 10:4, 10:5,
10:7, 10:8, 10:10,
10:13, 10:15, 10:19,
10:21, 10:24, 34:10,
34:13, 34:21, 60:8,
60:13, 60:15, 60:16,
60:24, 255:13
**nothing** [33] - 11:8,
31:18, 43:15, 82:14,
104:18, 114:13,
119:23, 120:25,
124:17, 150:9,

155:20, 161:7,
176:15, 184:7,
189:21, 196:12,
212:5, 228:25,
240:21, 250:12,
251:1, 251:6, 251:8,
261:3, 267:23,
297:2, 301:18,
317:10, 326:6,
329:22, 329:25,
334:12, 338:3
**nothing's** [2] - 170:19,
178:17
**notice** [2] - 66:7,
317:5
**noticed** [1] - 117:7
**notified** [3] - 222:22,
222:25, 320:22
**November** [1] - 319:7
**number** [69] - 32:16,
32:22, 34:6, 39:20,
46:17, 49:22, 60:21,
110:10, 110:11,
121:9, 122:3, 128:8,
128:15, 128:16,
132:8, 132:9,
132:13, 132:14,
132:15, 132:17,
132:18, 132:21,
133:8, 139:13,
146:1, 176:4, 176:5,
176:9, 176:14,
176:21, 176:25,
177:2, 188:14,
191:19, 191:20,
192:9, 203:3,
210:25, 241:8,
249:1, 249:5, 250:1,
250:4, 253:24,
256:10, 256:15,
303:6, 303:20,
313:3, 313:4, 322:7,
325:16, 332:23,
332:24, 332:25,
333:1, 333:2,
334:25, 337:4,
341:17, 342:6,
342:19
**Number** [17] - 27:23,
29:10, 39:1, 116:7,
229:6, 230:1, 230:6,
248:7, 249:15,
249:16, 249:23,
249:24, 252:1,
254:13, 256:11,
256:12, 303:6
**numbered** [2] -
203:22, 215:9
**numbers** [8] - 38:2,
128:19, 189:1,

232:25, 322:4,
325:15, 346:3, 350:7
**numerical** [1] - 275:2
**numerous** [5] -
122:18, 125:2,
149:5, 212:16,
235:10
**nurse** [5] - 131:8,
131:11, 131:13,
131:16
**nutrients** [1] - 136:1

# O

**oak** [1] - 112:25
**object** [14] - 8:25, 9:5,
27:5, 50:1, 103:1,
103:3, 147:4,
176:17, 182:11,
253:16, 263:12,
263:25, 265:17,
304:18
**objected** [1] - 6:14
**objection** [51] - 7:14,
26:25, 27:14, 37:3,
39:14, 47:15, 58:3,
65:11, 74:1, 78:6,
81:8, 86:14, 91:9,
91:21, 91:22, 92:11,
99:23, 100:7,
100:19, 101:20,
101:25, 102:14,
103:11, 104:4,
115:2, 117:17,
118:17, 130:22,
172:23, 180:12,
190:15, 191:22,
192:3, 194:3,
205:22, 220:11,
230:20, 231:23,
241:20, 244:14,
245:13, 251:18,
252:12, 258:25,
259:1, 278:18,
298:12, 324:4,
335:3, 335:4, 344:7
**Objection** [1] - 91:19
**objections** [1] - 102:5
**obligation** [1] - 10:7
**observation** [1] -
56:20
**observations** [4] -
35:7, 97:1, 100:4,
141:23
**observe** [8] - 142:8,
146:16, 199:24,
219:20, 228:14,
228:15, 233:22,
274:20
**obtained** [5] - 37:14,

40:1, 90:1, 179:23,
205:17
**obtaining** [1] - 84:16
**obvious** [3] - 78:22,
78:25, 100:9
**obviously** [9] - 16:7,
64:13, 132:14,
134:6, 180:6,
233:13, 243:9,
250:14, 337:5
**OC** [2] - 143:24,
143:25
**occasion** [5] - 99:18,
99:21, 303:4,
318:15, 340:15
**occasionally** [1] -
340:8
**occasions** [1] - 61:19
**occupants** [1] - 206:9
**occupy** [1] - 146:2
**occurred** [3] - 267:9,
267:10, 272:4
**Ocean** [2] - 54:20,
298:11
**ocean** [16] - 20:13,
22:12, 23:12, 67:10,
96:7, 96:8, 96:11,
113:18, 138:17,
153:22, 158:24,
194:9, 229:19,
229:21, 318:23,
351:4
**ocean-going** [1] -
318:23
**October** [46] - 15:7,
15:25, 16:16, 17:24,
19:1, 20:6, 22:8,
23:2, 23:12, 23:24,
29:6, 29:19, 32:24,
33:8, 36:24, 39:4,
39:9, 91:13, 92:10,
92:18, 96:17,
100:15, 106:24,
106:25, 107:13,
114:10, 118:10,
124:23, 161:15,
175:20, 191:25,
199:14, 200:5,
200:7, 210:9,
260:14, 274:4,
275:23, 276:17,
318:11, 318:16,
319:6, 351:11,
351:13, 351:14
**odor** [8] - 31:1, 87:15,
211:23, 212:1,
262:25, 264:21,
265:3, 265:4
**OF** [2] - 1:1, 1:4
**off-load** [1] - 141:11

**off-loaded** [2] -
319:25, 320:3
**offered** [2] - 27:2,
117:18
**Office** [4] - 1:21,
102:21, 318:10,
338:22
**office** [12] - 102:22,
287:14, 287:15,
287:17, 318:6,
318:24, 332:9,
340:3, 340:4, 340:5,
340:25, 344:2
**OFFICER** [8] - 3:5,
3:18, 4:21, 11:17,
80:3, 196:20,
300:21, 338:12
**Officer** [60] - 6:12,
6:16, 6:21, 11:5,
11:21, 22:9, 25:15,
25:16, 25:18, 25:20,
26:16, 28:15, 28:25,
31:21, 34:19, 36:14,
38:17, 39:19, 39:23,
47:2, 47:6, 48:6,
48:15, 53:23, 60:6,
60:13, 61:13, 62:7,
71:17, 71:18, 71:21,
74:13, 75:1, 75:3,
75:4, 75:17, 75:20,
75:25, 76:2, 76:12,
79:14, 79:22, 81:23,
90:24, 103:7,
104:14, 164:8,
167:14, 170:5,
196:9, 196:24,
198:16, 204:13,
229:4, 238:9, 300:5,
338:9, 347:12
**officer** [49] - 13:1,
13:9, 13:10, 13:16,
13:17, 13:18, 13:21,
13:25, 14:1, 19:16,
21:3, 21:18, 26:2,
26:8, 46:21, 55:1,
55:2, 59:23, 79:19,
84:12, 85:3, 86:10,
105:10, 106:11,
106:18, 106:22,
107:4, 107:5,
108:24, 124:16,
128:11, 142:1,
142:2, 155:23,
157:17, 162:19,
169:15, 178:11,
189:14, 197:14,
197:15, 199:23,
211:20, 215:10,
247:15, 254:11,
255:23, 338:18,

346:16
**officer's** [3] - 70:3,
70:5, 199:20
**officers** [4] - 47:22,
108:23, 129:6,
129:13
**Official** [2] - 2:16,
355:11
**offloaded** [1] - 139:4
**often** [1] - 233:9
**Ohio** [5] - 198:11,
268:21, 268:22,
302:18, 305:7
**oil** [4] - 235:22,
235:25, 259:7, 259:8
**oils** [1] - 259:8
**oily** [2] - 58:18, 58:22
**old** [4] - 66:11, 133:1,
154:13, 236:1
**older** [5] - 16:22,
66:17, 110:24,
187:6, 198:9
**oldest** [1] - 344:12
**onboard** [27] - 12:2,
21:5, 29:19, 40:17,
87:18, 94:2, 105:10,
106:12, 108:25,
112:24, 114:13,
116:14, 126:16,
129:6, 136:15,
137:4, 150:8,
154:25, 159:25,
160:6, 166:16,
186:5, 187:11,
209:24, 216:25,
218:4, 218:20
**once** [58] - 15:5, 17:4,
20:19, 20:22, 21:4,
21:9, 25:10, 29:22,
33:25, 60:14, 61:22,
72:18, 74:25, 78:22,
84:24, 85:3, 108:5,
110:21, 112:18,
122:13, 125:21,
126:11, 128:6,
128:10, 129:12,
129:18, 129:20,
130:4, 133:7,
136:25, 137:5,
137:7, 144:20,
144:22, 152:2,
154:19, 158:14,
158:17, 166:1,
187:11, 201:3,
202:25, 203:2,
204:25, 221:18,
304:11, 307:2,
311:16, 319:15,
321:1, 325:18,
342:2, 344:2,

344:11, 345:16,
349:14
**One** [2] - 197:21,
197:24
**one** [227] - 6:17, 6:22,
6:24, 9:1, 9:7, 10:2,
13:1, 16:5, 16:6,
22:14, 23:8, 30:14,
32:12, 32:16, 34:25,
35:25, 36:9, 38:22,
38:25, 39:4, 43:6,
43:7, 46:17, 52:17,
54:9, 55:23, 56:4,
57:10, 64:21, 65:18,
68:9, 69:13, 72:5,
73:9, 75:25, 76:17,
77:7, 79:24, 84:10,
84:24, 85:18, 96:13,
103:17, 105:17,
106:11, 108:1,
108:8, 109:9, 113:7,
114:6, 114:7,
116:13, 119:12,
119:18, 120:8,
120:19, 122:7,
127:11, 128:1,
128:22, 134:14,
135:6, 135:11,
135:14, 139:17,
140:3, 140:4, 140:6,
140:7, 142:15,
144:9, 145:6,
145:23, 147:7,
147:22, 149:4,
149:11, 149:15,
149:17, 149:18,
149:20, 149:21,
150:2, 153:2,
157:13, 157:15,
158:4, 160:16,
161:17, 164:6,
172:13, 172:15,
173:24, 174:22,
175:14, 175:23,
175:25, 176:6,
176:9, 176:12,
176:13, 176:14,
176:21, 177:2,
177:25, 185:4,
187:2, 189:25,
190:1, 190:10,
191:19, 192:7,
192:8, 192:9,
194:19, 197:17,
200:25, 201:18,
202:8, 203:3,
203:20, 203:22,
204:6, 204:16,
204:19, 205:4,
209:16, 213:1,
213:15, 214:21,

215:17, 217:24, 218:11, 220:20, 227:3, 227:21, 228:6, 230:7, 231:1, 231:10, 232:12, 235:11, 236:6, 236:7, 237:1, 237:2, 239:11, 239:13, 239:14, 239:16, 239:17, 239:18, 239:19, 239:20, 239:21, 239:25, 240:2, 240:18, 241:6, 247:19, 248:7, 248:14, 248:15, 249:7, 250:2, 251:5, 251:23, 251:25, 252:18, 256:13, 259:11, 261:4, 265:2, 265:5, 266:6, 267:13, 272:19, 275:24, 277:3, 279:14, 280:20, 285:20, 285:21, 286:13, 288:8, 289:20, 291:13, 300:13, 300:24, 300:25, 306:5, 308:22, 309:3, 310:12, 314:4, 314:6, 314:8, 314:9, 314:19, 314:24, 328:3, 328:4, 330:24, 332:1, 332:2, 337:12, 341:3, 343:6, 345:9, 347:14, 349:15, 352:10

**one's** [1] - 42:3
**one-page** [1] - 347:14
**ones** [5] - 102:12, 203:18, 278:8, 293:14, 323:9
**onesie** [1] - 133:2
**online** [1] - 122:5
**op** [1] - 161:22
**open** [23] - 9:17, 15:16, 22:1, 22:12, 28:21, 28:23, 32:7, 127:11, 128:1, 183:3, 186:24, 189:25, 190:1, 227:22, 287:16, 314:9, 314:18, 330:24, 331:2, 345:1, 345:2, 346:4
**open-source** [2] - 345:1, 345:2
**opened** [2] - 140:21,

159:21
**opening** [2] - 308:17, 314:8
**operated** [1] - 323:15
**operating** [4] - 68:2, 234:2, 261:1, 289:3
**operation** [1] - 215:5
**operations** [3] - 105:22, 199:21, 339:12
**operator** [1] - 289:13
**opinion** [6] - 58:23, 273:8, 273:11, 302:24, 307:17, 312:2
**opportunity** [17] - 7:23, 18:25, 22:25, 28:19, 35:9, 95:15, 99:18, 100:24, 142:8, 154:8, 197:16, 206:12, 237:2, 248:10, 263:15, 353:13, 354:3
**opposed** [6] - 10:10, 217:24, 226:13, 226:25, 283:19, 310:16
**opposite** [1] - 110:17
**optimal** [1] - 288:21
**option** [1] - 45:20
**options** [2] - 44:14, 45:18
**oral** [2] - 13:10, 64:7
**orange** [2] - 16:11, 155:2
**order** [18] - 19:22, 102:20, 106:15, 106:22, 122:11, 136:1, 149:8, 153:4, 164:2, 168:6, 171:6, 277:6, 285:10, 302:15, 303:15, 304:16, 307:22, 348:3
**ordered** [2] - 47:25, 332:11
**orders** [3] - 15:11, 15:12, 111:9
**ordinary** [2] - 14:2, 142:6
**Ordonez** [4] - 28:10, 29:6, 29:14, 61:3
**ORDONEZ** [2] - 1:8, 2:5
**original** [6] - 85:1, 160:11, 160:12, 261:5, 281:22, 309:4
**originally** [2] - 215:13, 311:2

**ORLANDO** [1] - 2:8
**ORTIZ** [2] - 1:10, 2:10
**Ortiz** [12] - 5:19, 80:9, 80:24, 169:22, 169:23, 169:25, 249:17, 249:19, 249:22, 249:23, 250:8, 250:10
**Ortiz's** [2] - 250:18, 251:15
**OTH** [12] - 62:18, 62:24, 65:4, 65:6, 65:25, 66:2, 93:22, 94:20, 167:23, 194:21, 209:23, 220:12
**otherwise** [8] - 7:22, 46:10, 60:15, 101:21, 103:7, 144:12, 144:14, 154:14
**ought** [1] - 264:6
**ourselves** [3] - 144:9, 170:22, 201:1
**out-of-court** [2] - 7:10, 7:23
**outboard** [1] - 22:2
**outdoors** [1] - 182:24
**outer** [5] - 28:22, 120:22, 159:11, 159:12, 192:20
**output** [1] - 308:1
**outside** [13] - 62:9, 120:24, 137:15, 159:16, 183:5, 224:1, 232:24, 233:2, 233:22, 253:14, 263:13, 290:25, 291:6
**over-label** [1] - 176:11
**over-pursue** [1] - 46:11
**over-the-horizon** [22] - 14:5, 14:7, 14:11, 14:13, 14:23, 15:11, 16:3, 16:8, 67:18, 68:1, 167:23, 192:13, 193:2, 195:4, 200:3, 229:23, 230:8, 230:22, 231:1, 260:6, 260:12
**over-the-horizons** [1] - 62:25
**overall** [5] - 69:23, 69:24, 170:15, 199:8, 328:6
**overarching** [1] - 221:3
**overboard** [2] - 221:2,

291:4
**overhead** [2] - 111:20, 112:19
**overly** [1] - 271:1
**overriding** [1] - 342:10
**overruled** [17] - 27:4, 27:16, 47:17, 91:10, 91:23, 92:13, 99:25, 100:8, 100:20, 117:19, 130:23, 135:21, 190:16, 192:4, 232:1, 245:15, 259:2
**overseas** [1] - 227:18
**overtake** [1] - 68:8
**overtook** [2] - 68:11, 68:12
**overview** [3] - 135:18, 346:21, 347:14
**overwhelming** [3] - 31:4, 48:19, 48:20
**overwrite** [1] - 344:13
**overwriting** [1] - 344:12
**overwritten** [1] - 351:24
**own** [15] - 9:12, 10:24, 60:20, 74:8, 77:25, 96:17, 116:15, 128:16, 128:17, 135:9, 147:12, 162:20, 206:5, 239:12, 308:3
**owner** [1] - 157:23
**owns** [1] - 331:4
**Oxy-10** [1] - 203:15

## P

**P-F-R-I-M-M-E-R** [1] - 338:10
**p.m** [14] - 1:8, 98:19, 98:20, 196:5, 196:6, 196:7, 299:5, 300:20, 300:22, 301:1, 353:11, 355:1
**Pacific** [20] - 15:17, 15:18, 54:20, 76:21, 77:14, 98:7, 107:9, 107:10, 134:18, 136:23, 139:21, 140:8, 140:9, 161:16, 161:18, 171:14, 181:24, 192:1, 298:11, 352:23
**package** [2] - 175:3, 314:22
**packaged** [6] - 148:18, 203:21,

227:24, 228:3, 304:5, 314:21
**packages** [31] - 92:1, 114:3, 114:16, 115:15, 125:2, 127:11, 148:1, 148:14, 148:16, 148:20, 149:24, 150:4, 150:8, 158:2, 158:8, 159:3, 159:17, 159:22, 160:4, 160:5, 160:11, 160:12, 160:13, 172:22, 227:20, 228:12, 316:9, 316:23
**packaging** [10] - 123:6, 148:17, 304:11, 304:13, 306:2, 313:6, 314:19, 314:22, 315:3, 315:21
**packet** [2] - 176:22, 176:23, 285:20
**PAGE** [4] - 3:1, 3:4, 4:1, 4:4
**Page** [1] - 209:4
**page** [6] - 162:17, 209:4, 273:25, 276:17, 346:21, 347:14
**Pages** [1] - 1:10
**pages** [5] - 54:1, 346:24, 348:21, 348:24, 354:11
**pain** [1] - 103:24
**pains** [3] - 186:20, 186:21, 186:22
**paint** [1] - 133:1
**painted** [3] - 21:24, 93:14, 96:4
**pale** [1] - 96:6
**Panama** [5] - 138:10, 153:25, 154:10, 163:7, 163:8
**pancake** [1] - 285:11
**panel** [1] - 114:23
**Panga** [103] - 15:12, 21:24, 22:12, 22:15, 23:12, 23:21, 24:24, 24:25, 25:14, 26:6, 29:19, 29:23, 30:18, 31:7, 35:7, 36:19, 36:21, 37:23, 38:1, 38:4, 38:8, 38:10, 52:3, 52:21, 52:25, 53:16, 53:22, 54:16, 54:17, 54:20, 55:8, 56:20, 57:6, 61:6, 61:7, 65:1, 65:4,

65:7, 65:15, 65:24, 66:4, 66:7, 66:20, 66:25, 67:8, 67:22, 68:8, 68:13, 70:18, 74:13, 74:21, 74:22, 74:25, 81:15, 83:2, 83:6, 83:10, 87:18, 88:3, 91:14, 92:1, 93:10, 93:14, 94:2, 96:4, 96:20, 98:15, 108:25, 110:25, 111:22, 124:23, 141:21, 141:23, 141:24, 142:5, 142:11, 142:13, 142:14, 147:18, 147:19, 147:20, 156:17, 157:9, 164:19, 176:2, 177:1, 191:6, 193:18, 193:20, 193:23, 194:17, 194:24, 200:8, 201:7, 201:10, 202:5, 206:8, 243:19, 243:24, 247:23, 247:25, 248:2, 263:8

**Pangas** [4] - 83:7, 96:10, 145:24, 191:25

**pants** [5] - 24:7, 24:9, 29:16, 126:18, 286:21

**paper** [23] - 9:12, 10:21, 31:11, 49:10, 56:5, 85:21, 85:24, 86:1, 129:24, 174:12, 175:18, 185:19, 188:3, 188:6, 201:18, 203:2, 203:14, 203:16, 203:17, 248:24, 257:5, 257:7

**paperwork** [1] - 13:20

**paragraph** [1] - 36:23

**parameters** [1] - 253:14

**paramount** [2] - 143:17, 243:8

**pardon** [2] - 243:14, 313:1

**part** [26] - 14:3, 31:13, 40:17, 51:24, 52:2, 54:8, 81:21, 107:7, 110:9, 124:3, 126:22, 130:25, 133:13, 155:9, 155:10, 210:4, 219:8, 219:17,

275:22, 299:19, 318:14, 319:3, 320:14, 327:16, 339:21, 351:2

**partially** [3] - 24:20, 33:10, 284:22

**particle** [3] - 201:5, 213:17, 311:15

**particles** [3] - 201:4, 270:3, 270:4

**particular** [2] - 13:14, 13:15, 22:13, 35:25, 41:15, 52:8, 87:15, 171:1, 184:22, 200:10, 200:11, 202:20, 265:2, 265:5, 273:4, 274:11, 276:13, 288:12, 288:14, 288:16, 289:13, 316:10, 328:23, 340:21, 341:21

**particularly** [4] - 46:21, 142:10, 145:16, 286:8

**parts** [1] - 327:16

**party** [4] - 6:13, 74:5, 246:11, 289:14

**pass** [2] - 217:25, 322:15

**passage** [1] - 282:10

**passed** [9] - 53:25, 54:3, 54:11, 106:21, 277:13, 281:6, 286:13, 286:15, 353:9

**passing** [1] - 279:14

**patch** [1] - 226:2

**patent** [3] - 270:19, 270:21, 270:22

**paths** [1] - 271:12

**patrol** [3] - 107:11, 107:12, 150:10

**patrolling** [1] - 140:7

**patrols** [2] - 105:20, 145:18

**patted** [1] - 225:16

**pattern** [4] - 307:4, 307:7, 307:25, 310:11

**Paul** [3] - 199:23, 228:13, 268:3

**pause** [3] - 6:19, 36:10, 352:11

**pay** [2] - 15:23, 15:24

**paying** [1] - 54:2

**peak** [1] - 284:7

**pedal** [1] - 164:17

**peers** [1] - 311:22

**pelican** [1] - 32:1

**pen** [7] - 9:12, 10:6, 10:21, 32:2, 70:15, 217:17, 217:20

**penetrate** [1] - 45:4

**people** [69] - 19:11, 41:18, 41:21, 41:24, 48:16, 59:17, 64:14, 64:25, 66:2, 66:4, 91:13, 92:20, 92:23, 92:25, 99:19, 99:21, 100:4, 100:9, 100:11, 136:7, 139:12, 140:25, 141:2, 141:23, 141:25, 146:1, 146:6, 158:20, 158:22, 158:23, 166:10, 181:14, 181:18, 181:21, 182:8, 206:12, 207:6, 211:19, 212:16, 212:18, 214:9, 214:19, 219:21, 220:6, 220:7, 220:23, 221:8, 221:17, 221:19, 222:2, 223:1, 226:15, 230:14, 231:22, 234:12, 240:18, 240:19, 244:11, 271:5, 280:4, 280:8, 280:14, 292:13, 292:20, 298:17, 301:10, 321:4, 326:4, 331:1

**pepper** [1] - 12:25

**per** [12] - 63:22, 64:13, 64:21, 138:23, 167:20, 216:6, 219:7, 239:13, 239:16, 239:18, 239:25, 240:2

**perceived** [1] - 7:4

**percent** [27] - 23:10, 30:14, 46:18, 209:11, 209:17, 228:6, 232:5, 232:13, 232:15, 232:23, 233:24, 240:25, 241:6, 241:14, 248:20, 274:23, 274:25, 275:4, 275:7, 275:25, 276:10, 276:18, 284:3, 295:11, 295:12

**percentage** [6] - 228:10, 232:17, 241:3, 274:6, 274:23

**perception** [1] - 44:9

**Perez** [8] - 61:16, 167:17, 238:11, 291:22, 330:9, 330:19, 331:8, 331:10

**PEREZ** [2] - 1:9, 2:7

**Perez-Cruz** [7] - 61:16, 167:17, 291:22, 330:9, 330:19, 331:8, 331:10

**PEREZ-CRUZ** [2] - 1:9, 2:7

**perfect** [1] - 298:8

**perform** [10] - 31:7, 60:14, 149:10, 206:5, 206:20, 298:4, 306:10, 309:23, 310:1, 340:2

**performed** [4] - 31:8, 149:1, 149:2, 149:3, 205:18, 260:22, 303:12, 309:17, 310:2, 310:3, 312:2

**performing** [1] - 340:5

**performs** [1] - 310:10

**perhaps** [10] - 8:3, 9:12, 42:15, 47:9, 212:15, 213:24, 214:16, 216:1, 219:5, 342:17

**period** [6] - 44:5, 287:1, 287:2, 295:10, 336:19, 336:21

**periods** [1] - 165:21

**permission** [29] - 19:22, 28:12, 29:22, 36:11, 37:6, 37:8, 38:15, 39:17, 52:22, 95:10, 115:20, 116:17, 116:21, 118:1, 118:19, 122:20, 123:15, 205:25, 256:7, 277:23, 308:6, 313:23, 314:11, 322:8, 324:7, 341:5, 342:15, 346:11, 347:7

**permitted** [1] - 7:15

**Perr** [4] - 267:20, 268:3, 268:14, 293:13

**perr** [5] - 287:23, 290:16, 291:19, 293:11, 296:11

**PERR** [2] - 4:5, 268:5

**person** [69] - 32:21,

39:21, 39:25, 64:21, 87:13, 96:17, 100:12, 106:14, 153:2, 158:24, 160:25, 176:12, 207:8, 208:15, 209:9, 214:21, 215:24, 217:9, 224:8, 227:3, 229:6, 229:7, 233:4, 233:6, 236:22, 236:25, 239:13, 239:15, 239:16, 239:18, 239:25, 240:3, 249:1, 250:5, 254:13, 255:2, 255:7, 256:10, 256:15, 259:16, 279:14, 279:25, 280:2, 280:3, 280:12, 281:4, 282:14, 282:15, 286:21, 290:5, 291:7, 295:2, 295:12, 297:20, 298:5, 325:4, 326:4, 328:22, 331:4, 331:7, 331:8, 332:10, 332:15, 334:21, 334:23, 335:20

**person's** [5] - 227:9, 227:15, 227:16, 280:5

**personal** [10] - 12:23, 35:18, 81:19, 110:4, 130:3, 130:6, 147:12, 153:7, 155:1, 221:1

**personally** [5] - 25:9, 87:20, 183:21, 328:8, 329:4

**personnel** [2] - 19:9, 106:13, 220:5, 238:4, 251:23

**persons** [3] - 73:11, 211:24, 259:17

**perspective** [1] - 172:20

**pertain** [1] - 256:16

**pertaining** [4] - 270:3, 323:1, 326:18, 337:3

**pertinent** [1] - 82:19

**PETTY** [2] - 4:21, 338:12

**Petty** [1] - 338:9

**PEW** [1] - 21:21

**PFDs** [1] - 155:1

**Pfrimmer** [4] - 337:25, 338:18, 346:16,

347:12
**PFRIMMER** [2] - 4:21, 338:12
**Ph.D** [2] - 268:23, 270:11
**phone** [6] - 121:10, 187:8, 325:15, 326:5, 328:19, 330:21
**phones** [3] - 130:8, 340:8, 340:9
**phonetic** [1] - 162:11
**photo** [9] - 70:7, 72:13, 87:9, 88:14, 125:1, 152:21, 242:21, 242:22, 242:23
**photocopies** [4] - 205:14, 205:16, 273:25, 274:1
**photograph** [23] - 22:13, 22:17, 22:18, 22:19, 22:20, 24:21, 36:20, 38:24, 56:15, 59:9, 71:7, 72:8, 72:11, 72:22, 120:8, 121:25, 124:21, 125:21, 125:23, 169:22, 219:19, 225:17, 342:7
**photographed** [5] - 70:4, 70:6, 121:22, 121:23, 219:15
**photographs** [10] - 22:11, 54:14, 54:16, 54:17, 62:3, 104:7, 118:8, 169:18, 171:20, 238:18
**photos** [11] - 38:21, 70:1, 88:16, 88:18, 157:8, 157:14, 158:3, 169:11, 171:25, 172:1, 172:3
**phraseology** [1] - 281:20
**physical** [3] - 280:6, 321:22, 333:17
**physically** [6] - 203:14, 332:3, 332:8, 348:7, 352:8
**picadillo** [1] - 183:16
**pick** [11] - 31:13, 106:15, 119:23, 148:5, 166:1, 201:1, 201:5, 242:9, 242:13, 242:15, 245:21
**picked** [10] - 102:12, 106:4, 119:2, 148:15, 166:6,

166:7, 192:14, 201:6, 230:18, 289:18
**picking** [10] - 112:20, 113:19, 113:20, 113:21, 148:1, 148:11, 217:24, 291:13, 292:13, 292:18
**picks** [2] - 242:18, 291:3
**Pico** [1] - 350:24
**PICO** [2] - 1:9, 2:8
**picogram** [3] - 285:17, 285:18, 286:10
**picograms** [1] - 285:23
**picture** [34] - 16:3, 16:7, 16:9, 22:20, 23:14, 33:9, 54:18, 57:6, 71:20, 73:4, 79:24, 80:6, 95:15, 97:7, 118:25, 119:1, 120:4, 120:11, 124:7, 129:24, 134:16, 166:5, 172:19, 173:15, 175:12, 175:17, 177:10, 184:12, 192:8, 193:23, 194:7, 238:1, 266:3
**pictured** [2] - 23:3, 35:8
**pictures** [50] - 22:14, 23:19, 23:22, 30:3, 51:10, 53:15, 59:2, 66:9, 72:19, 79:2, 79:5, 79:6, 79:8, 79:12, 79:14, 79:25, 81:24, 89:4, 89:7, 96:16, 97:4, 98:23, 101:16, 101:17, 101:18, 101:19, 101:22, 102:2, 102:5, 102:11, 102:12, 102:17, 102:18, 102:22, 102:24, 103:2, 103:7, 103:10, 103:17, 118:12, 122:17, 157:12, 157:24, 158:5, 173:24, 175:10
**pie** [6] - 200:21, 200:22, 200:23, 200:25, 201:3
**piece** [12] - 31:11, 36:5, 85:9, 85:21, 85:24, 175:18, 201:17, 203:2,

203:15, 203:17, 286:19, 306:22
**pieces** [2] - 90:2, 307:5
**piles** [1] - 125:5
**pillar** [1] - 43:5
**PINERA** [74] - 2:10, 6:5, 6:8, 6:11, 6:21, 9:5, 9:14, 26:25, 27:5, 27:14, 37:3, 39:14, 73:19, 74:10, 74:12, 76:8, 77:6, 77:9, 77:11, 77:13, 78:9, 80:4, 81:11, 83:21, 91:19, 91:22, 92:11, 99:23, 100:7, 100:19, 101:10, 101:15, 102:16, 103:6, 103:20, 104:1, 104:9, 118:17, 122:23, 130:22, 133:14, 169:10, 169:14, 169:20, 170:2, 170:4, 172:25, 174:11, 176:20, 178:21, 179:1, 180:14, 180:24, 190:15, 191:22, 192:3, 205:22, 224:14, 247:14, 251:19, 251:24, 252:14, 253:19, 254:5, 264:13, 278:18, 296:6, 300:16, 316:5, 324:4, 331:16, 332:17, 335:3, 354:3
**Pinera-Vazquez** [5] - 3:9, 3:16, 3:22, 4:14, 4:19
**pings** [1] - 323:25
**pipe** [1] - 210:6
**pistol** [2] - 21:21, 144:1
**pistols** [1] - 12:9
**pivotal** [1] - 8:3
**place** [18] - 15:3, 39:1, 58:20, 73:22, 84:25, 95:13, 153:9, 153:11, 162:11, 199:3, 205:3, 211:15, 211:18, 222:11, 244:1, 260:4, 287:17, 298:4
**placed** [6] - 73:21, 163:22, 224:17, 243:9, 308:25, 312:10
**places** [6] - 153:10, 214:19, 222:11, 331:1, 350:19, 350:20
**placing** [14] - 22:3, 22:16, 37:12, 37:17, 40:3, 40:4, 40:5, 40:7, 40:8, 40:9, 74:1, 95:5, 209:25, 254:11
**plane** [6] - 20:11, 111:20, 270:1, 297:2, 297:7, 297:9
**planning** [1] - 299:17
**plans** [1] - 72:24
**plasma** [3] - 278:11, 278:12, 278:22
**plastic** [10] - 32:1, 32:19, 34:2, 49:23, 84:19, 89:10, 89:18, 177:19, 298:7, 304:9
**platform** [1] - 138:5
**play** [5] - 272:15, 280:23, 286:23, 293:7, 354:9
**played** [1] - 181:17

**pleased** [1] - 73:14
**pleasure** [2] - 154:4, 220:25
**plenty** [2] - 89:6, 89:7
**plot** [1] - 351:9
**plots** [1] - 349:1
**plotted** [2] - 350:22, 351:15
**plotting** [3] - 326:22, 326:25, 327:12
**plug** [1] - 233:13
**plus** [7] - 93:14, 141:25, 148:12, 158:24, 240:11, 240:12, 240:13
**pocket** [2] - 29:16
**pockets** [1] - 286:21
**podium** [5] - 213:20, 224:17, 282:20, 283:17, 285:12
**point** [57] - 9:2, 16:25, 28:2, 28:6, 46:14, 48:7, 68:9, 68:12, 68:16, 77:19, 94:16, 107:13, 111:22, 119:16, 123:11, 131:25, 136:3, 136:23, 140:3, 140:4, 153:15, 163:2, 218:14, 222:22, 224:11, 279:17, 279:25, 280:2, 280:12, 280:17, 281:7, 281:8, 281:10, 281:11, 281:12, 281:13, 281:14, 282:7, 282:11, 282:12, 282:16, 286:13, 298:21, 298:22, 319:5, 319:20, 347:4, 348:15, 350:17, 352:3, 352:4, 352:7
**pointed** [4] - 28:10, 78:3, 207:8
**pointing** [4] - 33:12, 70:16, 248:15, 313:11
**points** [8] - 326:22, 326:25, 327:6, 327:12, 336:17, 348:4, 350:18, 350:19
**pole** [1] - 210:5
**policy** [10] - 136:25, 138:24, 139:19, 168:4, 170:16, 199:20, 219:7, 219:14, 219:16,

219:20

**pool** [1] - 284:16
**popular** [1] - 202:18
**Port** [5] - 318:22, 320:20, 320:21, 321:2
**port** [19] - 32:16, 33:19, 33:20, 76:6, 137:1, 137:9, 137:12, 137:17, 139:4, 139:10, 187:8, 198:18, 209:14, 260:18, 319:21, 319:24, 321:5, 344:25
**portable** [2] - 171:4, 171:10
**portion** [16] - 8:10, 17:1, 19:3, 70:18, 152:20, 173:24, 182:23, 193:16, 306:5, 306:8, 306:19, 307:3, 309:3, 309:7, 314:11, 314:18
**portions** [1] - 314:21
**portside** [2] - 16:6, 43:20
**Portsmouth** [1] - 105:16
**pose** [4] - 26:1, 26:4, 26:5, 129:21
**posed** [2] - 27:8, 155:14
**posing** [1] - 26:8
**position** [23] - 7:21, 15:20, 17:7, 17:10, 17:14, 21:1, 67:17, 107:3, 107:17, 107:21, 111:19, 121:11, 135:14, 158:18, 159:25, 162:4, 302:15, 336:17, 343:4, 345:25, 347:24, 348:1
**positioned** [1] - 151:11
**Positioning** [2] - 343:17, 343:19
**positions** [4] - 327:3, 327:5, 349:1, 352:2
**positive** [71] - 108:13, 111:7, 128:10, 128:11, 142:4, 149:4, 149:7, 175:7, 175:11, 175:14, 176:23, 204:21, 205:1, 207:18, 207:21, 209:16,

213:2, 213:6, 213:21, 214:3, 214:7, 216:2, 216:12, 218:12, 225:3, 225:11, 225:19, 227:11, 228:11, 231:10, 232:5, 232:12, 232:23, 236:8, 240:15, 248:20, 248:21, 248:25, 249:4, 250:5, 251:7, 251:12, 251:25, 252:16, 252:20, 253:3, 253:4, 255:17, 258:3, 279:17, 281:13, 282:17, 283:2, 283:3, 283:22, 285:10, 286:11, 292:1, 292:3, 292:5, 293:22, 294:7, 294:19, 295:18, 296:20, 297:11, 297:12, 297:14, 309:19, 310:22
**possession** [4] - 281:25, 282:1, 322:17, 342:3
**possibility** [10] - 83:16, 284:13, 284:15, 286:16, 286:24, 289:20, 291:9, 291:11, 291:12, 291:15
**possible** [13] - 68:2, 216:10, 246:18, 247:7, 280:18, 282:9, 282:12, 282:14, 282:19, 284:6, 286:8, 297:11, 298:15
**possibly** [12] - 86:5, 93:16, 123:24, 177:21, 245:21, 276:16, 277:4, 277:14, 277:16, 284:4, 284:9, 284:10
**potato** [3] - 113:10, 114:16, 159:5
**potential** [3] - 45:20, 277:18, 294:15
**potentially** [7] - 46:10, 46:11, 149:23, 294:7, 342:10, 344:13, 351:23
**pounded** [1] - 290:19
**pounding** [1] - 291:10
**pounds** [3] - 148:9, 172:10, 172:12

**powder** [9] - 49:25, 290:21, 290:22, 290:24, 304:6, 304:13, 306:19, 310:14, 311:12
**powdery** [1] - 306:1
**power** [7] - 57:22, 66:17, 188:22, 342:8, 342:11, 343:11
**power-on** [1] - 342:8
**powered** [1] - 350:10
**powerful** [4] - 63:2, 65:6, 65:8, 65:9
**POWERS** [2] - 2:16, 355:11
**Powers** [1] - 355:10
**practical** [1] - 300:15
**practice** [5] - 122:10, 124:1, 124:4, 126:12, 170:17
**practices** [2] - 187:4, 190:2
**pre** [2] - 193:14, 308:14
**pre-board** [1] - 193:14
**pre-marked** [1] - 308:14
**precaution** [1] - 187:9
**precautionary** [1] - 344:16
**precise** [3] - 241:24, 242:7, 242:8
**predominantly** [1] - 293:17
**preemptive** [1] - 199:7
**premarked** [4] - 28:15, 36:14, 38:17, 255:24
**preparation** [1] - 278:5
**prepare** [1] - 303:16
**prepared** [4] - 50:25, 103:16, 103:19, 136:13
**presence** [8] - 13:1, 21:18, 251:16, 261:12, 269:3, 276:20, 283:8, 298:3
**present** [21] - 52:4, 103:19, 230:25, 251:1, 258:15, 271:15, 272:5, 273:1, 274:19, 274:21, 275:18, 276:15, 284:7, 285:9, 286:16, 292:2, 295:1, 295:9, 295:20, 296:17
**presented** [3] - 7:17, 9:22, 51:10

**preserve** [7] - 85:6, 89:7, 89:22, 189:8, 265:10, 344:6
**preserved** [4] - 89:24, 170:21, 180:11, 217:23
**press** [1] - 203:6
**presumptions** [1] - 171:6
**presumptive** [7] - 149:8, 257:16, 258:9, 284:9, 296:16, 298:24, 311:3
**presumptively** [5] - 126:13, 127:22, 127:24, 128:6, 128:11
**pretend** [1] - 224:12
**pretrial** [1] - 8:13
**pretty** [36] - 42:3, 42:9, 46:1, 58:7, 59:7, 60:18, 78:22, 78:25, 112:1, 113:2, 113:4, 119:4, 131:11, 134:1, 147:25, 150:15, 151:11, 154:6, 154:7, 157:14, 161:16, 164:18, 165:9, 173:18, 187:9, 193:10, 195:8, 198:8, 199:6, 221:5, 235:10, 246:14, 253:24, 262:4, 265:22, 340:11
**prevent** [1] - 289:11
**prevents** [1] - 134:17
**previous** [2] - 61:18, 100:1
**previously** [5] - 9:25, 91:14, 115:23, 208:1, 309:6
**pride** [2] - 144:9, 259:20
**primarily** [1] - 340:8
**primary** [4] - 18:24, 73:7, 92:6, 220:21
**principle** [2] - 221:3, 221:5
**print** [7] - 102:8, 102:22, 103:2, 103:20, 103:21, 273:22, 275:8
**printed** [4] - 72:22, 78:21, 205:14, 208:12
**printed-out** [1] - 72:22
**printout** [9] - 205:17, 207:24, 256:15,

266:12, 274:22, 346:9, 346:19, 347:14, 348:25
**prints** [1] - 276:10
**probability** [2] - 50:4, 58:15
**probative** [1] - 102:12
**problem** [15] - 25:8, 101:24, 156:24, 160:25, 162:13, 182:2, 197:3, 202:15, 220:25, 227:1, 231:4, 254:6, 300:11, 300:16, 353:22
**problems** [5] - 103:9, 133:15, 133:17, 239:1, 263:8
**procedure** [9] - 32:24, 68:2, 122:10, 126:12, 204:25, 205:2, 221:15, 244:6, 266:24
**procedures** [3] - 236:24, 290:5, 312:3
**proceed** [2] - 109:17, 117:21
**proceedings** [4] - 36:10, 352:11, 355:1, 355:8
**process** [35] - 73:2, 121:17, 124:16, 126:1, 128:7, 128:22, 130:10, 131:24, 133:8, 137:3, 152:2, 153:2, 153:3, 153:9, 155:4, 160:1, 170:15, 170:16, 191:15, 201:17, 202:3, 202:5, 202:6, 203:7, 204:11, 208:1, 219:21, 229:20, 280:3, 299:10, 323:18, 324:10, 326:14, 336:14, 345:17
**processed** [6] - 128:21, 131:25, 167:6, 170:14, 237:9, 238:1
**processing** [8] - 131:5, 132:15, 152:12, 212:1, 218:18, 218:19, 228:19, 288:13
**produce** [3] - 300:4, 307:15, 307:19
**produced** [1] - 255:12
**produces** [2] - 307:15,

308:1
**professional** [1] - 339:2
**Professional** [1] - 318:10
**proffer** [4] - 7:14, 300:17, 300:18
**profile** [1] - 129:25
**profiles** [1] - 326:3
**profiling** [1] - 288:10
**program** [3] - 129:13, 132:11, 266:19
**programmed** [1] - 201:6
**programs** [6] - 188:12, 345:8, 345:9, 348:18, 349:9, 349:10
**prompt** [1] - 297:16
**prop** [1] - 165:20
**proper** [2] - 136:1, 345:11
**properly** [5] - 180:10, 235:13, 261:1, 279:1, 290:5
**properties** [1] - 276:5
**property** [9] - 123:5, 141:14, 189:6, 303:18, 320:11, 320:12, 321:7, 322:19, 342:16
**proposed** [2] - 8:20, 353:14
**prosecution** [2] - 52:5, 238:15
**prosecutor** [4] - 80:6, 183:25, 184:2, 248:6
**prosecutors** [1] - 7:17
**protect** [9] - 133:3, 166:16, 177:14, 212:21, 217:3, 217:4, 223:8, 223:14, 224:5
**protected** [2] - 6:16, 223:10
**protecting** [1] - 7:6
**protection** [2] - 110:5, 145:9
**protective** [3] - 22:4, 180:5, 223:17
**protocol** [5] - 130:18, 130:19, 155:6, 233:7, 312:3
**protocols** [1] - 154:23
**prove** [6] - 6:25, 90:6, 91:4, 91:7, 91:25, 339:24
**proved** [1] - 176:21
**proven** [2] - 8:14, 235:10

19:23
**pursuit** [18] - 17:15, 17:16, 17:19, 41:13, 43:18, 64:23, 64:24, 78:15, 78:16, 94:11, 109:2, 109:3, 109:4, 109:10, 109:12, 109:25, 110:1, 143:22
**pushed** [1] - 284:17
**put** [114] - 10:14, 27:22, 31:15, 31:17, 32:10, 34:1, 43:16, 49:23, 80:6, 81:19, 82:11, 82:16, 83:5, 83:16, 83:18, 84:18, 84:24, 85:1, 88:7, 89:10, 89:18, 116:15, 117:3, 117:25, 118:23, 119:12, 124:6, 126:11, 127:12, 127:16, 130:5, 132:6, 132:8, 132:10, 132:12, 132:15, 133:5, 134:5, 135:10, 149:6, 149:9, 155:7, 155:9, 161:5, 161:7, 166:2, 166:8, 173:7, 175:2, 176:12, 177:15, 177:19, 177:24, 182:21, 184:17, 187:13, 187:17, 188:5, 188:24, 189:6, 193:22, 202:9, 203:4, 203:5, 204:9, 204:12, 204:24, 205:1, 207:8, 213:3, 221:16, 224:23, 225:8, 228:23, 233:24, 234:24, 243:6, 245:9, 245:18, 245:24, 246:4, 246:6, 262:24, 265:21, 273:13, 277:6, 277:12, 280:2, 280:4, 280:5, 282:23, 283:18, 285:19, 291:4, 292:20, 292:21, 292:24, 298:6, 306:20, 308:23, 312:19, 313:25, 314:17, 321:4, 323:2, 323:11, 326:13, 334:24, 344:3, 344:5, 344:10, 345:13,

348:10, 350:6
**putting** [7] - 112:20, 117:7, 164:17, 179:4, 186:25, 255:15, 347:11

---

**Q**

**qualification** [2] - 106:22, 106:23
**qualifications** [1] - 305:5
**qualified** [5] - 13:13, 47:11, 64:7, 129:5, 129:13
**qualifies** [1] - 268:19
**quality** [2] - 228:4, 228:10
**Quantico** [1] - 302:19
**quantities** [3] - 50:8, 227:24, 285:16
**quantity** [3] - 262:14, 286:25, 294:25
**quarantined** [1] - 160:25
**quarterly** [1] - 13:6
**quarters** [1] - 128:17
**questioned** [3] - 75:17, 75:18, 152:18
**questioning** [6] - 29:18, 75:13, 75:25, 76:2, 283:1
**questions** [77] - 8:3, 8:4, 25:24, 25:25, 26:1, 26:3, 26:4, 26:5, 26:8, 40:10, 48:15, 48:16, 50:20, 55:16, 61:10, 67:2, 68:22, 72:10, 73:17, 75:1, 75:4, 75:5, 75:6, 75:8, 76:3, 82:20, 83:21, 84:1, 101:7, 142:16, 146:22, 164:9, 168:18, 169:9, 174:7, 184:4, 184:9, 186:12, 189:10, 189:15, 195:24, 238:5, 247:11, 247:12, 254:7, 261:6, 264:6, 266:5, 267:15, 279:3, 279:10, 283:1, 283:23, 287:25, 288:20, 290:13, 291:16, 293:8, 296:6, 296:7, 296:12, 299:1, 315:13, 315:15, 315:16, 315:25,

316:1, 316:2, 316:3, 316:15, 327:19, 329:14, 331:14, 332:17, 334:16, 337:20, 353:3
**quick** [1] - 317:4
**quicker** [2] - 299:22, 354:17
**quickly** [3] - 112:1, 136:6, 164:16
**quite** [7] - 73:14, 112:21, 142:25, 146:12, 147:9, 170:24, 192:17
**quote/unquote** [1] - 48:18

---

**R**

**R-U-T-L-E-D-G-E** [1] - 196:19
**race** [1] - 306:24
**radiation** [1] - 198:1
**radio** [8] - 14:14, 14:15, 14:18, 86:22, 143:5, 158:14, 168:11
**radioed** [4] - 19:24, 112:22, 112:23, 143:9
**radioing** [1] - 19:10
**radios** [3] - 29:25, 158:12, 158:16
**RAFAEL** [1] - 2:4
**rail** [3] - 33:19, 33:20, 98:14
**rails** [1] - 50:5
**rain** [1] - 291:1
**raining** [1] - 272:15
**raise** [6] - 11:6, 104:16, 119:23, 196:10, 267:21, 301:16, 317:8, 338:1
**raised** [2] - 199:3, 354:23
**raising** [1] - 103:22
**randomly** [1] - 149:15
**range** [7] - 107:24, 112:4, 139:17, 145:22, 158:12, 158:16, 161:19
**ranges** [1] - 154:15
**rank** [1] - 11:25
**rate** [2] - 38:6, 41:20
**rates** [2] - 14:24, 271:10
**rather** [4] - 18:12, 117:11, 296:16, 350:20
**rating** [1] - 38:2

raw [4] - 346:9, 346:24, 348:22, 349:15
re [1] - 343:6
re-trace [1] - 343:6
reach [7] - 57:19, 125:12, 222:10, 271:10, 273:3, 275:6, 275:14
reached [1] - 274:10
reaches [3] - 169:1, 169:3, 274:12
reactions [1] - 149:5
reacts [1] - 310:9
read [6] - 8:10, 8:17, 186:8, 206:25, 249:11, 275:24
reading [4] - 9:1, 232:19, 241:18, 273:20
readings [1] - 240:23
readout [1] - 290:4
reads [2] - 186:1, 186:3
ready [5] - 198:19, 201:20, 201:23, 235:3, 284:17
reagent [3] - 284:20, 284:23
real [7] - 223:6, 326:4, 328:13, 332:23, 332:24, 333:1
really [33] - 19:10, 31:12, 57:25, 58:22, 59:15, 62:24, 76:23, 77:23, 113:25, 120:25, 122:7, 139:18, 139:23, 142:11, 142:25, 143:17, 145:22, 146:6, 146:12, 155:8, 156:21, 159:18, 161:2, 173:2, 253:4, 271:7, 283:18, 286:22, 291:2, 292:25, 295:22, 323:6, 352:6
reason [20] - 14:19, 19:7, 32:20, 41:17, 41:18, 42:5, 78:15, 85:5, 89:24, 139:15, 141:2, 151:22, 166:14, 215:18, 226:18, 227:6, 236:25, 309:2, 344:5, 345:22
reasonable [3] - 78:2, 78:5, 108:5
reasonably [1] - 286:9
reasons [2] - 25:3,

213:1
recalling [1] - 10:13
receipt [9] - 123:6, 208:12, 209:5, 209:12, 275:8, 275:9, 275:16, 276:13, 313:2
receipts [4] - 141:14, 320:11, 322:20, 342:16
receive [29] - 12:16, 15:11, 19:21, 117:15, 137:4, 139:2, 149:3, 177:16, 178:9, 201:10, 201:12, 201:15, 201:16, 201:20, 202:25, 203:2, 203:10, 203:11, 203:12, 203:21, 203:24, 303:17, 308:21, 315:6, 324:11, 339:16, 342:2, 344:2, 349:25
received [18] - 15:12, 29:22, 90:1, 117:15, 128:10, 189:22, 203:4, 206:3, 304:4, 305:17, 308:19, 308:22, 313:17, 314:16, 316:9, 323:21, 325:3, 325:18
receives [2] - 55:2, 55:3
receiving [4] - 106:22, 136:1, 342:9, 344:14
recertified [1] - 13:8
Recess [1] - 104:11
recess [7] - 101:9, 196:2, 196:6, 299:4, 300:19, 300:20, 353:4
reciprocal [1] - 323:19
recognize [14] - 22:5, 22:17, 28:16, 36:15, 39:2, 70:18, 116:6, 118:6, 123:3, 123:5, 205:11, 210:1, 278:4, 346:17
recognized [1] - 305:13
recollection [4] - 10:10, 10:24, 238:21, 342:17
recommendation [1] - 14:1
recommendations [1] - 199:20

record [27] - 6:15, 11:13, 28:9, 56:9, 69:8, 80:5, 104:22, 132:13, 169:21, 186:1, 186:3, 186:7, 186:8, 196:16, 207:3, 268:2, 300:18, 301:22, 317:14, 324:3, 324:11, 337:17, 338:7, 343:4, 343:6, 343:12, 352:2
record's [2] - 169:17, 169:19
recorded [2] - 112:10, 354:10
recording [4] - 112:8, 343:9, 347:24, 348:1
records [18] - 130:15, 130:25, 131:2, 131:19, 161:8, 182:16, 183:22, 185:23, 190:5, 190:6, 323:1, 323:3, 324:15, 333:8, 334:4, 334:25, 336:16
recover [2] - 112:11, 295:3
recovered [3] - 124:22, 151:4, 295:12
recovering [1] - 158:2
RECROSS [2] - 261:9, 262:20
Recross [2] - 3:23, 3:23
recross [2] - 264:2, 265:18
Recross-Examination [2] - 3:23, 3:23
RECROSS-EXAMINATION [2] - 261:9, 262:20
red [6] - 24:7, 24:9, 113:12, 159:7, 210:6, 215:21
redirect [7] - 90:21, 189:11, 254:8, 264:3, 296:8, 316:16, 334:17
Redirect [5] - 3:10, 3:17, 3:22, 4:9, 4:20
REDIRECT [5] - 90:22, 189:12, 254:9, 296:9, 334:18
reduce [1] - 57:22
refer [4] - 39:20, 145:23, 256:15,

348:4
reference [9] - 8:8, 54:19, 56:6, 201:12, 208:2, 260:22, 308:20, 312:12, 313:15
referred [9] - 16:4, 40:25, 41:13, 50:9, 116:9, 121:5, 140:17, 194:17, 278:5
referring [10] - 22:7, 45:6, 107:18, 149:20, 151:3, 194:24, 208:10, 308:19, 313:10, 346:19
reflect [1] - 28:9
reflects [1] - 28:11
refresh [5] - 184:25, 185:7, 185:24, 263:10, 342:17
regard [10] - 8:3, 40:22, 145:9, 145:13, 185:23, 224:3, 226:6, 261:18, 261:19, 300:2
regarding [11] - 6:13, 6:23, 8:4, 8:11, 9:22, 13:3, 26:24, 27:8, 72:12, 319:5, 322:4
regardless [2] - 44:10, 96:16
regards [7] - 55:25, 59:21, 184:22, 185:6, 270:19, 278:14, 322:17
region [2] - 145:16, 288:12
register [1] - 122:4
registered [2] - 324:21, 332:14
registering [1] - 213:3
registration [2] - 6:23, 13:20
regular [2] - 133:1, 286:9
regularly [3] - 269:15, 324:15, 340:6
regulations [1] - 13:23
reiterate [1] - 7:14
rejected [1] - 7:5
relate [1] - 237:6
related [2] - 224:10, 331:21
relating [1] - 321:19
relation [4] - 71:1, 71:21, 79:21, 320:1
relationships [1] -

207:2
relative [1] - 211:1
relatively [2] - 44:5, 46:6
relax [1] - 166:19
relay [2] - 128:11, 158:15
relayed [2] - 86:6, 86:9
relaying [2] - 19:11, 21:1
relays [1] - 19:25
release [1] - 101:10
released [1] - 156:16
relevance [1] - 135:20
relevant [3] - 336:19, 336:21, 351:14
reliability [1] - 7:5
reliable [3] - 7:4, 226:12, 226:24
Reliance [1] - 155:12
relied [1] - 255:12
rely [6] - 97:4, 97:17, 97:19, 97:23, 114:24, 255:15
relying [1] - 76:12
remain [2] - 272:13, 286:25
remainder [4] - 140:16, 320:15, 320:23, 346:23
remained [3] - 140:14, 161:11, 161:15
remaining [3] - 104:7, 312:8, 312:10
remains [1] - 286:10
remember [23] - 15:7, 36:1, 45:14, 51:23, 52:15, 56:4, 69:25, 80:17, 85:23, 97:4, 114:3, 143:1, 146:11, 210:25, 220:9, 223:3, 223:5, 226:22, 237:13, 248:25, 249:4, 295:25, 303:9
remind [1] - 301:3
Remington [1] - 110:1
removal [2] - 203:14, 203:15
remove [7] - 29:22, 117:2, 225:9, 257:7, 287:12, 304:11, 316:23
removed [5] - 23:21, 167:2, 167:3, 314:22, 314:23
rep [11] - 122:18, 125:24, 126:23, 127:7, 127:9, 127:10, 149:18,

150:5, 159:24, 160:15

**repetitive** [2] - 146:23, 153:21

**rephrase** [3] - 191:23, 243:3, 245:24

**report** [23] - 19:24, 50:25, 75:12, 82:5, 87:21, 199:24, 219:20, 228:14, 228:15, 233:22, 248:24, 250:14, 251:14, 263:7, 265:8, 302:12, 303:18, 311:20, 311:21, 311:22, 312:1, 312:5, 312:7

**REPORTED** [1] - 2:16

**reported** [4] - 13:9, 17:7, 266:15, 339:15

**REPORTER** [1] - 198:21

**Reporter** [2] - 2:16, 355:11

**reports** [4] - 266:12, 278:24, 311:24, 350:2

**represent** [6] - 61:2, 61:15, 167:16, 238:11, 291:21, 330:8

**representation** [1] - 232:15

**representative** [15] - 139:8, 149:19, 150:5, 159:20, 190:2, 211:2, 211:5, 306:9, 309:11, 309:13, 310:2, 311:8, 315:9, 319:25, 320:6

**request** [13] - 7:15, 9:14, 73:19, 73:20, 73:23, 101:21, 102:25, 103:4, 116:17, 136:4, 136:6, 139:23, 238:25

**requested** [3] - 52:21, 197:20, 326:17

**requests** [1] - 301:8

**require** [2] - 154:23, 330:24

**required** [3] - 12:22, 138:23, 321:3

**rescue** [9] - 41:24, 73:8, 73:11, 76:16, 199:7, 199:8, 221:6, 339:11

**rescued** [2] - 41:23,

100:2

**rescuing** [1] - 100:10

**research** [2] - 270:11, 270:12

**reserve** [2] - 312:9, 312:12

**reside** [1] - 138:8

**residing** [1] - 106:8

**residue** [16] - 213:7, 242:9, 242:12, 242:19, 245:8, 245:19, 245:22, 246:7, 247:2, 269:25, 289:25, 290:1, 292:15, 292:23, 293:2

**resolved** [1] - 6:19

**resources** [1] - 105:21

**respect** [7] - 9:21, 85:10, 85:25, 86:3, 145:12, 262:3, 284:3

**respectfully** [1] - 8:25

**respond** [1] - 102:16

**responds** [1] - 136:6

**Response** [3] - 197:21, 197:24, 198:4

**response** [9] - 7:20, 27:15, 80:14, 92:12, 251:7, 251:8, 251:9, 251:11, 326:14

**responses** [1] - 251:5

**responsibilities** [2] - 109:13, 109:14

**responsibility** [6] - 29:19, 74:4, 178:11, 199:17, 199:18, 319:3

**Responsibility** [1] - 318:10

**responsible** [9] - 50:16, 74:5, 74:8, 103:15, 103:23, 143:14, 215:22, 215:24, 235:15

**rest** [11] - 19:10, 21:1, 72:17, 99:8, 141:5, 148:25, 161:5, 232:9, 232:25, 259:19, 353:24

**restrained** [1] - 135:14

**result** [17] - 208:16, 209:10, 252:4, 252:7, 252:9, 252:11, 252:15, 253:5, 255:5, 255:17, 295:7, 295:19, 297:12, 328:8, 329:1

**results** [28] - 178:18,

179:21, 180:19, 204:7, 205:14, 251:13, 252:3, 252:6, 252:24, 252:25, 253:2, 253:9, 253:11, 253:13, 253:22, 254:3, 255:12, 275:9, 275:11, 275:17, 277:6, 283:13, 288:21, 289:25, 290:1, 290:3, 307:7

**retain** [1] - 315:3

**retained** [2] - 52:14, 87:4

**retrieve** [4] - 27:20, 27:22, 178:7, 333:20

**retrieved** [3] - 29:6, 29:14, 303:21

**return** [1] - 243:16

**reversible** [1] - 7:22

**review** [10] - 51:5, 51:8, 184:9, 248:12, 272:18, 272:22, 273:17, 303:4, 311:24, 317:4

**reviewed** [9] - 53:23, 62:3, 62:5, 190:5, 238:18, 273:7, 278:5, 278:8, 311:22

**reviewing** [2] - 322:19, 354:4

**rib** [2] - 67:17, 209:23

**rice** [4] - 135:23, 136:2, 183:10, 183:14

**Rich** [1] - 197:21

**ride** [1] - 221:25

**riding** [1] - 293:4

**rifle** [3] - 18:2, 18:21, 110:2

**rig** [2] - 20:14

**rights** [4] - 7:9, 86:12, 97:12

**rigid** [1] - 134:16

**rigidly** [1] - 166:19

**rise** [4] - 6:4, 101:12, 196:4, 300:21

**risk** [4] - 60:15, 129:20, 168:12, 235:9

**river** [7] - 271:4, 271:6, 271:7, 271:12, 271:14, 289:11

**road** [1] - 170:21

**rock** [1] - 153:16

**Rockland** [1] - 197:9

**Rodriguez** [6] - 3:7,

3:14, 3:20, 4:7, 4:13, 4:17

**RODRIGUEZ** [18] - 2:4, 50:22, 55:15, 117:17, 155:22, 163:1, 164:8, 229:3, 230:24, 238:5, 287:22, 290:12, 315:16, 315:18, 315:24, 329:8, 329:14, 353:22

**role** [7] - 13:14, 13:15, 124:15, 170:9, 181:17, 200:10, 200:11

**roll** [1] - 166:16

**roller** [1] - 222:2

**roof** [1] - 183:5

**room** [7] - 171:1, 171:9, 171:10, 189:6, 287:10, 292:23, 320:12

**Room** [1] - 2:17

**rope** [3] - 114:16, 159:7, 159:9

**rough** [7] - 31:12, 134:16, 135:6, 178:2, 210:17, 240:8, 292:14

**rougher** [1] - 134:18

**roughly** [3] - 108:7, 165:13, 260:21

**round** [4] - 18:4, 174:1, 210:6

**rounds** [4] - 18:11, 18:21, 45:2

**route** [2] - 29:17, 343:15

**routine** [1] - 107:11

**RPMs** [1] - 57:18

**RPR** [2] - 2:16, 355:11

**rub** [1] - 134:6

**rubber** [8] - 31:16, 32:3, 223:10, 223:13, 223:23, 223:25, 304:9

**rubbing** [2] - 134:8, 292:22

**rule** [2] - 7:4, 281:10

**ruling** [1] - 169:21

**run** [8] - 32:14, 46:11, 49:18, 57:18, 93:16, 106:12, 204:2, 274:9

**running** [10] - 57:16, 57:25, 58:1, 146:2, 146:7, 215:22, 215:24, 216:1, 216:5, 290:6

**runs** [1] - 50:12

**rush** [1] - 153:6

**rust** [1] - 190:20

**RUTLEDGE** [2] - 3:18, 196:20

**Rutledge** [11] - 34:19, 196:9, 196:18, 196:19, 196:24, 197:3, 204:14, 211:20, 238:9, 247:15, 254:11

---

**S**

**sack** [2] - 114:16, 159:5

**sack-like** [1] - 114:16

**sack-type** [1] - 159:5

**sacks** [2] - 113:10, 128:2

**safe** [12] - 21:7, 23:20, 30:17, 43:16, 68:3, 109:16, 109:17, 144:23, 146:14, 168:2, 184:19, 243:7

**safely** [2] - 17:17, 113:25

**safest** [1] - 153:15

**Safety** [3] - 197:13, 197:25, 198:2

**safety** [31] - 46:17, 46:21, 54:3, 108:15, 109:14, 123:24, 124:2, 143:17, 153:17, 154:23, 157:17, 166:20, 168:8, 187:13, 187:14, 187:19, 187:24, 188:7, 189:15, 195:22, 220:21, 221:2, 221:6, 221:12, 243:8, 250:21, 280:19, 280:21, 280:24

**sake** [1] - 126:15

**salmon** [2] - 279:7, 279:10

**salt** [1] - 225:23

**saltwater** [6] - 179:15, 190:11, 190:12, 190:19, 190:25, 191:9

**Sample** [1] - 274:4

**sample** [73] - 50:16, 126:23, 127:7, 127:9, 127:10, 138:24, 139:8, 148:22, 149:18, 149:19, 150:5, 159:20, 159:25, 160:15, 190:2,

203:4, 203:7, 204:6,
204:9, 204:24,
207:20, 207:22,
208:15, 209:9,
209:14, 211:1,
211:2, 215:21,
217:7, 217:12,
217:13, 217:22,
224:5, 224:7, 226:9,
226:23, 231:16,
254:12, 280:17,
280:25, 281:3,
281:21, 281:22,
281:24, 281:25,
282:1, 282:4,
283:18, 288:8,
288:12, 290:1,
290:20, 291:2,
298:5, 298:15,
303:4, 303:9,
303:16, 304:4,
305:17, 306:9,
309:11, 309:13,
310:2, 311:7, 311:8,
312:12, 315:9,
319:25, 320:6,
320:15

**sample's** [2] - 215:21,
274:9

**samples** [36] - 122:19,
125:24, 203:1,
203:10, 203:13,
203:14, 204:12,
208:3, 208:6,
208:23, 211:5,
215:12, 216:7,
226:6, 226:7,
226:10, 231:13,
233:23, 236:18,
239:6, 239:9,
239:11, 239:23,
239:24, 240:1,
240:2, 240:3, 240:7,
240:14, 240:15,
277:15, 289:14,
290:22

**sampling** [5] - 270:21,
270:23, 280:23,
290:23, 326:13

**sanitized** [1] - 202:1

**sat** [1] - 224:17

**Satellite** [1] - 343:18

**satellite** [4] - 336:17,
340:9, 342:9, 344:15

**satellites** [1] - 343:23

**saturated** [1] - 148:11

**save** [8] - 92:6,
102:20, 167:4,
345:19, 345:21,
348:8, 349:4

**saving** [1] - 245:4

**saw** [32] - 20:11,
20:17, 23:2, 23:11,
36:24, 37:25, 39:4,
39:9, 41:21, 42:5,
51:10, 53:25, 54:3,
54:10, 54:18, 56:8,
62:9, 68:23, 68:25,
101:4, 111:4,
111:11, 114:15,
120:13, 159:24,
177:10, 193:19,
193:23, 210:8,
223:17, 278:14

**Scan** [1] - 202:15

**scan** [37] - 50:7,
200:12, 200:14,
200:16, 200:17,
204:17, 205:3,
205:17, 206:3,
206:20, 208:2,
208:17, 208:23,
212:12, 238:25,
246:25, 247:4,
256:15, 256:18,
260:22, 260:25,
270:6, 270:7,
270:10, 270:14,
271:2, 273:23,
274:3, 276:10,
280:23, 284:13,
288:2, 288:21,
289:3, 291:25,
294:20, 296:13

**scanner** [2] - 251:5,
253:22

**scanning** [2] - 257:19,
293:13

**scans** [7] - 49:7,
212:19, 212:20,
213:11, 214:10,
279:11, 285:15

**scattered** [1] - 113:2

**scenario** [1] - 288:11

**scene** [78] - 75:11,
108:24, 110:25,
112:18, 112:23,
143:1, 143:2,
144:20, 144:23,
146:9, 146:14,
146:19, 146:24,
147:17, 157:5,
157:6, 226:24, 333:3

**schedule** [1] - 301:3

**Scheduled** [1] - 1:7

**School** [2] - 198:17,
339:14

**school** [6] - 105:25,
106:18, 129:14,
197:7, 197:14,

302:19

**science** [7] - 50:13,
106:2, 106:5,
233:19, 233:20,
235:11

**Science** [2] - 302:17,
305:6

**scientific** [2] - 271:2,
278:22

**scissors** [3] - 308:9,
308:16, 308:17

**scooter** [1] - 199:25

**scope** [10] - 231:24,
232:24, 233:2,
233:3, 233:22,
259:1, 263:13,
264:2, 265:18

**scratch** [1] - 272:1

**screen** [6] - 152:16,
218:25, 219:2,
219:4, 219:5, 311:15

**screened** [2] - 257:25,
306:5

**screening** [13] -
129:15, 153:5,
160:23, 184:21,
225:16, 257:16,
257:23, 258:3,
258:9, 258:11,
258:13, 311:2, 311:3

**screenshot** [1] -
346:21

**screwdriver** [1] -
322:11

**Sea** [1] - 139:22

**sea** [21] - 24:17, 49:5,
67:14, 67:19, 99:19,
99:22, 100:5, 100:6,
100:17, 127:2,
131:14, 131:17,
134:17, 140:19,
171:15, 171:16,
190:8, 230:14,
243:24, 277:9, 289:4

**sea-with-magazine**
[2] - 127:2, 140:19

**seaboard** [1] - 154:22

**seal** [4] - 28:22,
312:17, 312:19,
313:10

**sealed** [5] - 148:19,
179:24, 180:5,
180:10, 313:7

**seaport** [6] - 318:9,
318:13, 318:14,
318:20, 318:23,
319:2

**search** [11] - 35:9,
73:7, 73:11, 76:16,
129:7, 199:7, 199:8,

218:21, 218:23,
218:25, 339:11

**searched** [2] - 30:16,
152:13

**searches** [1] - 50:8

**searching** [1] - 30:5

**seas** [5] - 135:6,
220:25, 298:10,
298:16, 318:16

**seat** [5] - 33:18, 33:21,
46:2, 70:20, 99:8

**seatbelt** [2] - 46:3,
168:6

**seated** [12] - 11:11,
22:21, 22:23,
104:15, 104:21,
168:5, 196:15,
268:1, 300:23,
301:21, 317:13,
338:6

**seats** [4] - 166:15,
168:7, 193:8, 193:9

**Seattle** [2] - 161:22,
199:3

**seawater** [2] - 148:12,
159:12

**second** [12] - 9:11,
72:5, 74:1, 93:8,
107:5, 162:6, 174:7,
187:15, 223:12,
231:10, 299:19,
313:11

**secondary** [1] - 187:9

**secondly** [2] - 10:2,
10:17

**seconds** [1] - 42:20

**secure** [6] - 19:14,
119:25, 155:18,
178:8, 197:23, 243:7

**secured** [3] - 134:3,
155:13, 171:19

**Securities** [2] -
197:20, 197:24

**SECURITY** [2] - 80:3,
300:21

**Security** [6] - 197:13,
197:25, 198:2,
198:3, 318:4, 336:6

**security** [18] - 13:15,
19:18, 20:25, 26:2,
26:10, 29:17, 29:18,
43:9, 75:5, 79:18,
108:12, 108:15,
109:15, 111:1,
143:14, 143:16,
195:22, 198:18

**see** [132] - 11:1, 14:1,
16:3, 16:7, 17:3,
17:11, 18:19, 18:25,
19:3, 19:12, 23:2,

23:6, 24:5, 27:11,
27:18, 28:23, 29:14,
33:10, 35:11, 35:24,
36:3, 36:5, 37:23,
39:21, 39:25, 41:9,
41:25, 42:10, 47:8,
55:23, 56:22, 62:7,
64:1, 66:6, 67:8,
71:22, 78:8, 82:8,
85:13, 90:12, 93:7,
94:15, 94:17, 95:7,
95:14, 95:15, 95:17,
96:16, 100:11,
114:5, 116:3, 116:6,
119:20, 119:21,
124:6, 125:1, 125:6,
126:8, 127:22,
131:8, 134:16,
134:18, 136:5,
136:18, 137:21,
144:23, 146:24,
147:3, 155:2,
162:17, 163:2,
166:11, 171:13,
173:14, 174:1,
177:21, 179:17,
183:3, 189:18,
194:7, 208:11,
208:16, 208:24,
209:6, 213:17,
213:20, 214:24,
224:6, 224:22,
227:3, 227:5, 227:7,
233:24, 234:16,
242:4, 242:6, 243:1,
243:2, 244:22,
244:23, 246:25,
247:1, 256:10,
258:10, 262:2,
263:10, 270:5,
273:15, 274:10,
275:12, 286:5,
286:25, 289:18,
293:18, 295:13,
295:23, 296:21,
314:5, 316:25,
322:1, 333:8,
347:12, 347:18,
348:21, 350:23,
351:17, 352:4,
353:9, 354:24

**seeing** [7] - 19:24,
21:2, 42:7, 71:21,
96:14, 147:16,
147:18

**seek** [1] - 94:9

**seem** [1] - 243:2

**segregate** [1] - 34:2

**segregated** [1] - 32:5

**seize** [2] - 84:12,

**84**:15

**seized** [6] - 84:10, 84:24, 303:18, 320:23, 321:7, 337:5

**seized-property** [1] - 321:7

**seizing** [1] - 84:17

**selected** [1] - 197:24

**selective** [1] - 10:12

**self** [1] - 257:1

**self-calibrate** [1] - 257:1

**semi** [1] - 13:6

**semi-annually** [1] - 13:6

**send** [8] - 14:18, 108:4, 117:14, 117:24, 155:3, 171:16, 323:11, 332:6

**sending** [1] - 322:25

**sends** [3] - 121:8, 123:23, 335:18

**senior** [5] - 268:14, 269:8, 302:10, 302:11, 302:15

**sense** [11] - 57:24, 64:11, 64:12, 67:24, 187:19, 213:8, 224:7, 236:3, 236:4, 247:10, 288:8

**sensitive** [3] - 241:23, 285:8, 294:21

**sent** [6] - 14:3, 50:11, 128:12, 158:17, 179:24, 324:10

**separate** [9] - 34:2, 34:25, 171:10, 203:21, 203:22, 304:14, 306:1, 309:3

**separated** [2] - 139:6, 211:25

**separately** [2] - 33:23, 203:23

**September** [1] - 268:17

**sequence** [5] - 236:16, 237:12, 266:23, 267:12, 267:13

**sequential** [1] - 348:3

**serial** [6] - 122:3, 322:4, 322:7, 341:17, 342:6, 342:19

**serialized** [1] - 266:25

**served** [5] - 318:5, 318:7, 318:8, 323:18, 336:13

**service** [1] - 234:12

**set** [10] - 118:5, 126:25, 202:20, 202:22, 218:11, 219:22, 275:4, 299:23, 326:6, 329:2

**setting** [1] - 150:12

**seven** [54] - 23:6, 23:11, 30:19, 35:22, 47:13, 47:19, 66:4, 71:12, 91:25, 92:22, 93:11, 96:16, 96:23, 100:14, 138:20, 139:9, 139:12, 141:25, 146:6, 151:24, 153:22, 166:24, 168:10, 168:15, 190:8, 206:12, 206:20, 207:14, 216:16, 218:3, 218:15, 220:8, 221:11, 222:13, 222:23, 223:6, 224:4, 225:13, 232:10, 239:9, 239:11, 239:23, 240:1, 240:2, 240:3, 240:11, 240:19, 242:24, 300:3, 320:3, 337:12

**several** [5] - 25:3, 25:25, 213:2, 279:14, 352:6

**severe** [1] - 161:3

**shackle** [2] - 135:9

**shackled** [7] - 134:13, 134:14, 135:2, 154:23, 161:10, 182:21

**shackles** [5] - 134:4, 134:5, 134:7, 134:9, 155:19

**shallow** [1] - 193:10

**shape** [2] - 95:25, 271:11

**shaved** [1] - 24:20

**shaven** [1] - 24:20

**sheet** [10] - 70:19, 76:3, 129:23, 129:24, 140:25, 185:19, 232:14, 252:16, 252:17, 349:16

**shield** [1] - 114:23

**shifted** [1] - 140:10

**shifty** [1] - 108:14

**ship** [78] - 24:15, 34:4, 50:11, 59:17, 86:20, 106:12, 106:14, 107:23, 107:24,

112:24, 114:13, 114:14, 116:14, 116:15, 117:15, 117:24, 119:17, 122:14, 122:17, 124:2, 126:16, 126:22, 129:4, 129:6, 129:19, 129:21, 130:1, 131:12, 133:5, 133:13, 135:18, 135:22, 136:15, 136:16, 136:22, 137:4, 137:15, 137:22, 137:23, 138:21, 153:9, 153:12, 153:14, 153:18, 155:3, 155:6, 155:10, 156:20, 157:2, 159:25, 166:16, 166:18, 171:18, 182:23, 183:6, 184:20, 186:5, 187:3, 187:6, 187:11, 187:17, 187:19, 189:6, 193:16, 195:22, 199:4, 201:25, 219:10, 219:17, 222:12, 225:15, 225:21, 244:5, 259:22, 286:13, 320:16

**ship's** [3] - 187:14, 187:23, 226:1

**shipped** [2] - 315:1, 336:22

**ships** [1] - 187:6

**shirt** [3] - 27:25, 87:12, 286:22

**shocked** [1] - 277:14

**shoe** [1] - 262:10

**shoot** [3] - 18:11, 18:16, 18:21

**shooting** [2] - 45:11, 45:20

**shootout** [2] - 47:13, 47:19

**short** [3] - 44:5, 104:10, 276:2

**shorter** [1] - 44:9

**shot** [3] - 109:17, 127:1, 154:17

**shotgun** [5] - 18:2, 18:3, 18:10, 110:1, 110:4

**shots** [2] - 18:3, 18:16

**show** [39] - 20:15, 21:16, 46:5, 70:10,

70:14, 71:14, 77:16, 79:24, 88:21, 91:17, 92:3, 96:13, 115:23, 118:4, 120:10, 121:3, 124:19, 130:3, 140:25, 144:12, 144:13, 150:24, 163:4, 172:18, 173:24, 188:7, 210:3, 230:1, 230:2, 230:6, 230:7, 265:21, 266:15, 266:17, 314:3, 321:25, 341:4, 342:16, 346:13

**showed** [6] - 73:14, 172:19, 232:23, 248:6, 249:3, 266:12

**shower** [1] - 136:4

**showing** [7] - 21:17, 121:24, 205:10, 209:4, 277:25, 295:7, 324:14

**shown** [2] - 59:2, 121:15

**shows** [8] - 41:23, 69:8, 125:24, 125:25, 129:25, 210:4, 248:20, 332:14

**shut** [2] - 48:1, 179:15

**SIA** [1] - 129:8

**side** [17] - 16:5, 16:7, 32:19, 71:12, 79:16, 110:17, 120:15, 120:22, 129:25, 153:14, 154:10, 154:22, 163:15, 166:23, 171:16, 319:15

**sidebar** [3] - 9:8, 101:11, 102:23

**Sidebar** [2] - 9:10, 9:16

**sieve** [4] - 311:12, 311:13, 311:14

**sieved** [1] - 306:9

**sift** [1] - 311:13

**sifter** [1] - 311:14

**sight** [6] - 67:10, 68:10, 68:11, 68:16, 78:22, 144:22

**sign** [3] - 127:3, 140:20, 140:24, 164:7, 169:1, 169:4, 173:18, 173:19, 176:14, 232:17, 312:5

**sign-out** [2] - 140:20, 140:24

**signal** [15] - 117:15, 117:24, 121:9, 123:23, 158:17, 187:8, 187:17, 187:18, 188:15, 274:24, 274:25, 275:3, 295:13, 301:7, 342:8

**signals** [5] - 177:16, 177:17, 276:18, 342:10, 344:15

**signature** [4] - 116:13, 312:25, 313:3, 313:8

**signed** [4] - 140:22, 154:20, 320:11, 334:22

**significant** [1] - 134:1

**significantly** [1] - 194:23

**signs** [1] - 13:12

**silly** [1] - 223:6

**SILVIA** [1] - 2:10

**similar** [14] - 16:19, 16:20, 29:8, 95:25, 96:8, 138:1, 150:15, 230:9, 257:16, 265:3, 276:5, 293:14, 293:25, 353:19

**similarly** [3] - 224:4, 225:13, 294:4

**simple** [3] - 207:2, 321:3, 329:21

**simply** [3] - 285:5, 326:17, 332:14

**single** [8] - 119:16, 128:1, 210:24, 210:25, 294:14, 309:7, 343:8, 347:23

**singling** [1] - 9:1

**sink** [8] - 83:6, 83:8, 83:9, 83:10, 83:14, 83:17, 83:19, 93:16

**sinking** [2] - 92:10, 92:18

**siren** [7] - 42:21, 43:2, 43:4, 43:5, 44:2, 44:5, 44:10

**sirens** [2] - 43:21, 94:13

**sit** [5] - 52:6, 63:19, 166:10, 166:19, 185:12

**site** [2] - 167:19, 343:13

**sites** [1] - 335:19

**sits** [3] - 13:10, 193:14, 201:23

**sitting** [20] - 17:15, 30:20, 33:17, 84:5,

88:21, 89:2, 94:17,
98:14, 99:1, 119:18,
133:6, 148:10,
159:14, 192:17,
217:19, 272:9,
279:9, 287:15,
287:16, 337:13
**situated** [1] - 15:15
**situation** [7] - 111:12,
144:9, 170:22,
201:4, 201:6, 298:8,
298:16
**six** [17] - 13:2, 38:12,
106:20, 125:11,
154:15, 165:10,
168:10, 168:15,
169:2, 232:10,
252:2, 299:7,
299:17, 299:20,
302:18, 302:20,
339:6
**Six** [1] - 7:8
**sixteen** [1] - 302:22
**Sixth** [1] - 7:6
**size** [14] - 31:11, 33:2,
35:18, 57:22, 58:7,
93:8, 95:25, 125:2,
133:25, 149:16,
213:17, 271:11,
311:15, 321:3
**sized** [2] - 49:10,
58:10
**sizes** [1] - 57:8
**sketch** [2] - 150:24,
151:1
**skewed** [1] - 113:3
**skill** [1] - 219:22
**skin** [12] - 117:15,
117:23, 129:19,
134:6, 134:7, 134:9,
171:18, 175:5,
175:9, 187:5,
187:17, 284:24
**sky** [3] - 158:15,
343:23, 343:25
**sleep** [1] - 134:20
**sleeve** [1] - 22:4
**sleeves** [1] - 126:18
**slick** [1] - 25:5
**sliding** [1] - 134:19
**slightly** [3] - 138:3,
138:4, 283:10
**slip** [2] - 25:11, 82:9
**slipped** [5] - 25:9,
82:2, 82:5, 82:9,
82:18
**sloshes** [1] - 49:5
**slow** [13] - 20:14,
73:2, 83:9, 83:14,
119:7, 157:2, 158:8,

158:10, 159:1,
165:17, 198:10,
198:21, 198:24
**slowed** [2] - 157:1,
157:2
**slower** [3] - 64:17,
64:19, 82:25
**slowing** [3] - 94:19,
165:21
**slowly** [7] - 11:12,
46:6, 151:5, 167:25,
168:2, 195:8
**slug** [4] - 18:11, 18:12,
45:1
**small** [55] - 14:5,
14:16, 17:2, 17:18,
22:14, 31:11, 32:1,
36:1, 53:7, 53:10,
94:1, 108:5, 108:19,
108:20, 110:24,
119:1, 122:15,
127:10, 127:12,
129:4, 144:21,
144:23, 151:13,
153:18, 154:25,
157:18, 193:2,
209:22, 209:23,
242:4, 247:19,
262:14, 270:3,
270:4, 271:5,
277:10, 285:13,
285:18, 285:25,
286:4, 286:17,
286:25, 290:18,
294:11, 294:12,
294:25, 295:9,
295:11, 295:24,
295:25, 298:11,
298:16, 306:19,
311:15, 339:10
**smaller** [8] - 32:3,
105:17, 108:8,
112:20, 138:3,
138:4, 177:23
**smart** [1] - 168:14
**smell** [15] - 25:6,
30:25, 31:4, 48:20,
48:23, 81:15, 82:11,
87:15, 87:18,
200:22, 211:21,
211:22, 211:23,
262:4, 262:12
**smelled** [5] - 30:24,
80:12, 87:17, 87:19,
263:20
**smelling** [3] - 200:23,
200:24
**smells** [1] - 262:8
**Smith** [15] - 200:17,
202:15, 204:17,

232:21, 233:5,
233:19, 234:15,
256:19, 257:1,
257:15, 258:9,
258:22, 260:25,
270:15, 272:17
**smoking** [1] - 297:17
**smooth** [1] - 124:16
**smoothly** [1] - 199:19
**so..** [5] - 92:5, 166:24,
176:12, 185:16,
331:4
**soaked** [1] - 175:5
**soccer** [3] - 24:5,
24:9, 81:6
**social** [2] - 326:2,
326:3
**soda** [1] - 200:25
**software** [5] - 275:14,
341:23, 344:21,
344:23, 349:9
**software-based** [1] -
344:23
**softwares** [1] - 345:16
**soil** [1] - 264:25
**soiled** [4] - 265:3,
266:2, 266:3, 266:4
**Solar** [8] - 249:14,
256:13, 256:16,
328:14, 328:16,
329:2, 329:4, 354:21
**solar** [1] - 114:23
**SOLAR** [2] - 1:7, 2:2
**sold** [2] - 200:17,
328:24
**sole** [1] - 206:18
**solely** [1] - 114:24
**solemnly** [7] - 11:7,
104:17, 196:11,
267:22, 301:17,
317:9, 338:2
**solid** [1] - 262:8
**solvents** [1] - 288:13
**someone** [25] - 10:24,
27:11, 27:18, 50:6,
60:15, 72:19, 93:17,
136:7, 136:18,
155:16, 167:4,
214:9, 220:24,
222:9, 244:6,
257:25, 258:12,
269:23, 277:5,
277:9, 281:11,
282:10, 286:11,
325:16, 332:6
**someplace** [2] -
84:25, 226:25
**something's** [1] -
256:24
**sometime** [2] -

225:19, 281:4
**sometimes** [12] - 22:2,
172:13, 174:12,
176:11, 203:16,
233:23, 236:4,
284:25, 286:20,
293:21, 294:12
**somewhat** [1] -
144:22
**somewhere** [11] -
15:19, 22:1, 68:5,
68:7, 69:1, 77:20,
98:6, 280:8, 281:11,
281:15, 297:21
**son** [2] - 198:19, 237:3
**son's** [1] - 199:2
**soon** [6] - 17:6, 45:18,
46:9, 112:20,
128:23, 186:5
**sorry** [41] - 6:9, 16:5,
25:20, 25:21, 31:20,
37:18, 37:21, 39:22,
42:22, 71:19, 72:24,
75:8, 84:7, 103:6,
125:9, 125:15,
156:7, 157:5,
169:15, 177:7,
179:4, 179:25,
184:1, 198:3,
198:22, 209:15,
211:17, 237:19,
240:1, 243:19,
243:22, 247:22,
251:21, 254:1,
269:12, 282:20,
313:1, 323:8, 327:4,
328:15, 343:20
**sort** [11] - 29:25, 30:5,
30:8, 33:7, 130:11,
160:19, 161:1,
179:6, 274:7,
295:17, 298:7
**sought** [1] - 7:11
**sound** [3] - 44:3,
150:25, 223:6
**sounds** [11] - 75:16,
213:16, 220:9,
240:4, 240:5, 240:6,
243:1, 254:4,
296:18, 299:16,
328:13
**source** [7] - 44:3,
288:12, 288:14,
344:25, 345:1, 345:2
**south** [14] - 107:8,
161:11, 161:21,
161:23, 162:3,
162:5, 162:24,
163:10, 163:12,
181:7, 181:8, 181:9,

350:24, 351:1
**South** [10] - 12:20,
51:13, 106:19,
129:14, 154:10,
182:3, 182:10,
331:1, 334:5, 334:8
**SOUTHERN** [1] - 1:1
**Southwest** [1] -
268:15
**space** [10] - 93:4,
127:2, 127:4,
127:18, 140:23,
140:24, 141:1,
141:2, 171:19, 208:8
**spaceship** [6] - 174:3,
174:4, 178:22,
179:2, 179:23,
224:14
**spaghetti** [1] - 306:22
**Spanish** [15] - 6:2,
6:24, 27:1, 54:1,
60:3, 75:20, 75:23,
76:1, 76:10, 97:9,
164:1, 206:24,
206:25, 249:10
**spat** [1] - 235:8
**speaking** [2] - 102:4,
330:23
**Special** [1] - 328:4
**special** [4] - 128:16,
128:17, 305:22,
318:3
**specialist** [5] - 50:12,
122:6, 126:24,
199:6, 339:14
**specialists** [4] - 109:6,
122:18, 174:22,
187:2
**specialized** [2] -
12:16, 284:24
**specialty** [3] - 50:10,
63:17, 197:25
**specific** [23] - 64:5,
76:3, 99:15, 107:14,
108:3, 109:6,
111:17, 126:16,
126:25, 132:7,
137:12, 139:4,
145:23, 156:22,
160:3, 161:17,
171:5, 189:1,
263:14, 270:14,
323:3, 328:22,
339:16
**specifically** [12] -
49:25, 106:24,
106:25, 110:13,
138:12, 272:17,
272:19, 318:21,
319:4, 334:9,

**specifies** [1] - 64:10
**specify** [1] - 345:2
**spectrometer** [8] -
306:7, 306:13,
307:3, 307:9, 308:1,
309:18, 310:3, 311:6
**spectrometry** [8] -
270:11, 270:12,
270:13, 270:22,
270:25, 271:3,
283:6, 288:18
**spectrophotometer**
[2] - 310:5, 310:8
**speculate** [8] - 53:25,
147:24, 159:19,
163:23, 173:2,
182:7, 185:13,
188:11
**speculation** [15] -
47:16, 58:4, 65:12,
78:6, 91:9, 91:21,
100:19, 130:22,
172:23, 194:4,
220:12, 230:21,
241:20, 244:15,
245:14
**speed** [15] - 14:24,
15:2, 38:6, 41:20,
57:19, 64:6, 64:9,
64:13, 64:14, 64:15,
68:8, 112:2, 112:3,
112:15, 168:2
**spell** [7] - 11:13,
104:22, 196:17,
268:2, 301:22,
317:15, 338:8
**spelled** [1] - 104:24
**spend** [3] - 96:19,
194:9, 194:11
**spent** [2] - 106:20,
190:11
**spew** [1] - 260:3
**spices** [1] - 135:25
**spilled** [3] - 25:5, 95:3,
262:7
**splashes** [2] - 18:17,
18:19
**splashing** [1] - 43:1
**split** [4] - 71:10, 71:11,
71:12, 286:2
**spoken** [2] - 238:13,
238:14
**sponson** [5] - 16:12,
78:21, 110:8,
151:13, 193:15
**spot** [25] - 16:9,
113:15, 118:9,
120:12, 121:5,
121:7, 121:25,

122:24, 123:4,
123:8, 124:6,
124:10, 177:5,
177:6, 177:8, 177:9,
187:25, 189:15,
190:22, 324:18,
328:23, 329:11,
329:13, 332:11,
336:2
**Spot** [15] - 321:19,
321:22, 322:2,
322:13, 322:16,
322:24, 323:4,
323:6, 323:14,
333:9, 333:15,
333:17, 334:13,
349:25, 350:3
**spots** [1] - 214:16
**spray** [6] - 12:25,
143:24, 143:25,
171:16, 225:23,
298:17
**spread** [1] - 161:4
**spreadsheet** [10] -
249:2, 249:3, 249:6,
250:5, 255:8,
255:10, 255:11,
255:23, 256:1
**square** [1] - 135:23
**stable** [1] - 288:22
**stack** [1] - 173:21
**staff** [1] - 219:6
**staging** [1] - 171:18
**stamp** [4] - 127:4,
140:20, 275:23,
343:5
**stand** [7] - 28:2, 69:3,
115:25, 125:6,
125:8, 125:11,
168:25
**Stand** [1] - 13:19
**standard** [12] - 68:1,
124:3, 126:12,
130:18, 130:19,
136:25, 272:25,
273:1, 307:8,
307:16, 353:16
**standing** [8] - 27:24,
38:11, 44:2, 71:4,
71:6, 71:7, 71:23,
111:1
**stands** [2] - 174:18,
202:16
**star** [3] - 20:2, 20:5,
55:3
**Star** [15] - 323:5,
323:8, 323:12,
323:19, 324:10,
326:12, 326:16,
330:23, 332:12,

332:15, 333:10,
333:12, 333:24,
334:9, 336:8
**starboard** [5] - 16:5,
16:7, 33:19, 33:21,
60:22
**staring** [1] - 156:21
**start** [12] - 57:17,
99:11, 99:14,
149:11, 274:3,
300:17, 342:23,
343:9, 343:10,
344:12, 348:3, 351:8
**started** [9] - 33:16,
74:25, 112:19,
112:23, 172:7,
197:5, 350:24,
351:11
**starting** [1] - 61:22
**starts** [1] - 350:10
**starving** [2] - 100:11,
100:15
**state** [11] - 11:12,
13:23, 104:22,
134:17, 171:15,
196:16, 268:2,
301:22, 317:14,
319:15, 338:7
**state-side** [1] - 319:15
**statement** [12] - 7:10,
7:11, 50:25, 82:12,
82:14, 82:17, 125:3,
140:11, 140:12,
240:4, 264:10, 265:3
**statements** [4] - 6:14,
7:3, 7:16, 7:24
**states** [1] - 140:21
**STATES** [3] - 1:1, 1:4,
1:15
**States** [34] - 1:21,
2:17, 7:1, 7:4, 9:24,
11:5, 76:18, 76:20,
76:24, 77:23, 78:11,
78:12, 78:13, 78:17,
78:23, 99:17, 137:7,
137:11, 154:22,
163:15, 181:15,
181:17, 181:18,
182:9, 194:13,
196:8, 196:9, 197:3,
197:22, 267:19,
301:14, 316:21,
330:24, 355:12
**stating** [1] - 157:22
**station** [10] - 130:5,
152:23, 201:20,
202:9, 202:25,
339:11, 342:12,
342:13, 344:22,
344:24

**stationary** [2] -
166:15, 262:8
**stationed** [2] - 98:6,
100:1
**stay** [2] - 58:18,
101:21
**stayed** [1] - 140:17
**stays** [1] - 139:9
**steel** [3] - 187:6,
187:7, 190:19
**steer** [1] - 33:15
**STENOGRAPHICAL
LY** [1] - 2:15
**step** [10] - 18:20, 28:2,
101:8, 116:2, 116:6,
117:1, 195:25,
267:16, 316:18,
337:21
**stepped** [1] - 77:8
**steps** [4] - 20:4, 44:15,
343:6, 353:12
**sterile** [1] - 201:16
**stern** [2] - 122:16,
135:8
**STEWART** [1] - 2:2
**stick** [5] - 113:14,
120:12, 120:16,
121:4, 287:4
**sticking** [2] - 120:24,
214:24
**still** [23] - 14:17,
68:17, 93:4, 107:4,
139:12, 147:11,
150:11, 150:12,
154:13, 183:6,
187:8, 238:2, 262:8,
275:4, 280:13,
286:16, 287:8,
287:9, 287:15,
287:18, 297:18,
299:17, 312:15
**stimulant** [2] - 231:22,
232:6
**stipulate** [2] - 104:6,
299:12
**stipulated** [1] - 169:18
**stipulations** [1] -
299:10
**stirrups** [1] - 46:3
**stone** [1] - 184:10
**stop** [30] - 17:21, 18:2,
18:9, 18:10, 18:14,
18:19, 18:20, 18:22,
19:8, 19:21, 20:8,
20:9, 20:17, 20:18,
40:19, 41:21, 44:16,
45:18, 46:9, 58:6,
63:10, 65:10, 102:4,
137:11, 181:18,
204:13, 208:21,

343:10, 348:1
**stopped** [8] - 21:15,
42:12, 44:11, 54:6,
65:15, 112:22, 337:6
**stopping** [3] - 41:4,
49:2, 137:10
**stops** [2] - 20:19,
154:18
**store** [1] - 344:11
**stored** [6] - 211:7,
211:10, 211:16,
211:18, 321:8,
321:12
**storing** [3] - 210:13,
236:17, 347:24
**storm** [1] - 139:22
**story** [2] - 247:6,
247:10
**straight** [3] - 17:2,
154:17, 158:19
**strain** [1] - 135:11
**stranded** [4] - 99:19,
100:5, 100:6, 100:17
**strapped** [1] - 46:2
**streamline** [1] - 299:9
**streamlined** [1] -
170:16
**street** [1] - 287:11
**strength** [10] - 53:19,
57:12, 232:17,
274:15, 274:24,
274:25, 275:3,
275:5, 275:6, 295:15
**stretch** [2] - 107:25,
158:13
**strictly** [1] - 50:2
**string** [2] - 113:12
**strip** [3] - 130:5,
248:18, 254:17
**strips** [7] - 248:7,
248:12, 252:18,
266:13, 266:21,
273:22, 274:2
**strong** [8] - 25:7, 31:1,
31:3, 48:23, 82:11,
87:18, 271:9, 275:14
**stronger** [1] - 179:16
**stuck** [1] - 80:2
**students** [3] - 237:1,
237:3, 271:23
**studied** [1] - 197:17
**study** [1] - 294:12
**stuff** [10] - 19:13,
19:24, 50:12,
112:24, 130:8,
135:25, 164:5,
236:24, 286:8,
351:24
**subject** [4] - 9:23,
179:15, 206:21,

218:20
subject's [2] - 13:4,
207:12
subjects [1] - 207:7
subjects' [1] - 207:14
submitted [1] - 303:5
subpoena [9] -
322:25, 323:2,
323:8, 323:11,
326:14, 335:1,
335:12, 337:2
subpoenaed [2] -
336:19, 337:3
subscriber [3] -
323:22, 323:24,
325:22
subscribing [1] -
326:10
substance [21] -
145:7, 175:2,
207:21, 225:9,
225:10, 261:12,
269:23, 276:3,
280:1, 298:1,
304:11, 304:19,
306:1, 306:25,
307:14, 307:18,
307:25, 309:19,
310:9, 311:16
substances [12] -
40:23, 50:8, 145:5,
213:14, 269:3,
269:15, 277:1,
283:8, 283:10,
294:5, 294:8, 307:10
substantially [1] -
29:5
suddenly [2] - 47:13,
47:19
sugar [3] - 285:20,
286:1, 286:2
suggest [2] - 334:12,
353:19
suggesting [1] -
295:17
suggestive [1] -
353:18
suit [3] - 132:6,
132:16, 133:2
suitcase [2] - 125:2,
293:18
Suite [1] - 1:22
suits [3] - 130:6,
132:24, 133:9
sun [6] - 133:3, 133:5,
133:6, 150:11,
150:12, 183:3
Sunday [1] - 61:22
superiors [2] - 99:5,
311:23

superstructure [1] -
16:10
supervise [3] -
124:12, 124:13,
160:3
supervised [2] -
116:14, 122:16
supervising [2] -
121:16, 121:17
supervision [1] -
140:19
supervisor [6] -
311:24, 312:1,
312:5, 319:11,
349:19, 352:14
support [1] - 13:25
supports [1] - 135:5
supposed [3] - 43:25,
108:1, 181:19
supposedly [3] -
76:12, 236:8, 291:3
Supreme [1] - 7:5
surface [7] - 49:19,
178:2, 179:18,
179:19, 242:9,
285:8, 295:25
surfaces [1] - 293:1
surname [4] - 249:9,
256:13
surprised [5] - 277:20,
277:21, 279:16,
279:20, 279:23
surrounded [1] -
192:18
suspect [1] - 19:9
suspected [4] -
155:17, 210:18,
303:24, 303:25
suspects [4] - 13:19,
22:20, 22:22, 29:22
suspicious [1] -
297:15
sustained [17] - 65:13,
81:10, 86:15, 115:3,
176:19, 180:13,
182:14, 220:13,
230:23, 241:21,
252:13, 253:18,
265:19, 298:13,
335:5, 336:25, 344:8
swab [22] - 49:11,
49:18, 49:21, 50:1,
58:23, 200:20,
203:17, 203:19,
204:7, 215:25,
218:4, 223:25,
239:11, 239:12,
239:14, 239:17,
239:18, 239:19,
259:16, 259:17,

293:18, 295:2
swabbed [3] - 58:21,
58:22, 258:13
swabs [12] - 49:17,
49:24, 50:11, 52:11,
52:14, 52:19, 58:13,
204:2, 205:3, 217:3,
217:4
swear [7] - 11:7,
104:17, 196:11,
267:22, 301:17,
317:9, 338:2
swim [3] - 271:8,
284:16, 284:18
swimmer [3] - 271:9,
271:11, 274:12
swimmers [14] -
271:6, 271:13,
273:2, 273:3, 273:5,
274:10, 275:13,
276:14, 284:15,
284:19, 284:21,
284:22, 284:25,
285:6
swimming [4] - 271:6,
271:13, 279:8, 279:9
swipe [45] - 31:9,
31:11, 31:13, 31:19,
31:24, 32:12, 32:14,
32:17, 33:7, 33:23,
33:25, 34:5, 34:6,
34:7, 34:11, 35:5,
60:16, 89:16, 90:15,
202:2, 202:4, 202:5,
202:9, 203:20,
204:16, 204:19,
207:11, 207:14,
207:16, 212:21,
213:21, 239:19,
239:20, 239:21,
247:17, 277:10,
296:19
swiped [8] - 33:16,
33:18, 211:24,
250:11, 277:5,
277:6, 277:9, 298:6
swipes [43] - 31:8,
31:16, 32:4, 32:21,
33:1, 33:3, 33:5,
34:15, 34:21, 34:23,
49:8, 60:9, 60:14,
60:17, 81:24, 81:25,
201:7, 201:10,
201:12, 201:16,
201:16, 201:17,
201:20, 203:24,
204:18, 205:4,
206:3, 206:5, 206:6,
206:20, 207:18,
211:20, 212:11,

212:14, 212:20,
215:10, 216:9,
223:10, 223:13,
223:20, 226:12,
239:2, 253:20
swiping [1] - 31:14
sworn [7] - 11:17,
105:1, 196:20,
268:5, 302:1,
317:19, 338:12
synopsis [1] - 318:18
syringe [1] - 306:21
system [4] - 6:18,
126:19, 343:20,
350:10
System [1] - 343:19
systems [1] - 245:4

T

table [4] - 74:6,
217:19, 217:23,
272:1
TACLET [1] - 109:5
Tactical [2] - 197:11,
197:12
tactics [1] - 45:10
tags [1] - 130:7
taker [1] - 10:17
talks [1] - 187:4
tall [4] - 69:5, 125:5,
125:13, 169:6
taller [1] - 173:19
tampered [1] - 180:6
tank [1] - 14:21
tanks [3] - 54:19,
68:22, 88:12
tap [1] - 284:25
tape [12] - 120:14,
121:4, 121:14,
121:15, 167:2,
167:4, 177:11,
177:12, 177:13,
313:8, 313:10,
314:17
taped [2] - 159:6,
166:25
tapped [3] - 284:16,
284:17, 284:19
taps [2] - 284:20,
284:21
target [37] - 17:4,
17:11, 17:25, 19:21,
20:19, 20:23, 21:19,
21:22, 22:7, 25:13,
31:25, 38:1, 38:10,
92:20, 92:25, 93:10,
94:15, 95:1, 95:17,
98:14, 107:14,
107:16, 107:21,

108:3, 110:3, 111:2,
156:23, 176:6,
203:1, 203:24,
205:4, 206:4, 206:8,
206:13, 206:21,
247:23
tarp [12] - 66:25,
126:6, 126:7, 126:8,
146:22, 146:24,
147:4, 155:9,
160:19, 292:20,
292:21, 293:3
tarp-like [1] - 147:4
tarps [2] - 66:21,
66:23
Task [1] - 349:20
task [11] - 13:7, 19:16,
19:18, 55:6, 99:6,
103:24, 150:1,
352:19, 352:20,
352:22
tasked [3] - 49:8,
50:13, 146:10
tasks [2] - 60:14, 64:5
teach [4] - 271:21,
271:22, 280:16
Team [8] - 197:11,
197:12, 197:13,
197:21, 197:24,
197:25, 198:2, 198:4
team [28] - 12:5,
12:12, 12:17, 12:22,
13:14, 17:7, 51:16,
81:7, 106:23,
108:11, 108:15,
108:24, 109:4,
109:15, 111:6,
121:20, 129:6,
129:12, 142:1,
142:2, 151:3,
198:17, 199:19,
200:3, 200:7,
289:15, 319:17,
321:4
teammates [1] - 26:12
teams [1] - 244:19
Technical [1] - 174:9
technical [3] - 6:19,
20:3, 162:13
technician [1] - 197:7
technique [2] - 284:9,
339:3
techniques [2] - 13:5,
286:7
technology [1] -
174:10
techs [1] - 114:25
teetered [1] - 119:24
temperature [1] -
201:24

**temperature-controlled** [1] - 201:24
**temperatures** [1] - 141:3
**ten** [15] - 67:20, 67:21, 67:22, 69:1, 69:14, 71:12, 74:21, 74:23, 75:10, 106:1, 138:24, 138:25, 139:9, 242:18, 242:19
**tend** [3] - 30:12, 66:17, 157:18
**tender** [2] - 40:11, 304:21
**tendered** [2] - 304:20, 340:18
**tenders** [1] - 304:22
**tension** [1] - 48:4
**term** [4] - 20:3, 145:24, 276:2, 281:23
**terminology** [1] - 323:23
**terms** [8] - 66:25, 135:17, 194:21, 207:4, 217:16, 322:23, 325:19, 348:5
**terrorism** [1] - 198:5
**Tesla** [2] - 256:21, 256:22
**test** [91] - 7:5, 53:19, 127:13, 134:4, 138:25, 148:23, 148:24, 148:25, 149:2, 149:3, 149:6, 149:10, 149:14, 174:13, 175:7, 213:7, 214:3, 214:7, 214:10, 214:18, 215:23, 215:24, 215:25, 216:12, 217:15, 218:1, 222:23, 223:1, 223:2, 224:6, 225:1, 225:3, 225:11, 228:1, 228:2, 233:21, 233:25, 234:16, 235:6, 235:16, 246:22, 246:23, 247:4, 257:17, 257:20, 257:23, 258:10, 259:14, 260:22, 266:8, 267:9, 267:10, 276:8, 279:16, 280:11, 281:8, 281:10,
282:17, 283:2, 283:22, 284:13, 285:7, 285:10, 286:11, 294:7, 295:3, 295:8, 296:14, 296:16, 298:4, 298:24, 303:12, 304:16, 306:4, 306:6, 309:6, 310:19, 310:21, 310:24, 311:1, 311:2, 311:3, 311:19, 312:3, 315:6, 315:19, 339:24
**tested** [52] - 177:21, 178:2, 180:9, 180:15, 217:3, 218:12, 218:16, 218:18, 222:15, 223:10, 225:19, 228:11, 228:17, 232:5, 232:9, 232:12, 234:19, 247:18, 248:21, 248:25, 249:4, 250:5, 250:10, 250:18, 250:19, 250:24, 251:1, 251:6, 251:8, 251:14, 251:15, 251:23, 252:22, 253:3, 253:21, 253:22, 279:15, 280:9, 280:15, 281:6, 281:12, 282:11, 282:15, 294:19, 295:13, 295:18, 313:14, 315:21, 316:7
**testified** [32] - 6:12, 6:16, 6:22, 11:17, 37:14, 44:14, 44:18, 48:18, 67:7, 76:15, 77:4, 91:20, 105:2, 183:22, 196:20, 218:3, 220:12, 230:21, 231:25, 238:24, 239:6, 241:23, 261:11, 268:6, 269:10, 294:20, 302:2, 302:23, 317:19, 331:19, 334:20, 338:12
**testify** [4] - 163:24, 182:13, 302:13, 340:15
**testifying** [2] - 247:15, 269:4
**testimonial** [1] - 7:10
**testimony** [25] - 7:12, 7:24, 9:21, 10:10, 10:25, 11:7, 53:18, 61:24, 62:15, 65:2, 83:10, 104:17, 168:24, 176:21, 196:11, 245:10, 267:22, 278:5, 301:4, 301:17, 317:9, 338:2, 353:24, 354:10, 354:19
**testing** [29] - 31:7, 50:16, 53:2, 84:25, 171:11, 171:12, 175:10, 176:22, 212:21, 215:5, 217:23, 226:12, 226:16, 226:23, 226:25, 235:7, 236:8, 236:17, 236:24, 250:20, 280:22, 283:14, 289:14, 292:1, 304:16, 309:9, 310:18, 311:7, 311:16
**tests** [13] - 149:7, 171:6, 213:2, 234:18, 238:25, 257:15, 257:16, 257:20, 267:1, 296:20, 309:24, 310:19
**THE** [229] - 1:15, 1:20, 6:7, 6:17, 6:20, 7:25, 8:7, 8:16, 8:19, 8:22, 9:4, 9:6, 9:9, 9:18, 11:3, 11:10, 11:14, 27:4, 27:16, 28:4, 28:11, 29:11, 36:12, 37:4, 37:7, 37:10, 39:15, 40:12, 47:17, 65:13, 70:12, 72:25, 73:18, 74:4, 74:7, 76:5, 77:12, 78:8, 81:10, 86:15, 90:21, 91:10, 91:23, 92:13, 95:11, 99:25, 100:8, 100:20, 101:8, 101:14, 101:24, 103:5, 103:9, 103:21, 104:6, 104:10, 104:13, 104:15, 104:20, 104:23, 115:3, 115:21, 116:4, 116:19, 116:24, 117:4, 117:18,
118:2, 118:18, 118:20, 122:22, 123:13, 123:16, 130:23, 133:17, 133:18, 135:21, 135:22, 142:17, 162:17, 162:19, 162:21, 162:23, 167:11, 168:19, 169:16, 169:24, 172:24, 174:10, 176:19, 178:23, 178:24, 180:13, 182:14, 185:4, 186:10, 186:11, 186:16, 186:17, 189:11, 190:16, 191:23, 192:4, 194:5, 195:25, 196:2, 196:14, 196:18, 198:21, 198:22, 205:23, 206:1, 212:6, 220:13, 229:1, 230:23, 232:1, 241:21, 244:16, 245:15, 251:20, 251:21, 251:22, 251:23, 252:13, 253:18, 254:6, 254:8, 256:5, 256:8, 259:2, 261:4, 263:13, 264:1, 264:4, 264:7, 264:15, 265:19, 266:6, 266:9, 266:11, 266:14, 266:15, 266:17, 266:21, 266:22, 266:23, 266:24, 267:1, 267:3, 267:4, 267:5, 267:6, 267:8, 267:9, 267:11, 267:12, 267:13, 267:15, 267:18, 267:25, 268:3, 277:24, 278:19, 279:4, 296:8, 298:13, 299:3, 299:6, 299:14, 299:19, 300:1, 300:6, 300:10, 300:15, 300:19, 300:23, 300:24, 300:25, 301:2, 301:20, 301:23, 304:21, 305:1, 305:12, 305:14, 308:7, 308:10, 308:12, 313:21, 313:24, 314:2,
314:6, 314:10, 314:13, 315:14, 316:16, 316:18, 316:20, 316:24, 317:3, 317:7, 317:12, 317:16, 322:9, 324:6, 324:8, 334:17, 335:5, 336:25, 337:21, 337:22, 337:24, 338:5, 338:9, 341:6, 344:8, 346:12, 347:6, 347:8, 353:4, 353:8, 353:13, 353:21, 353:25, 354:5, 354:13, 354:18, 354:24
**theirs** [1] - 216:11
**themselves** [10] - 32:4, 47:20, 137:7, 142:12, 148:8, 148:16, 159:3, 184:6, 203:13, 245:9
**theoretically** [1] - 294:24
**theory** [1] - 233:19
**therefore** [2] - 91:7, 144:16
**they've** [2] - 281:5, 289:18
**thick** [2] - 86:3, 187:7
**thin** [1] - 306:22
**thinking** [1] - 279:10
**third** [2] - 6:13, 255:2
**third-party** [1] - 6:13
**thousand** [5] - 149:22, 149:24, 150:2, 285:20, 286:3
**thousands** [1] - 212:18
**threat** [4] - 129:21, 142:7, 155:14, 184:20
**three** [37] - 61:22, 84:21, 92:24, 106:11, 131:18, 132:5, 141:25, 142:23, 146:4, 150:23, 165:11, 173:19, 173:21, 173:23, 178:1, 190:10, 248:7, 248:8, 248:22, 249:7, 251:6, 255:3, 255:7, 285:22, 285:23, 318:8, 339:12, 339:23, 342:12, 343:3, 343:23, 345:18, 349:8, 349:9, 354:21

three-and-a-half [1] - 339:12
threshold [2] - 275:3, 275:14
threw [1] - 92:3
throttle [4] - 46:13, 147:10, 164:16, 164:24
throughout [1] - 161:16
throw [4] - 32:19, 183:16, 214:23, 258:20
throwing [1] - 292:13
ticking [1] - 296:24
tied [2] - 120:19, 159:8
tight [3] - 166:21, 166:22
Tijuana [1] - 161:23
time-wise [2] - 156:21, 299:21
timing [2] - 74:18, 237:11
tip [2] - 18:12, 18:13
tipped [1] - 69:19
tipping [1] - 135:5
tired [2] - 222:17, 237:15
Title [1] - 353:19
tobacco [1] - 297:20
today [10] - 23:4, 51:6, 51:8, 52:6, 61:24, 62:1, 105:12, 238:16, 246:4, 337:13
today's [1] - 174:10
together [12] - 57:16, 120:25, 134:25, 135:2, 148:3, 148:4, 159:4, 159:6, 159:9, 200:25, 321:4, 323:2
TOIs [1] - 247:21
Tom [1] - 197:21
tomorrow [5] - 299:24, 353:9, 354:4, 354:24
ton [1] - 290:18
tonight [1] - 103:2
took [64] - 13:10, 22:11, 22:18, 32:15, 32:17, 34:11, 34:23, 36:22, 41:5, 53:15, 54:14, 54:17, 60:8, 61:6, 66:9, 67:25, 68:19, 72:8, 72:22, 74:21, 79:2, 79:4, 79:8, 81:25, 84:11, 88:14, 88:16, 101:16, 103:7, 111:7, 117:8,

120:14, 122:7, 124:8, 137:16, 143:3, 156:19, 156:20, 157:14, 158:4, 158:18, 158:24, 159:1, 159:20, 165:4, 165:14, 172:7, 175:10, 191:5, 211:4, 218:4, 234:12, 236:17, 255:8, 298:21, 306:5, 306:8, 321:5, 348:17, 354:15
tool [2] - 343:2, 344:16
tools [3] - 12:24, 344:24, 345:1
top [21] - 15:2, 21:25, 64:6, 64:9, 64:13, 64:14, 64:15, 114:22, 125:12, 166:10, 169:1, 172:14, 207:20, 207:24, 208:11, 208:19, 209:5, 249:1, 289:8, 308:15, 314:6
topic [1] - 264:7
topics [1] - 58:11
tops [1] - 63:22
toss [1] - 291:4
tossing [2] - 291:13
tostones [1] - 183:16
total [5] - 65:22, 210:17, 240:7, 240:14
totally [1] - 236:21
touch [6] - 122:12, 134:7, 222:10, 225:18, 258:17, 271:25
touched [8] - 50:4, 50:6, 214:1, 214:20, 277:13, 277:14, 286:11, 294:24
touches [2] - 225:10, 225:11
touching [4] - 58:16, 214:21, 225:15, 258:14
tow [1] - 93:22
toward [4] - 23:21, 94:4, 94:5, 135:8
towards [3] - 107:17, 162:3, 211:11
town [2] - 116:2, 245:25
trace [43] - 121:5, 121:7, 121:9,

121:25, 123:4, 123:8, 124:6, 124:11, 177:6, 177:7, 177:8, 177:9, 189:21, 190:22, 269:25, 270:2, 271:17, 271:18, 271:23, 272:6, 272:13, 277:18, 279:21, 280:9, 280:16, 283:6, 285:13, 285:14, 286:22, 286:24, 287:4, 287:8, 287:9, 287:12, 289:18, 289:23, 291:6, 291:7, 292:17, 293:19, 294:16, 295:25, 343:6
Trace [12] - 321:19, 321:22, 322:2, 322:13, 322:16, 322:24, 323:4, 323:6, 323:14, 333:17, 349:25, 350:3
traced [2] - 117:25, 331:3
tracer [4] - 118:9, 324:18, 332:11, 336:2
traces [4] - 90:12, 291:5, 291:10, 291:14
track [20] - 59:18, 188:13, 188:16, 188:23, 266:8, 325:21, 333:5, 333:6, 343:3, 347:22, 348:3, 348:4, 348:5, 348:15, 350:8, 350:17, 350:18, 350:19
track/show [1] - 132:12
tracked [5] - 123:24, 124:2, 189:23, 190:4, 328:21
Tracker [9] - 321:20, 321:22, 322:2, 322:13, 322:16, 323:6, 323:14, 349:25, 350:3
tracker [28] - 113:14, 113:16, 120:12, 121:12, 121:13, 121:14, 121:25, 122:24, 174:6, 177:5, 177:8, 177:9,

179:23, 189:15, 321:23, 324:20, 324:24, 324:25, 326:5, 326:10, 327:6, 327:8, 328:23, 329:11, 329:13, 336:17, 337:8, 337:13
trackers [2] - 122:19, 189:19
tracking [6] - 111:21, 333:9, 335:20, 335:21, 336:2, 336:3
tracks [1] - 350:23
traditional [1] - 288:6
train [4] - 106:13, 106:14, 126:16, 214:18
trained [14] - 54:24, 84:14, 84:15, 127:14, 145:13, 160:2, 197:17, 212:14, 212:16, 212:18, 237:10, 263:3, 297:24
training [28] - 12:16, 51:13, 51:21, 58:9, 64:4, 83:7, 106:17, 145:20, 146:1, 146:3, 146:5, 209:1, 215:7, 216:7, 216:11, 227:14, 228:5, 232:22, 232:24, 233:3, 247:6, 252:5, 268:19, 302:14, 302:20, 339:2, 339:8, 339:16
Training [1] - 198:15
trains [1] - 214:9
transactions [1] - 236:23
transceiver [1] - 166:25
transcription [1] - 355:7
transcripts [1] - 354:11
transfer [15] - 29:23, 138:17, 140:13, 153:22, 154:20, 161:17, 245:10, 280:3, 283:5, 292:23, 294:25, 295:1, 295:10, 295:17, 295:24
transference [8] - 225:6, 225:8, 245:12, 245:17, 245:19, 245:20,

247:8
transferred [8] - 138:6, 138:20, 141:6, 141:10, 141:11, 154:16, 155:1, 280:2
transferring [3] - 141:13, 245:10, 295:2
transfers [1] - 292:15
transit [3] - 154:3, 154:9, 168:9
transiting [2] - 126:8, 153:25
translation [1] - 162:14
translator [3] - 97:8, 97:19, 97:21
translators [2] - 97:14, 97:23
transmit [2] - 177:16, 179:13
transmits [1] - 123:23
transmitter [2] - 179:11, 179:13
transmitting [1] - 337:6
transport [4] - 195:2, 230:10, 230:13, 321:4
transportation [3] - 216:15, 216:18, 225:14
transported [5] - 99:3, 219:25, 220:1, 220:3, 321:9
transporting [2] - 220:23, 221:10
trash [1] - 35:13
travel [6] - 14:23, 38:6, 112:1, 144:21, 151:5, 167:25
traveled [5] - 112:2, 147:2, 168:2, 168:15, 197:22
traveling [3] - 161:20, 161:22, 279:14
travelling [1] - 68:8
treat [3] - 85:9, 85:25, 144:11
treated [2] - 86:2, 135:16
treatment [1] - 170:18
trial [5] - 8:14, 9:20, 187:24, 188:10, 301:6
TRIAL [1] - 1:13
trip [2] - 112:10, 162:7
triple [2] - 241:3, 241:9

trouble [1] - 110:19
true [10] - 46:8, 146:5, 185:14, 205:16, 216:3, 247:7, 273:25, 285:4, 311:8, 347:1
truly [2] - 236:8, 297:12
truth [23] - 11:8, 27:2, 104:18, 117:18, 196:12, 267:23, 301:18, 317:10, 338:3
try [10] - 169:11, 249:21, 280:17, 333:8, 333:20, 335:14, 336:8, 345:9, 354:5
trying [12] - 8:12, 18:18, 32:15, 65:10, 160:14, 181:15, 181:18, 195:18, 195:20, 284:25, 299:12, 299:14
TSA [4] - 203:18, 227:17, 258:12, 293:14
tubes [1] - 271:5
turn [7] - 233:14, 343:9, 348:1, 348:2, 348:14, 352:1, 352:3
turned [5] - 337:4, 343:8, 347:23, 351:18, 352:8
turning [2] - 57:17, 351:21
TV [1] - 233:14
twenty [1] - 253:24
twice [1] - 136:2
two [90] - 9:19, 12:21, 14:13, 16:21, 16:25, 18:2, 20:2, 20:5, 22:2, 24:15, 25:3, 33:15, 33:16, 37:24, 37:25, 38:2, 53:9, 53:11, 53:13, 55:3, 56:10, 57:5, 57:6, 65:15, 72:1, 78:21, 93:8, 93:25, 95:17, 100:18, 105:12, 105:19, 106:21, 107:23, 113:25, 128:24, 135:23, 139:23, 149:7, 150:20, 165:6, 166:2, 166:8, 168:7, 169:22, 172:13, 173:24, 176:3, 176:4, 176:5, 176:15, 177:25,

186:18, 191:21, 204:12, 204:16, 204:18, 204:20, 209:4, 209:17, 210:5, 223:4, 232:5, 240:13, 240:15, 242:12, 243:19, 243:25, 248:7, 249:7, 251:4, 251:6, 253:1, 253:22, 256:13, 275:4, 275:25, 276:10, 281:15, 284:3, 307:18, 308:17, 308:21, 312:11, 321:4, 325:15, 329:22, 343:15, 354:16
two-agent [1] - 321:4
two-inch [1] - 78:21
two-point [1] - 16:25
two-star [3] - 20:2, 20:5, 55:3
two-week [1] - 12:21
TYLER [3] - 3:12, 104:24, 105:1
Tyler [3] - 104:14, 104:23, 105:9
type [27] - 17:24, 21:23, 37:18, 106:20, 113:14, 114:17, 115:5, 132:1, 132:9, 133:2, 134:20, 134:22, 136:8, 145:19, 149:8, 155:1, 159:5, 204:8, 274:4, 274:5, 276:23, 288:10, 292:4, 322:4, 342:2, 342:12
typed [1] - 51:4
types [8] - 30:10, 30:11, 145:20, 149:5, 251:5, 276:14, 340:6, 343:3
typical [2] - 96:10, 203:17
typically [2] - 194:17, 315:1
Tyvek [5] - 130:5, 132:6, 132:16, 132:24, 133:9

## U

U.S [13] - 78:20, 78:21, 78:25, 106:25, 107:6, 110:10, 110:14, 110:15, 157:21, 171:1,

319:21, 337:25, 338:21
ultimately [6] - 111:12, 137:16, 141:5, 141:10, 279:15, 323:19
unaffected [1] - 287:17
unavailable [1] - 53:19
uncommon [1] - 93:7
uncovered [1] - 187:24
under [11] - 7:4, 7:8, 10:6, 55:1, 106:2, 111:12, 140:19, 232:15, 270:18, 324:3
undergraduate [1] - 270:12
underneath [1] - 193:14
underway [2] - 225:22, 300:12
undue [1] - 10:9
unexpected [1] - 144:11
unfair [1] - 152:7
unfortunately [2] - 154:4, 326:9
unhooking [1] - 17:17
uniform [2] - 247:2, 247:5
unique [6] - 237:2, 307:7, 307:25, 308:3, 310:11
unit [16] - 13:8, 13:9, 105:15, 105:19, 128:13, 137:11, 139:5, 155:12, 180:2, 341:3, 342:7, 342:14, 343:2, 343:8, 347:23, 348:2
UNITED [3] - 1:1, 1:4, 1:15
United [33] - 1:21, 7:1, 7:4, 9:24, 11:5, 76:18, 76:20, 76:23, 77:23, 78:11, 78:12, 78:13, 78:17, 78:23, 99:17, 137:7, 137:11, 154:22, 163:15, 181:15, 181:17, 181:18, 182:9, 194:13, 196:8, 196:9, 197:3, 197:22, 267:19, 301:14, 316:21, 330:24, 355:12
united [1] - 2:17

units [11] - 117:16, 117:22, 123:25, 139:18, 139:21, 139:23, 139:24, 140:1, 170:17, 189:22, 340:8
universal [1] - 345:19
University [6] - 197:17, 268:21, 268:24, 271:22, 302:18, 305:7
university [1] - 106:20
unknown [1] - 213:3
unless [4] - 109:19, 144:12, 155:14, 330:10
unlike [1] - 177:23
unlikely [4] - 295:4, 295:6, 296:2, 296:4
unload [1] - 236:16
unrelated [2] - 236:21, 237:6
unruly [1] - 155:15
unsafe [1] - 146:16
unsealed [1] - 84:25
unturned [1] - 184:10
unusual [1] - 146:6
unwrap [2] - 121:14, 121:15
unwrapped [5] - 121:16, 121:20, 121:22, 121:23, 122:1
up [137] - 8:21, 8:24, 9:2, 9:20, 12:9, 13:2, 15:4, 15:6, 18:7, 20:1, 20:20, 20:23, 20:24, 20:25, 21:25, 27:23, 30:4, 31:13, 33:22, 38:11, 39:25, 41:23, 47:7, 47:22, 48:1, 55:23, 56:3, 68:13, 69:3, 73:2, 73:14, 75:11, 76:5, 80:3, 82:10, 87:17, 94:18, 95:7, 95:13, 95:15, 106:4, 106:15, 107:23, 112:20, 113:19, 113:20, 113:21, 117:4, 118:23, 119:23, 120:1, 121:3, 122:9, 122:14, 122:15, 125:6, 125:22, 127:11, 128:1, 128:24, 134:6, 135:10, 138:7, 139:22, 139:23, 148:1, 148:8,

148:11, 148:15, 150:11, 150:12, 151:12, 153:7, 155:25, 156:10, 159:21, 161:8, 163:9, 163:12, 166:1, 166:6, 166:7, 166:24, 183:2, 186:25, 190:1, 193:22, 197:8, 197:9, 197:10, 197:19, 203:6, 203:8, 203:16, 204:10, 214:23, 214:24, 216:7, 217:24, 221:24, 227:4, 227:7, 230:18, 240:9, 242:9, 242:13, 242:15, 242:18, 245:21, 266:6, 273:5, 284:18, 287:8, 287:25, 289:18, 290:23, 291:3, 291:13, 292:13, 292:18, 292:22, 307:4, 307:22, 312:17, 325:19, 326:3, 326:6, 326:13, 330:24, 332:7, 334:22, 335:8, 343:10, 344:20, 349:20, 351:12
updated [1] - 111:19
uploading [2] - 103:16, 103:23
upright [1] - 193:16
upset [2] - 183:8, 183:13
upstream [11] - 271:7, 271:8, 271:10, 271:12, 271:13, 273:3, 279:8, 279:9, 284:16, 284:22, 285:5
urine [3] - 24:12, 80:12, 81:16
user [6] - 343:13, 345:23, 348:6, 348:7, 350:14, 350:20
user-entered [1] - 343:13
user-friendly [1] - 345:23
users [2] - 343:2, 350:19
uses [2] - 203:18, 293:15

**utilized** [1] - 119:25

# V

**vacuum** [1] - 298:7
**vague** [1] - 7:20
**VALECILLO** [2] - 1:10, 2:10
**Valecillo** [2] - 5:19, 169:25
**VALECILLO-ORTIZ** [2] - 1:10, 2:10
**Valecillo-Ortiz** [2] - 5:19, 169:25
**value** [1] - 344:14
**vantage** [1] - 94:16
**vaporizes** [2] - 262:15, 262:16
**various** [2] - 226:15, 261:11
**vary** [2] - 64:15, 64:16
**vast** [1] - 187:3
**vault** [2] - 303:10, 303:21
**VAZQUEZ** [74] - 2:10, 6:5, 6:8, 6:11, 6:21, 9:5, 9:14, 26:25, 27:5, 27:14, 37:3, 39:14, 73:19, 74:10, 74:12, 76:8, 77:6, 77:9, 77:11, 77:13, 78:9, 80:4, 81:11, 83:21, 91:19, 91:22, 92:11, 99:23, 100:7, 100:19, 101:10, 101:15, 102:16, 103:6, 103:20, 104:1, 104:9, 118:17, 122:23, 130:22, 133:14, 169:10, 169:14, 169:20, 170:2, 170:4, 172:25, 174:11, 176:20, 178:21, 179:1, 180:14, 180:24, 190:15, 191:22, 192:3, 205:22, 224:14, 247:14, 251:19, 251:24, 252:14, 253:19, 254:5, 264:13, 278:18, 296:6, 300:16, 316:5, 324:4, 331:16, 332:17, 335:3, 354:3
**Vazquez** [5] - 3:9, 3:16, 3:22, 4:14, 4:19
**vehicle** [2] - 256:23,

270:1
**verbally** [1] - 207:13
**verbiage** [1] - 247:9
**verdict** [1] - 353:17
**verific** [1] - 273:1
**verifies** [1] - 204:10
**verify** [3] - 341:12, 342:6, 349:9
**versa** [1] - 26:3
**versed** [1] - 238:20
**version** [3] - 16:22, 131:11, 348:25
**versus** [6] - 7:1, 228:6, 267:4, 294:13, 294:14, 348:14
**vessel** [19] - 9:22, 9:23, 14:7, 15:25, 17:5, 17:16, 17:20, 18:1, 18:5, 18:10, 18:16, 18:18, 18:22, 19:7, 19:8, 19:9, 19:12, 19:15, 19:23, 20:3, 20:7, 20:9, 20:17, 20:19, 21:5, 21:10, 21:23, 31:7, 33:2, 33:9, 38:6, 43:6, 43:15, 44:23, 44:24, 45:10, 45:11, 45:12, 47:25, 50:3, 52:3, 52:14, 52:15, 75:18, 78:16, 78:22, 82:23, 82:25, 85:15, 86:23, 92:16, 93:8, 93:15, 94:2, 94:14, 94:17, 107:5, 108:10, 109:13, 110:5, 110:9, 110:23, 111:10, 132:2, 138:2, 141:6, 141:8, 141:14, 152:9, 152:11, 157:2, 157:8, 157:11, 157:22, 157:23, 162:1, 163:9, 163:19, 163:22, 175:23, 175:25, 176:3, 176:9, 176:15, 176:21, 177:2, 191:19, 191:20, 192:9, 193:10, 193:11, 193:13, 195:9, 201:8, 201:10, 202:5, 203:20, 206:9, 208:3, 209:24, 220:2, 220:3, 226:11, 239:7, 239:23, 240:2, 240:9, 247:18,

247:20, 254:21, 261:12, 289:17
**vessels** [18] - 53:10, 63:9, 63:10, 78:3, 78:4, 78:10, 78:12, 108:20, 109:7, 109:8, 157:21, 230:8, 230:10, 230:13, 230:18, 231:1, 260:7
**vests** [4] - 55:9, 55:12, 221:12, 260:6
**VHF** [1] - 14:14
**via** [5] - 14:18, 16:25, 207:6, 209:22, 306:21
**vial** [1] - 306:20
**vIAMONTES** [1] - 198:23
**Viamontes** [7] - 3:6, 3:10, 3:19, 3:22, 4:12, 4:13, 61:18
**VIAMONTES** [101] - 1:20, 8:8, 8:18, 8:20, 8:24, 11:2, 11:4, 11:20, 27:2, 27:7, 27:17, 28:1, 28:5, 28:9, 28:12, 28:14, 29:9, 29:13, 36:9, 36:11, 36:13, 37:1, 37:6, 37:8, 37:11, 38:15, 38:16, 39:11, 39:17, 39:18, 40:10, 47:15, 58:3, 65:11, 73:25, 74:6, 74:9, 78:6, 81:8, 86:14, 90:23, 91:11, 91:12, 91:24, 92:15, 95:10, 95:12, 100:3, 100:13, 100:22, 101:7, 101:25, 103:11, 104:8, 169:17, 196:8, 196:23, 205:20, 205:25, 206:2, 212:5, 220:11, 230:20, 231:23, 241:20, 244:14, 245:13, 251:18, 252:12, 253:16, 254:10, 255:19, 255:22, 256:3, 256:7, 256:9, 259:3, 261:3, 263:12, 263:25, 264:2, 265:17, 301:13, 302:4, 304:22, 305:16, 308:6, 308:8, 308:11, 308:13, 313:19,

313:23, 313:25, 314:5, 314:7, 314:8, 314:11, 314:14, 315:13, 316:17, 316:23
**Viamontes'** [1] - 48:19
**vice** [1] - 26:3
**vice-versa** [1] - 26:3
**Victor** [1] - 317:17
**video** [13] - 18:25, 19:3, 20:25, 42:16, 42:18, 42:24, 51:11, 62:5, 101:4, 147:16, 147:18, 158:1, 198:17
**videos** [2] - 51:9, 101:3
**view** [5] - 63:20, 86:12, 103:13, 273:13, 345:22
**viewed** [1] - 238:21
**Vigilance** [11] - 137:22, 137:23, 138:9, 152:8, 153:23, 153:25, 154:2, 154:17, 154:18, 161:24
**Vigilant** [1] - 161:24
**Vigorous** [1] - 319:21
**VILLANUCCI** [2] - 4:15, 317:19
**Villanucci** [11] - 303:6, 305:18, 313:17, 316:22, 317:16, 318:3, 327:20, 330:6, 330:17, 331:17, 331:19
**VILLEZ** [2] - 1:9, 2:8
**VILLEZ-PICO** [2] - 1:9, 2:8
**violate** [1] - 86:11
**violence** [3] - 271:23, 286:12, 296:1
**violent** [4] - 271:24, 272:1, 272:2, 283:17
**Virginia** [6] - 100:2, 197:7, 197:11, 198:4, 302:19, 339:13
**virtue** [1] - 139:12
**visible** [1] - 88:8
**vision** [1] - 67:10
**visit** [2] - 25:25, 29:18
**visual** [1] - 100:4
**visually** [2] - 17:11, 265:24
**voir** [2] - 304:24, 305:11
**Voir** [1] - 4:12
**VOIR** [1] - 305:2

**volumes** [1] - 270:23
**vs** [1] - 1:6
**Vs** [1] - 161:25

# W

**wait** [4] - 31:20, 99:5, 223:12, 265:2
**waited** [3] - 111:6, 143:1, 143:2
**waiting** [4] - 99:1, 111:8, 226:13, 236:11
**walk** [10] - 24:25, 127:4, 163:4, 186:14, 222:3, 222:6, 222:10, 258:12, 274:7, 282:25
**walk-through** [1] - 274:7
**walking** [3] - 134:19, 222:8, 225:15
**wall** [1] - 225:18
**wand** [2] - 189:20, 190:3
**War** [1] - 197:18
**warehouse** [2] - 321:7, 321:10
**warfare** [1] - 144:1
**warm** [2] - 15:4, 80:3
**warming** [1] - 15:6
**warning** [5] - 18:3, 18:16, 125:8, 125:10, 168:25
**wash** [4] - 225:24, 235:23, 272:6
**Washington** [2] - 260:18, 349:21
**waste** [1] - 354:6
**watch** [1] - 136:8
**watched** [2] - 42:15, 51:9
**watches** [1] - 156:22
**watching** [2] - 30:20, 146:12
**water** [70] - 15:16, 16:13, 16:24, 17:3, 17:4, 17:6, 17:12, 17:17, 35:13, 35:14, 35:15, 35:16, 41:8, 42:3, 42:25, 43:22, 66:15, 68:13, 93:15, 96:7, 110:21, 114:4, 115:8, 115:16, 116:10, 119:3, 120:6, 120:24, 123:9, 124:8, 136:2, 136:3, 136:4, 147:4, 148:6, 148:10,

148:15, 148:17, 148:19, 151:20, 157:7, 159:14, 159:15, 165:20, 172:11, 173:6, 179:5, 181:21, 182:4, 182:5, 182:6, 182:13, 192:14, 192:16, 192:17, 192:18, 192:21, 221:14, 228:8, 234:24, 279:14, 280:3, 284:17, 289:9, 292:14, 354:20, 354:22
**waterproof** [4] - 32:2, 32:4, 157:19, 179:8
**waters** [2] - 98:9, 98:11
**waterways** [1] - 198:18
**wave** [2] - 165:18, 298:17
**wavelength** [1] - 14:18
**waves** [1] - 291:1
**waypoint** [2] - 343:12, 348:12
**waypoints** [4] - 343:13, 343:16, 348:5, 348:7
**weak** [3] - 295:7, 295:8, 295:19
**weapon** [3] - 17:24, 21:19, 26:13
**weapons** [19] - 12:8, 18:2, 29:24, 43:16, 47:4, 47:10, 47:11, 51:18, 51:19, 74:16, 105:10, 106:11, 107:4, 124:15, 129:9, 143:23, 155:5, 226:17, 250:21
**wear** [4] - 132:1, 132:24, 143:22, 245:25
**wearing** [11] - 24:7, 80:21, 81:2, 110:13, 130:1, 130:9, 143:21, 155:3, 218:9, 246:1, 298:6
**weather** [3] - 171:15, 286:7, 287:18
**Wednesday** [1] - 1:6
**week** [2] - 12:21, 242:15
**weeks** [6] - 24:15, 100:18, 106:20, 107:24, 225:22,

302:18
**weigh** [3] - 211:1, 211:2, 304:11
**weighed** [2] - 313:4, 321:7
**weighing** [1] - 210:15
**weight** [28] - 10:9, 10:18, 10:23, 56:21, 56:24, 64:16, 64:19, 82:23, 82:25, 83:2, 83:5, 83:16, 83:18, 151:8, 151:10, 172:12, 210:17, 210:21, 303:22, 303:23, 303:24, 303:25, 312:9, 312:12, 321:14, 321:15
**welcome** [1] - 229:1
**Welin** [4] - 119:15, 119:16, 129:3, 153:15
**well-versed** [1] - 238:20
**West** [12] - 1:4, 138:12, 170:7, 179:25, 180:8, 188:21, 318:25, 319:6, 319:9, 319:18, 319:22
**wet** [5] - 179:13, 191:13, 191:17, 192:18, 289:12
**whatever's** [3] - 148:11, 160:15, 175:4
**whatsoever** [1] - 56:24
**whereabouts** [1] - 15:15
**whichever** [1] - 17:9
**white** [11] - 18:7, 21:25, 27:25, 93:14, 95:20, 105:16, 113:12, 159:7, 203:17, 245:2, 304:6
**whoa** [2] - 237:21
**whoever's** [1] - 153:17
**whole** [14] - 11:8, 30:20, 104:18, 119:11, 140:8, 196:12, 261:14, 261:16, 267:23, 273:15, 301:18, 317:10, 328:21, 338:3
**wide** [2] - 69:5, 134:1
**wife** [1] - 198:8
**wife's** [1] - 200:23
**wild** [1] - 246:14

**willing** [1] - 299:12
**Wilson** [2] - 349:19, 352:14
**wind** [3] - 225:23, 287:11, 291:1
**window** [1] - 45:19
**winds** [1] - 171:17
**wipe** [1] - 202:7
**wise** [2] - 156:21, 299:21
**wish** [2] - 343:15, 343:16
**wished** [1] - 350:19
**witness** [48] - 8:2, 8:4, 11:1, 28:1, 28:2, 28:10, 40:11, 40:21, 91:19, 101:10, 101:16, 101:20, 101:21, 102:15, 103:3, 103:4, 103:5, 103:6, 104:13, 115:25, 116:2, 116:22, 182:12, 211:4, 221:15, 222:16, 222:18, 244:20, 247:12, 262:2, 267:15, 267:18, 299:7, 301:3, 301:12, 304:20, 308:9, 316:20, 316:25, 317:2, 317:5, 331:14, 337:24, 340:18, 353:5, 353:6, 353:12
**WITNESS** [46] - 11:10, 11:14, 104:20, 104:23, 135:22, 162:17, 162:21, 162:23, 167:11, 168:19, 169:16, 174:10, 178:24, 185:4, 186:11, 186:17, 196:14, 196:18, 198:22, 229:1, 251:21, 251:23, 254:6, 264:1, 264:7, 266:9, 266:14, 266:17, 266:22, 266:24, 267:3, 267:5, 267:8, 267:11, 267:13, 267:25, 268:3, 301:20, 301:23, 305:14, 314:10, 317:12, 317:16, 337:22, 338:5, 338:9
**Witness** [5] - 196:1, 267:17, 299:2, 316:19, 337:23

**witness's** [1] - 301:4
**witnessed** [1] - 238:2
**WITNESSES** [2] - 3:4, 4:4
**witnesses** [9] - 102:15, 299:7, 299:13, 299:17, 299:20, 299:23, 300:2, 300:7, 354:20
**witnessing** [1] - 220:9
**word** [12] - 20:15, 41:1, 41:3, 48:19, 78:16, 107:14, 111:8, 137:4, 137:7, 206:14, 247:9, 323:25
**words** [11] - 68:9, 71:3, 72:1, 79:5, 159:1, 173:6, 236:16, 275:9, 316:12, 347:19, 350:14
**wore** [1] - 246:16
**work-up** [1] - 332:7
**works** [3] - 271:2, 284:23, 323:14
**World** [2] - 197:18, 222:1
**world** [5] - 59:15, 107:7, 139:24, 141:18, 334:3
**worries** [2] - 125:16, 169:16
**worry** [1] - 108:6
**worst** [2] - 144:4, 144:5
**worth** [1] - 264:5
**worthy** [1] - 215:4
**wow** [1] - 251:2
**wrap** [2] - 117:14, 223:17
**wrapped** [14] - 117:8, 117:23, 123:19, 123:22, 123:25, 149:24, 159:4, 159:6, 177:11, 223:8, 223:25, 298:7, 304:6, 314:16
**wrapping** [7] - 148:16, 150:3, 159:11, 159:12, 227:21, 305:25
**wraps** [1] - 157:17
**wristband** [1] - 132:16
**wristbands** [2] - 132:6, 132:7
**write** [13] - 32:15, 32:17, 49:22, 60:18, 60:21, 85:22, 87:21, 129:23, 153:5,

185:15, 201:18, 203:3, 311:20
**writes** [1] - 32:22
**writing** [1] - 322:21
**written** [2] - 51:3, 245:2
**wrote** [5] - 57:5, 92:4, 185:19, 255:12, 265:8

**X**

**Xerox** [2] - 257:3, 257:9

**Y**

**Yamaha** [3] - 37:20, 37:22, 66:7
**yards** [2] - 18:5, 94:18
**year** [12] - 105:12, 106:1, 139:19, 229:10, 229:11, 234:3, 234:11, 236:6, 318:11, 319:7, 319:21
**years** [19] - 12:2, 83:8, 93:7, 99:17, 105:19, 126:24, 154:13, 197:5, 198:7, 198:19, 199:12, 257:13, 302:22, 318:5, 318:8, 339:6, 339:12, 339:23
**yell** [1] - 86:24
**yellow** [9] - 24:4, 24:9, 27:25, 80:7, 80:9, 81:2, 81:4, 81:6, 87:14
**yesterday** [8] - 6:12, 9:22, 61:22, 62:7, 62:11, 101:16, 102:19, 354:15
**yoga** [1] - 134:14
**York** [3] - 145:8, 197:19, 318:6
**Yorktown** [2] - 197:7, 339:13
**Yorrea** [9] - 325:7, 325:16, 325:21, 325:22, 328:14, 328:17, 330:18, 331:20, 334:22
**Yorreas** [1] - 332:1
**young** [2] - 28:8, 45:14
**yourself** [12] - 11:23, 19:3, 25:13, 26:1, 54:14, 72:25, 105:7, 143:17, 197:1,

268:11, 317:25,
338:18

## Z

**zero** [2] - 176:12,
176:13
**zeroes** [2] - 285:23
**zeros** [2] - 285:22,
285:24
**Ziploc** [1] - 292:24
**Zodiac** [2] - 108:20,
172:10
**zoom** [3] - 254:24,
273:14, 273:16